UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Planned Parenthood of
Greater Ohio, *et al.*,

    Plaintiffs,

v.

Richard Hodges, *et al.*,

    Defendants.

Case No. 1:16cv539

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court upon Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 7). Defendant Timothy Ingram, Health Commissioner, Hamilton County General Health District, has filed a Memorandum in Opposition. (Doc. 16). Defendant Richard Hodges, Director of the Ohio Department of Health, has also filed a Memorandum in Opposition. (Doc. 17). Plaintiffs filed a Reply. (Doc. 18). The parties agreed to waive oral argument on Plaintiffs' Motion as to the temporary restraining order. (Doc. 14).

For the reasons stated herein, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction is granted as to the temporary restraining order; and held in abeyance as to the preliminary injunction.

## I. BACKGROUND

Plaintiffs Planned Parenthood of Greater Ohio ("PPGOH") and Planned Parenthood Southwest Ohio Region ("PPSWO") filed this action under 42 U.S.C. § 1983 based on an alleged violation of Plaintiffs' First Amendment rights to associate and

engage in constitutionally protected activities, as well as an alleged violation of Plaintiffs' rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment. Plaintiffs seek to enjoin Defendants Richard Hodges, in his official capacity as the Director of the Ohio Department of Health ("ODH"), and Timothy Ingram, in his official capacity as Health Commissioner, Hamilton County General Health District ("Hamilton County"), from enforcing Ohio Revised Code § 3701.034 or terminating Plaintiffs' funding pursuant to that provision.

### A. **PPGOH and PPSWO**

Plaintiffs operate twenty-eight health centers throughout the State of Ohio. (Doc. 7-1, Iris E. Harvey Decl. ¶ 9; Doc. 7-2, Jerry H Lawson Decl. ¶ 8). At three of the health centers, Plaintiffs provide abortion services to women who want to terminate a pregnancy. (Harvey Decl. ¶ 13; Lawson Decl. ¶ 12). Plaintiffs also engage in advocacy for a woman's right to a safe and lawful abortion. (Harvey Decl. ¶ 15; Lawson Decl. ¶ 14). Although Plaintiffs are independent entities, they are affiliates of Planned Parenthood Federation of America, Inc., which advocates for a woman's access to comprehensive reproductive health care, including abortion. (Harvey Decl. ¶ 16; Lawson Decl. ¶ 15).

At all of their health centers, Plaintiffs provide educational and counseling services to thousands of women, men, and teens, along with a wide range of health care services, including reproductive health and family-planning services and accompanying health care services, breast and cervical cancer examinations, testing and treatment for sexually transmitted diseases ("STDs"), and relationship, parenting, and sex education programs. (Harvey Decl. ¶ 9; Lawson Decl. ¶ 8).

For over twenty years, Plaintiffs have received federally-funded grants and contracts administered by the ODH to provide these non-abortion related services.[1] Relevant to the discussion here, Plaintiffs have received funds under the following programs: (1) The Infertility Prevention Project/STD Prevention Program, a federal program that subsidizes diagnostic tests and treatments for STDs. Through this program, PPGOH provides approximately 64,300 STD tests annually and PPSWO provides approximately 3,970 STD tests annually. (Harvey Decl. ¶¶ 23-26; Lawson Decl. ¶¶ 21-24); (2) The Breast and Cervical Cancer Project, a federal program designed to provide cancer screening and follow-up services for low-income and minority women. Through this program, Plaintiffs provide pap tests, breast exams, colposcopies, and cervical biopsies to low-income women over the age of 40 who are at risk for cancer but are not yet Medicare-eligible.  (Harvey Decl. ¶¶ 27-31; Lawson Decl. ¶¶ 25-28); (3) The Minority HIV/AIDS Initiative, a federal program designed to promote HIV testing and education for racial and ethnic groups that are disproportionately impacted by the disease; and the HIV Prevention Program, a federal prevention program intended to reduce new infections, increase access to care, improve health outcomes for people living with HIV, and promote health equity.  (Harvey Decl. ¶¶ 32-39; Lawson Decl. ¶¶ 29-34); (4) The Infant Mortality Initiative, a federally-funded program which provides community-based outreach and care coordination services in targeted communities to at-risk, low-income, African-American pregnant women and

---

[1] For example, the STD Prevention Program funds are granted by the United States Centers for Disease Control to states or state agencies, such as ODH, ("grantees") which then may then enter into agreements with other entities ("subgrantees") to provide services under the program.  (Doc. 1, ¶ 30). PPGOH has served as a subgrantee in the STD Prevention Program for more than 15 years.  (Doc. 1, ¶ 31). PPSWO has served as a subgrantee in the STD Prevention Program for more than 14 years.  (Doc. 1, ¶ 32).

their families.  PPGOH uses this funding for its "Healthy Moms Healthy Babies" program, which provides case management work for women before pregnancy, during pregnancy, and up to two years after the birth, including education and assistance in the areas of health, housing, nutrition, and employment.  (Harvey Decl. ¶¶ 40-45); (5) The Personal Responsibility Education Program, a federal grant program designed to educate young people regarding abstinence and contraception, with the goal of reducing teen pregnancy and STD rates.  Plaintiffs use this funding to provide training to staff who work with the targeted populations.  (Harvey Decl. ¶¶ 46-53; Lawson Decl. ¶¶ 35-39); and (6) The Violence Against Women Act Sexual Violence Prevention Program, which aims to reduce the incidence of sexual violence through primary prevention and education. Under this program, PPSWO educates approximately 700 students in middle and high schools in Montgomery, Clark, Greene, and Preble Counties each year about healthy relationships, sexual assault recognition, and bystander intervention skills. (Lawson Decl. ¶¶ 40-45).

It is undisputed that in providing service to Ohio residents under these six programs, Plaintiffs have routinely passed audits and program reviews.  (Doc. 1, ¶ 2). There is also no dispute that Plaintiffs have not used the funding they received through these programs to provide abortions.

B. **Section 3701.034**

Ohio Revised Code § 3701.034 was signed into law on February 21, 2016 and takes effect on May 23, 2016.  Section 3701.034 will impact the funding Plaintiffs receive under the six programs listed above.  Section 3701.034 identifies these programs by name and requires ODH to ensure the funds and materials that ODH

4

receives and distributes through the programs "are not used to do any of the following:"

    (1) Perform nontherapeutic abortions;

    (2) Promote nontherapeutic abortions;

    (3) Contract with any entity that performs or promotes nontherapeutic abortions;

    (4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions.

Ohio Rev. Code § 3701.034(B)-(G).  Under the statute, "promote" means "to advocate for, assist with, encourage, or popularize through advertising or publicity."  Ohio Rev. Code § 3701.034 (A)(8).

After the passage of Section 3701.034, Plaintiffs received letters from ODH and local health departments that their current contracts under the impacted programs would be terminated.  (Harvey Decl. Exs. A-J; Lawson Decl. Exs. A-G).  On an annual basis, PPGOH will lose $640,000 in grant funds as well as $420,000 worth of diagnostic testing and treatment under these programs.  (Harvey Decl., ¶ 5).  PPSWO will lose $469,460 in grant funds annually as well as $49,500 worth of diagnostic testing and treatment. (Lawson Decl. ¶ 5).

Plaintiffs argue that Section 3701.034 violates the First Amendment by conditioning eligibility for government funds on recipients agreeing to forgo constitutionally protected speech and activities. Plaintiffs also argue that Section 3701.034 violates the Due Process Clause of the Fourteenth Amendment by placing an unconstitutional condition on a woman's right to an abortion.  Finally, Plaintiffs argue that Section 3701.034 violates the Equal Protection Clause by discriminating against entities, such as Plaintiffs, who perform or "promote" abortion.

5

## II. ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 65, the purpose of a temporary restraining order "is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996).

The Sixth Circuit has held that the standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are the same. *Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007). In determining whether to grant or deny a temporary restraining order, this Court must consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc) (internal quotation marks omitted).

"These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together." *Northeast Ohio Coalition for Homeless and Service Employees*, 467 F.3d 999, 1009 (6th Cir. 2006) (quoting *Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991)). "For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer." *Id*.

### B. Delay in seeking injunctive relief

Defendants argue that Plaintiffs could be denied relief based upon their delay in

6

seeking injunctive relief alone.  Plaintiffs respond that there was uncertainty as to whether ODH would interpret the statute to require the termination of all existing contracts on May 23, 2016, or whether after the effective date, the statute prohibited ODH from entering into new contracts with entities that "promote" or provide abortions. Plaintiffs explain that on March 24, 2016 ODH confirmed that it would interpret Section 3701.034 to require termination of existing contracts as of May 23, 2016.  Plaintiffs explain that they requested injunctive relief on May 11, 2016, which was seven weeks after ODH's position was made clear and only two weeks after receiving termination letters from several grantees.

"Where a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004) (citing *Brown–Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000)).

The Court finds that under the circumstances, Plaintiffs have not delayed unreasonably in asserting their rights.  Plaintiffs' delay was attributable to a lack of certainty regarding the effect of Section 3701.034. *Cf. Bell v. Rankin*, No. 2:11-CV-168, 2011 WL 761544, at *4 (S.D. Ohio Feb. 24, 2011) (denying motion for temporary restraining order on several alternative basis, including laches; plaintiff was aware of his legal position and the facts giving rise to claims for several years); *Advocacy Org. For Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 970 (E.D. Mich. 1997) denying motion for temporary restraining order under doctrine of laches, but also

because plaintiffs did not demonstrate irreparable harm; plaintiffs knew about the merger at least three months before requesting the TRO, as evidenced by a complaint filed with the FTC in an attempt to stop the merger).

Even if the Court were to find that Plaintiffs' delay was unreasonable, the Court finds that Defendants have not been prejudiced by the delay. Defendants claim prejudice based on their work to develop plans for transitioning services to other providers. Specifically, Defendants have reassigned providers to cover the geographic areas previously served by Plaintiffs. (Doc. 17-5, Angela Norton Aff., ¶¶ 10-12). Defendants also explain that it is their understanding that the Mahoning County District Board of Health will be hiring staff previously employed by Plaintiffs. (Doc. 17-6, Dyane Gogan Turner Aff., ¶ 6).[2] Defendants explain that it is also their understanding that the local health districts who contracted with Plaintiffs have entered into contracts with other providers, or are in negotiations with prospective providers. (Doc. 17-4, Amanda Dennison Aff., ¶ 16). Other than this effort expended, most of which did not involve Defendants, Defendants have not identified any other form of prejudice. *Cf. Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (doctrine of laches bars equitable relief because "the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.").

Therefore, Plaintiffs' request for injunctive relief is not barred by the equitable defense of laches.

---

[2] However, Defendants have not explained what role they played in making these arrangements or whether Defendants will have any obligation after the Mahoning County District Board of Health hires these employees.

### C. Discussion of four factors

#### 1. Likelihood of success on the merits

##### a. First Amendment: Freedom of Speech and Association

Plaintiffs argue that Section 3701.034 violates Plaintiffs' First Amendment rights of freedom of speech and association because it imposes unconstitutional conditions on the receipt of government funds.

Under the "modern 'unconstitutional conditions' doctrine . . . the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). As the Supreme Court has explained, "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited . . . allow[ing] the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)).

The principle that a funding condition can result in an unconstitutional burden on First Amendment rights was discussed in depth by the Supreme Court in *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S.Ct. 2321, 186 L.Ed.2d 398 (2013). The Supreme Court explained that an unconstitutional funding condition is not limited to those situations where the condition is not relevant to the objectives of the program, or "when the condition is actually coercive, in the sense of an offer that cannot be refused." *Id.* at 2328. Instead, the Supreme Court explained, "the relevant distinction that has

emerged from our cases is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* This distinction echoed the Supreme Court's earlier decision in *Rust v. Sullivan*, 500 U.S. 173, 197, 111 S.Ct. 1759, 1774, 114 L.Ed.2d 233 (1991), wherein the Court held that unconstitutional conditions doctrine is violated where the government places "a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."

Here, the federal Hyde Amendment and Ohio's own laws have long barred Plaintiffs from using state or federal funds to provide abortions.[3] However, Section 3701.034 bars any entity that engages in advocacy in favor nontherapeutic abortions from receiving funds administered by ODH, even though those funds would not be used to "promote" or perform abortions. Section 3701.034 allows ODH to leverage its control over government funds to prevent recipients of government funds from engaging in constitutionally protected speech and association, even if that speech is undertaken with private funds. Therefore, the Court concludes that Section 3701.034 "compels as a condition of federal funding the affirmation of a belief that by its nature cannot be

---

[3]As the Sixth Circuit has explained:

> The Hyde Amendment prohibits federal reimbursement for abortions except in circumstances Congress, rather than a doctor, deems medically necessary. . . . Every year since 1976, Congress has passed some version of the Hyde Amendment. . . . Following passage of the first Hyde Amendment, many states promulgated laws restricting Medicaid coverage to those abortions federally funded under the Hyde Amendment.

*Planned Parenthood Affiliates of Michigan v. Engler*, 73 F.3d 634, 636 (6th Cir. 1996).

10

confined within the scope of the Government program. In so doing, it violates the First Amendment and cannot be sustained." *Alliance*, 133 S.Ct. at 2332; *see also Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 942-44 (9th Cir. 1983) (although the state need not fund abortions, the state "may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities")).

ODH relies on the Fifth Circuit's decision in *Planned Parenthood Association of Hidalgo County. Texas, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012) in support of its position that Ohio can choose to adopt a policy of disfavoring abortion with its own subsidies. Like Section 3701.034, the program created by the Texas Legislature, the Women's Health Program ("WHP"), denied funding to entities who perform or "promote" elective abortions. *Id.* at 347. However, unlike Section 3701.034, the WHP was designed to "expand access to preventative health and family planning services for women." *Id.* at 346. The Fifth Circuit concluded that although the WHP's restriction on promoting elective abortions "functions as a speech-based funding condition, it also functions as a direct regulation of the content of a state program, and is therefore constitutional under the reasoning of *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)." In contrast, Section 3701.034 is unconstitutional because it places the speech-based funding condition on the recipient for activities outside the six impacted programs. *See Planned Parenthood of Mid–Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 462 (8th Cir. 1999) ("Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional").

11

Therefore, the Court concludes that Plaintiffs have a strong likelihood of success on the merits of their First Amendment claims.

### b. **Fourteenth Amendment: Due Process**

Plaintiffs argue that Section 3701.34 violates the Due Process Clause of the Fourteenth Amendment because Ohio may not use its control over government funds to do indirectly what it could not do directly under the Constitution: stop abortion providers from providing safe and legal abortions.

Defendants seem to argue that Plaintiffs are not proper parties to raise this Fourteenth Amendment claim. However, abortion providers have standing to enforce their patients' right to choose to have an abortion under the Due Process Clause. *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (concluding that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) (concluding that Planned Parenthood has standing to assert the due process rights of women seeking right to have an abortion).

"[W]hile the unconstitutional conditions doctrine has been most consistently applied to protect First Amendment rights, it has also been applied by the Supreme Court to other constitutional provisions." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005); *see Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594, 186 L. Ed. 2d 697 (2013) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'") (quoting *Regan v. Taxation With Representation of Wash.*, 461

U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)). Accordingly, the Sixth Circuit has held that "[t]he doctrine should equally apply to prohibit the government from conditioning benefits on a citizen's agreement to surrender due process rights." *R.S.W.W*, 397 F.3d at 434 (citing *Vance v. Barrett*, 345 F.3d 1083, 1089 (9th Cir. 2003)).

In *Planned Parenthood of Indiana v. Commissioner of Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012), plaintiffs sought to enjoin an Indiana law which prohibited abortion providers from receiving any state contracts and grants, including those involving state-administered federal funds. *Id.* at 969. The Seventh Circuit began its analysis by explaining that the plaintiffs' "unconstitutional-conditions claim necessarily derives from a woman's constitutional right to obtain an abortion." *Id.* at 986 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). The court explained this constitutional right derives from the Due Process Clause of the Fourteenth Amendment. *Id.* at 986-87. The court then explained that under *Casey*, the government may not impose an "undue burden" on a woman's right to have an abortion, which exists if the challenged law has "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 987 (quoting *Casey*, 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion)). However, the court also noted that the Supreme Court has held that "[t]he Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and may validly choose to fund childbirth over abortion." *Id.* (quoting *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)).

Applying this analysis, the Seventh Circuit found that plaintiffs were not likely to succeed on their unconstitutional-conditions claim. *Id*. at 988. The court noted that plaintiffs did not argue that the loss of funding imposed an undue burden on a woman's right to obtain an abortion. *Id*. The court concluded that a state funding condition can violate the constitutional right to abortion only if the effect of the funding condition itself is to place an undue burden on women's ability to choose to have an abortion. *Id*. (explaining that if "the government's refusal to subsidize abortion does not unduly burden a woman's right to obtain an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services—cannot indirectly burden a woman's right to obtain an abortion.").

Plaintiffs argue that in contrast to the plaintiffs in *Planned Parenthood of Indiana,* Plaintiffs can show that the effect of Section 3701.034 is to place an undue burden on a woman's right to obtain an abortion.

Plaintiffs explain that they provided approximately 30% (approximately 6,257 of 21,186) of the abortions in the State of Ohio in calendar year 2014. Plaintiffs point out that in 2014, PPGOH provided approximately 36% (approximately 1,500 of 4,137) of the abortions in Franklin County and 23% (approximately 2,000 of 8,548) of the abortions in Cuyahoga County. (Harvey Decl., ¶ 8). Plaintiffs explain that the loss of these services in Franklin and Cuyahoga counties would likely overwhelm existing providers, expand wait times, and leave some women in those counties with no feasible option for exercising their constitutional right to choose to have an abortion. (Harvey Decl., ¶ 8). Plaintiffs explain that PPSWO operates the only surgical abortion clinic in the Cincinnati area, and in 2014 performed 2,757 abortions there. (Lawson Decl., ¶ 7). Plaintiffs

14

maintain that if they were to comply with Section 3701.034's funding condition, Cincinnati would become the largest metropolitan area in the country without a surgical abortion clinic. (Lawson Decl., ¶ 7).

The Court concludes that for purposes of deciding Plaintiffs' Motion for Temporary Restraining Order, Plaintiffs have established that the effect of Section 3701.034 is to impose an "undue burden" on a woman's right to have an abortion.

There is also no doubt that the Ohio Legislature enacted Section 3701.034 for the purpose of placing a substantial obstacle in the path of a woman seeking to obtain an abortion. In a statement on the floor of the Ohio Senate, Senator Peggy Lehner explained that the law was:

> necessary only because Planned Parenthood has chosen—you like the word choice—they have chosen to be the leading abortion provider in this nation. You say, but oh, but that's only three percent of what they do. Well if it's only three percent, then perhaps they should be looking to say, let's drop abortion, and concentrate on all those other things. … [W]e have an obligation … to say … to Planned Parenthood, until you get out of the business of termination of pregnancy, the destruction of human life, we are not going to choose to fund you.

Senate Floor Debate, Statement of Sen. Peggy Lehner (Jan. 27, 2016).

Therefore, the Court concludes that Plaintiffs have a strong likelihood of success on the merits of their Fourteenth Amendment Due Process claims.

### c. Equal protection

The Equal Protection Clause of the Fourteenth Amendment "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788

15

(6th Cir. 2005)).

Plaintiffs argue that Section 3701.034 violates the Equal Protection Clause by singling out entities that perform or promote abortions and those who contract or affiliate with those entities. Plaintiffs argue that Section 3701.034 is subject to strict scrutiny because the State of Ohio lacked any legitimate reason for distinguishing Plaintiffs from the other similarly-situated service providers whose contracts were approved. Defendants respond that Section 3701.034 is only subject to rational-basis review because Plaintiffs are not a suspect class. *See United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (explaining that an indigent woman desiring an abortion does not come within a category of a suspect class).

"[E]ven in the absence of a suspect class, a classification warrants strict scrutiny if it burdens the exercise of a fundamental right." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007). While *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) established a fundamental right to abortion, the Court concludes that Section 3701.034 cannot satisfy the rational basis test, and therefore it is unnecessary to address a strict scrutiny analysis.

Defendants explain that Section 3701.034 is rationally related to Ohio's interest in favoring childbirth. However, Defendants fail to explain how the prohibition on funding found in Section 3701.034 is necessary to prevent state funds from being used to fund abortion services. Defendants do not claim that any of the funds from the six impacted programs have ever been used to fund abortions. Instead, it appears that the interest of Ohio, in the words of Senator Lehner, was to have Plaintiffs "get out of the

business of termination of pregnancy."

The Supreme Court has explained that the "desire to harm a politically unpopular group" does not constitute a legitimate governmental interest. *Moreno*, 413 U.S. at 534, 93 S.Ct. 2821. For example, in *Planned Parenthood of Minn. v. Minnesota*, the Eighth Circuit explained that the record demonstrated that "Planned Parenthood of Minnesota in its abortion stance has made itself unpopular among some segments of the population." 612 F.2d 359, 361 (8th Cir. 1980). However, the court explained that "Planned Parenthood's unpopularity in and of itself and without reference to some independent considerations in the public interest" did not justify a Minnesota statute prohibiting the state health commissioner from issuing grants to nonprofit corporations that perform abortions. *Id.* at 361; *see also Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F. Supp. 2d 724, 737 (M.D. Tenn. 2012) (same and collecting cases).

Because Section 3701.034 bears no rational relationship to Ohio's stated interest of favoring childbirth, the Court concludes that Plaintiffs have a strong likelihood of success on the merits of their Equal Protection claims.

Based on the foregoing, the factor of likelihood of success on the merits weighs in favor of granting a temporary restraining order.

### 2. Irreparable injury

The Supreme Court has held that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987)

(finding irreparable injury where plaintiff has shown substantial likelihood of success on merits of constitutional challenge to abortion regulation).

Moreover, Plaintiffs explain that without the funds at issue here, Plaintiffs will be forced to stop providing services such as pap smears and other cancer screenings, tests for HIV/AIDS and tests and treatment for other STDs, infant mortality prevention programs, and sexual health education programs. Plaintiffs maintain that it would be difficult to reconstitute those programs if and when the statute is held unconstitutional.

Therefore, the Court concludes that for purposes of deciding Plaintiffs' Motion for Temporary Restraining Order, Plaintiffs have established irreparable injury. This factor weighs in favor of granting a temporary restraining order.

### 3. Substantial harm to others

The Court finds that Defendants will not suffer substantial harm if the Section 3701.034 is enjoined. *See Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (no substantial harm in preventing city from enforcing ordinance that was likely to be found unconstitutional, as the state has no valid interest in enforcing an unconstitutional ordinance); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment.").

Defendants argue that it has already begun working with local health departments and service providers to develop transition plans to implement Section 3701.034. While ODH has not specifically identified any new contracts or other obligations, Hamilton County has explained that it has entered into a contract with the

18

nonprofit organization Caracole to provide HIV testing and counseling services in Hamilton County. (Doc. 15-1, Ex. D). Plaintiffs maintain that any harm to Caracole can be avoided by tailoring the TRO to exclude the contract with Caracole. The same exclusion can be made for any other contracts where Defendants have already replaced Plaintiffs' contract with a contract with another organization.

Therefore, the Court concludes Plaintiffs have established that the harm to others is minimal. This factor weighs in favor of granting a temporary restraining order.

### 4. Public interest

The Sixth Circuit has explained that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 950 (2015).

Moreover, Plaintiffs explain that if Section 3701.034 is enforced, Plaintiffs will be forced to end health care and education programs and terminate employees, depriving thousands of Ohioans of high-quality, affordable health care services and education programs. For example, Plaintiffs conduct approximately 50 percent of the STD tests in the state of Ohio each year. (Doc. 18-2, Lawson 2d. Decl. ¶ 2). In addition, Plaintiffs explain that only certified and trained HIV testers can provide testing under the HIV Prevention Program, and officials in Canton have reported that they have not been able to locate a replacement for PPGOH under this program. (Doc. 18-1, Harvey 2d Decl. ¶ 3).

Therefore, the Court concludes Plaintiffs have established that the public interest factor weighs in favor of granting a temporary restraining order.

## II. **CONCLUSION**

Based on the on the foregoing, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7) is **GRANTED** as to the temporary restraining order; and **HELD IN ABEYANCE** as to the preliminary injunction. It is hereby **ORDERED** that:

1. Defendants Richard Hodges, Director of the Ohio Department of Health, and Timothy Ingram, Commissioner of Hamilton County Public Health, and their agents, employees, appointees, and successors are temporarily RESTRAINED from enforcing Ohio Rev. Code § 3701.034;

2. While this Temporary Restraining Order is in place, Defendants shall not terminate Plaintiffs' funding pursuant to Section 3701.034, shall accept and consider without regard to Section 3701.034 Plaintiffs' applications for grants and funding, and shall reinstate Plaintiffs' contracts which were terminated pursuant to Section 3701.034, except where Defendants have already replaced Plaintiffs' contract with a contract with another organization that has already become effective and under which another organization is already providing services;

3. There is evidence in the record that Hamilton County has replaced Plaintiff PPSWO's HIV Prevention Program services by entering into a contract with Caracole, Inc., and that the contract was effective April 1, 2016. Out of concern for disrupting ongoing care and services, the Court will not at this time order reinstatement of PPSWO's contract with Hamilton County for these services. This does not prevent the Court from ordering reinstatement of such contract in the future, and Defendants must refrain from terminating Plaintiffs' other contracts;

4. This Temporary Restraining Order shall expire on June 6, 2016 at 11:59 p.m., unless extended by the Court;

5. This Temporary Restraining Order is effective upon its entry; and

6. There is no requirement of any bond.

**IT IS SO ORDERED.**

                                                    */s/ Michael R. Barrett*
                                            JUDGE MICHAEL R. BARRETT