## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

Planned Parenthood of     :
Greater Ohio, et al.,     :
                          :
          Plaintiffs,     :
                          :
     vs.                  : Case No. 1:16-cv-539
                          :
Richard Hodges, et al.,   :
                          :
          Defendants.     :

- - -

DEPOSITION
of 30(b)(6) witnesses Diego Espino, Barbara Singhaus,
and Iris Harvey, taken before me, Valerie J.
Grubaugh, Registered Merit Reporter, and a Notary
Public in and for the State of Ohio, at the offices
of Vorys, Sater, Seymour & Pease, 52 East Gay Street,
Columbus, Ohio, on Friday, July 8th, 2016, at 9:30
a m.

- - -

ARMSTRONG & OKEY, INC.
222 East Town Street, Second Floor
Columbus, Ohio  43215-4620
(614) 224-9481 - (800) 223-9481
FAX - (614) 224-5724

- - -

## Page 2

1    APPEARANCES:
2         Wilmer, Cutler, Pickering, Hale
            and Dorr, LLP
3         Paul R.Q. Wolfson, Esq.
          John Sprangers, Esq.
4         1875 Pennsylvania Avenue NW
          Washington, DC  20006
5         Paul.wolfson@wilmerhale.com
6            On behalf of the Plaintiffs.
7         Michael DeWine, Esq.
          Ohio Attorney General
8         By Ryan L. Richardson, Esq.
          Tiffany L. Carwile, Esq.
9         Constitutional Offices Section
          30 East Broad Street, 16th Floor
10        Columbus, Ohio  43215
          ryan.richardson@ohioattorneygeneral.gov
11        tiffany.carwile@ohioattorneygeneral.gov
12           On behalf of the Defendants.
13        Ohio Department of Health
          Lisa Eschbacher, Esq.
14        246 North High Street
          Columbus, Ohio  43215
15        Lisa.eschbacher@odh.ohio.gov
16           - - -
17
18
19
20
21
22
23
24
25

## Page 3

1              Friday Morning Session,
2              July 8th, 2016.
3                    - - -
4              STIPULATIONS
5         It is stipulated by and between counsel
6    for the respective parties that the deposition of
7    30(b)(6) witnesses Diego Espino, Barbara Singhaus,
8    and Iris Harvey, called by the Defendants under the
9    applicable Rules of Civil Procedure, may be reduced
10   to writing in stenotype by the Notary, whose notes
11   thereafter may be transcribed out of the presence of
12   the witnesses; and that proof of the official
13   character and qualification of the Notary is waived.
14                   - - -
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                    INDEX
2                    - - -
3    WITNESSES:                          PAGE
4    Diego Espino
       Examination by Ms. Richardson        5
5    Barbara Singhaus
       Examination by Ms. Richardson      134
6      Examination by Mr. Wolfson         252
       Further examination by Ms. Richardson  255
7    Iris Harvey
       Examination by Ms. Richardson      257
8
                   - - -
9
     DEPOSITION EXHIBITS              IDENTIFIED
10
     1 - Notice of Rule 30(b)(6)          33
11
     2 - Plaintiff responses to interrogatories   104
12
     3 - Complaint                        118
13
                   - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1 Diego Espino,
2 being by me first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4 EXAMINATION
5 By Ms. Richardson:
6 Q. Good morning.
7 A. Good morning.
8 Q. And we did not yet get a chance to meet.
9 A. No.
10 Q. My name is Ryan Richardson and I work at
11 the Ohio Attorney General's office, and I'm here
12 today representing the Ohio Department of Health, the
13 defendant in this case.
14 Have you ever been deposed before today?
15 A. I have not.
16 Q. Well, to begin, I'll just go over some
17 of the basic ground rules before we get started. As
18 you probably know, I'll be asking you a series of
19 questions during the time that you're here today.
20 Your counsel will be making objections for the
21 record.
22 Unless your counsel expressly instructs
23 you not to answer the question, those objections are
24 just for the record and you'll be able to go ahead
25 and answer the question.

Page 6

1 If at any point in time you don't
2 understand something that I've asked you, just let me
3 know and I will be happy to stop and rephrase the
4 question. If you answer a question I've asked, then
5 I'm going to assume that you have in fact understood
6 it. Is that fair?
7 A. Yes.
8 Q. As you can see, we have a Court Reporter
9 here, so that means a couple of things. First we
10 need to try to speak slowly so we don't make her life
11 miserable. We also need to make sure that we don't
12 talk over each other.
13 So I'll ask that you wait until I finish
14 my question before you answer, and I'll try to do the
15 same.
16 We also need to make sure that we answer
17 audibly, so no head nodding or any other visual
18 gestures that she won't be able to pick up for the
19 transcript.
20 A. Okay.
21 Q. And if at any point in time you feel
22 like you need to take a break, let me know, we can
23 take as many breaks as we need to. The only thing
24 that I ask is that you wait until you've answered the
25 pending question before we take a break.

Page 7

1 A. Sounds good.
2 Q. Are you under any medications or is
3 there any other reason that you would not be able to
4 answer truthfully and completely today?
5 ████████████████████████████████████████
6 ████████████████████████████████████████.
7 Q. Great. Perfect. One last sort of
8 ground rule just to clarify before we get started. I
9 do not intend today to ask you for any personal
10 identifying information about any patients that you
11 may work with, so if something that I ask makes you
12 believe that you would be required to reveal that
13 information, please let me know and we'll make sure
14 that we rephrase so we don't elicit that information.
15 A. Okay.
16 Q. Any questions before we get started?
17 A. No.
18 Q. So first if you could just explain to me
19 for the record what your current position is for
20 Planned Parenthood of Greater Ohio.
21 A. Okay. I am currently the Vice-President
22 of Community Engagement at Planned Parenthood of
23 Greater Ohio. In that capacity I oversee the
24 Education and Outreach programs of the organization.
25 The Education and Outreach Director

Page 8

1 reports to me. That is the position that oversees
2 the local allocation managers throughout the State.
3 Q. Thank you. And how long have you been
4 in that position?
5 A. Since last year, I believe February or
6 March of last year. Prior to that I was the
7 education director.
8 Q. So that would be February or March of
9 2015?
10 A. That's correct.
11 Q. And prior to that you were the Education
12 and Outreach Director?
13 A. Correct.
14 Q. And how long were you in that position?
15 A. For almost five years.
16 Q. So approximately 2000, somewhere in the
17 2000 range you would have begun in that position; is
18 that correct?
19 A. I began in that position --
20 Q. I'm sorry, 2010?
21 A. 2008, yes.
22 Q. So from 2008 to 2015 approximately you
23 were the Education and Outreach Director?
24 A. Yes.
25 Q. And what did you do prior to that?

1     A. I was the education manager.
2     Q. And what is an education manager?
3     A. So an education manager oversees the
4 education programs locally; the structure we have
5 where education managers oversee local programs in
6 the area where they are based.
7         So I was based in the Columbus area as
8 an education manager for four years.
9     Q. And just to clarify for the record, you
10 were an education manager for Planned Parenthood of
11 Greater Ohio?
12     A. So let me -- if you will allow me, let
13 me backtrack chronologically so it might make more
14 sense.
15     Q. Thank you.
16     A. So in 2004 I started as Community Health
17 Educator for Planned Parenthood of Central Ohio.
18     Q. Thank you.
19     A. Four years after that, in 2008, I became
20 education manager for Planned Parenthood of Central
21 Ohio. I was in that position for four years.
22         In 2012 I became the -- what is now the
23 Education and Outreach Director. Back then it was
24 called the statewide education director, but it was
25 the same function, similar functions.

1         So from 2012 when I became the statewide
2 director of education to last year, when I became the
3 VP of Community Engagement, I was working with -- for
4 Planned Parenthood of Greater Ohio.
5     Q. Thank you. And what is Planned
6 Parenthood of Central Ohio?
7     A. It's one of the pre -- the
8 organizations -- one of the Planned Parenthoods that
9 were in existence prePlanned Parenthood of Greater
10 Ohio.
11     Q. What is its relationship if any to the
12 Planned Parenthood of Greater Ohio?
13         MR. WOLFSON: I'm just going to object.
14 I think that the corporate structure issues are
15 better directed to Ms. Singhaus, but go ahead.
16 By Ms. Richardson:
17     Q. To the extent that you know.
18     A. In 2012 there were affiliates, what we
19 call Planned Parenthood Affiliates that merged to
20 form Planned Parenthood of Greater Ohio, which is the
21 current affiliate. And Planned Parenthood of Central
22 Ohio was one of those affiliates. That's my
23 limited --
24     Q. Thank you.
25     A. -- way of explaining.

1     Q. And so when did you first become
2 involved in any capacity with any of the Planned
3 Parenthood organizations?
4     A. 2004 as community health educator;
5 June 14, 2004.
6     Q. And what did you do prior to joining
7 Planned Parenthood in 2004?
8     A. I was a student. That was my first job.
9     Q. Okay. Great. Thank you.
10     A. My first professional job.
11     Q. And --
12     A. I had other part-time jobs, but that was
13 my first professional job.
14     Q. Thank you. And if you could just
15 briefly describe your educational background.
16     A. So I graduated from high school in 2000,
17 in Los Angeles, and I decided to come to college to
18 Ohio, Ohio -- attending Ohio Wesleyan for four years,
19 and just one month after college I found a job at
20 Planned Parenthood.
21     Q. You decided to stay in tropical Ohio.
22     A. Yes. And so from 2004 -- 2004 to today
23 I've been involved with Planned Parenthood.
24     Q. Thank you. So I'd like to focus now on
25 your current role. And I think you began to describe

1 for me some of the general responsibilities of that
2 role.
3         If you could walk me through in a little
4 more detail what you are responsible for on a
5 day-to-day basis.
6     A. So currently as I mentioned before, I
7 supervise the Education and Outreach Director, who in
8 turn supervises the education -- the local education
9 managers throughout the organization.
10         In this role I oversee grant
11 applications, grant report submissions, so it's an
12 administrative role of the -- the Education and
13 Outreach programs.
14     Q. How many total employees report to you?
15     A. Currently there's two employees.
16     Q. And who are those two employees?
17     A. The -- names or titles?
18     Q. Titles.
19     A. The Education and Outreach Director and
20 the Managing Director of Public Affairs.
21     Q. And what does the Managing Director of
22 Public Affairs do?
23     A. She work in the public affairs
24 department conducting the work that public affairs
25 does.

Page 13

1    Q. And so would that include things like
2  press releases and other public messaging?
3    A. That would be the communications
4  department.
5    Q. Okay. So what would the public affairs
6  person do as compared to communications?
7    A. So the public affairs person will
8  oversee advocacy work that is conducted through that
9  department.
10   Q. And what types of advocacy work would
11 you include within that umbrella?
12   A. So it completely depends on what Planned
13 Parenthood Advocates of Ohio is doing. Planned
14 Parenthood Advocates of Ohio is a separate entity
15 that buys the time of the public affairs staff.
16   Q. And I'm sorry. It buys the time?
17   A. It contracts with the public affairs
18 department to purchase the time of those in that
19 department.
20   Q. So they would pay for the salaries, or
21 at least some part of the salaries of individuals
22 within the public affairs department for Planned
23 Parenthood of Greater Ohio?
24   A. Can you repeat that?
25   Q. Sure. So there's Planned Parenthood

Page 14

1  Advocates of Ohio. Is that also known as PPAO?
2    A. Correct.
3    Q. And you said that's a separate
4  organization that would enter into contracts with
5  individuals in the public affairs department. That's
6  the public affairs Department of Planned Parenthood
7  of Greater Ohio; is that correct?
8    A. They will enter into contract with
9  Planned Parenthood of Greater Ohio, not the
10 individual. Then they -- the Planned Parenthood
11 Advocates of Ohio will reimburse Planned Parenthood
12 of Greater Ohio for the times of these people.
13   Q. Thank you for clarifying.
14      And Planned Parenthood Advocates of Ohio
15 is -- and just let me know if this is not something
16 within your area of knowledge for purposes of today's
17 deposition. But is that also an affiliate of Planned
18 Parenthood -- of the national Planned Parenthood
19 organization?
20      MR. WOLFSON: Objection. I think that
21 is probably better for Ms. Singhaus, but go ahead.
22      THE WITNESS: I am not sure of that
23 connection. I know it's a statewide organization,
24 but I don't think there is any connection between
25 Planned Parenthood Federation and Planned Parenthood

Page 15

1  Advocates of Ohio as it is locally.
2  By Ms. Richardson:
3    Q. Thank you. And for purposes of
4  hopefully shortening some of this a little bit today,
5  I think at the deposition earlier this week we
6  referred to Planned Parenthood of Greater Ohio as
7  PPGOH. Is that correct?
8    A. That is one of the ways in which we
9  refer to it.
10   Q. So if we use that terminology today,
11 we'll both understand that that's Planned Parenthood
12 of Greater Ohio?
13   A. Correct.
14   Q. Great. Perfect. Thank you.
15      And Planned Parenthood -- is it
16 Federation or Federated?
17   A. Federation.
18   Q. Federation. Which is the national
19 Planned Parenthood organization; is that correct?
20   A. It's a federation, yes. It's Planned
21 Parenthood Federation of America. It's a
22 nationwide --
23   Q. And if we refer to that as PPFA, will we
24 both understand that to mean the national Planned
25 Parenthood organization?

Page 16

1    A. Correct.
2    Q. Thank you. And we're making our poor
3  Court Reporter's life miserable with all of these.
4      So I'd like to understand a little bit
5  more about what the education department that you
6  oversee does. And you mentioned that you oversee the
7  grant application process.
8      Would you be able to just describe
9  generally how many grants currently Planned
10 Parenthood of -- well, PPGOH covers within its
11 education department?
12   A. When you say grants, you just refer to
13 State of Ohio grants?
14   Q. Well, maybe we'll step back and I'll ask
15 it more generally. Can you just sort of describe
16 generally what the role of the education department
17 within PPGOH is?
18   A. Yes. The Education and Outreach
19 department is tasked with providing educational
20 services out in the community with the intent to
21 reduce teen pregnancy rates, the spread of SDIs, and
22 information about healthy habits among the
23 population.
24   Q. And currently how many educational
25 programs does the educational department operate or

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

1  provide?
2      A. It varies from area of the state -- from
3  area of state to area of the state. But the programs
4  include HIV testing out in the community,
5  comprehensive sex education, infant mortality
6  prevention. In essence those are the three
7  categories that you can group the programs.
8      What is done within each of those is --
9  again, it varies from area of the state.
10      Q. And that kind of leads me to another
11  question. What do you consider overall to be your
12  coverage area?
13      A. So that would also be another
14  organizational question, but I can speak to you that
15  Planned Parenthood of Greater Ohio is -- has an area
16  of 68 of the 88 counties of Ohio.
17      We do have educational programs in some
18  of the cities within those 68 counties, and based on
19  the grants that we receive from each of those areas.
20      Q. And so let's start -- you mentioned HIV
21  testing as one of the three general categories of
22  education. What types of HIV testing programs does
23  PPGOH purposely operate?
24      A. We have -- sorry. Let me ask, do you
25  want to just hear about the HIV testing programs that

1  are affected by those grants?
2      Q. No, right now I'm talking about all of
3  the different programs that you would operate.
4      A. Okay. And I will only speak to the ones
5  that -- the programs that Education and Outreach
6  oversees, as there might be some programs that also
7  our health services division might offer and that
8  would be a question for Barbara.
9      But under education, under the umbrella
10  of Education and Outreach, we have an HIV testing
11  program in the Canton area, an HIV testing program in
12  the Summit County area, HIV -- two HIV testing
13  programs in the Cuyahoga County area.
14      Q. And can you describe to me how those
15  testing programs work?
16      A. Yes. When we submit an application to
17  the local entity or local Health Department that has
18  released an RFP, a request for proposals, we submit
19  an application to that local government entity in
20  where we are proposing to serve the population that
21  they have predetermined they need the services.
22      In that RFP the local entity also
23  specifies how they will want the chosen entity to
24  serve that population. It could be specific segment
25  of the population in that region, it could be a

1  specific demographic within that segment of
2  population. All of that is predetermined in the RFP
3  that the local government entity releases.
4      Once we submit a competitive application
5  and when we get the award, we follow the protocols
6  that were outlined in that application process.
7      So to answer your question, the work
8  that is done within those regions follows -- it could
9  be different, it could follow different target
10  populations, but in essence, in general, it's
11  providing rapid HIV testing to the target population.
12      Q. And would these -- would this testing be
13  offered in Planned Parenthood facilities, or would
14  they be offered in mobile units, for example, out in
15  the communities?
16      A. It varies from grant to grant.
17      Q. And so let's talk then about the grants.
18  And now just focusing specifically on the HIV testing
19  programs that you've just described. How many
20  different grants is PPGOH currently receiving for
21  those programs?
22      A. One grant from the Canton City Health
23  Department, one grant from the Summit County Board of
24  Health, and one grant from the City of Cleveland
25  Health Department. And another grant from a

1  collaborative group in the -- also in the City of
2  Cleveland.
3      Q. And when we started this you said
4  something about programs that were impacted. Were
5  you referring to programs that are outlined in the
6  statute that's being challenged in this litigation?
7      A. I was trying to clarify for myself if
8  that is what you were referring to, just the programs
9  that come from state funding.
10      Q. And so is it your understanding then
11  that some of these programs are impacted by the law
12  that is being challenged in this case?
13      A. Some of them -- most of them are, yes.
14      Q. Which ones would be impacted,
15  specifically?
16      A. As indicated by the letters we got from
17  the local Health Departments announcing that we
18  will -- they will not be able to contract with us
19  anymore, that would be the City of Canton Health
20  Department, the Summit County Health Department, and
21  the City of Cleveland Health Department.
22      Q. And so I think you had also mentioned a
23  collaborative group based out of Cleveland.
24      A. Uh-huh.
25      Q. Is it your understanding that that grant

1    is not impacted?
2         A.  That is my understanding, is that
3    funding comes directly to that collaborative group
4    from the CDC, Centers For Disease Control
5    information.
6         Q.  And how much funding does PPGOH receive
7    from that CDC grant?
8         A.  I believe that from that grant we're
9    receiving around 70-- -- I don't know the exact number
10   at this point.
11        MR. WOLFSON:  Could you clarify what you
12   mean by 70?
13        THE WITNESS:  70,000.
14   By Ms. Richardson:
15        Q.  Is that per year?
16        A.  Yes.
17        Q.  Any other funding that PPGOH would
18   receive related to its educational HIV testing
19   programs?
20        A.  No.
21        Q.  And then I believe one of the other
22   categories that you mentioned would be other regional
23   categories related to infant mortality; is that
24   correct?
25        A.  Correct.

1         Q.  What services or programs do you offer
2    under that category?
3         A.  That is more limited to the Mahoning
4    County and Trumbull County area.  And those services
5    are funded by a grant called the Ohio Infant
6    Mortality Reduction Initiative.
7         Q.  Is that also referred to as OIMRI?
8         A.  Correct.
9         Q.  Thank you.  And apart from the services
10   that you would provide under the OIMRI program, are
11   there any other infant mortality services that PPGOH
12   would offer?
13        A.  Infant mortality prevention services?
14        Q.  Thank you.  Yes.
15        A.  Not in the same category as these
16   services.
17        Q.  What category would they be in?
18        A.  We could -- so for instance, when I --
19   we could talk about programs that promote the usage
20   of long acting reversible contraceptives, which are
21   also known as LARCs in the type of programs.
22        LARCs have been proven to be a way to
23   reduce infant mortality because they promote the
24   spread of pregnancies.  Again, that has been proven
25   to reduce infant mortality.

1         If you consider that as an infant
2    mortality initiative, then that's also incorporated
3    in other aspects of our education programs.
4         Q.  Thank you.  And apart from the OIMRI and
5    the LARCs program that you just mentioned, any other
6    infant mortality prevention services that PPGOH would
7    provide?
8         A.  In the education department?
9         Q.  In the education department.
10        A.  No.
11        Q.  Do you know whether there are programs
12   outside of the education department that PPGOH would
13   offer?
14        MR. WOLFSON:  Objection.  Go ahead.
15        THE WITNESS:  I will say that our health
16   services division has a comprehensive list of
17   services that could also aid in the prevention of
18   infant mortality.
19   By Ms. Richardson:
20        Q.  Thank you.  And then I think the third
21   category that you mentioned was comprehensive sex
22   education?
23        A.  Yes.
24        Q.  What programs or services does PPGOH
25   provide under that category?

1         A.  So under the comprehensive sex education
2    umbrella we have -- we currently have the Personal
3    Responsibility Education Program, also known as PREP,
4    in three areas of the State.
5         We also -- as part of comprehensive sex
6    education we also provide comprehensive
7    evidence-based education in schools in certain areas
8    of the State, and also at universities or
9    community-based organizations.
10        And under that category also falls peer
11   education programs which are programs intended to
12   work with youth in order to prevent the spread of
13   STIs and teen pregnancy.
14        Q.  Thank you.  And the peer education
15   programs, are those working -- I just want to make
16   sure I heard correctly.
17        Those are working with the people that
18   work with youth as opposed to working with youth
19   directly?
20        A.  Peer education program is -- the short
21   answer is no.
22        Q.  Okay.  Thank you.
23        A.  The peer education program is working
24   with -- directly with youth in training them to
25   become, in essence, expert on the subject matter of

Page 25

1  reducing teen pregnancies and the spread of SDIs
2  among their peer groups.
3      Q. Okay. Thank you. And what about with
4  respect to the education in schools, does PPGOH
5  provide that education directly within the schools,
6  or does it provide training to educators within the
7  school?
8      A. It's a direct service to the schools.
9      Q. So in other words, would staff members
10  employed by PPGOH actually go directly into the
11  classrooms and work with students?
12      A. As requested per the school, yes. A
13  teacher would call and request a program, and our
14  staff member -- one of our staff members will go and
15  provide an evidence-based curriculum there.
16      Q. And what does an evidence-based
17  curriculum mean?
18      A. So the United States Department of
19  Health and Human Services has identified a list of
20  curricula that has been proven to reduce teenage
21  pregnancy or the spread of STIs among the population,
22  once that curriculum has been tested. And that list
23  is posted in the HSS website, Department of Health
24  and Human Services website.
25      We choose one of those curricula and we

Page 26

1  replicate it in the settings where we are invited to
2  come.
3      Q. Is it -- would it only be in the case of
4  the school reaching out to PPGOH that you would
5  provide that training to those schools?
6      A. As opposed to?
7      Q. In other words, I'm just trying to
8  understand, how do you select the schools in which
9  you would offer this education?
10      A. It varies. So if we, for instance, have
11  a grant that specifically says you have to provide
12  this program in these schools in this city, we will
13  have to only work with those schools, that school
14  district.
15      If the grant says this funding is to
16  provide sex education in this larger geographic area,
17  then you incorporate schools from all of those --
18  from within that larger geographic area.
19      Q. And in that latter circumstance where
20  you have a larger area, how would you select the
21  schools in which you would offer the educational
22  program?
23      A. It is based on requests by the school.
24      Q. So the school would reach out to PPGOH
25  and specifically request those education services; is

Page 27

1  that correct?
2      A. That is correct. Based on our history
3  providing the programs in that area, most school
4  districts understand our expertise on the subject
5  matter and they call for our services.
6      Q. And you mentioned that there are various
7  different grants that might apply within the sex
8  education program. Can you just walk me through what
9  grants PPGOH is currently receiving for its
10  comprehensive sex education programs?
11      A. There are private foundations that, for
12  instance, provide that funding specifically for the
13  area where the foundation is located. That's one
14  source.
15      There's also our federal Title 10 grant
16  that also allows us to provide sex education in areas
17  of the state.
18      Q. Any other funding sources?
19      A. No, just those are the grants.
20      Q. And in terms of private foundations, how
21  many grants are you currently receiving from private
22  foundations?
23      A. I really don't know the exact number.
24  And again, it varies from area of the State to area
25  of the State.

Page 28

1      Q. What about total monetary amounts for
2  the private foundations combined?
3      A. I don't have the exact amount, but I can
4  say it's an average -- because it also varies from
5  year to year.
6      Q. Sure.
7      A. And some foundations some years will not
8  fund it, some years they will. But I will say on
9  average it's about between 100,000 and 150,000.
10      Q. 100,000 to $150,000?
11      A. I'm sorry. Yes.
12      Q. And how many different geographic
13  regions would those private foundations cover?
14      A. The greater Cleveland area, the greater
15  Columbus area, Richland County. I'm trying to think.
16      Q. Sure. Take your time.
17      A. Those are currently what we have.
18      Q. And what about with respect to the Title
19  10 grant, how does that work?
20      MR. WOLFSON: Objection to form.
21  By Ms. Richardson:
22      Q. If you understand. It was a very
23  general question, but if you can describe just
24  generally the Title 10 grant that PPGOH receives.
25      A. Title 10 is a family planning grant. It

7 (Pages 25 to 28)

1 was established by President Nixon to provide family
2 planning services to the population.
3        Within the Title 10 services that is
4 overseen by HHS, the Department of Health and Human
5 Services, it is stipulated that grantees incorporate
6 a community education component into this family
7 planning grant.
8        And that's how Planned Parenthood of
9 Greater Ohio incorporates educational and outreach
10 services as part of Title 10 services where we go out
11 in the community and we talk about the -- we use sex
12 education curricula to reduce teen pregnancy.
13     Q. And so I want to break that down a
14 little bit. But first of all, it sounds like this is
15 a grant that you receive directly from HHS, is that
16 accurate?
17     A. That's correct.
18     Q. And what is the amount of the funding
19 you receive under the Title 10 grant?
20     A. I don't know that number, because that
21 also incorporates health services.
22     Q. Okay.
23     A. Barbara will be able to --
24     Q. Thank you. And is that something that
25 you have to reapply for on a particular time frame?

1     A. It is a competitive grant, which means
2 we do have to apply. I don't know if it's every year
3 or every two years, but it is --
4     Q. And how long have you been receiving the
5 Title 10 grant, if you know?
6     A. It varies because I believe for some
7 areas of what our affiliates cover, we were receiving
8 that grant directly from the federal government, but
9 in other areas we were receiving it from the Ohio
10 Department of Health at some point.
11        And then in the recent years we just
12 apply to the federal government to receive it
13 directly from them for all of our areas. So I'm not
14 sure of the timelines on when they changed back from
15 one source of funding to another source of funding.
16     Q. Sure. But currently you receive it all
17 directly from the federal government?
18     A. Correct.
19     Q. Is that correct?
20     A. Yes.
21     Q. And you mentioned that it requires a
22 local community component. Is that how you said it?
23     A. Yes.
24     Q. What does that mean exactly?
25     A. The grant stipulates that as part of a

1 comprehensive approach to family planning, the
2 grantee should also incorporate education out in the
3 community about what the intent of the grant is, to
4 promote family planning services.
5     Q. And which communities in particular do
6 you focus on?
7     A. So the grant covers -- or the grant is
8 awarded for us to cover 18 counties in Ohio. I can
9 try to name most of them.
10        MR. WOLFSON: Why don't you wait to see
11 if you're asked that question.
12 By Ms. Richardson:
13     Q. Maybe you could just describe the sort
14 of geographic areas in which the 18 counties are
15 located, if they are all in a particular area.
16     A. So I could say the Crawford County area,
17 which is Crawford County or Richland County -- I
18 don't know if that's called northern central Ohio.
19 The Mahoning Valley area. The Stark County/Wayne
20 County area. The Lucas County area. Southern Ohio,
21 Appalachian Ohio area, and metropolitan areas like
22 Cleveland and greater Cleveland, greater Columbus,
23 and also the Lorain County area.
24     Q. And were those specific communities
25 selected by PPGOH, or were they set forth in the

1 actual Title 10 grant that came in, the
2 specifications from the federal government?
3     A. They came from specifications from the
4 grant.
5     Q. Do you know why those specific areas
6 were targeted?
7     A. I don't know exactly why the federal
8 government did that. In the RFP it is stipulated
9 that they will focus on the need, the greater need --
10 where the greatest need is in every state throughout
11 the country.
12     Q. And so would these be things like teen
13 pregnancy rates, or would there be other sort of
14 factors that would trigger including a particular
15 county within that?
16     A. I will say that as a family planning
17 program they will most likely target family planning
18 needs such as lack of providers, high rates of
19 unintended pregnancy, high rates of STIs, sexually
20 transmitted infections.
21     Q. And we have been talking a little bit
22 about the statute that is challenged in this case,
23 and just for the record, is it your understanding
24 that that's Revised Code 3701.034? I
25     A. I don't recall the exact number. I

Page 33

1 refer to it as House Bill 294.
2     Q.  Thank you.  Okay.  And if I just refer
3 to that as the law that's being challenged in this
4 case, will we both understand that that's what you
5 refer to as House Bill 294?
6     A.  Yes.
7     Q.  And to your understanding, which if any
8 of the sex education programs that you've just
9 described are impacted by the law that's challenged?
10     A.  The ones that I just described, none of
11 them -- you did not ask me about PREP.  PREP is under
12 that same category, and PREP is -- will be affected
13 by this.
14     Q.  And so is it fair to say that apart from
15 PREP, none of the other education programs that PPGOH
16 offers would be affected by the challenged law?
17     MR. WOLFSON:  Objection.
18     THE WITNESS:  As far as we know.  We
19 have not received any notice from these funders, no.
20 By Ms. Richardson:
21     Q.  Okay.  Thank you.  And so I want to take
22 a moment -- I'm going to hand you a document that
23 we'll mark as Exhibit 1.
24     (EXHIBIT MARKED FOR IDENTIFICATION.)
25 By Ms. Richardson:

Page 34

1     Q.  And I'll represent to you that this is
2 the notice for the deposition that you're here for
3 today.  And feel free to take a moment to look at it
4 and just let me know when you're ready.
5     A.  Okay.
6     Q.  And have you seen that document prior to
7 today?
8     A.  I have.
9     Q.  And I'll just ask you is it your
10 understanding that you're appearing here today as a
11 30(b)(6) witness?
12     MR. WOLFSON:  Objection.  Go ahead.
13     THE WITNESS:  Yes.
14 By Ms. Richardson:
15     Q.  And is it your understanding that that
16 means that the answers that you will be giving today
17 will be answers of Planned Parenthood of Greater
18 Ohio?
19     MR. WOLFSON:  Objection.
20     THE WITNESS:  Yes.
21 By Ms. Richardson:
22     Q.  And are you in fact prepared to talk
23 about some of the topics that are set forth in this
24 notice?  And I'll direct you specifically to Schedule
25 A attached to this document.

Page 35

1     A.  To some of the programs, yes.
2     Q.  And I know counsel has let me know that
3 you will not be talking about all of these topics,
4 but if we could just walk through briefly to make
5 sure that I understand which ones you are prepared to
6 talk about.
7     I understand that you will not be
8 talking about item No. 1, which related to corporate
9 structure; is that correct?
10     A.  That's correct.
11     Q.  In terms of No. 2, which discusses
12 provision of services from PPGOH, I understand that
13 you will be talking about some services that would
14 fall under No. 2; is that correct?
15     A.  That's correct.
16     Q.  And can you just briefly walk me through
17 which services you will be prepared to talk about
18 today?
19     A.  The HIV/AIDS initiative, and HIV
20 Prevention Program, the healthy moms, healthy babies
21 infant mortality prevention initiative, and the
22 personal responsibility education program.
23     Q.  Thank you.  And No. 3 relates to claims
24 and allegations set forth in your complaint.  I
25 understand that you will be talking about No. 3 to

Page 36

1 the extent it relates to the programs you just
2 mentioned; is that correct?
3     A.  That is correct.
4     Q.  Same with respect to No. 4, that you
5 will be prepared to talk about that as it relates to
6 these programs; is that correct?
7     A.  That's correct.
8     Q.  And also Nos. 5 and 6 as it relates to
9 those programs?
10     A.  That's correct.
11     Q.  And then I understand you will not be
12 speaking with respect to No. 7, is that correct,
13 which relates to financial statements, reports,
14 plans, and other information?
15     A.  That is correct.
16     Q.  Okay.  And --
17     MR. WOLFSON:  I just want to clarify.  I
18 think that Mr. Espino was prepared to talk about
19 these insofar as they related to the program-specific
20 expenses.  Is that right?
21     THE WITNESS:  That is correct.  I will
22 be able to speak to specific program budgets, but not
23 overall agency budgets.
24 By Ms. Richardson:
25     Q.  Thank you for that clarification.

Page 37

1      And No. 8, will you be testifying with
2  respect to correspondence sent or received by you or
3  any of your employees or agents that reference or
4  relate to Section 3701.034, or Substitute House Bill
5  294?
6      A. In relation to those three programs,
7  yes.
8      Q. Thank you. I understand you will not be
9  speaking about No. 9; is that correct?
10      A. That's correct.
11      Q. And it's my understanding you will be
12  speaking about No. 10 as it relates to the specific
13  programs we have been discussing; is that correct?
14      A. That is correct.
15      Q. Okay. Thank you. And can you just
16  describe generally what you have done to prepare for
17  this deposition today with respect to the topics we
18  have just gone through?
19      A. I have read the -- this document that we
20  are referring to, and I have met with our attorneys.
21      Q. And did you meet with anyone else within
22  PPGOH to prepare for your deposition today?
23      A. I met with our -- some of our staff to
24  collect some information.
25      Q. And who specifically did you meet with?

Page 38

1      A. I met with Barbara Singhaus, Isis
2  Harvey, to talk about this deposition.
3      Q. Anyone else within staff at PPGOH that
4  you spoke to in preparation for today's deposition?
5      A. No.
6      Q. And what about outside of PPGOH, was
7  there anyone else apart from counsel that you spoke
8  with to prepare for today's deposition?
9      A. No.
10      Q. Did you review any documents apart from
11  the 30(b)(6) notice that we just went through to
12  prepare for today's deposition?
13      A. I read the complaint document, and I
14  reviewed our responses to interrogatories.
15      Q. Thank you. And you're referring to the
16  complaint that was filed in this case; is that
17  correct?
18      A. Yes, that is correct.
19      Q. When did you first review the complaint
20  that was filed in this case?
21      A. I reviewed it the first time right after
22  it was submitted. I don't have the exact date.
23      Q. Were you consulted or did you review any
24  drafts of the complaint prior to the time that the
25  complaint was filed?

Page 39

1      MR. WOLFSON: And in answering that
2  question, I just want to caution you not to reveal
3  the substance of any conversations you had with
4  attorneys or in preparing for the lawsuit.
5      THE WITNESS: Okay. I was part of
6  looking at the drafts.
7  By Ms. Richardson:
8      Q. Okay. And what -- again, without
9  revealing any confidential communications from your
10  counsel, what was your role in assisting with or
11  compiling information for the filing of the
12  complaint?
13      A. I was gathering information from the
14  three programs that we were talking about earlier.
15      Q. Thank you. And so I'd like to just
16  start walking through some of these topics that are
17  listed in this complaint. And we'll start with
18  No. 2 as it relates to the programs that you are
19  prepared to talk about.
20      I'd like to understand the locations at
21  which such services either are or were provided. And
22  so let's start with -- Let's start with HIV, and I
23  understand you've started to tell me a little bit
24  about some of that.
25      First of all, can you just specify again

Page 40

1  which HIV programs PPGOH offers that you believe are
2  impacted by the law that's challenged?
3      A. Free HIV testing program in the Canton
4  area that is funded by the City of Canton Health
5  Department, the HIV testing program in the Summit
6  County area funded by Summit County Health
7  Department, and the HIV -- the free HIV testing
8  program in the greater Cleveland area that is funded
9  by the City of Cleveland Health Department.
10      Q. Thank you. And so let's focus on Canton
11  specifically first. Can you just describe
12  specifically what services PPGOH offers under that
13  grant with Canton?
14      A. We provide free HIV testing, also known
15  as rapid free HIV testing, to the population
16  specified in that grant by the Health Department, in
17  collaboration with some community partners with the
18  Health Department, itself, and also we provide that
19  service within our health center located in Canton,
20  Ohio.
21      Q. And so with respect to community
22  partners, what do you mean?
23      A. They are community-based organizations
24  that we work with that invite us to put a testing
25  event together, a free HIV testing event together

1  with them, and we go -- there might be other services
2  being offered during that event, and Planned
3  Parenthood comes in to do HIV testing, free HIV
4  testing.
5      Q. And in that circumstance you would
6  provide the testing within the community partner --
7  wherever the event is taking place, is that fair?
8      A. That is correct.
9      Q. And who specifically would provide the
10  HIV testing in that circumstance?
11      A. Our HIV testing specialists.
12      Q. And do you just have one testing
13  specialist?
14      A. In the Canton area, yes.
15      Q. And that person is employed by Planned
16  Parenthood of Greater Ohio?
17      A. That is correct.
18      Q. Are there particular community partners
19  that you would have these arrangements with ongoing,
20  or does it vary?
21      A. It varies. There are some of them that
22  are more frequent than others, but it varies.
23      Q. And I'm not asking for a list of your
24  specific partners, but is there a sort of general way
25  to describe them? Do they tend to fall in a

1  particular category? Are they nonprofit
2  organizations, are they schools, a general way -- an
3  umbrella under which they would fall if there is one?
4      A. If there is one, I would say nonprofit
5  organizations, social service agencies within that
6  category, or -- yeah, mostly social service agencies.
7  And occasions we have partnered with faith-based
8  organizations, too.
9      Q. And the social service organizations
10  that you partner with most frequently, do they focus
11  specifically on HIV, or do they have a broader
12  mission or focus?
13      A. In fact they actually don't have an
14  expertise in HIV, that is the reason why they bring
15  us in.
16      Q. And so again, continuing to focus on
17  these community partnerships, you would offer free
18  HIV testing at those events. Any other services that
19  you would provide?
20      MR. WOLFSON: Object to the form. Go
21  ahead.
22      THE WITNESS: At that particular event,
23  when we're just invited to do HIV testing, no.
24  By Ms. Richardson:
25      Q. And how often would you say you

1  participate in events with community partnerships at
2  which you provide HIV testing?
3      A. In that Canton area, on average I will
4  say two to three community events per month.
5      Q. And apart from the HIV specialist that
6  you mentioned, would other employees typically attend
7  those events?
8      MR. WOLFSON: By "employees", you mean
9  PPGOH employees?
10      MS. RICHARDSON: Thank you.
11  By Ms. Richardson:
12      Q. PPGOH employees.
13      A. I'm trying to think of situations where
14  we are invited, if we ever bring anyone else. No,
15  the answer is no.
16      Q. And then I think you mentioned that in
17  some cases you work with the Health Department
18  specifically. Were you referring to the Canton
19  Health Department?
20      A. Correct.
21      Q. And can you describe generally what
22  types of services you would provide in partnership
23  with the Canton Health Department?
24      A. So there is something very popular in
25  the Canton area that -- in the HIV world that are

1  called bar calls where HIV testing specialists go and
2  they -- to a chosen bar, and they provide the HIV
3  testing services right there.
4      In the case of the Cleveland City Health
5  Department, they will coordinate that with a specific
6  venue. They will call us and say we have secured
7  this venue for X date, can you please come and do the
8  HIV testing.
9      MR. WOLFSON: You said Cleveland City
10  Health Department.
11      THE WITNESS: I'm sorry, Canton.
12  By Ms. Richardson:
13      Q. In those circumstances, logistically how
14  do you provide the HIV testing?
15      A. What do you mean logistically?
16      Q. So do you have a van in which you keep
17  the HIV testing kits, or do you actually go into the
18  bars and provide the testing in the actual facility?
19  How would that work logistically?
20      A. In those circumstances the City Health
21  Department -- the Canton City Health Department would
22  already secure a private room within the venue to
23  conduct that.
24      Q. Do the participants in the program --
25  and now I'm referring to the people who actually

1    receive the HIV testing, do they make appointments,
2    or is it just walk up when you're in the bar?
3        A.  When we are in the bar they just -- it's
4    a walk-in service.
5        Q.  Do you provide any kind of advertisement
6    or other materials to indicate to the public that
7    you'll be at that particular bar?
8        A.  It varies from venue to venue.  Some
9    venues do want us to advertise ahead of time, some
10   others don't, so it varies.
11       Q.  And would that be something that the
12   venue would provide, or would there be circumstances
13   where PPGOH would provide promotional materials or
14   other advertisements?
15       A.  It's also a mix of that.
16       Q.  And then you mentioned that there are
17   also circumstances where the health center would
18   actually provide the free HIV testing; is that
19   correct?
20       A.  No, the testing specialist will provide
21   the free HIV testing at the health center, but not --
22   it's not incorporated into the health center
23   services.
24       Q.  And so first of all, what do you mean by
25   health center?

1        A.  The Planned Parenthood health center
2    location.  HIV testing specialist has a schedule
3    where they will be at the health center.
4        Q.  How many health centers does PPGOH
5    operate?
6        A.  In Canton or in Ohio?
7        Q.  Let's start -- well, start with Canton,
8    specifically.
9        A.  One.
10       Q.  And how about in Ohio as a whole?
11       MR. WOLFSON:  Objection.  Go ahead.
12       THE WITNESS:  We have 19 health centers.
13   By Ms. Richardson:
14       Q.  And then you clarified that the HIV
15   specialist would actually go to the health center to
16   provide HIV testing, but that it would not be
17   incorporated within the health services.  Did I
18   understand that correctly?
19       A.  Yes.
20       Q.  What do you mean by that?
21       A.  That the HIV testing specialist will be
22   at the health center just to provide free HIV testing
23   under this grant, and the HIV testing specialist does
24   not work for the health center or do any other work
25   related to the health center.

1        Q.  So under what circumstances would the
2    HIV testing specialist appear at the health center to
3    provide testing?
4        A.  So the HIV testing specialist has a
5    predetermined schedule that is advertised in the
6    community when they will be available at the Planned
7    Parenthood health center to provide free HIV testing.
8        Q.  And who would receive HIV testing from
9    the specialist when he or she is at the health
10   center?
11       A.  Anyone who comes to -- requesting those
12   free HIV testing services.
13       Q.  Is it a walk-up clinic, or would it be
14   someone who would make an appointment in advance?
15       A.  You can do both for this particular
16   service.
17       Q.  And would the patients receiving the HIV
18   testing also be receiving other services while they
19   are at the health center?
20       MR. WOLFSON:  Objection.  Go ahead.
21       THE WITNESS:  From the HIV testing
22   specialist?
23   By Ms. Richardson:
24       Q.  Well, we'll start with the HIV testing
25   specialist.  Would they receive any other services

1    from the specialist?
2        A.  The specialist is a hundred percent
3    dedicated to this grant.  It's fully a hundred
4    percent covered by this grant, so they do not provide
5    any other services but the services specified by the
6    grant.
7        Q.  And so would the patient receive any
8    services from anyone else at the family center during
9    their visit?
10       MR. WOLFSON:  Objection.
11       THE WITNESS:  It's a situational
12   question, I think, because the patients have the
13   liberty to receive other services in the health
14   center if they walk to the health -- if they walk to
15   the front desk and request services.
16   By Ms. Richardson:
17       Q.  And so just so I kind of understand just
18   how that would work, and understanding there may be
19   variances from case to case, so let's say -- so I
20   understand that you would advertise to the community
21   that the HIV testing specialist would be in the
22   health center on a particular date; is that correct?
23       A.  Correct.
24       Q.  And so let's take the case you mentioned
25   there are some people who would just walk up and

Page 49

1  indicate that they would like to receive HIV testing;
2  is that correct?
3      A.  That's correct.
4      Q.  And so let's take one of those patients
5  who comes into the center and says I'd like to see
6  the HIV specialist.  How would that patient be
7  processed, for lack of a better word,
8  administratively when he or she walks in the door?
9      A.  So let me just recap that to see if I
10 understand.
11     Q.  Sure.
12     A.  So a patient walks into a Planned
13 Parenthood health center, goes to the reception and
14 says I'm here for free HIV testing; is that the
15 situation?
16     Q.  Exactly.
17     A.  The person at the front desk will
18 immediately call the HIV testing specialist, who is
19 in another room solely dedicated for the specialist,
20 in the same building.
21         The HIV testing specialist will come to
22 the front, greet the person, and will take the person
23 back to the HIV room to provide the testing, and fill
24 out all the forms that are required to be filled out
25 by the grant process that has to take place.

Page 50

1          The patient receives the testing, and
2  the testing specialist walks him out.
3      Q.  And is there any protocol or policy for
4  the HIV testing specialist to ask the patient while
5  he or she is there about other potential services?
6      A.  There is no protocol within the grant
7  that requires us to do that.  The grant does specify
8  that if the patient requests other information about
9  other services, then -- to be provided to the best of
10 the HIV testing specialist's knowledge.
11     Q.  And so what if this person mentions,
12 while he or she is getting the HIV testing, that they
13 would also like to receive testing for other STIs,
14 what would happen to that patient?
15     MR. WOLFSON:  Objection.
16     THE WITNESS:  So I'm trying to think of
17 that scenario.  I really don't know if that happens,
18 so I'm trying to see if -- the grant requires us
19 again to provide referral numbers to -- or names of
20 other providers, depending on the service that the
21 client is requesting, and the specialist will provide
22 those names.
23 By Ms. Richardson:
24     Q.  And so the specialist would provide
25 referral information to the patient; is that correct?

Page 51

1      A.  Based on the service that is being
2  requested, yes.
3      Q.  Would there be circumstances where the
4  HIV specialist would simply send the patient over to
5  one of the health providers within the center to
6  receive, in our example, STI testing?
7      MR. WOLFSON:  Objection.
8      THE WITNESS:  We are -- Planned
9  Parenthood is an approved provider of STI testing
10 within the referral list approved by the City of
11 Canton, if -- you're saying there's a possibility --
12 there's a possibility that the name of Planned
13 Parenthood is given since it's part of the referral
14 list.
15 By Ms. Richardson:
16     Q.  And so what about if the patient is
17 in -- and again, we're talking about the patient who
18 walked in and asked to see the HIV specialist for
19 free HIV testing, would there be circumstances where
20 the HIV testing specialist would ask the patient if
21 she might be pregnant?
22     MR. WOLFSON:  Objection.
23     THE WITNESS:  Again, I'm trying to think
24 of that situation.  It is not part of our HIV testing
25 protocol.

Page 52

1  By Ms. Richardson:
2      Q.  Are there procedures or policies that
3  explain what the HIV testing specialist should do if
4  the patient indicates that she might be pregnant?
5      A.  The grant does not specifically address
6  those type of situations as related to just a testing
7  service.
8      Q.  What about outside of the grant, does
9  PPGOH have any policies or procedures that the HIV
10 specialist would follow if a patient indicates that
11 she might be pregnant?
12     A.  The HIV testing specialist follows --
13 since it's a hundred percent covered by the grant, it
14 follows everything that the grant stipulates.
15     Q.  And then a slightly different version of
16 that scenario, let's say that the patient actually
17 specific asks can you provide me with a pregnancy
18 test, is that something that the specialist could do?
19     MR. WOLFSON:  Objection.
20     THE WITNESS:  No.  STI testing
21 specialists are not -- do not offer any other
22 services than the ones in the grant.
23 By Ms. Richardson:
24     Q.  And in that circumstance would the HIV
25 specialist be able to refer the patient over to other

1    health providers in the center to receive a pregnancy
2    test?
3         MR. WOLFSON:  Objection.
4         THE WITNESS:  They will provide within
5    the list -- that referral list the names of providers
6    that can do that.
7    By Ms. Richardson:
8       Q.  And would that include the -- in our
9    Canton example, would that include the Canton health
10   center, which she's receiving the HIV testing?
11        MR. WOLFSON:  Objection.
12        THE WITNESS:  It is part of the referral
13   list, yes.
14   By Ms. Richardson:
15      Q.  And now you referred a couple of times
16   to the fact that the HIV testing specialist is one
17   hundred percent covered by the grant.  Can you
18   explain to me a little bit more about what you mean
19   by that?
20      A.  Yes.  This person's salary is a hundred
21   percent allocated to the grant that we receive from
22   the Canton Health Department.
23      Q.  And so the grant money that comes in
24   covers all of that specialist's salary, is that
25   correct?

1      A.  It covers -- Yes, the time that this
2    person is just providing HIV testing, it's covered by
3    that.
4      Q.  And does that work on a reimbursement
5    type basis, or how is that funding received?
6      A.  It's reimbursement in that scenario.
7      Q.  So is it accurate then to say that the
8    HIV specialist would -- and is it a he or a she, just
9    for ease of questioning?
10      A.  It's a she.
11      Q.  A she.  Okay.  Thank you.
12        MR. WOLFSON:  Are we talking about the
13   City of Canton still?
14       MS. RICHARDSON:  Yes, City of Canton.
15   By Ms. Richardson:
16      Q.  So she would basically log her time
17   spent on the various activities that you've been
18   describing, and then would -- would Planned
19   Parenthood of Greater Ohio initially pay her and then
20   receive a reimbursement, or would she receive payment
21   directly from the City of Canton?
22      A.  Planned Parenthood will receive
23   reimbursement for the time that this person is being
24   allocated to the City of Canton's program, yes.
25      Q.  Is there a cap on the amount that can be

1    reimbursed?
2      A.  Yes.
3      Q.  And what is that cap?
4      A.  It is based on the grant, itself.  So a
5    certain percentage of the grant is allocated to
6    salary, so that's the only amount that can be billed
7    to the City of Canton for reimbursement.
8      Q.  And what if the specialist works more
9    hours than are allotted within the grant, what would
10   happen under that circumstance?
11      A.  In that circumstance the specialist will
12   have to be paid -- let me go back because those
13   situations -- I don't think we have had that many of
14   those situations.
15        But in the case where the specialist
16   goes over that hourly limit, they will have to be
17   paid out of Planned Parenthood's funds.
18      Q.  And does Planned Parenthood impose any
19   restrictions on the amount of time that the
20   specialist can work in order to keep it within the
21   grant?
22      A.  Like with any of our grants, the one in
23   City of Canton we give instructions -- specific
24   instructions to the specialist that they cannot --
25   they should not put more of the allowed hours in

1    their time sheets.
2      Q.  And so would there be circumstances
3    where they might ask for permission to exceed that
4    amount?
5        MR. WOLFSON:  Objection.
6        THE WITNESS:  I'm trying to think of
7    situations.  I believe we have been clear that that's
8    not something that should be done.  And I cannot
9    recall any time that I personally have said yes, it's
10   okay to.
11        MR. WOLFSON:  Could we take a
12   five-minute break soon?
13       MS. RICHARDSON:  Sure.  And we can take
14   ten minutes.
15        (Recess was taken.)
16   By Ms. Richardson:
17      Q.  Before the break we were walking through
18   and talking about programs, specifically the HIV
19   testing program, and I think we were still talking
20   about the Canton program, specifically.
21        And we talked about the fact that the
22   HIV testing specialist is generally one hundred
23   percent paid for by the grant in terms of her salary;
24   is that correct?
25      A.  That's correct.

Page 57

1    Q. Is she considered, however, to be an
2 employee of Planned Parenthood of Greater Ohio?
3    A. That is correct.
4    Q. And so would she be subject to all other
5 policies and protocols that Planned Parenthood of
6 Greater Ohio would have in place for its employees?
7    A. She would be subject to the general
8 employee protocols.
9    Q. Apart from just the specifications that
10 are listed in the grant that she would have to comply
11 with, would there be any other differences in the
12 rules and procedures that she would need to comply
13 with for her as compared to other PPGOH employees?
14       MR. WOLFSON: Objection.
15       THE WITNESS: She will have to follow
16 the general rules or regulations or protocols of a
17 PPGOH employee. And then she will have to follow the
18 grant.
19 By Ms. Richardson:
20    Q. And we were talking about various
21 scenarios that might come up in the event that a
22 patient comes into a health center on a day when the
23 HIV specialist is there providing tests.
24       What if a patient comes in and is
25 already pregnant and asks to receive an HIV test,

Page 58

1 would the HIV specialist provide any other counseling
2 or options to that patient?
3       MR. WOLFSON: Objection.
4       THE WITNESS: The HIV testing specialist
5 would only provide the services that are stipulated
6 by the grant when the patient comes in to be HIV
7 tested. And those services just include HIV testing
8 intervention.
9 By Ms. Richardson:
10    Q. And so literally just giving the -- the
11 rapid HIV test that you mentioned earlier?
12    A. Correct.
13    Q. Would there be any other protocols or
14 policies that the HIV specialist would need to comply
15 with with respect to the patient that comes in?
16       MR. WOLFSON: Objection to the form. Go
17 ahead.
18       THE WITNESS: Any other protocols from
19 where?
20 By Ms. Richardson:
21    Q. Any other PPGOH protocols for patient
22 services or any other protocol that she would need to
23 follow in treating the patient who comes in to
24 receive the HIV testing.
25    A. The protocols that she is -- that the

Page 59

1 specialist is operating under are -- for the patient
2 are aligned with the protocols that Planned
3 Parenthood has when seeing a client.
4       So the HIV testing specialist will have
5 to follow patient confidentiality, for instance, that
6 it's already stipulated in the grant and that Planned
7 Parenthood stipulates.
8    Q. Thank you. Now I'd like to ask about a
9 different scenario. If you know, if a patient is
10 receiving services in the health center, are there
11 circumstances under which that patient might be
12 referred over to the HIV testing specialist?
13    A. So I have not encountered that
14 situation. But if a patient says that they will
15 require that HIV testing, the health center will
16 provide them with the options of where they can get
17 tested.
18    Q. And outside of the HIV testing
19 specialist that we have been talking about, are there
20 other employees within the PPGOH health center who
21 would be able to provide HIV testing to a patient
22 receiving services?
23       MR. WOLFSON: Objection. I just want to
24 say I think that the issue that happens in the health
25 centers is more in Ms. Singhaus' domain, but go

Page 60

1 ahead.
2       MS. RICHARDSON: Thank you.
3 By Ms. Richardson:
4    Q. Go ahead and answer.
5    A. To my knowledge the health center
6 division that I have not a lot of knowledge of, does
7 provide HIV testing for fees that patients can
8 receive, if they have health insurance or some type
9 of health insurance, or they pay out-of-pocket.
10    Q. And so how do you determine as an
11 organization who would be eligible to receive the
12 free testing from the HIV testing specialist versus
13 the other HIV testing that would be offered in a
14 health center?
15    A. If the client falls within the guidance
16 of the grant, that is the population that the grant
17 is targeting.
18    Q. And so let's go outside of the day when
19 the HIV specialist is present in the health center.
20 Let's say a patient is in receiving services and asks
21 to receive HIV testing.
22       Would there be an analysis done as to
23 whether the person would qualify for the free HIV
24 testing that the specialist would provide?
25       MR. WOLFSON: Same objection.

By Ms. Richardson:

1  By Ms. Richardson:
2      Q.  If you know.
3      A.  Really I don't know what the health
4  center side will do in that scenario.
5      Q.  And so I want to move ahead to -- I
6  think you indicated previously that this was one of
7  the programs that you believe would be impacted by
8  the law that's challenged in this case, correct?
9      A.  Correct.
10     Q.  What is your understanding of the ways
11 in which the law will impact this program?
12     A.  According to the letter we received from
13 the Canton Health Department stating that they will
14 not be able to partner with us due to this law, that
15 means that we will have to let go or terminate
16 employment of the HIV testing specialist as her
17 salary is allocated to this grant.
18     Q.  Are there other steps that you either
19 have or plan to take if the law takes effect with
20 respect to the HIV Prevention Program we have been
21 describing?
22     A.  The one in Canton?
23     Q.  Again, yes, we'll focus specifically on
24 Canton first.
25     A.  Other steps, what do you mean by that?

1  In what direction?
2      Q.  So you indicated that you would have to
3  terminate the employment of the HIV testing
4  specialist.
5      A.  Correct.
6      Q.  Are there other actions that you would
7  need to take in the event that the law you're
8  challenging actually takes effect?
9      A.  We haven't taken any other actions.
10     Q.  Do you have plans in place to take any
11 other actions going forward in the event that the law
12 takes effect?
13     A.  Besides terminating employment of that
14 person?
15     Q.  Uh-huh.
16     A.  No.
17     Q.  And so in the event that the law takes
18 place would you still be offering HIV testing in
19 events that are offered by your various community
20 partners?
21     A.  No.
22     Q.  Would you still offer HIV testing in
23 your health centers?
24         MR. WOLFSON:  Objection.
25 By Ms. Richardson:

1      Q.  To the extent that you know.
2      A.  The Education and Outreach department
3  will not be providing free HIV testing at our health
4  centers.
5      Q.  And you don't know the extent to which
6  the health centers would otherwise continue providing
7  HIV testing outside of this program, is that fair?
8      A.  Outside of this program, I don't know
9  what the health center protocol -- the health center
10 services will be after this.
11     Q.  And it's your understanding that that is
12 something that Ms. Singhaus would be able to testify
13 about later today?
14     A.  Correct.
15     Q.  Thank you.  So we have talked about
16 Canton specifically.  And I think you mentioned two
17 other areas in which you have grants under this HIV
18 Prevention Program; is that correct?
19     A.  Correct.
20     Q.  And one is, I think, the greater
21 Cleveland area; is that correct?
22     A.  Correct.
23     Q.  Are there ways in which the services you
24 offer under the program in greater Cleveland differ
25 from what you've just described for Canton?

1      A.  The only difference is the extension of
2  the program.  In Cleveland we provide a program in
3  the community like in Canton, the free HIV testing in
4  the community like in Canton, but in the greater
5  Cleveland area we provide it at three health centers
6  rather than just one.  So that is the only
7  difference.
8      Q.  And what are those three health centers?
9      A.  It's -- sorry, it's four of them.  They
10 are called the Cleveland Health Center located in the
11 City of Cleveland, the Rocky River Health Center also
12 located in the City of Cleveland, the Old Brooklyn
13 Health Center also located in the City of Cleveland,
14 and the Bedford Heights family planning center
15 located in Bedford Heights, Ohio.
16     Q.  And do you also have HIV testing
17 specialists that provide services under the grant in
18 the greater Cleveland area?
19     A.  The same as in the Canton area, they are
20 specific for -- we have HIV testing specialists
21 specific in that area.
22     Q.  And how many testing specialists do you
23 have in the greater Cleveland area?
24     A.  We have three of them.
25     Q.  And is there any particular division of

1  their responsibilities in terms of coverage areas or
2  other divisions?
3      A.  It's more coverage area, so they are
4  assigned to health centers in communities that are
5  divided for their easy access to.
6      Q.  And are the salaries of these three
7  health specialists in the greater Cleveland area also
8  provided by the grant, itself?
9      A.  Correct.
10     Q.  Does the grant pay entirely for the
11 salaries of these three individuals?
12     A.  Not for all three of them.
13     Q.  And so in other words, PPGOH would
14 directly pay for salaries of at least some of these
15 employees?
16     A.  For some allocation of the salaries of
17 two of them, yes.
18     Q.  Of two of them.  And can you describe
19 what that allocation would be between PPGOH and the
20 grant?
21     A.  In one instance one employee is --
22 salary is allocated at 90 percent to the HIV testing
23 grant and ten percent to another grant.
24     Q.  Which grant?
25     A.  Our Title 10 grant.

1      Q.  Okay.
2      A.  In another instance half of an
3  employee's salary allocation is to the health
4  services grant, and the other one is -- the other
5  half, the other 50 percent is to a private foundation
6  grant.
7      Q.  Okay.
8      A.  And the third employee is a hundred
9  percent HIV testing.
10     Q.  And with respect to the greater
11 Cleveland area, in the event that the law that's
12 being challenged here takes effect, what steps would
13 you take with respect to the HIV testing
14 prevention -- the HIV Prevention Program in greater
15 Cleveland?
16     A.  Same as Canton.
17     Q.  And specifically does that mean then
18 that you would terminate an employee?
19     A.  We'll terminate the employee that is at
20 a hundred percent allocated.  We have taken steps to
21 allocate the employee that is 50 percent/50 percent
22 to another grant -- a different grant to do other
23 type of work, and the same thing with the employee
24 who is at 90/10 split.
25     Q.  And so you've determined that for the

1  50/50 employee you would be able to provide that 50
2  percent funding that is currently provided into the
3  HIV Prevention Program with another grant, am I
4  understanding that correctly?
5          MR. WOLFSON:  Objection to the form.
6  Did you understand the question?
7          THE WITNESS:  Yes.  If we get the -- if
8  that other 50 percent that was originally allocated
9  from the free HIV testing grant, that we identified
10 another grant that covered this person's salary?
11 By Ms. Richardson:
12     Q.  Yes, that's a much better way to ask
13 that question.  Thank you.
14     A.  To do other work, not HIV related, yes,
15 the answer is yes.
16     Q.  And for the person who was 90 percent/10
17 percent, have you also then determined an alternate
18 source of funding to offset what was previously
19 provided under the HIV prevention grant?
20     A.  An alternate source to do different
21 work, yes.
22     Q.  Any other steps you would take with
23 respect to the HIV Prevention Program in the greater
24 Cleveland area in the event that the law takes
25 effect?

1      A.  We will notify our partners that we
2  won't be able to keep providing free HIV testing.
3      Q.  The community partners in the greater
4  Cleveland area?
5      A.  Correct.
6      Q.  Thank you.  Any other differences with
7  respect to the way the program works in the greater
8  Cleveland area as compared to the Canton program that
9  you've just described?
10     A.  No.
11     Q.  And so I think the last area in which
12 you provide services under the HIV Prevention Program
13 is the Summit area; is that correct?
14     A.  That's correct.
15     Q.  Summit County?
16     A.  Correct.
17     Q.  And are there ways in which the services
18 you offer in Summit County differ from what you've
19 already described with respect to Canton and
20 Cleveland?
21     A.  No.
22     Q.  Are there HIV testing specialists
23 specifically designated for the Summit County area?
24     A.  One, yes.
25     Q.  And so is it fair to say that there are

Diego Espino, Barbara Singhaus and Iris Harvey

Page 69

1 a total of five HIV testing specialists that provide
2 services under the HIV Prevention Program?
3     A.  Correct.
4     Q.  And how is the specialist in Summit
5 County -- how is his -- is it a her?
6     A.  Her.
7     Q.  How is her salary funded?
8     A.  A hundred percent by the HIV testing
9 grant.
10     Q.  And in the event that the law that's
11 being challenged takes effect, what steps will you
12 take with respect to the provision of services in
13 Summit County?
14     A.  The specialist -- employment of the
15 specialist will be terminated, services will not be
16 provided.
17     Q.  And so is it fair to say that a total of
18 three employees, three HIV testing specialists, will
19 be terminated in the event that the law takes effect?
20     A.  Yes.
21     Q.  Do you know whether any of these three
22 employees have been hired, or whether there's an
23 agreement to hire any of these employees by another
24 provider?
25     A.  No.

Page 70

1     Q.  And now I believe with respect to Summit
2 County specifically, in some of your interrogatory
3 responses you mentioned that Summit County has
4 already entered into an arrangement with another
5 provider; is that correct?
6     A.  We were informed of that, yes.
7     Q.  And can you describe your understanding
8 of what that arrangement is?
9     A.  On May 24th, the day after the TRO was
10 granted, our HIV testing specialist went to the
11 Summit County Health Department to pick up HIV
12 testing kits to continue her work, and she was
13 informed that another entity was already being given
14 the contract that we had the day before, and that we
15 couldn't -- that she couldn't pick up testing kits.
16     Q.  And so is it your understanding that
17 that this contract entirely covers the services that
18 PPGOH previously provided under the Summit County HIV
19 Prevention Program contract?
20     A.  I really can't say what the contract is,
21 all I can tell is what I just described, that our
22 testing specialist was turned away.
23     Q.  And so is it fair to say that currently
24 PPGOH is not offering any of these HIV prevention
25 services in the Summit County area?

Page 71

1     A.  That is correct.
2     Q.  Your understanding, that's being
3 provided by another provider with whom Summit has
4 contracted?
5     MR. WOLFSON:  Objection.
6     THE WITNESS:  I don't know if that other
7 entity has already started to provide the services.
8 What I know is that what I just described, that our
9 testing specialist was told that the contract went to
10 another entity, but I don't know if that entity has
11 already started providing services.
12 By Ms. Richardson:
13     Q.  Thank you for that clarification.
14     And is the testing specialist for Summit
15 County still employed by PPGOH?
16     A.  Yes, currently she is still employed by
17 PPGOH.
18     Q.  And how is her salary being funded
19 currently now that the contract is no longer in place
20 with PPGOH?
21     A.  At this point her salary is being
22 absorbed by PPGOH's funds as we were waiting to hear.
23     Q.  And are there other grants that could
24 provide -- that could cover her salary in the event
25 that the law takes effect?

Page 72

1     A.  At this point all grants have been
2 identified that could match her skills.
3     Q.  And so at what point would she be
4 terminated?
5     MR. WOLFSON:  Objection.  Go ahead.
6 By Ms. Richardson:
7     Q.  And I can clarify.  My understanding
8 from your previous testimony was that if this law
9 takes effect, this particular employee would need to
10 be terminated.  Did I understand that correctly?
11     A.  That's correct.
12     Q.  And so currently the contract with
13 Summit County has already been terminated, correct?
14     A.  The original contract has been
15 terminated.
16     Q.  And so right now PPGOH is not receiving
17 any funding for the salary of the specialist in
18 Summit County under the grant; is that correct?
19     A.  No.  We were informed two weeks ago by
20 Summit County Health Department that they had
21 identified a different source of funding for us to
22 continue providing HIV testing, for this specialist
23 to continue providing HIV testing -- free HIV
24 services starting July 1st.
25     Q.  Starting July 1st.

18  (Pages 69 to 72)

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Page 73

1    A.  However, that process had to go through
2  their board, and we have not heard since, I want to
3  say July 1st, since last Friday.  We have not heard
4  from them.
5    Q.  And so the plans that you mentioned to
6  terminate this employee in Summit County, when would
7  you implement those?  When would she be terminated?
8    A.  So those plans, we had originally
9  planned to terminate all affected employees on that
10  Monday, May 23rd, if the TRO was not granted.
11  Because the TRO was granted those positions have just
12  been on hold until we hear more from the result of
13  this case.
14        In this particular case we were waiting
15  to hear from Summit County Health Department about
16  this alternate -- alternative source of funding to
17  have the testing specialist go back to continue doing
18  the work that she did.
19    Q.  And so assuming that the contract that
20  Summit County has entered into with this alternate
21  provider takes effect on July 1st, at that point in
22  time PPGOH would no longer be providing services in
23  Summit County, correct?
24    A.  No, the contract that I -- the contract
25  that I was referring to that we heard from Summit

Page 74

1  County through the situation I described, according
2  to what they said was that contract, they signed on
3  May 23rd.
4        What I was referring to as July 1st was
5  another contract they were going to give to us on
6  July 1st to continue the HIV testing program.
7    Q.  Okay.  So maybe we could step back for a
8  minute.  I apologize because I think I'm getting
9  confused.
10        So historically you -- you've described
11  the services that you provided in Summit County under
12  the HIV Prevention Program, correct?
13    A.  Correct.
14    Q.  And as of May 23rd Summit County entered
15  into a contract with a different provider, correct?
16    A.  Correct.
17    Q.  And at that point in time PPGOH stopped
18  providing HIV prevention services in Summit County,
19  correct?
20    A.  Correct.
21    Q.  And so currently PPGOH is not providing
22  services in Summit County?
23    A.  Correct.
24    Q.  And so recently you received an
25  indication that you might receive a contract

Page 75

1  effective July 1st from Summit County?
2    A.  Correct.
3    Q.  And what services would you be providing
4  under that contract?
5    A.  The same exact services; free HIV
6  testing program.
7    Q.  And so is it your understanding that
8  Summit County would cancel the contract that it's
9  currently under with the alternate provider, or would
10  this be in addition to that contract?
11    A.  It would be in addition to that
12  contract.
13    Q.  And so would the amount of funding that
14  PPGOH receives under that grant differ from what it
15  received previously?
16    A.  From the notice we got from the Health
17  Department, would be -- the amount of that contract
18  would be the exact amount that was left from the
19  previous contract.
20    Q.  And so would this be a contract under
21  the HIV Prevention Program that we have been
22  discussing, or would it be a different grant source?
23    A.  That I have no information.  What
24  they -- the information they provided to us was it
25  was to continue the HIV testing program, but they

Page 76

1  didn't disclose what source of -- that came from.
2    Q.  Okay.  And so in the event that that
3  contract comes through, would you still terminate the
4  employee -- the HIV prevention specialist in Summit
5  County?
6    A.  No.
7    Q.  And if that contract does not go
8  through, is it your intent to terminate that
9  employee?
10    A.  Correct.
11    Q.  And when would that termination take
12  place?
13    A.  As soon as we hear from -- as soon as we
14  hear from them what the plans are to implement or not
15  implement the contract, and also when we hear from
16  the result of this case.
17    Q.  Okay.  Go ahead.
18    A.  No, that's it.
19    Q.  And I want to talk a little bit about
20  the financial information related to the HIV
21  Prevention Program.  And does it make sense to break
22  these down by the three regions that you've talked
23  about, or can we talk about it as a whole?
24    A.  We can do both.  It will depend on your
25  question.

19  (Pages 73 to 76)

Page 77

1    Q.  Okay.  Well, let's start with the Canton
2  grant.  How much money do you receive through the HIV
3  prevention grant in Canton -- in the Canton area?
4    A.  That is about 18,000 -- it's about
5  $18,000.
6        MR. WOLFSON:  Is there a time frame on
7  that?
8        THE WITNESS:  For calendar year
9  starting -- the current grant is calendar year
10  starting January 1st of this year.
11  By Ms. Richardson:
12    Q.  January 1st of 2016?
13    A.  2016 to December 31st, 2016.
14    Q.  Thank you.  And what expenses are
15  associated with operating the HIV Prevention Program
16  services that you've described in Canton?
17    A.  Salaries and office supplies.
18    Q.  And what is the total amount of expenses
19  that PPGOH would -- what's the total amount of
20  expenses associated with this program for PPGOH?
21        MR. WOLFSON:  Objection to the form.
22        THE WITNESS:  Yeah, I'm trying to
23  understand your question.  The total expenses for the
24  person that is providing the program?
25  By Ms. Richardson:

Page 78

1    Q.  No.  So basically do you break down your
2  revenues or profits or financial information by
3  program?
4    A.  We do -- we do submit a budget, a
5  program budget, when we submit the grant proposal
6  when we compete for the grant.
7        In the case of Canton the program -- HIV
8  testing program in Canton, it's all dependent on this
9  grant.  So everything that is done under that -- the
10  program, it's paid by this grant.
11    Q.  Okay.  So I think I understand that.
12  Let me just make sure that I understand.  So you
13  mentioned that you pay salaries and there are office
14  expenses?
15    A.  Sorry.  Office supplies.
16    Q.  Office supplies.  Thank you.
17        Does the amount of the grant fully cover
18  the cost of salaries and office supplies for PPGOH?
19    A.  For that person that is doing the
20  testing, yes.
21    Q.  And you clarified for the person that is
22  doing the testing.  Are there expenses not related to
23  the person who is doing the testing associated with
24  operating the program?
25    A.  I only clarify because you said -- you

Page 79

1  asked if it covers salaries and expenses for PPGOH,
2  so I didn't know if you were saying for the whole
3  agency.  So no, it -- the expenses that the program
4  has are all paid by this grant, yes.
5    Q.  Do you receive any revenues beyond what
6  the expenses are?  In other words, do you make a
7  profit off of operating the HIV Prevention Program?
8    A.  No.  In fact, we actually don't allocate
9  office space -- when you mentioned office, that's
10  what came to my mind.  We don't allocate office space
11  or rental of equipment or anything that the
12  specialist uses to this grant.
13    Q.  And so if you factored in those expenses
14  as well, is it fair to say that it actually costs
15  PPGOH more to operate the HIV Prevention Program than
16  it receives from the grant?
17        MR. WOLFSON:  Objection.
18        THE WITNESS:  I don't -- I cannot
19  quantify it because I don't know if there's a formula
20  to come up with all of the expenses.  So I really
21  can't quantify to say yeah, there's much more money
22  or less money.
23  By Ms. Richardson:
24    Q.  But you can say that you don't operate
25  at a profit, so looking at Canton specifically, the

Page 80

1  $18,000, none of that is left over after you paid for
2  the expenses associated with the program, is that
3  fair?
4    A.  That's correct.
5    Q.  What about with respect to Cleveland
6  city?  Is it Cleveland city or is it the greater
7  Cleveland area?
8    A.  It's funded by the City of Cleveland,
9  but it does work in the greater Cleveland.  So
10  outside the city limits.
11    Q.  Thank you for that clarification.
12        And how much money comes in through that
13  grant?
14    A.  That's about -- for this same calendar
15  year on January 1st, 2016, December 31st, 2016, it's
16  about $75,000.
17    Q.  And what expenses are associated with
18  the HIV prevention services that you offer in the
19  greater Cleveland area?
20    A.  Salary, office supplies, and mileage.
21    Q.  And I think you already mentioned that
22  the grant does not completely cover the salaries of
23  the HIV specialists who work under the program; is
24  that correct?
25    A.  That's correct.

Page 81

1    Q.  And then you mentioned office supplies.
2  And what was the other source of expense?
3    A.  Mileage reimbursement.
4    Q.  And what does that refer to?
5    A.  So when a testing specialist goes from
6  one testing site to another testing site, to another
7  one, they get reimbursed for the mileage they incur
8  during that travel.
9    Q.  Is that something -- would the Canton
10  HIV specialist also receive mileage reimbursement?
11    A.  That grant doesn't have the funds to
12  cover for that.
13    Q.  Okay.  And so with respect to office
14  supplies, mileage reimbursement, does the -- is the
15  grant sufficient to cover those expenses?
16    MR. WOLFSON:  Objection.
17    THE WITNESS:  Can you repeat the
18  question?
19  By Ms. Richardson:
20    Q.  Can you quantify the amount of expenses
21  associated with office supplies and mileage
22  reimbursement for the HIV Prevention Program in
23  greater Cleveland?
24    A.  I don't have it memorized.  It is part
25  of the program budget that was provided.

Page 82

1    Q.  And my question then was is the $75,000
2  that comes in through the grant sufficient to
3  coverage the mileage reimbursement and office
4  supplies associated with that program?
5    A.  It covers what it's allowed to spend on
6  that program.
7    Q.  Are there other expenses that PPGOH
8  would have in operating the program that it pays for
9  through other funds or sources?
10    A.  No.
11    Q.  And so apart from the salaries you
12  mentioned where PPGOH has to contribute some
13  additional amount to pay for the salaries of the HIV
14  services, are there other expenses associated with
15  the HIV Prevention Program that PPGOH would pay for
16  outside of the grant?
17    MR. WOLFSON:  Objection.
18    THE WITNESS:  It would be the same as
19  with the Canton occupancy or office space equipment.
20  By Ms. Richardson:
21    Q.  And can you quantify those expenses?
22    A.  No, unfortunately.
23    Q.  Is that something you would document or
24  record?
25    A.  No.

Page 83

1    Q.  And then finally with respect to the
2  Summit County area, same question.  What is the
3  amount of the grant?
4    A.  It's $22,000 for the same grant cycle,
5  January to December, and that grant is a hundred
6  percent salaries, salary of the person.
7    Q.  And so then how do you pay for the
8  office supplies and other expenses that you might
9  experience in operating the program?
10    A.  They would have to come out of Planned
11  Parenthood's budget.
12    Q.  And do you know the amount of expenses
13  that Planned Parenthood pays for in the Summit County
14  area?
15    A.  No.
16    Q.  Is that a number that you would document
17  or record somewhere in your financial documents?
18    A.  No.
19    Q.  So is it fair to say then that for
20  Summit County, certainly the expenses associated with
21  operating the HIV Prevention Program exceed the
22  amount that comes in through the grant, is that fair?
23    MR. WOLFSON:  Objection.
24    THE WITNESS:  Because we don't have it
25  quantified, I really can't tell you yes or no because

Page 84

1  I don't have evidence.
2  By Ms. Richardson:
3    Q.  But one hundred percent of the $22,000
4  that comes in goes to the salary?
5    A.  Salary.
6    Q.  And Planned Parenthood has to pay for
7  the equipment and the other materials that are
8  associated with operating that program, correct?
9    A.  That is correct, yes.
10    Q.  I want to move now to the PREP program.
11    A.  Okay.
12    Q.  And can you describe for me just
13  generally what services PPGOH offers under the PREP
14  program?
15    A.  Okay.  Trying to summarize it.
16    Q.  Sure.  I know it's a tough question.
17    A.  Under this grant the PREP program --
18  it's basically a program created to provide services
19  for the PREP that is ODH -- Ohio Department of
20  Health program.
21    Under that grant we provide services to
22  professionals and youth in the juvenile justice
23  system and foster care system.  They are provided
24  with an ODH curricula -- ODH -- they are provided by
25  an ODH provided curricula on comprehensive sex

1   education, and three adulthood preparation topics.
2   So that's what that is.
3      Q. And what are the three topics?
4      A. So healthy relationships, job readiness,
5   and career development.
6      Q. And apart from the ODH curriculum that
7   is established by the department, does PPGOH provide
8   any of its own materials or does it make any
9   additions or changes to the curriculum?
10     A. No, we can't. It's prohibited by the
11   grant.
12     Q. And in the course of operating these
13   training programs would you distribute any materials
14   from PPGOH or any other information to -- to the
15   attendees or participants?
16     A. Aside from the ones provided -- approved
17   by the Ohio Department of Health?
18     Q. Correct.
19     A. No.
20     Q. And what geographic areas do you cover
21   with respect to the PREP program?
22     A. We cover three areas. The State has
23   divided -- the Ohio Department of Health has divided
24   the State in nine PREP -- they call it PREP
25   territories, or PREP regions. And we are in three of

1   those regions.
2      We are the sole provider of PREP in
3   Region 4, which is 14 counties in southern Ohio. We
4   are a provider in Region 7 which incorporates
5   counties in the northern part of Ohio. Our
6   responsibility is to cover the Cuyahoga County within
7   that region.
8      And then we cover PREP Region 8 which
9   incorporates -- there are several counties, but we're
10   responsible to provide PREP in Summit County.
11     Q. Thank you. And how many employees
12   within PPGOH would provide services under the PREP
13   program?
14     A. Point-five -- FDR half -- 50 percent of
15   an employee for Region 7, 50 percent of an employee
16   for Region 8, and two employees for
17   Region 4.
18     Q. Where are these employees housed
19   normally?
20     A. They are located -- they are located --
21   they are located in our health centers in the
22   northern regions, in Akron and Bedford Heights, and
23   then in southern Ohio some of them are located --
24   they work remotely from their homes, or they commute
25   to one of our offices either in Athens, Ohio or

1   Columbus, Ohio.
2     Q. And did you say in Athens?
3     A. Correct.
4     Q. And in the event that the law that's
5   being challenged here takes effect, what steps do you
6   intend to take with respect to the PREP program?
7     A. Again, unfortunately we'll have to
8   terminate the employment of the two employees in
9   Region 4.
10     Q. And these would be the two employees who
11   are one hundred percent devoted to the PREP program?
12     A. Yes. And then for the past six months
13   the one -- we had one employee whose time was divided
14   equally 50 percent-50 percent to Region 7 and Region
15   8, which meant a hundred percent of the employee's
16   time was to PREP from different PREP regions, but one
17   employee. Unfortunately that person resigned in
18   anticipation of this, so we basically would just not
19   be able to rehire.
20     Q. And you said that -- did you say it was
21   a she?
22     A. Yes.
23     Q. You said that she resigned in
24   anticipation of this. What do you mean by that?
25     A. In her letter of resignation she

1   stipulated that she -- the uncertainty of where this
2   case was going was not something in her benefit, and
3   did not want to leave under that uncertainty and she
4   looked for other employment opportunities.
5     Q. And she left voluntarily?
6     A. Yes.
7     Q. What is the amount that PPGOH receives
8   pursuant to the PREP grants?
9     A. For Region 4, for one grant cycle, which
10   is August 1st -- the current one is August 1st of
11   2015 to July 30 or 31st of 2016, it's about $166,000.
12     For Region 7 it's same grant cycle, it's
13   17,000 to 18,000. And for Region 8 it's 23,000;
14   about 23,500, I think.
15     Q. And what expenses are associated with
16   operating the PREP program?
17     A. Salaries -- mainly salaries, mileage
18   reimbursement -- we call it travel expenses --
19   mileage reimbursement, office supplies.
20     In the PREP grant as authorized by the
21   Ohio Department of Health, it also allocates a
22   portion of the grant to incentives for the program
23   participants, so that's a big part of it.
24     Q. And what is the total amount of the
25   expenses that you've just identified?

Page 89

1    MR. WOLFSON:  Objection.
2    THE WITNESS:  Per grant?
3 By Ms. Richardson:
4    Q.  We can do it per grant or if there's a
5 total amount.
6    A.  Yeah, I would just -- I can't -- I
7 believe we provided the program budgets for all of
8 them.  I can't recall exactly what they are.
9    Q.  And so we can break it down by each one
10 of these.  So you said it's Area 4, Area 7, and I'm
11 sorry, what are the other areas?
12    A.  Area 8.
13    Q.  And so with respect to Area 4,
14 understanding that you don't know the exact amount,
15 but ballpark, what would be the cost of the expenses
16 that you've just identified related to operating PREP
17 in Area 4?
18    A.  So again, I don't know the exact amount
19 of, you know, mileage, how many mileage, how much of
20 that.
21    Q.  Sure.
22    A.  It's -- again, it's in the program
23 budget approved by the Ohio Department of Health, so
24 I can't recall, really, the exact amount.
25    Q.  And again, we can do it by area if

Page 90

1 that's easier for you, but do the expenses exceed the
2 amount of money that comes in to PPGOH through the
3 grant?
4    MR. WOLFSON:  Objection.
5    THE WITNESS:  Do you mean do we get more
6 grants than what we spend to provide the program?
7 By Ms. Richardson:
8    Q.  So I asked the exact opposite of that.
9 Do the costs that you bear exceed the amount that
10 comes in from the revenue?  In other words, are there
11 expenses that Planned Parenthood has to pay for
12 outside of what it receives from the grant?
13    A.  To my knowledge in those grants, no.
14 The expenses are very on par with the funding.
15    Q.  So essentially it's a wash, is that
16 fair?
17    MR. WOLFSON:  Objection.
18    THE WITNESS:  It's even, yes.
19 By Ms. Richardson:
20    Q.  It's even?
21    A.  Yes.
22    Q.  And so you're not bringing in more money
23 from the revenue than what you're spending?  You
24 don't have any left over from the grant after you've
25 operated the program, is that fair?

Page 91

1    A.  In the current year we haven't had any
2 leftover funding.
3    Q.  Have there been years where you've had
4 revenues left over that were not spent on the
5 program?
6    A.  There was -- if I recall correctly,
7 three years ago there was some left over that had to
8 be returned to the Ohio Department of Health.
9    Q.  Do you know what the amount of that
10 excess was?
11    A.  I don't know the exact amount, no.
12    Q.  And was the entire amount of the excess
13 returned to the Department of Health?
14    A.  Yes.
15    Q.  And outside of that year you don't
16 recall any other time where you had excess left over?
17    A.  I would like to clarify when I said
18 returned to the Department of -- Ohio Department of
19 Health.  Because these are reimbursable grants, truly
20 there was no return of it, you only bill for what you
21 expend.  So we just didn't spend the amount that we
22 were allowed to spend.
23    Q.  Thank you.  So you just essentially
24 never collected that amount?
25    A.  Yeah.

Page 92

1    Q.  That makes sense.  Thank you.
2    And then similarly looking back over,
3 we'll say the last five years, do you recall any
4 years where the total amount of the expenses exceeded
5 what was brought in through the grant?
6    A.  No, I don't recollect any.
7    Q.  I want to turn now to the Healthy Moms,
8 Healthy Babies Program, and I think we said earlier
9 that that is also the same thing as the OIMRI
10 program; is that correct?
11    A.  That's correct.
12    Q.  Can you describe the services that PPGOH
13 offers through -- we'll call it the healthy moms,
14 healthy babies program?
15    A.  Yes.  So under the OIMRI, PPGOH operates
16 infant mortality prevention initiatives under the
17 name Healthy Moms, Healthy Babies, but following all
18 of the protocols of the OIMRI grant.  So the grant,
19 itself, tells you exactly what you need to be doing
20 with the clients.
21    In this case it's safe sleeping
22 education, safe eating education, referral services
23 to the clients, help with job placement.
24    It is, in essence, a case management
25 program in which the clients are with -- assigned to

Page 93

1  one of our staff members for the period of -- they
2  can be with -- with the program from the moment they
3  are pregnant up to the time when their child turns
4  two years old.  So again, it's a case management.
5      Q.  And historically how many employees has
6  PPGOH hired that worked on the OIMRI program?
7      A.  When we are at full capacity we employ
8  nine employees, a hundred percent allocated to -- a
9  hundred percent of their salary allocated to this
10  grant.
11     Q.  And you mentioned when you're at full
12  capacity, has there been times -- and again, we'll
13  look over the last five years, where you were not at
14  full capacity?
15     A.  Currently we in one of the areas -- we
16  have not been able to replace one position.
17     Q.  And so you have eight employees
18  currently, is that --
19     A.  That's correct.
20     Q.  And I think you testified earlier that
21  these services are primarily provided in the Mahoning
22  and Trumbull County areas, is that correct?
23     A.  Correct.
24     Q.  Do the staff members that provide
25  services under OIMRI provide any other services or

Page 94

1  functions for PPGOH?
2      A.  No.
3      Q.  Where are they housed?
4      A.  Four of them are housed at our
5  administrative offices in Youngstown, Ohio, which is
6  Mahoning County, and three of them are housed in our
7  health center in Cortland, Ohio, which is Trumbull
8  County.
9      Q.  And in the event that the law you're
10  challenging takes effect, what steps do you expect to
11  take with respect to the OIMRI program?
12     A.  Their employment will be terminated.
13     Q.  And do you have an understanding as to
14  whether there was an arrangement for the Mahoning
15  County Health Department to directly employ the
16  employees who were previously employed by PPGOH?
17     A.  My understanding was that our Healthy
18  Moms, Healthy Babies Program manager, the person that
19  oversees that small group, had conversations with
20  Mahoning County Board of Health about the possibility
21  of them employing those staff members.
22        My understanding was also that as we got
23  close to the May 23rd hearing she was told by the
24  County that they were going to post the positions to
25  the -- they had to post the positions to the general

Page 95

1  public, so our staff will have to apply for those
2  positions.
3      Q.  And in the event that the law takes
4  effect, would PPGOH be providing any of these OIMRI
5  services directly anymore?
6      A.  We will not be having an OIMRI program,
7  no.
8      Q.  The entirety of those services would be
9  provided by the Mahoning County Health Department
10  directly, correct?
11        MR. WOLFSON:  Objection.
12        THE WITNESS:  The -- my understanding is
13  that the Mahoning County Health Department will take
14  the contract themselves.  I don't know if they will
15  contract with another entity or if they will provide
16  the programs themselves; that, I don't know.
17  By Ms. Richardson:
18     Q.  Do you know -- and we'll look at the
19  most recent year first.  What is the amount of the
20  OIMRI grant that PPGOH received?
21     A.  The basic grant award is $150,000 for
22  each of the programs for one grant cycle year.
23     Q.  And you said for each program.  Does
24  that mean one for Mahoning and one for Trumbull?
25     A.  150,000 for Mahoning and 150,000 four

Page 96

1  Trumbull, yes.
2      Q.  And what expenses are associated with
3  operating the OIMRI program?
4      A.  Salaries, travel expenses, training
5  expenses, office supplies, and client incentives.
6      Q.  And can you quantify the amounts of
7  expenses associated with those that you just
8  described?
9      A.  No, I can't recall the exact amounts.
10     Q.  And can you give me just a ballpark, and
11  we'll look at the most recent year specifically?
12        MR. WOLFSON:  Objection.
13        THE WITNESS:  Yeah, I can't -- I can't
14  recall.  The salaries, of course, are the biggest
15  amount.  I will say mileage is probably the second
16  biggest amount.  Training, the third biggest.  Client
17  incentives -- so you see, I don't know how the exact
18  numbers -- because now I'm thinking client incentives
19  actually are higher than mileage requirement.
20  By Ms. Richardson:
21     Q.  So let's look at each one individually
22  then.  What is the amount that is attributed to
23  salary for the employees that work on the OIMRI
24  program?
25     A.  So again, I don't know the exact amount,

1    but it would be -- for instance, for Mahoning County
2    it would be three full-time employees' salaries, plus
3    half of the program manager's salary.
4        Q. And how much do they receive in salary?
5        A. It ranges from -- I can tell you the
6    hourly rate range. The hourly range, it's from 15 --
7    sorry, from $13 an hour to $19 an hour, depending on
8    skills and time of service -- length of service in
9    the organization.
10        There are some staff in that program
11   that have been doing that program with us for 19
12   years.
13        Q. And you don't recall what their yearly
14   salary would amount to?
15        A. The exact amount right now, no.
16        Q. That's something you would record,
17   correct?
18        A. It is in the program budget.
19        Q. That's submitted to the Department of
20   Health?
21        A. Correct.
22        Q. And are they paid any incentives or
23   benefits or amounts beyond what would be referenced
24   in the ODH budget?
25        A. That's a good question, because we have

1    been talking about salaries. And when I talk about
2    salaries I also -- I also include fringe benefits.
3    So if that's benefits that you're talking about,
4    unemployment, health insurance and all that, that's
5    incorporated into the salary.
6        Q. Into the salaries?
7        A. Yes.
8        Q. And so is the amount of the grant that
9    you receive enough to pay for the entire salaries of
10   the eight individuals that you've identified?
11        A. That's correct.
12        Q. And you don't -- Planned Parenthood does
13   not have to pay any additional amount beyond what the
14   grant covers?
15        A. That is correct.
16        Q. And what about with respect to travel
17   expenses, training expenses, office supplies, and
18   client incentives, does the grant cover all of those?
19        A. The grant covers all of them with the
20   exception of client incentives. Sometimes there's
21   not enough funding in the grant to buy enough client
22   incentives for the clients, and when there is an
23   opportunity and if there is extra funding available,
24   it is purchased to buy client incentives to give to
25   the clients such as diapers, baby formula, that some

1    in the community might donate to the program.
2        Q. And so these are costs then that Planned
3    Parenthood would pay for out of its own budget rather
4    than directly through the grant, correct?
5        MR. WOLFSON: Objection.
6        THE WITNESS: Not necessarily the
7    budget. It would be donations from the community.
8    By Ms. Richardson:
9        Q. But sources funding other than the
10   grant, is that fair?
11        A. Yes.
12        Q. And so is it fair to say then that the
13   costs associated with operating OIMRI exceed what
14   comes in through the grant in revenues?
15        MR. WOLFSON: Objection.
16        THE WITNESS: The cost of certain
17   aspects of the grant will -- we see if there are
18   other external sources, I will say that.
19   By Ms. Richardson:
20        Q. And --
21        A. Sorry. Sorry for interrupting. Because
22   we can run the program with the existing budget, it's
23   just external sources help with providing more
24   incentives to the clients.
25        Q. And so I want to just understand

1    financially. It's my understanding that this is one
2    area that you are prepared to talk about and would
3    have knowledge of, basically the overall costs and
4    revenues associated with these programs; is that
5    correct?
6        A. Yes.
7        Q. And so what I'm trying to understand is,
8    it sounds like there are costs associated with
9    operating OIMRI that are not entirely offset by the
10   revenues that come in through the grant, is that
11   fair?
12        MR. WOLFSON: Objection. Asked and
13   answered. Go ahead.
14        THE WITNESS: Yes.
15   By Ms. Richardson:
16        Q. And can you quantify just in a ballpark
17   what the amount of the costs that are not covered by
18   the grant would be?
19        A. No, because as I mentioned, it
20   completely depends on what the donation is that we
21   would just transfer to the client.
22        So one year it could be we got $50 in
23   diapers that we're just sending to the clients,
24   another year it could be more than that. So I can't
25   quantify it.

1     Q. So let's look specifically at 2015.
2 What would you quantify for that year the amount of
3 the expenses that were not covered by the grant?
4     A. I'm trying to in my head see if I can
5 recall that line item in the budget, or a donation.
6 The ballpark if I want to say is a thousand dollars.
7     Q. In 2016?
8     A. In incentives, yes.
9     Q. And what about any other expenses that
10 wouldn't be covered by the grant?
11     A. No.
12     Q. And what about for 2014?
13     A. I will say the same amount, or maybe
14 $1,500.
15     Q. And what about for 2013?
16     A. That, I don't recall having any
17 donations for incentives.
18     Q. Is it fair to say that the 1,000 to
19 $1,500 amount that you've offered would be sort of a
20 typical average of the expenses that exceed the
21 amount that comes in through the grant?
22     A. I'm sorry, I'm confused with the word
23 "expenses", because they are really not expenses. If
24 we had not had those donations for diapers, for
25 instance, we would not provide that -- those diapers

1 to the client, thus not being an expense. That's
2 what I'm a little bit confused.
3     Q. So is there a term that you feel more
4 comfortable using? It's an expense, it's an amount
5 that has to be paid, there's a cost associated?
6     MR. WOLFSON: Objection.
7     THE WITNESS: It's an amount -- it
8 doesn't have to be paid. If that amount is not there
9 to give to the client, then it's not given to the
10 client. So it doesn't have to be an expense.
11     If a private donor says here is $50
12 worth of diapers, then we take those diapers to the
13 client, but that's only in the case when that is
14 available. If it's not available, then there's no
15 expense. That's what I'm trying to explain.
16 By Ms. Richardson:
17     Q. Sure. Do you recall any year where the
18 amount that came in through the OIMRI grant exceeded
19 what you spent on the program?
20     A. No.
21     Q. I'd like to ask you for a moment about a
22 program called VAWA. That is a program that PPGOH
23 participates in?
24     A. No.
25     Q. Are there any other educational programs

1 that PPGOH offers that you believe are impacted by
2 the law that you're challenging in this case?
3     A. We have not received any letters from --
4 about the other programs other than these three, so
5 no.
6     Q. And going back now for a moment to the
7 OIMRI program, are there any grant funds that you use
8 directly to purchase incentive for the participants?
9     A. Yes.
10     Q. And how much in grant funding would you
11 devote to incentives?
12     A. Again, I don't recall the exact
13 percentage out of $150,000.
14     Q. Sure.
15     A. But as I was trying to recall from an
16 earlier question, it is -- besides salaries and
17 benefits, it's one of our biggest expenses.
18     Q. Can you give me just a ballpark range in
19 terms of thousands of dollars that would be devoted
20 to incentives?
21     A. And I've been trying to. I've been
22 trying to figure out and get a ballpark when you ask
23 me. I would say between 5,000 to $10,000.
24     Q. And would that be typical looking back
25 over the last five years, that it would be 5- to

1 10,000 of the grant devoted to incentives?
2     A. Yes.
3     Q. I want to move now to some of the
4 interrogatory responses that I believe you may have
5 assisted in preparing.
6     MR. WOLFSON: Could I take just a quick
7 break?
8     MS. RICHARDSON: Ten minute break?
9     (Recess taken.)
10 By Ms. Richardson:
11     Q. And so I'm going to hand you now what we
12 will mark as Exhibit 2, and I'll represent to you
13 that these are the responses from PPGOH to the
14 interrogatories in this case.
15     And feel free to take a moment to look
16 at that before we begin questioning. And just let me
17 know when you're ready.
18     A. Okay.
19     Q. And to begin, I will direct your
20 attention to Interrogatory No. 1 which appears on
21 Page 4. And it asks to identify each person
22 answering these interrogatories. And is your name
23 included among the individuals who participated in
24 completing these interrogatories?
25     A. It is.

Page 105

1    Q.  And did you in fact contribute to
2  preparing these responses?
3    A.  Yes.
4    Q.  What was your role in responding to
5  these interrogatories?
6    A.  I was collecting information in regards
7  to those three programs that we have been talking
8  about.
9    Q.  And so I want to take a look at a couple
10  of answers specifically, and if at any point we get
11  to an answer that you did not participate in or you
12  don't have knowledge about, just let me know.
13    And so I'd ask you to turn to request
14  No. 3, which begins on Page 10.  And that request
15  states, "Identify the bases, evidence, information,
16  sources, witnesses and any other support for your
17  allegation that Ohio Revised Code Section 3701.034
18  will cause you significant and irreparable harm, or
19  will have a devastating impact on you as alleged in
20  Paragraphs 8 and 67 of the complaint."  Did I read
21  that correctly?
22    A.  Yes.
23    Q.  And it appears that there are a series
24  of objections provided on Page 10, and the
25  substantive answer begins at the top of Page 11,

Page 106

1  would you agree with me on that?
2    MR. WOLFSON:  Objection.  Go ahead.
3    THE WITNESS:  I see more of that answer
4  on Page 11.
5  By Ms. Richardson:
6    Q.  And is this an answer that you would
7  have been involved in responding to -- or sorry.
8    Is this an answer that you would have
9  been involved in preparing?
10    A.  If you give me a second to review.
11    Q.  Sure.
12    A.  That is correct.
13    Q.  And it lists there, starting at the
14  second full paragraph on Page 11, the sentence that
15  says, "First, PPGOH will have to discontinue the PREP
16  program."  Did I read that correctly?
17    A.  Yes.
18    Q.  And I believe we have talked about that
19  already here today.  Any other ways in which the law
20  that's being challenged here would impact the PREP
21  program?
22    A.  Other than eliminating funding for that
23  program in its entirety, no.
24    Q.  And I believe you testified earlier that
25  PPGOH would continue to offer a number of different

Page 107

1  educational programs that are not impacted by the
2  statute that's being challenged here; is that
3  correct?
4    A.  For different populations, yes.
5    Q.  And a little bit further down it
6  mentions, "Second, PPGOH would no longer be able to
7  provide testing and treatment for sexually
8  transmitted diseases without charge to patients who
9  currently qualify under the STD Prevention Program."
10    It's my understanding that that is not a
11  program that you are prepared to talk about today,
12  but that will be covered by another witness later
13  this afternoon?
14    A.  That's correct.
15    Q.  And the same with respect to the breast
16  and cervical health services that are mentioned
17  there?
18    A.  Correct.
19    Q.  And so moving down to the third -- the
20  sense that beings with, "Third, PPGOH will have to
21  cease providing HIV testing under the HIV Prevention
22  Program."  And that is the HIV Prevention Program
23  that we have been discussing today, correct?
24    A.  That's correct.
25    Q.  And so is it fair to say that this

Page 108

1  answer is just describing what you detailed today,
2  which is that PPGOH will no longer be offering the
3  specific HIV testing services that it previously
4  offered under this grant, correct?
5    A.  Yes.
6    Q.  And I believe you testified earlier that
7  you don't know whether HIV testing will continue to
8  be offered through the health centers, correct?
9    A.  That's not under my area of expertise,
10  correct.
11    Q.  And that's something that another
12  witness would be able to talk about today?
13    A.  Yes.
14    Q.  And in making this statement here on
15  Page 11 of the interrogatory responses, you were only
16  referring specifically to the HIV testing that takes
17  place under the prevention program we have discussed
18  here today, correct?
19    A.  The free HIV testing, yes.
20    Q.  Turning to Page 12.  The first full
21  paragraph that begins -- states, "The following ten
22  positions were scheduled to be eliminated upon and as
23  a result of Section 3701.034 becoming effective."
24  Did I read that correctly?
25    A.  Correct.

1    Q.  And there are some positions identified
2  here.  Have we talked about all of these positions
3  already today?  Are these the same individuals that
4  you have referenced so far in our discussion today?
5    A.  We have talked about all of them.
6    Q.  And so it's fair to say that the
7  individuals that we have talked about are subsumed
8  within these ten positions that are identified here?
9    A.  That's correct.
10    Q.  I'd like to direct your attention to
11  Interrogatory No. 4, please, which is on Page 13.
12  And feel free to take a moment to review.
13    A.  Okay.
14    Q.  And specifically I'd like to ask you
15  about the sentence that begins with, "Additionally,"
16  in the second paragraph under the response to
17  Interrogatory No. 4.
18       It states, "Additionally, they created a
19  new organization chart for PPGOH's education
20  department to account for the changes in funding,
21  staffing, and programming that would result from
22  Section 3701.034."  Did I read that correctly?
23    A.  Yes.
24    Q.  What changes were made to the
25  organization chart?

1    A.  Basically the positions that are
2  outlined on Page 12 were taken from the Education and
3  Outreach department org. chart.
4    Q.  And so apart from those employees, were
5  there any other changes made to the organization
6  chart that are -- that's being referred to here on
7  Page 13?
8    A.  No.
9    Q.  And so I'd like you to take a moment and
10  just read the paragraph that begins on the bottom of
11  Page 13, and continues on to the first half of Page
12  14.  I'm going to ask you about parts of it, but we
13  won't be reading through the whole response.
14    A.  That paragraph refers to the STD testing
15  program, and I have no knowledge of that program.
16    Q.  And another witness will be prepared to
17  talk about that today?
18    A.  Correct.
19    Q.  Thank you.  And then I'd like to draw
20  your attention to interrogatory No. 5.  And again, it
21  refers to employees' positions that would likely be
22  terminated.  Are these positions all subsumed within
23  the positions that we have previously discussed?
24    A.  That's correct.
25    Q.  And so those would be the same ten

1  positions that were described in the prior answer, is
2  that fair?
3    A.  That is correct.  Yes.
4    Q.  And I'd like to direct your attention to
5  Interrogatory No. 7.  And please let me know if this
6  is not something that you can testify about.  And I
7  direct your attention to the top of page 17.  And it
8  says, "The PPGOH health centers in Columbus and
9  Cleveland that provide abortions do not provide
10  services funded through any of the programs
11  identified in Section 3701.034.  At those locations
12  as part of the abortion process PPGOH provides
13  medical evaluation and education to papers."  Do you
14  see that?
15    A.  Yes.
16    Q.  Were you involved in preparing the
17  response to that question?
18    A.  No.
19    Q.  Is that something that you have any
20  knowledge about, or would that be covered by another
21  witness today?
22    A.  It would be covered by another witness.
23    Q.  I'd like to ask you about Interrogatory
24  No. 10, which begins on the top of Page 18.  And it
25  asks, "For each fiscal year 2010 through 2015,

1  describe the annual revenues, expenses, and net
2  income or losses attributable to each of the services
3  you claim has been, is, or will be impacted by
4  Section 3701.034."  Do you see that?
5    A.  Yes.
6    Q.  And we have discussed some of that.  If
7  you look at the response, it refers to annual program
8  budgets from 2013 to 2015.  Are those the budgets
9  that you described earlier that are submitted to the
10  Ohio Department of Health?
11    A.  That is correct.  Either to the Ohio
12  Department of Health directly in some instances, or
13  indirectly to the subgovernment entity, which is a
14  local Health Department also outlined there.
15    Q.  Thank you.  And are there any program
16  budgets that PPGOH creates out of what is submitted
17  specifically to either ODH or the subrecipient, or
18  subgrantor?
19    A.  No, each of these programs had their own
20  budget where the grant is allocated.
21    Q.  Perfect.  And let me rephrase a little
22  bit.
23       So it's my understanding based on what
24  you've described today, that you submit a formal
25  budget to either ODH or the local health district

Page 113

1  that issues the grant, is that fair?
2      A. That's correct.
3      Q. And outside of what is formally
4  submitted in connection with the grant, does PPGOH
5  keep any internal budgets or financial documents that
6  would track revenues and expenses on a program basis?
7      A. Outside of those budgets? No, all of
8  our budgets are -- all of our expenses are allocated
9  to the specific budget of each of those grants.
10     Q. And in the case of -- there were a few
11  examples earlier that we discussed where there were
12  some expenses that Planned Parenthood pays directly
13  or through alternate sources of funding, correct?
14     A. Correct.
15     Q. Where would those be recorded? Those
16  would not be reflected in the budgets submitted in
17  connection with the grant, correct?
18         MR. WOLFSON: Objection.
19         THE WITNESS: They will -- they will not
20  be reflected in that budget, but they are not
21  recorded in any other budget. The budget that we
22  have for the program, it is basically the same exact
23  budget that we submitted with the grant proposal.
24  By Ms. Richardson:
25     Q. Okay. And so any other expenditures,

Page 114

1  would those be sort of subsumed within the
2  organization's overall expenses?
3      A. That is correct.
4      Q. Okay. Response to Interrogatory No. 13
5  begins on the top of Page 20. And the second
6  sentence there states, "None of the funds received
7  from each of the programs identified in Section
8  3701.034 contribute directly or indirectly to the
9  provision, performance, or promotion of abortion."
10  Do you see that?
11     A. Yes.
12     Q. And is that a statement you would agree
13  with?
14     A. Yes.
15     Q. And how do you know -- and we'll focus
16  specifically on the programs that you are talking
17  about, the educational programs.
18         How do you know that none of the funding
19  that comes in related to those programs directly or
20  indirectly contributes to the performance of
21  abortion?
22     A. So as I was mentioning before, each
23  expense for this these programs is immediately
24  allocated to that program and tracked to that program
25  through salary, expenses, purchases, or anything like

Page 115

1  that, will immediately be tracked to that. And the
2  education department and outreach has no connection
3  with our health provision services.
4      Q. And do you know whether -- are there
5  overarching protocols or policies in place that help
6  keep funds from these various programs separate from
7  the provision of abortion services?
8      A. What I can say is there are a lot of
9  systems in place for that type of funding not to be
10  allocated to different types of fundings, and the
11  next witness will be an expert in this subject.
12     Q. Thank you. And then I'd ask you to take
13  a look at interrogatory No. 15, and the interrogatory
14  is on Page 20, and the response begins on Page 21.
15     A. Okay.
16     Q. And interrogatory No. 15 asks you to,
17  "Identify any and all programs, services, or
18  activities that you contend you will not provide if
19  Section 3701.034 is implemented." Did I read that
20  correctly?
21     A. That's correct.
22     Q. And I believe we have covered all of the
23  items that are identified in your response to
24  interrogatory No. 15.
25     A. Correct.

Page 116

1      Q. And aside from what is listed here and
2  what we have talked about today, are there any other
3  services or programs that you contend you will no
4  longer be able to provide if the challenged law takes
5  effect?
6      A. We have not -- we have no inclination to
7  believe that there are other programs effected.
8      Q. So what's listed here in response to
9  interrogatory No. 15 would cover all of the programs
10  that you claim you will no longer be able to provide
11  if the law takes effect, is that fair?
12         MR. WOLFSON: Objection. Asked and
13  answered. Go ahead.
14         THE WITNESS: These are all the programs
15  that for which we have received a letter of
16  termination from the funder, yes.
17  By Ms. Richardson:
18     Q. And I just want to make sure. I
19  understand that you received a letter from ODH. And
20  in addition to that you've described certain analyses
21  or steps that PPGOH has taken to determine the impact
22  that this law would have if it takes effect, correct?
23     A. Correct.
24     Q. And what I just want to make sure is,
25  are there any other programs, services, or activities

Page 117

1 that you believe, based on your analyses, that you
2 would no longer be able to provide if this law takes
3 effect?
4         MR. WOLFSON:  Objection.  Asked and
5 answered.
6         THE WITNESS:  No.
7 By Ms. Richardson:
8     Q.  I'll ask you to turn to interrogatory
9 No. 18.  And we may need to pull out the actual
10 complaint, and we can do so if you need to.
11         In interrogatory 18 says, "With regards
12 to the HIV test you allege you provide in Paragraph
13 39 of the complaint, state the number of tests that
14 are funded through the HIV Prevention Program and all
15 bases, evidence, information, sources, witnesses, and
16 any other support for your response."  Do you see
17 that?
18     A.  Yes.
19     Q.  And do you have knowledge of how many of
20 the overall STD -- I'm sorry, strike that.
21         Do you have knowledge of the overall
22 number of HIV testing that is attributable to the HIV
23 Prevention Program?
24         MR. WOLFSON:  Is there a time frame to
25 that?

Page 118

1         MS. RICHARDSON:  Let me stop for a
2 moment.  It might be easier if we -- I think we have
3 the complaint, and if not, we can get it.  And I will
4 mark this as Exhibit 3.
5         (EXHIBIT MARKED FOR IDENTIFICATION.)
6 By Ms. Richardson:
7     Q.  So I'm handing you what's been marked as
8 Exhibit 3.  And I'll direct your attention to
9 Paragraph 39.
10     A.  Okay.
11     Q.  And first of all, is this the
12 complaint -- you indicated earlier that you had
13 reviewed the complaint that was submitted in this
14 case.
15     A.  Yes.
16     Q.  And is this the complaint that you
17 reviewed?
18     A.  Yes.
19     Q.  And on Page 11 of the complaint, and
20 actually it's starting with Paragraph 37, there's a
21 caption there that says, "Minority HIV/AIDS
22 Initiative and HIV Prevention Program."  Do you see
23 that?
24     A.  Yes.
25     Q.  And the terminology is a little bit

Page 119

1 different, but is that referring to the HIV
2 Prevention Program that we have been discussing
3 today?
4     A.  Yes.
5     Q.  The minority HIV/AIDS initiative, does
6 that relate to something different?
7     A.  No, I believe the minority HIV/AIDS
8 initiative is the name of the grant that comes out of
9 the Ohio Department of Health to the local health
10 departments.
11     Q.  And so this is all again referring to
12 the HIV Prevention Program that we have been
13 discussing today?
14     A.  Yes.
15     Q.  And so what I was interested in just
16 understanding, there are some statistics set forth in
17 this section, and I'll actually direct your attention
18 to Paragraph 42.  Actually, I apologize, it's
19 Paragraph 39.  Sorry about that.
20     A.  No problem.
21     Q.  And the last sentence in that paragraph
22 states, "PPGOH uses its minority HIV/AIDS initiative
23 fund to provide anonymous and confidential HIV tests
24 to low income and minority Ohioans.  PPGOH's program
25 focuses on African American women with risk factors

Page 120

1 for HIV."  Do you see that?
2     A.  Yes.
3     Q.  And this may relate to the same question
4 earlier that you may not know.  This is not intended
5 to represent that all anonymous and confidential HIV
6 tests that PPGOH provides are funded through the HIV
7 Prevention Program, is it?
8     A.  It is -- yeah, the sentence here only
9 refers to the free HIV testing and not to the HIV
10 testing services that our health services division
11 provides.
12     Q.  And do you know what percentage of the
13 HIV testing you provide is attributable to the HIV
14 Prevention Program?
15     A.  I do not.
16     Q.  Is that something that the other witness
17 would be able to testify to?
18     A.  I do not know if we have ever allocated
19 both testings in that matter, if we have -- at any
20 point put them all together.
21     Q.  Do you know -- Just focussing on the HIV
22 Prevention Program specifically, do you know how many
23 tests you provide through the HIV Prevention Program
24 specifically?
25     A.  In the last calendar year?

Page 121

1    Q.  Yes.
2    A.  We provided 3,600 tests, free HIV tests.
3    Q.  And do you know how many tests overall
4  that PPGOH would provide?
5    A.  No.
6    Q.  Is that a number that would be tracked?
7    A.  Yes.  And I believe that number would be
8  in agency program reports that were submitted.
9    Q.  So earlier we talked about a budget
10  that's submitted to the Department of Health.  Is
11  this something different?
12    A.  Yes.  An agency program report was
13  submitted as part of the documentation requested.
14    Q.  In response to our request for
15  production of documents?
16    A.  Yes, that's correct.
17    Q.  Okay.  And is that something that you
18  submit to the Department of Health or to any other
19  entity?
20    A.  It is a public document that you can
21  obtain from our website, but I am not sure if we send
22  it directly to any entity.  I'm not sure.
23    Q.  And do you participate in preparing the
24  agency program report?
25    A.  In certain aspects, yes.

Page 122

1    Q.  What aspects would you contribute to?
2    A.  The education number, Education and
3  Outreach numbers.
4    Q.  Let me just double-check to see if there
5  are any other issues that I need to cover with you
6  before we let you go, but I think I am close to being
7  done here.
8      Let me just ask you -- let me return
9  back for a moment to the OIMRI program that we were
10  discussing previously.
11      Are there circumstances where one of the
12  PPGOH employees providing counselling or services
13  under OIMRI would provide counseling to a participant
14  who is currently pregnant?
15    MR. WOLFSON:  Objection.  Go ahead.
16    THE WITNESS:  So I would like to clarify
17  the word "counseling".
18  By Ms. Richardson:
19    Q.  So my understanding is that in
20  connection with OIMRI, the staff members devoted to
21  that program work with various participants, women,
22  who are receiving various services and counseling, is
23  that fair and correct as preface necessary?
24    A.  Yeah, that is not correct, as they are
25  not -- the staff members which are community health

Page 123

1  workers, certified community health workers, are not
2  counselors, so that's not a word that we would use to
3  describe the services that they provide to the
4  mothers.  They are educational services in case
5  management and referrals.
6    Q.  And so in connection with referrals, I
7  assume then that they would provide various referrals
8  to agencies or other services in the community that
9  might be helpful for the women participating, is that
10  fair?
11    A.  That's correct.
12    Q.  And what happens in the event that a
13  current participant tells the OIMRI staff member that
14  she is pregnant?
15    MR. WOLFSON:  Objection.
16  By Ms. Richardson:
17    Q.  Would she be given referrals to other
18  resources available in the community?
19    A.  According to the grant guidelines, the
20  OIMRI grant guidelines, when a current program
21  participant -- and remember that in order to become a
22  program participant you already are being pregnant,
23  or have a child under the age of 2.
24      If someone within the program is
25  pregnant again, the case -- the staff member -- the

Page 124

1  PPGOH staff member's required to provide referral
2  services to -- according to the needs of the person.
3    Q.  And would the referrals that the staff
4  member would provide include referrals to abortion
5  centers?
6    MR. WOLFSON:  Objection.
7    THE WITNESS:  I'm trying to think if
8  that is something that's stipulated by the grant, and
9  I don't think it is outlined specifically by the
10  grant that that referral has to be made.
11  By Ms. Richardson:
12    Q.  What about outside of the grant, is that
13  something that you would have PPGOH policies or
14  procedures that would direct the employee to provide
15  various counseling referrals related to abortion
16  services?
17    A.  The employee has to follow the grant
18  guidelines strictly, and if that is something that
19  the grant is not stipulated that the staff member can
20  do, that's not allowed.
21    Q.  And does the grant specify specifically
22  all of the community services that are available as
23  referrals, or is that something that the employee
24  comes up with his or herself to provide?
25    A.  I believe that's a list that is agreed

Page 125

1  upon by the grantor, or in this case the local Health
2  Department.
3      Q. And so the grant wouldn't necessarily
4  cover all areas that might come up in the course of
5  the employee working with the participant, would
6  they?
7      A. By all areas, what do you mean?
8      Q. So I think you testified earlier that
9  the employee would provide referrals or services
10 based on the particular needs of the participant,
11 correct?
12     A. Right. Correct.
13     Q. And so that could be a number of
14 different possibilities, right?
15     A. Yes.
16     Q. And the grant wouldn't specify in detail
17 referrals for all of those possibilities, right?
18     A. Correct.
19     Q. So the employee has some discretion then
20 to offer referrals or information that the
21 participant needs that are not specifically
22 identified in the grant, correct?
23         MR. WOLFSON: Objection.
24         THE WITNESS: As long as it's within
25 what the grant intent is, which is the reduction in

Page 126

1  infant mortality, the employee can make referrals to
2  that purpose.
3  By Ms. Richardson:
4      Q. And so if a current participant
5  indicates that she is pregnant again and that she
6  does not want to continue the pregnancy, would there
7  be referrals made to abortion services?
8         MR. WOLFSON: Objection.
9         THE WITNESS: I don't know -- I can't
10 speak of a situation that I have encountered, so I
11 don't know.
12 By Ms. Richardson:
13     Q. Who would know the answer to that?
14     A. That would be someone who works directly
15 with the staff -- with the client, or the local
16 Health Department who sets the regulations.
17     Q. And so these would be the OIMRI staff
18 members who actually provide the counseling?
19     A. Right.
20         MR. WOLFSON: Objection.
21 By Ms. Richardson:
22     Q. And ultimately these OIMRI staff members
23 report to you, correct? They are within the
24 education system?
25     A. They report to someone, an education

Page 127

1  manager who reports to an education director, who
2  reports to me.
3      Q. But sitting here today you don't know
4  whether abortion services would be among the referral
5  items that the OIMRI employee would provide if a
6  woman in the program becomes pregnant?
7         MR. WOLFSON: Objection. Asked and
8  answered. Go ahead.
9         THE WITNESS: My answer was as to your
10 specific situation, if a woman came to one of our
11 staff members and asked that, I don't know if that
12 ever happens, so that's why I can't speak to that
13 situation.
14 By Ms. Richardson:
15     Q. And do you provide training to your
16 OIMRI staff members?
17     A. Yes.
18     Q. Is that an area that would be covered in
19 the training that they would receive?
20     A. It would be not specifically -- a
21 referral process is part of the training, but not
22 specifically what do you do in this particular case.
23     Q. Sure. So let's step out of the specific
24 example then and talk about more generally. What
25 would the training or protocols that you offer for

Page 128

1  the OIMRI program -- what would they instruct the
2  staff member to do with respect to referrals,
3  generally speaking?
4      A. Right. So according to the grant
5  guidance, a referral list has to be preapproved by
6  the local Health Department on services that are
7  related to the infant mortality prevention or infant
8  mortality reduction.
9         So staff members are presented with that
10 referral list, and they are instructed to adhere to
11 that list when making referrals.
12     Q. And are abortion providers included on
13 that list of referrals?
14     A. No, they are not.
15     Q. Is PPGOH provided on the list of
16 referrals?
17     A. PPGOH is provided as a family planning
18 provider in that area.
19     Q. Go ahead.
20     A. I just want to remind you, PPGOH does
21 not provide abortion services in the Youngstown and
22 Trumbull County area.
23     Q. And so let me ask you, this was an area
24 that I was going to go into later in the day with the
25 other witness, but do you have knowledge as to which

Page 129

1    of the PPGOH locations do provide abortion services?
2         MR. WOLFSON:  Objection.
3         THE WITNESS:  Planned Parenthood of
4    Greater Ohio has two locations that provide abortion
5    services.  They are located in Columbus and another
6    one is located in Bedford Heights.
7    By Ms. Richardson:
8         Q.  I'm sorry, Bethel Heights?
9         A.  Bedford Heights.
10        Q.  Thank you.  Are you familiar with a term
11   called options counseling?
12        A.  Yes.
13        Q.  What does that mean to you?
14        MR. WOLFSON:  Objection.
15        THE WITNESS:  Options counseling is a
16   term -- in my knowledge, is a term referred to an
17   education session that is provided to a woman when
18   she decides to talk to a professional about her
19   pregnancy options.
20   By Ms. Richardson:
21        Q.  And are there circumstances under which
22   an OIMRI staff member would provide options
23   counseling to one of the participants?
24        A.  No, they are not qualified to do that.
25        Q.  Who is qualified to do that?

Page 130

1         A.  Another professional.
2         Q.  Within PPGOH specifically, which
3    professionals are qualified to provide options
4    counseling?
5         A.  That would be a question for the other
6    witness.  That's part of the health services.
7         Q.  What about within the education program
8    of PPGOH generally, are there any employees who would
9    be qualified to provide options counseling?
10        A.  They are not.
11        Q.  What about the HIV testing specialists?
12        A.  They are not.
13        Q.  Those would all be exclusively covered
14   within the Health Department section or health center
15   section?
16        A.  Health services, yes.
17        Q.  Health service, thank you.  And I think
18   you mentioned earlier that the Youngstown health
19   center has some involvement in the OIMRI program; is
20   that correct, or did I misunderstand that?
21        A.  No, you were asking where these people
22   were housed, and I think that's what my reference to
23   some of them are housed -- their desks are in the
24   Cortland area, that same building where our health
25   center is.

Page 131

1         Q.  Okay.  Are there circumstances in which
2    health professionals in the Youngstown health center
3    would provide options counseling to patients?
4         A.  Can you specify which health
5    professionals?
6         Q.  Sure.  Let me back up more generally.
7    You just testified that within the education
8    department none of the employees are qualified to
9    provide options counseling?
10        A.  Correct.
11        Q.  Are there protocols or policies in place
12   for circumstances where an employee in the education
13   department would refer participants to someone in the
14   health services center for options counseling?
15        A.  I'm sorry, I'm trying to think of a
16   situation where that would be the case.  No.
17        Q.  And so if someone in the course of PREP
18   or the HIV testing or OIMRI encounters a participant
19   who says I'm pregnant and I'm not sure what to do,
20   what would be the appropriate response for the PPGOH
21   employee that's interacting with that individual?
22        A.  To follow the guidelines of the grant on
23   the stipulation of the grant.  If the grant provides
24   any information about that, the staff member will
25   provide the information.  But it is not located in

Page 132

1    any of these three grants specifically.
2         So in that case the staff member will
3    say at this point that's not part of what I'm here to
4    present, and I'm here to present this information.
5         Q.  And would the staff member then say in
6    the event that you would like information on that,
7    you can contact someone at our -- in our health
8    services department?
9         A.  I'm trying to think of that.  Staff --
10   the staff member will say there's resources in the
11   community that you could search for for that
12   particular service, but not give specifics.
13        Q.  And not provide specifics in terms of
14   the --
15        A.  If it's not listed in the approved list
16   of referrals, no.
17        Q.  And I apologize if I asked you this
18   earlier, but for any of the education programs that
19   we have been discussing today, would there be
20   organizations that provide abortion services included
21   among the referrals in the list?
22        MR. WOLFSON:  Objection.  Asked and
23   answered.
24        THE WITNESS:  The referral list -- I'm
25   going program by program on this.

Page 133

1  By Ms. Richardson:
2      Q. Thank you.
3      A. Some of those referral lists include
4  Planned Parenthood.
5      Q. And which lists would that be?
6      A. That would be the PREP list.
7      Q. Any other referral lists?
8      A. That includes specific Planned
9  Parenthood? Let me think. I don't believe so.
10     Q. What about any other abortion provider?
11     A. No.
12     Q. And you mentioned that in OIMRI, Planned
13 Parenthood of Greater Ohio is listed as a referral,
14 correct?
15     A. Correct.
16     Q. For family planning services?
17     A. For family planning. And here I think
18 we need to clarify, because my second answer when you
19 said any other abortion provider, does it include any
20 abortion provider, when we're talking about OIMRI, I
21 was not thinking of Planned Parenthood as an abortion
22 provider because it's name is there for family
23 planning services. Same thing with PREP. But if you
24 think of Planned Parenthood as overall services, it
25 is an abortion provider.

Page 134

1      Q. Thank you for clarifying.
2          MS. RICHARDSON: I think that I am done
3  with you. I would reserve the right to call him back
4  in the event that an area that we believe is being
5  covered by another witness is not covered. Is now a
6  good time to take a lunch break?
7          MR. WOLFSON: Sure.
8          (Lunch recess.)
9              - - -
10         Barbara Singhaus,
11 being by me first duly sworn, as hereinafter
12 certified, deposes and says as follows:
13         EXAMINATION
14 By Ms. Richardson:
15     Q. Good afternoon, Ms. Singhaus.
16     A. Thank you.
17     Q. We just met, but for the record my name
18 is Ryan Richardson, and I work for the Ohio Attorney
19 General's office, and I'm here today on behalf of the
20 defendant in this case, the Department of Health.
21         Have you ever been deposed prior to
22 today?
23     A. No.
24     Q. And so I'm just going to try to quickly
25 go over a couple of the ground rules for today. As

Page 135

1  you probably already know, I'm going to be asking you
2  a series of questions today. You have counsel here
3  who will be making objections. Unless he expressly
4  instructs you not to answer a question, then those
5  objections are just for the record and you will be
6  able to go ahead and just answer the question that
7  I've asked, if you understand it.
8          If at any point you don't understand a
9  question that I've asked, please let me know and I'm
10 happy to rephrase the question. If you do answer the
11 question, however, I'm going to assume that you did,
12 in fact, understand it. Is that fair?
13     A. Yes.
14     Q. If you need a break at any point in
15 time, just let me know and we'll take one. All that
16 I ask is that you wait until you have answered the
17 pending question before you take a break.
18         None of the questions that I'm going to
19 ask you today are intended to elicit any personal
20 identifying information about any patient. So if you
21 believe that a question I have asked would require
22 you to divulge that information, please stop and let
23 me know and I will make sure that we rephrase it.
24         Are you taking any medication or is
25 there any reason today that you would not be able to

Page 136

1  answer questions completely and honestly?
2      A. No.
3      Q. Okay. Any questions before we start?
4      A. No.
5      Q. I am going to just start and ask you to
6  state for the record what your current position is
7  for Planned Parenthood of Greater Ohio.
8      A. I am the chief operating officer and the
9  chief financial officer.
10     Q. And how long have you been in that
11 position?
12     A. Two-and-a-half years.
13     Q. And that is the chief operating officer
14 and financial officer for Planned Parenthood of
15 Greater Ohio?
16     A. That's correct.
17     Q. And if I refer to that today as PPGOH,
18 will we understand that that's Planned Parenthood of
19 Greater Ohio?
20     A. Yes.
21     Q. And prior to becoming the chief
22 operating officer and chief financial officer were
23 you employed with Planned Parenthood?
24     A. No.
25     Q. So two-and-a-half years ago was your

Page 137

1   first position with Planned Parenthood; is that
2   correct?
3       A. That's correct.
4       Q. What did you do prior to joining Planned
5   Parenthood, Greater Ohio?
6       A. I was in public accounting for 15 years.
7   I was a nonprofit consultant in the accounting area
8   for 20 years before that, after that, and I was
9   currently serving on the Planned Parenthood of
10  Greater Ohio board when I resigned from the board and
11  became employed.
12      Q. And so when did you begin serving on the
13  Planned Parenthood board?
14      A. I served on the Planned Parenthood of
15  Northeast Ohio board premerger.
16      Q. And maybe now this is as good of time as
17  any. One of the questions that I wanted to ask you
18  about is Planned Parenthood of Greater Ohio's
19  corporate structure. And I understand that has
20  changed a little bit over time; is that correct?
21      A. We merged; Planned Parenthood of
22  Northeast Ohio and Planned Parenthood of Central Ohio
23  merged as of July 1, 2012.
24      Q. So is it fair to say that Planned
25  Parenthood of Greater Ohio did not exist until 2012?

Page 138

1       A. Until July 1 of 2012, that's correct.
2       Q. And so that was a merger of Planned
3   Parenthood of Northeast Ohio and Planned Parenthood
4   of Central Ohio; is that correct?
5       A. Correct.
6       Q. And aside from merging those two
7   organizations and changing the name, did that have
8   any other legal impact on Planned Parenthood of
9   Greater Ohio's sort of corporate status?
10      A. We formed the corporate status at that
11  time, and it's a 501(c)(3) organization, independent
12  corporation.
13      Q. And at that point in time Planned
14  Parenthood of Central Ohio and Planned Parenthood of
15  Northeast Ohio ceased to exist as independent
16  corporate entities?
17      A. Correct.
18      Q. Thank you. And so I apologize for
19  asking you again, but you were initially on the board
20  for Planned Parenthood of Northeast Ohio; is that
21  correct?
22      A. Yes.
23      Q. And when did you begin on that board?
24      A. In 2007.
25      Q. Did you have any executive roles on the

Page 139

1   board?
2       A. Yes, I was the chairperson initially in
3   2007.
4       Q. And did you serve in any other capacity
5   on the board besides chairperson?
6       A. No.
7       Q. So from 2007 until the time that you
8   took the position for Planned Parenthood of Greater
9   Ohio, you were the chairperson of the board?
10      A. I was the chairperson of the Northeast
11  Ohio board from 2007 until approximately 2010.
12      Q. And then what did you do between 2010
13  and 2012?
14      A. I was just a board member.
15      Q. And I will not ask you to go through all
16  of your various positions previously, but prior to
17  joining the board for Planned Parenthood of Northeast
18  Ohio did you have any other employment or affiliation
19  with any Planned Parenthood organization?
20      A. I served on other Planned Parenthood
21  boards of Stark County.
22      Q. And when was that?
23      A. From approximately late 1990s to 2007.
24  I was also a board member of Planned Parenthood
25  Federation of America, PPFA.

Page 140

1       Q. Thank you. And when were you a board
2   member of PPFA?
3       A. From 2003 to -- I'm sorry. From 1993 to
4   2000.
5       Q. And can you describe what Planned
6   Parenthood -- what we'll call PPFA for short today,
7   can you describe what that is?
8       A. PPFA is a federation of which Planned
9   Parenthood separate corporation affiliates across the
10  country belong to in a membership status.
11      Q. And what is Planned Parenthood of
12  Greater Ohio's relationship to PPFA?
13      A. We are a member of PPFA.
14      Q. And what does it mean to be a member?
15      A. It means that we abide by their
16  standards of care, and we pay membership dues, and we
17  can use the trademark.
18      Q. Do you receive funding from PPFA?
19      A. We receive specific restricted grants
20  from time to time.
21      Q. And what is a restricted grant?
22      A. A grant to be used for a specific
23  purpose.
24  ████████████████████████████████████████
    ██    ████████████████████████████



Page 141

Page 143

1    [REDACTED]
2        A.  No.
3        Q.  What is PPGOH's relationship to Planned
4    Parenthood of Southwest Ohio?
5        A.  We are the only two Planned Parenthoods
6    in the State of Ohio.  We both operate in separate
7    corporations, and are colleagues to --
8        Q.  Thank you.  I apologize for
9    interrupting.
10       A.  That's okay.
11       Q.  And are each of you then members of
12   PPFA?
13       A.  Yes.
14       Q.  And if I refer to Planned Parenthood of
15   Southwest Ohio as PPSWO today, will you understand
16   what I'm referring to?
17       A.  Yes.
18       Q.  Thank you.  And can you just briefly
19   describe what your educational background is and any
20   certifications you may possess?
21       A.  I have a bachelor of science in
22   accounting, and I'm a certified public accountant in
23   inactive status.
24       Q.  And how long have you been in inactive
25   status?

Page 142

Page 144

1        A.  Since I left public accounting 25 years
2    ago.
3        Q.  Can you generally describe for me now
4    what your responsibilities include as the COO and CFO
5    for PPGOH?
6        A.  In terms of the chief operating officer
7    position I oversee the administrative portions of our
8    health services division, our IT division, facilities
9    with managers underneath that.
10           And I oversee the finance department.
11       Q.  Approximately how many employees total
12   report to you?
13       A.  I have approximately 15 direct reports.
14       Q.  And how many different locations does
15   PPGOH operate throughout the State of Ohio?
16       A.  We have 21 health centers in 20
17   locations.
18       Q.  Twenty-one health centers in 20
19   locations?
20       A.  Yes.
21       Q.  And that reminds me, one ground rule I
22   forgot to go over.  As you can see, we have a Court
23   Reporter here, so we do have to make sure that all of
24   our answers are audible for her to get down on the
25   transcript.

1      A. Thank you.
2      Q. And so why are there 21 health centers
3  but only 20 locations?
4      A. In Bedford Heights we have a three-story
5  building with a family planning center on the ground
6  floor and our surgical center on the second floor.
7      Q. And that's in Bedford Heights?
8      A. Correct.
9      Q. And how many surgical centers does PPGOH
10 operate?
11     A. Two.
12     Q. And so one is the Bedford Heights that
13 you just mentioned; is that correct?
14     A. Correct.
15     Q. And what's the other location?
16     A. East Columbus.
17     Q. And are those the only two locations at
18 which abortion services would be provided?
19     A. Correct.
20     Q. And in the Bedford Heights location what
21 additional services beyond abortion services are
22 provided there?
23     A. On the first floor is our family
24 planning center, which is separate from the abortion
25 facility.  And we provide complete gynecological

1  family planning services there.
2      Q. And what about in the surgical center in
3  Bedford Heights, beyond abortion services what other
4  services would be offered?
5      A. Primarily the education, the informed
6  consent, the preservices to the surgical procedure.
7      Q. Would testing for STIs take place in the
8  surgical center?
9      A. No, it's in the -- for -- there is
10 testing that takes place in the surgical center.  For
11 our program related, it would only be in the family
12 planning center.
13     Q. And so right now I'm just talking STI
14 testing generally without reference to any particular
15 program.  So there would be some STI testing that
16 would take place in the surgical center; is that
17 correct?
18     A. Correct.
19     Q. And do you know specifically what types
20 of STI screening or testing would take place in the
21 surgical center?
22     A. Syphilis -- gonorrhea.  And any other
23 specific test that there may be symptoms appearing
24 from.
25     Q. Talking again still with respect to STI

1  testing?
2      A. Yes.
3      Q. And is there someone then who would
4  conduct an evaluation to determine whether any
5  symptoms were present for STIs?
6      A. It would be part of their prescreening.
7      Q. And so the protocol would require them
8  to do that for every patient that would come in, is
9  that accurate?
10     A. I believe that's just part of the
11 prescreening protocol to do the inquiry.
12     Q. What else does the prescreening inquiry
13 at the surgical center include?
14     A. It includes the hemoglobin, blood work,
15 it includes the ultrasound.  It would include the
16 educational informed consent.
17     Q. Could a patient receive any other
18 general gynecological services or screening at the
19 surgical center?
20     A. Birth control; discussion of birth
21 control would be part of that prescreening.
22     Q. What about breast cancer or cervical
23 cancer screening, would that be done at the surgical
24 center?
25     A. No.

1      Q. Any other services that we haven't
2  discussed that would be conducted in the surgical
3  center?
4      A. Not to my knowledge at this point.
5      Q. And what about with respect to the other
6  location that you mentioned, east Columbus, what
7  services would be offered at that location?
8      A. In addition to everything I named,
9  vasectomies are offered at that location as well.
10     Q. And is there a family planning center
11 located at east Columbus?
12     A. No.
13     Q. And so are the two surgical centers
14 included within the 21 health centers that you
15 offered, or are those separate?
16     A. Included.
17     Q. And for the other health centers, are
18 those all family planning centers, or would those
19 include other types of services?
20     A. They are all family planning centers.
21     Q. And what types of services are offered
22 at the family planning centers?
23     A. We offer complete gynecological care,
24 which includes the breast cancer, breast screening,
25 pap smears, any kinds of birth control options,

Page 149

1   management of your periods, those kinds of things, as
2   well as we do offer colposcopies in some of our
3   centers where the clinicians can offer that.  We
4   offer the STI testing, the HIV testing to both men
5   and women.
6       Q.  HIV testing you're referring to?
7       A.  Yes.
8       Q.  And in general, do the services that are
9   offered in the family planning centers -- is that
10  consistent across the board, or do the particular
11  health centers vary in terms of what services they
12  provide?
13      A.  It's consistent across the board except
14  for the more sophisticated centers like the
15  colposcopy procedures where some clinicians are
16  trained to do that and others are not, so that would
17  be the only difference.
18      Q.  So apart from the colposcopies, then,
19  the other services that you mentioned would be
20  available at all the family planning centers, is that
21  accurate?
22      A.  That's correct.
23      Q.  And so looking then at all of PPGOH's
24  centers, how many total employees does PPGOH employ?
25      A.  We range from 245 to 260 employees, both

Page 150

1   full-time and part-time.
2       Q.  And are there general categories of
3   positions that would fall within that 245 to 260?
4   Let me rephrase that.
5       A.  Thank you.
6       Q.  So I assume that -- but tell me if I'm
7   wrong -- that some of the staff members would be
8   medical professionals, is that accurate?
9       A.  Correct.
10      Q.  And so what types of medical
11  professionals would PPGOH employ?
12      A.  We employ physicians in our surgical
13  centers.
14      Q.  And what other medical professionals?
15      A.  Nurse practitioners and registered
16  nurses.  Our family planning centers work on the
17  nurse practitioner model, and that's primarily the
18  nurse practitioners in the family planning centers,
19  L.P.N.s and health care assistants, in addition to
20  the R.N.s.
21      Q.  And we'll start with the surgical
22  centers.  Approximately how many physicians are
23  employed in a given surgical center?
24



Page 151

Page 152

1
2       Q.  And you mentioned nurse practitioners
3   both in the surgery centers and in the family
4   planning centers.  Focusing first on the surgical
5   centers, how many nurse practitioners would be
6   employed in a surgical center?
7       A.  Currently there are not any in either
8   one, but there has been a nurse practitioner as an
9   assistant in Bedford Heights.
10      Q.  And when was that that there was a nurse
11  practitioner in Bedford Heights?
12      A.  During this current calendar year.
13      Q.  And why is there not a nurse
14  practitioner at Bedford Heights now?
15          MR. WOLFSON:  Objection.
16          THE WITNESS:  It isn't part of our
17  standard work flow, it's not a requirement.
18  By Ms. Richardson:
19      Q.  And so at what point did you stop
20  employing a nurse practitioner in the Bedford
21  Heights?
22          MR. WOLFSON:  Objection.
23          THE WITNESS:  She actually just left the
24  organization probably a month ago.
25  By Ms. Richardson:

1    Q. Did she provide a reason for her
2  leaving?
3         MR. WOLFSON: Objection.
4         THE WITNESS: Correct, she found -- I
5  mean, she moved on in the state.
6  By Ms. Richardson:
7    Q. And is there an intent to replace that
8  position in the Bedford Heights location?
9    A. Yes, but not necessarily with a nurse
10 practitioner.
11   Q. And so who would be employed then to
12 take her spot, not by reference to name, by position?
13   A. A registered nurse can perform those
14 duties as well.
15   Q. And in a surgical center what duties
16 does either a registered nurse or nurse practitioner
17 provide?
18        MR. WOLFSON: Objection.
19        THE WITNESS: In general, they provide
20 support to the entire process of the -- of the work
21 flow of the center in terms of assisting in the
22 recovery room.
23 By Ms. Richardson:
24   Q. And so do they assist the physicians?
25   A. Yes.

1    Q. And more specifically, what services
2  would they provide? What would their role be?
3         MR. WOLFSON: Objection.
4         THE WITNESS: I don't know that I can
5  detail the medical procedure further than assisting.
6  By Ms. Richardson:
7    Q. And I don't need to know specific
8  medical procedures, I'm just trying to sort of
9  understand the allocation of responsibilities and who
10 would be responsible for particular things at these
11 locations.
12        So you can just describe kind of in
13 general terms. Would they assist with actual
14 procedures, or would they be more in pre and post
15 surgery, those kinds of general descriptions?
16   A. Pre and post surgery in a more
17 general --
18   Q. And who would provide counseling
19 services at the surgical center?
20   A. That's a combination of educators and
21 the physician.
22   Q. Would the nurse practitioner or
23 registered nurse be responsible for providing any
24 counseling to a patient at a surgical center?
25        MR. WOLFSON: Objection.

1         THE WITNESS: I'm not certain of that.
2  By Ms. Richardson:
3    Q. You're not certain whether they would be
4  involved, or you just don't know the answer?
5    A. I don't know the answer.
6    Q. And who would know the answer to that?
7    A. Our health services director.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   Q. And what does a practice manager do?
24   A. Basically facilitates the work flow of
25 the surgery center, supervises employees.

1    Q. Would she supervise all employees within
2  the surgical center, or both surgical centers?
3    A. She only supervises the unlicensed
4  staff. Our medical director would supervise the
5  physicians and the other R.N.s.
6    Q. And who is the medical director?
7    A. Dr. Tim Kress.
8    Q. And the practice manager, you said she
9  supervises nonlicensed, so these would be nonmedical
10 personnel, is that a fair characterization?
11   A. Yes.
12   Q. What types of nonmedical personnel would
13 be employed in the surgical center?
14        MR. WOLFSON: Objection. Go ahead.
15        THE WITNESS: There are health care
16 assistants available there that would do financial
17 intakes.
18 By Ms. Richardson:
19   Q. You also mentioned educators. Would she
20 be responsible for overseeing the educators?
21   A. Yes.
22   Q. How many educators are employed by the
23 surgery centers?
24        MR. WOLFSON: Objection.
25        THE WITNESS: There is not a specific

Page 157

1    title of education, it would be a combination of the
2    educators.  I believe there are two people
3    assigned -- two positions assigned in each facility.
4    By Ms. Richardson:
5        Q.  I'm sorry, I didn't mean to cut you off.
6            Did you have anything else to add?
7        A.  No.
8        Q.  So there are two people assigned to
9    provide education services at each surgery center; is
10   that correct?
11       A.  Correct.
12       Q.  And what are their job titles?
13           MR. WOLFSON:  Objection.
14           THE WITNESS:  I know the physicians
15   supply some of the education services, and there are
16   other people that participate in that process.
17   That's -- I'm not clear about that specifically.
18   By Ms. Richardson:
19       Q.  You're not clear what the other people
20   are --
21       A.  I'm not clear the specific positions
22   that fulfill that -- fulfill the education services.
23       Q.  So maybe if we just step back, I think a
24   couple of times you've kind of described kind of
25   supporting the work flow at the surgery centers.  So

Page 158

1    maybe you can just walk me through the work flow as
2    you understand it in general terms.
3            MR. WOLFSON:  Ryan, I'm going to just
4    register an objection with this whole line of
5    questioning which I think is completely irrelevant
6    to -- I mean, you've obviously been able to see I've
7    registered a lot of objections.
8            I don't understand the point of this
9    questioning which is not a subject matter of the
10   lawsuit.
11           MS. RICHARDSON:  I appreciate your
12   objection, which is noted.
13   By Ms. Richardson:
14       Q.  And you can answer the question.
15       A.  So there are two visits in the surgery
16   centers.  The initial visit is all the prescreening,
17   as I described before.
18       Q.  And who would be involved in the
19   prescreening for the first visit?
20       A.  That's exactly what we were talking
21   about in terms of there will be personnel with the
22   nursing, and there will be -- the physician would
23   both be involved, and that would include the
24   education session, the vitals and all of that
25   prescreening information.

Page 159

1        Q.  And that would include the STI testing,
2    the ultrasound and the other services that I
3    described earlier with respect to the prescreening?
4        A.  Correct.
5        Q.  Is that accurate?
6        A.  Correct.
7        Q.  Is there anything else that would take
8    place on that first visit?
9            MR. WOLFSON:  Objection.
10           THE WITNESS:  I'm not -- all of the
11   required elements will take place at that first
12   visit.
13   By Ms. Richardson:
14       Q.  And you mentioned all of the required
15   elements.  You mean the required elements of the
16   prescreening?
17       A.  Of the regulations required for informed
18   consent, all of the fetal heartbeat detection, is all
19   included in the first visit.
20       Q.  And there's a second visit I think you
21   said?
22       A.  The second visit is the procedure.
23       Q.  And who would interact with the patient
24   on that second visit?
25       A.  Many of the same individuals that

Page 160

1    interacted on the first.
2        Q.  And so these would be the nurses and the
3    physicians?
4        A.  Correct.
5        Q.  Are there health care assistants there
6    that would also facilitate --
7        A.  Yes.
8        Q.  And then you mentioned that there are
9    also educators that would be there to provide
10   counseling.  Is that a day one thing?
11       A.  Yes.
12       Q.  Or a day two?
13       A.  Day one.
14       Q.  So the educators would be part of the
15   prescreening and initial visit?
16       A.  Yes.
17       Q.  Do the educators interact with the
18   patient at all on the second visit?
19           MR. WOLFSON:  Objection.
20           THE WITNESS:  I'm not aware of that.
21   By Ms. Richardson:
22       Q.  Do the staff members that are employed
23   as educators in the two surgical centers also work in
24   the family planning centers?
25       A.  No.

Page 161

1    Q. Do they provide education under other
2  programs that PPGOH offers?
3    A. No.
4    Q. Do they provide any services other than
5  the education services at the surgical center?
6    A. No.
7    Q. Are they housed full-time in the
8  surgical center?
9    A. Yes. The -- Yes.
10   Q. That's where their offices are, is in
11  the surgical center?
12   A. Yes.
13   Q. Full-time?
14   A. The education services are not provided
15  by educators, they are provided by the nurses and the
16  physician and the health care assistants within the
17  surgical center. The staff is completely separate.
18   Q. The staff -- what do you mean the staff
19  is completely separate?
20   A. All staff within the surgical center is
21  separate from any other services that we provide.
22   Q. And so I just want to make sure, because
23  I thought you used the term educators and said there
24  are two educators employed at each surgery center,
25  correct?

Page 162

1    A. There are two individual -- there are
2  two positions that provide educational services in
3  the center.
4    Q. And these are in addition to the medical
5  personnel?
6    A. No, they are part of the medical team.
7  They are part of the surgical services staff.
8    Q. So are they also providing medical
9  services, or just education services in those
10  positions?
11   MR. WOLFSON: Objection.
12  By Ms. Richardson:
13   Q. You can answer.
14   A. They also provide other services within
15  the surgery center.
16   Q. And what other services would those
17  individuals provide?
18   A. They could provide any of the support
19  services, including the physician who would actually
20  provide the surgery services.
21   Q. So the educator could be the physician
22  who is providing the service?
23   MR. WOLFSON: Objection.
24   THE WITNESS: That could be.
25  By Ms. Richardson:

Page 163

1    Q. And so I'm a little bit confused because
2  it sounds like there are two specific employees that
3  you've referenced, and I know you indicated earlier
4  that you don't recall what their position titles --
5  there are two positions. So I'm sure I'm just not
6  understanding exactly what you're referring to there.
7  What do you mean when you say two positions that
8  provide education?
9    A. Out of all of -- there are not two
10  distinct positions that provide education services.
11  I'm sorry, that was -- I misinterpreted that.
12     There are at least two staff members
13  that provide educational services in the health
14  center at any given time. It could be part of, and
15  generally is part of, one of the -- of other job
16  duties that they might perform as well. But one of
17  their job positions is to provide the education and
18  counseling services.
19   Q. And so is it always the same two people
20  then that would be providing these education services
21  in the surgery center?
22   A. Not always.
23   Q. And so I'm having trouble understanding,
24  and I don't want you to provide their names, so if we
25  don't have job titles for them maybe you could

Page 164

1  provide initials or something else so that I could
2  understand what you're referring to if these two
3  individuals are part of the process.
4    MR. WOLFSON: Objection. Is there a
5  question?
6  By Ms. Richardson:
7    Q. Can you please identify the two staff
8  members who would be providing these services? And
9  feel free to use a job title or initials other than a
10  name.
11     MR. WOLFSON: Please don't use the
12  initials if you can avoid it, if you can give the job
13  titles.
14  By Ms. Richardson:
15   Q. And I would prefer the job titles if
16  available.
17   A. I'm afraid specifically I can't answer
18  that because I don't know. I know that the
19  physicians themselves provide a component of the
20  education and counseling services.
21     The registered nurses are part -- one of
22  the registered nurses could provide part of the
23  education and counseling services, and part of the
24  prescreening process which would include the vitals
25  and some of that information could be delivered by

1    the health care associate assistants that are part of
2    that process.
3         And so it's a team effort that provides
4    both the day one and then the day two. I believe I
5    was confused when I said there were two positions.
6    There are at least two positions involved in the
7    first day, one of which can be the physician itself.
8         And I don't want to misspeak in terms of
9    exactly who those people are. It's because I'm aware
10   of the services, I'm not aware completely of the
11   service mix.
12        Q. And so would it be more accurate then to
13   say that there are two components of the education
14   that would be provided rather than necessarily two
15   individuals?
16        MR. WOLFSON: Objection.
17        THE WITNESS: I'm aware of the services
18   that are included in the first visit.
19   By Ms. Richardson:
20        Q. And so what are those services?
21        A. We already -- we detailed those in terms
22   of the services.
23        Q. And so again, I apologize for my
24   confusion here. I am simply trying to understand, we
25   have talked about medical professionals and the

1    services that they would provide, and then you
2    mentioned educators, and I believe that was your word
3    and maybe that's creating the confusion.
4         And so I'm trying to understand the
5    education component that is offered in the surgical
6    center, and who would be responsible for providing
7    those. And it can vary, but I'm just trying to
8    understand what the sources of this -- the educator
9    role.
10        MR. WOLFSON: Is there a question?
11   That's not a question.
12   By Ms. Richardson:
13        Q. And so the question is, can you describe
14   for me, when you referred earlier to the educators
15   that would work in the surgical center, what did you
16   mean by that?
17        MR. WOLFSON: Objection.
18        THE WITNESS: There is an educational
19   component in the first visit at the surgical center
20   that would include the informed consent, all of the
21   requirements required by law in terms of our
22   educational -- of the education that is required by
23   law.
24        And we also do provide birth control
25   discussion at that time with the individual. And

1    that's provided by a combination of the health care
2    assistants, the registered nurses, and the physician.
3    By Ms. Richardson:
4         Q. And are there any other education
5    services provided on day one in the surgery center?
6         A. No.
7         Q. What about on day two, any other
8    educational services?
9         MR. WOLFSON: Objection.
10        THE WITNESS: No.
11   By Ms. Richardson:
12        Q. In terms of the nursing staff that works
13   in the surgery center, do any of those nurses,
14   whether R.N.s or L.P.N.s or nurse practitioners, also
15   work in the family planning centers at any point in
16   time?
17        MR. WOLFSON: Objection.
18        THE WITNESS: No.
19   By Ms. Richardson:
20        Q. And how do you know that?
21        A. Because they are not assigned there.
22   That's where they report to work.
23        Q. And so how do your assignments work?
24   Are particular nurses assigned to a given location,
25   or do they rotate among various locations?

1         A. Our surgical center nurses are assigned
2    to a particular location.
3         Q. And does that change at points during
4    the staff's time at the -- at PPGOH?
5         A. No. Our surgical center staffing is
6    separate from all of our other medical services
7    staffing.
8         Q. And do you have any protocols or
9    policies that are written in any form that reflect
10   that separation of staff?
11        A. Absolutely.
12        Q. And where would that be found?
13        A. In our personnel policies, and from all
14   of our staffing requirements.
15        Q. And so you mentioned a personnel policy.
16   Is that in a handbook, or what would that document be
17   called?
18        A. It's an electronic file, personnel
19   policy.
20        Q. Any -- go ahead.
21        A. Our staffing requirements are dictated
22   by the Ohio Department of Health in terms of the
23   licensure for our surgical facilities.
24        Q. And what about any other -- aside from
25   the personnel policy that you just mentioned, are

1  there any other handbooks or documents that would
2  reflect the policy for keeping the staff separate
3  between the two different types of facilities?
4      A.  We maintain all of our Title 10
5  guidelines for our family planning services which are
6  covered under Title 10, and the payroll recording for
7  that would be totally separate from any of our
8  surgical facilities.
9      Q.  So I want to step back for a moment and
10 I'm going to hand you what has already been marked
11 today as Exhibit 1.  And it's actually right in front
12 of you.  If you could take a look at that document,
13 please.  And feel free to take a moment to review.
14     (Pause.)
15     Are you ready?
16     A.  Ready.
17     Q.  And is that a document that you've
18 reviewed prior to today?
19     A.  Yes.
20     Q.  And is it your understanding that this
21 is a notice of 30(b)(6) deposition which you're here
22 for today?
23     A.  Yes.
24     Q.  And is it your understanding that you
25 are here today testifying on behalf of Planned

1  Parenthood Greater Ohio?
2      A.  Yes.
3      Q.  And if you would turn to Schedule A,
4  which is attached to Exhibit 1.  I understand that
5  you are here offering testimony on behalf of PPGOH on
6  some but not all of the topics that are set forth in
7  this schedule; is that correct?
8      A.  That's correct.
9      Q.  And so I just want to walk through very
10 briefly and make sure that I understand what you will
11 be testifying about here today.
12     No. 1 is corporate structure.  And we
13 have been talking about that here today.  And you are
14 in fact prepared to testify about corporate
15 structure; is that correct?
16     A.  Correct.
17     Q.  It's my understanding that you will be
18 testifying about what is listed in topic No. 2, but
19 only with respect to particular programs; is that
20 correct?
21     A.  Correct.
22     Q.  And which programs will you be prepared
23 to talk about here today?
24     A.  The infertility prevention program, the
25 STI testing, and the breast cancer awareness grant.

1      Q.  And for breast cancer awareness, if we
2  refer to this as BCCP would you understand that to
3  mean --
4      A.  Sure.
5      Q.  -- breast cancer and cervical cancer
6  screening program?
7      A.  Yes.
8      Q.  And you mentioned -- the other
9  organization that you mentioned, can you give me the
10 name that you used for that?
11     MR. WOLFSON:  Objection.
12 By Ms. Richardson:
13     Q.  The infertility prevention, IPP; is that
14 correct?
15     A.  Correct.
16     Q.  And what does that stand for?
17     A.  Infertility prevention program.
18     Q.  And if we refer to that as the STD
19 Prevention Program, would that be referring to the
20 same program, as you understand it?
21     A.  Yes.
22     Q.  Any other programs or organizations that
23 you will be talking about here today with respect to
24 topic No. 2?
25     A.  No.

1      Q.  And it's my understanding that you will
2  also be here to talk about the topic in No. 3, which
3  is the claims and allegations set forth in the
4  complaint, again as they relate to the programs that
5  we have just discussed; is that correct?
6      A.  Correct.
7      Q.  Same with respect to topic No. 4,
8  regarding the alleged affects of Ohio Revised Code
9  Section 3701.034, that you'll be prepared to talk
10 about topic No. 4 as it relates to the programs that
11 you've alleged --
12     A.  Correct.
13     Q.  The programs that we have just
14 discussed.
15     And with respect to Section 3701.034, is
16 it your understanding that that is the statute that
17 you're challenging in this case?
18     A.  Yes.
19     Q.  And so if I just refer to that as the
20 challenged statute, would we both agree that that
21 relates to Section 3701.034?
22     A.  Yes.
23     Q.  And I understand you'll be talking today
24 about topic No. 5 as it relates to the programs
25 you've identified?

1    A. Yes.
2    Q. And also topics 6, 7, 8 and 10 as they
3  relate to those programs; is that correct?
4    A. Correct.
5    Q. And you will not be talking about topic
6  No. 9; is that right?
7    A. That's correct.
8    Q. And so with respect to the topics that
9  we have just gone over that you are here to talk
10  about today, are there any of those that you're not
11  prepared to talk about?
12    A. No.
13    Q. Can you describe for me what you did to
14  prepare for today's deposition?
15    A. I met with our attorneys.
16    Q. And aside from meetings with counsel,
17  did you meet with anyone else to prepare for today's
18  deposition?
19    A. No.
20    Q. Did you talk to anyone else even outside
21  of a meeting to prepare for today's deposition?
22    A. I reviewed the materials and talked with
23  some of my staff.
24    Q. And which staff members specifically did
25  you talk to to prepare for today's deposition?

1
2
3    A. Her role is the director of business
4  operations.
5    Q. What does the director of business
6  operations do?
7    A. She has a wide variety of
8  responsibilities related to supporting of health
9  services.
10    Q. And if you could just give me an example
11  of some of the responsibilities that would fall
12  within her job title.
13    A. She's in charge of our Title 10 program,
14  data analysis.
15    Q. And what type of data analysis would she
16  provide?
17    A. Reports upon request.
18    Q. What types of reports?
19    A. Service statistics.
20    Q. And so those would be statistics on the
21  number of abortions that PPGOH provides?
22    A. Not part of her Title 10
23  responsibilities, no.
24    Q. As part of any of her responsibilities?
25    A. Not necessarily, no.

1    Q. Would they be part of her data analysis
2  responsibilities?
3    A. No.
4    Q. And would they be part of any of her
5  other responsibilities?
6    A. No.
7    Q. Who would be responsible for maintaining
8  or compiling data with respect to the number of
9  abortions provided?
10    MR. WOLFSON: Objection. And do we have
11  to have the names?
12    MS. RICHARDSON: In almost all
13  circumstances, unless I specify otherwise, job titles
14  will be sufficient.
15    MR. WOLFSON: All right.
16    THE WITNESS: That information would be
17  available by a practice manager -- or practice
18  manager in the surgery centers.
19  By Ms. Richardson:
20    Q. And how many practice managers are
21  there?
22    A. One.
23    Q. And where is he or she located?
24    A. She splits her time between Bedford
25  Heights and east.

1    Q. And so would she be responsible for
2  compiling that data?
3    A. Yes.
4    Q. And then I assume that that would be
5  maintained somewhere by the organization as a whole,
6  correct?
7    MR. WOLFSON: Objection.
8    THE WITNESS: Yes.
9  By Ms. Richardson:
10    Q. Are there reports that PPGOH provides
11  that contain that information, correct?
12    A. Yes.
13    Q. And who would be responsible for
14  creating those reports?
15    MR. WOLFSON: Again, job title if you
16  can.
17    THE WITNESS: Practice manager.
18  By Ms. Richardson:
19    Q. And you supervise the practice manager,
20  correct?
21    A. Correct.
22    Q. Did you speak with a practice manager in
23  preparation for your deposition today?
24    A. No.
25    Q. Did you review any of these reports in

1  preparation for your deposition today?
2      A.  No.
3      Q.  And who else did you speak with to
4  prepare for today's deposition?
5      A.  I reviewed the reports in general.
6      Q.  Which reports specifically did you
7  review?
8      A.  The documents that are in front of me.
9      Q.  And so right now you have in front of
10  you the notice of 30(b)(6) deposition, which we have
11  marked as document 1.  Are you also referring to the
12  interrogatory responses which are in front of you?
13      A.  Yes.  And the claim, the original claim.
14      Q.  And so are you referring to -- and the
15  interrogatory responses are marked as Exhibit 2 in
16  front of you; is that correct for the record?
17      A.  Yes.
18      Q.  And are you also then referring to the
19  complaint that was filed in this case which has been
20  marked as Exhibit 3?
21      A.  Yes.
22      Q.  Apart from those documents related to
23  this case, did you review any other documents to
24  prepare today?
25      A.  No.

1      Q.  Did you review any financial reports or
2  other data reports?
3      A.  I reviewed what was submitted originally
4  in your document review -- or the document request.
5      Q.  You reviewed the documents that PPGOH
6  provided to the defendant in this case in response to
7  our request for production of documents; is that
8  correct?
9      A.  That's correct.
10      Q.  And which documents in particular did
11  you review?
12      A.  Our audited financial statements.
13      Q.  For which years?
14      A.  '13, '14, and '15.
15      Q.  Did you review any other documents that
16  you had produced to us?
17      A.  I reviewed the budgets that were
18  produced as well.
19      Q.  And are these program budgets that
20  you're referring to?
21      A.  I reviewed the overall budget that was
22  produced.
23      Q.  For which year?
24      A.  '13, '14, and '15.
25      Q.  Did you review any other documents to

1  prepare for today?
2      A.  No.
3      Q.  And I believe -- I'm sure I'm going to
4  get this number wrong, but I believe you, meaning
5  Planned Parenthood of Greater Ohio, produced
6  approximately 4,000 documents.  Did you personally
7  review all of those documents?
8      A.  No.
9      Q.  Were there other documents within those
10  that you produced to the defendant in this case that
11  you personally reviewed, either in preparation for
12  this deposition or at any other point recently?
13      A.  I personally reviewed the overall
14  financial documents, the audit, and the budget
15  numbers, because those were ultimately, as CFO, my
16  responsibility.
17      Q.  Did you review any e-mails or
18  correspondence?
19      A.  I reviewed one e-mail chain regarding
20  data.
21      Q.  And who was that e-mail chain between?
22      MR. WOLFSON:  Objection.
23      THE WITNESS:  It was between Diego and
24  members of our --███████████  and
25  myself.

1  By Ms. Richardson:
2      Q.  And what was the substance of that
3  e-mail chain?
4      A.  It was collecting the data in regards to
5  the IPP program.
6      Q.  What data specifically was discussed in
7  that e-mail chain?
8      MR. WOLFSON:  Objection.  Let me just
9  ask a question here.  Barbara, were you -- are you
10  saying that you reviewed this e-mail as part of your
11  preparation for the deposition, or as part of another
12  aspect of the lawsuit?  Do you understand the
13  difference?
14      THE WITNESS:  I reviewed this as
15  preparation for the lawsuit, as part of the lawsuit.
16      MR. WOLFSON:  But was it as part of the
17  preparation for the deposition today?
18      THE WITNESS:  Yes.
19  By Ms. Richardson:
20      Q.  And I'm sorry, I believe the question
21  that I had asked was which -- I believe you testified
22  that this e-mail chain that you reviewed related to
23  data from the STD Prevention Program; is that
24  correct?
25      A.  Correct.

Page 181

1      Q.  And which data in particular was
2   discussed in that e-mail chain?
3      A.  The number of procedures that we
4   provided and the documentation -- the data for the
5   number of procedures for the -- for the number of
6   tests that were actually provided.
7      Q.  The number of STD tests that were
8   provided?
9      A.  Right.
10      Q.  Do you recall what that number was, the
11   number of tests that PPGOH provides pursuant to --
12   the number of STD tests that were discussed in this
13   e-mail?
14      A.  It's approximately 60,000 tests and
15   treatments.
16      Q.  And are these the total number of STD
17   tests and treatments that PPGOH provides?
18      A.  Yes -- no, I'm sorry.  It's the total
19   number that they provide under the grant.
20      Q.  And you're referring to the STD
21   Prevention Program grant?
22      A.  Correct.  As part of the program.
23      Q.  And we're going to talk some about that
24   program here momentarily, but how many total STD
25   tests does PPGOH provide in a given year?

Page 182

1      A.  We provide approximately 90,000 tests in
2   a given year.
3      Q.  And how many treatments for STDs does
4   Planned Parenthood provide in a given year, PPGOH
5   provide?
6      A.  I don't know the answer to that.
7      Q.  And so let me just start with a broader
8   question.  What is your understanding of the programs
9   that would be impacted by the law that's being
10   challenged in this case?
11      A.  In this instance we receive free testing
12   services for syphilis and gonorrhea, and the
13   treatment for those.
14      Q.  And this is under the STD Prevention
15   Program?
16      A.  And this is under the STD Prevention
17   Program.
18      Q.  And you just said you provide 60,000
19   tests pursuant to -- specifically to that program, is
20   that accurate?
21      A.  That's correct.
22      Q.  And would that be for a particular year?
23      A.  That's for calendar year 2015.
24      Q.  How does that compare to prior years in
25   terms of the total number of STD tests provided under

Page 183

1   the STD Prevention Program?
2      A.  It's actually consistent with prior
3   years as well.
4      Q.  And so can you just briefly kind of
5   describe to me, as you understand it, how the STD
6   Prevention Program works?
7      A.  We submit the tests to the State.  We
8   receive the results back from that.  We provide the
9   treatment services for that.  The testing kits are
10   actually mailed to us as well.
11      We are -- the lab that performs the test
12   bills commercial insurance or Medicaid for those
13   tests, and ODH is billed for those that don't have
14   Medicaid or commercial insurance available for them.
15      As part of our continuous quality
16   improvement, because this is an infertility
17   prevention project, we include those tests in our
18   well women visits.
19      Q.  So does that mean that all women who
20   would come into one of the family planning centers to
21   receive an overall well woman visit would be tested
22   as a matter of course?
23      A.  They would be provided the opportunity
24   for a test as a matter of course, yes.
25      Q.  And so which if any of those patients

Page 184

1   would receive tests that were provided by the
2   Department of Health pursuant to the STD Prevention
3   Program?
4      MR. WOLFSON:  Objection.  Go ahead.
5      THE WITNESS:  I'm sorry, could you state
6   that again?
7   By Ms. Richardson:
8      Q.  Sure.  So as I understand it -- well,
9   can you just describe for me generally what is a well
10   woman visit?
11      A.  That would be your standard
12   gynecological care visit when you would come in for
13   your annual pap test and all the vitals that go with
14   that.
15      Q.  And all of those women would be offered
16   an opportunity to be screened for an STI; is that
17   correct?
18      A.  That's correct.
19      Q.  Are those women -- do they all receive
20   testing using testing kits that have been provided
21   pursuant to the STD Prevention Program?
22      A.  In all but two of our family planning
23   centers.  Mansfield and Wooster do not have that.  In
24   all of our other 17 family planning centers, yes,
25   they would receive those.

Page 185

1    Q. And I'm sorry, which were the two that
2  do not offer?
3    A. Mansfield and Wooster are the only two.
4    Q. And so pursuant to the STD Prevention
5  Program, ODH would provide PPGOH with actual testing
6  kits, is that correct?
7    A. That's correct.
8    Q. And then as I understand your testimony,
9  PPGOH submits those tests to a particular lab; is
10  that correct?
11    A. That's correct.
12    Q. And is that outlined in the ODH grant,
13  for lack of a better word, although I understand it's
14  not a monetary grant?
15    A. Yes.
16    Q. And then in the event that that test is
17  positive and shows that there is an STI, treatment
18  would be provided for that patient; is that correct?
19    A. Yes.
20    Q. And does the treatment also come
21  directly from the Department of Health in that
22  circumstance?
23    A. The medication itself, yes.
24    Q. Does PPGOH provide -- assess any charges
25  to the patient for the provision of that STD

Page 186

1  screening?
2    A. No.
3    Q. What about any kind of collection fee or
4  other type of fee?
5    A. Not for that screening.
6    Q. What fees would that patient be charged?
7    A. They would be charged an office visit
8  according to the CPT code for that particular
9  service.
10    Q. And so would all patients who come into
11  PPGOH to obtain an STD screening test be charged an
12  office visit fee?
13    A. Not necessarily, but most of them would.
14    Q. And under what circumstances would a
15  patient not be charged that fee?
16    A. They would be charged some office visit
17  fee.
18    Q. What is the amount of that office visit
19  fee?
20    A. It would vary depending on what was
21  included in that office visit.
22    Q. So let's start first with the well woman
23  visit that you described. What would the office fee
24  for that visit be?
25    A. Again, it would vary depending on what

Page 187

1  was included in that overall visit, and it's a
2  standard -- that's the standard CPT code billed
3  through the Medicaid services.
4    Q. And so if this is a patient who is not
5  on Medicaid, would it be different?
6    A. No, it's a standard charge.
7    Q. And you don't know sitting here what
8  the -- off the top of your head what that charge
9  would be?
10    A. I don't.
11    Q. Is that set forth in a fee schedule or
12  some other document?
13    A. Yes.
14    Q. Is it the same for all patients who
15  receive a particular service, or is it based on
16  ability to pay, or some other factor?
17    A. The top charge is the same, and that's
18  based on, again, the regulations between commercial
19  insurance payers, Medicaid and so forth. We provide
20  services on a sliding fee scale based on the client's
21  ability to pay. We use the sliding fee scale
22  obligated by the Title 10 and federal guidelines.
23    Q. And how does that sliding fee scale
24  work? I've seen that referenced in some of the
25  documents.

Page 188

1    A. There's a financial interview with the
2  person as part of their normal intake. They offer
3  either -- they either bring documented evidence or
4  provide documentary discussion of their sources of
5  income, the number of their family, and they are
6  charged a percentage of the fee based on the number
7  of people in their family and the annual income.
8    Q. So do I understand correctly, then, that
9  a patient receives a particular set of services, and
10  that would basically determine the baseline charge
11  for that visit, but then the amount that that patient
12  actually pays might be different based on ability to
13  pay, is that correct?
14    MR. WOLFSON: Objection to the form.
15    THE WITNESS: So could you ask that
16  again?
17  By Ms. Richardson:
18    Q. I'm just trying to make sure I
19  understood correctly your answers to the prior
20  question. And so I thought you said that as a
21  starting point, that patients who received the same
22  service would be charged the same amount because it's
23  the service itself that dictates the charge; is that
24  correct?
25    A. That's correct.

1    Q. And then I asked you about the sliding
2 fee scale, which it sounds like based -- the amount
3 that a patient actually pays would depend on his or
4 her actual ability to pay as determined by various
5 factors that you've just described?
6    A. Yes, in addition to their other
7 resources such as commercial insurance and/or
8 Medicaid.
9    Q. And so let's say two different patients
10 come in and receive a well woman visit. Would they
11 both go through that financial interview?
12    A. Yes.
13    Q. Is that true for all patients who come
14 in as a matter of course?
15    A. Yes.
16    Q. And so let's assume that those two
17 patients receive exactly the same services pursuant
18 to their well woman visit. It's possible, depending
19 on the outcome of their financial interview, that
20 those two patients would pay different amounts; is
21 that correct?
22    A. I'm sorry, could you -- could you repeat
23 that again, please?
24    Q. Sure. Those two patients would not
25 necessarily pay the same amount for the services they

1 received even though the services are the same,
2 correct?
3    A. What two patients?
4    Q. I just -- I just described two different
5 hypothetical patients who come in for a well woman
6 visit and receive identical services. Those two
7 patients would not necessarily pay the same amount of
8 money even though they received the same services,
9 correct?
10    A. For what -- what would dis -- describe
11 what is distinguishing those two individuals.
12    Q. Their ability to pay. I'm trying to
13 understand the role that the ability to pay interview
14 and the sliding scale has, how that fits in. So I'm
15 basically trying to reconcile -- I thought you
16 started out saying that the service dictates the
17 charge; is that correct?
18    A. That's correct.
19    Q. And yet there's also the sliding scale
20 that determines what the person should pay based on
21 his or her ability to pay, correct?
22    A. Correct.
23    Q. And so I'm trying to figure out how
24 those two things fit together.
25    A. There is one standard fee schedule. A

1 percentage discount is applied to the fee schedule
2 based on the individual's ability to pay.
3    Q. Thank you. And is that sliding fee
4 scale, is that set forth in particular documents?
5    A. Yes.
6    Q. And what would the name of that document
7 be? Where would that be set forth?
8    A. The sliding fee schedule. And this is a
9 federal schedule that is approved by Title 10.
10    Q. It's dictated by the Title 10 grant?
11    A. Yes.
12    Q. So going back to the STD Prevention
13 Program, I understand that all patients who come in
14 to receive a well woman visit will receive an STD
15 screening pursuant to the STD Prevention Program; is
16 that correct?
17    A. They will be provided the opportunity.
18    Q. Under what other circumstances would
19 patients receive STD screening pursuant to the STD
20 Prevention Program? Can a patient make an
21 appointment just to come in and receive STD
22 screening?
23    A. Yes.
24    Q. And under that circumstance would
25 they -- would you use one of the kits that was

1 provided pursuant to the STD Prevention Program?
2    A. Yes.
3    Q. And so I believe you testified earlier
4 that looking just at the most recent year, PPGOH
5 provided approximately 90,000 STD screening tests; is
6 that correct?
7    A. Yes.
8    Q. And only 60,000 of those were provided
9 under the STD Prevention Program, right?
10    A. Correct.
11    Q. And so where do those other 30,000 come
12 from?
13    A. They would have been from our Mansfield,
14 our Wooster center, or the two surgical centers.
15    Q. And in the Mansfield and Wooster
16 centers, how are patients charged for the STD
17 screening?
18    A. We have a separate lab for those
19 services.
20    Q. And are patients charged for receiving
21 STD screening?
22    A. They would be if they didn't have the
23 Medicaid or insurance, and then they would bill us
24 back for the lab fee.
25    Q. Who would bill you back for the lab fee?

Diego Espino, Barbara Singhaus and Iris Harvey

Page 193

1     A.  The lab.
2     Q.  And is it possible, depending on ability
3  to pay, that some of those patients would not
4  actually pay anything for the STD test?
5     A.  Yes.
6     Q.  And approximately of those 30,000 that
7  are not covered by the STD Prevention Program, how
8  many of those are provided free of charge?
9     A.  I don't know that.
10    Q.  But if a patient comes in and meets the
11  various specifications under your sliding scale, he
12  or she would not actually have to pay anything for
13  that STD screening, correct?
14       MR. WOLFSON:  Objection.
15       THE WITNESS:  In those locations.
16  By Ms. Richardson:
17    Q.  And in the surgical centers -- I believe
18  you testified that patients also receive STI
19  screening in the surgical centers; is that correct?
20    A.  Correct.
21    Q.  And is that when they are going to the
22  surgical center to receive abortion services?
23    A.  Correct.
24    Q.  Are all patients receiving abortion
25  services given the option to have STI screening as a

Page 194

1  matter of course?
2     A.  No.
3     Q.  Under what circumstances would a patient
4  receiving abortion services receive STI screening?
5     A.  If they were presented in an
6  asymptomatic way.
7     Q.  And I believe you testified earlier that
8  as part of the initial screening, a health
9  professional would conduct some type of evaluation to
10  determine whether or not there are any symptoms or
11  signs of an STI; is that correct?
12    A.  Correct.
13    Q.  And could a patient in a surgical center
14  receive testing using one of the kits that is
15  provided by the Department of Health under the STD
16  Prevention Program?
17    A.  No.
18    Q.  And how do you know that?
19    A.  They are not available to them.
20    Q.  Why not?
21    A.  Because they are not part of the
22  program.
23    Q.  And are the testing kits that are
24  used -- well, where does PPGOH obtain the testing
25  kits that are used in the surgical centers?

Page 195

1     A.  They are ordered from the CDD lab.
2     Q.  And that's the same lab that processes
3  the tests that do come in through the STD Prevention
4  Program, right?
5     A.  Right.
6     Q.  And has it always been true that
7  patients in the surgical centers were tested using
8  tests other than those provided for the STD
9  Prevention Program?
10    A.  Yes.
11    Q.  Has there ever been a time when STD
12  tests, but not medication, was provided to patients
13  receiving services at the surgical centers?
14       MR. WOLFSON:  Objection.  Go ahead.
15       THE WITNESS:  East surgical center had
16  family planning services two years ago, and had a
17  contract for IPP testing.  We discontinued that
18  contract when they stopped providing family planning
19  services at the east center.
20  By Ms. Richardson:
21    Q.  And when did they stop providing family
22  planning services?
23    A.  Two years ago.
24    Q.  So sometime in 2014?
25    A.  Correct.

Page 196

1     Q.  Do you know what month that would have
2  been?
3     A.  It would have been June 30th, July 1st,
4  2014.
5     Q.  Does that relate to a fiscal year?
6     A.  It relates to the contract, the IPP
7  contract and the fiscal year, yes.
8     Q.  And why did the east Columbus surgical
9  center stop providing family planning services?
10    A.  We could more effectively provide that
11  at our Franklinton center.
12    Q.  And are the family planning services
13  still provided at the Franklinton center?
14    A.  Yes.
15    Q.  In the event that the law that is being
16  challenged here takes effect, what impact do you
17  believe that will have on STD testing, specifically?
18       MR. WOLFSON:  Objection.  You mean under
19  the program, or generally?
20  By Ms. Richardson:
21    Q.  I'm asking generally.
22    A.  I believe that the -- the lack of the
23  free testing, which will result if the law takes an
24  affect, will make those women who are offered the
25  opportunity for the preventive nature of that STI

49 (Pages 193 to 196)

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Page 197

1  testing, or who may even need it but can't provide
2  any ability to pay for it, will choose not to have
3  the test, and so it will be both a financial burden
4  for us for those -- for that piece, but it will be --
5  it will impact the health service provided for that
6  patient.
7      Q.  And so I want to break that down a
8  little bit.
9      MR. WOLFSON:  Before do you, Ryan, could
10  we take a break at this point?  We have been going
11  more than an hour.
12      MS. RICHARDSON:  Sure, we can take a
13  ten-minute break.
14      (Recess taken.)
15      MR. WOLFSON:  Pursuant to the protective
16  order, we're going to designate the entire transcript
17  of this deposition as confidential, and we'll review
18  the transcript as provided by the protective order.
19      MS. RICHARDSON:  We object to that
20  designation for the reasons previously discussed, but
21  we agree that that is what the order that the court
22  has entered requires.
23  By Ms. Richardson:
24      Q.  Before the break we were talking about
25  the law that's being challenged in this case, and I

Page 198

1  want to make sure I understand, you began to provide
2  an answer about some of the impacts that you believe
3  may occur.  Do you recall that?
4      A.  Yes.
5      Q.  And so I want to make sure that I
6  understand.  I believe it's been provided in
7  documents that PPGOH has provided to us, which we'll
8  go over in more detail later, that you will stop
9  providing STD screening pursuant to the specific STD
10  Prevention Program that is referenced in the law
11  that's being challenged; is that correct?
12      A.  No, we will -- we will not be able to
13  provide that for free under all circumstances.
14      Q.  But you will still provide STD screening
15  going forward even if this law takes effect; is that
16  correct?
17      A.  Yes.
18      Q.  And in some cases you will still provide
19  STD screening for free; is that correct?
20      A.  In those cases where our Title 10
21  funding would qualify the individual for zero fee.
22      Q.  And that's based on the ability to pay
23  system that you were describing earlier, correct?
24      A.  Correct.
25      Q.  So if the individual is not able to pay

Page 199

1  under the guidelines set forth in Title 10, that
2  individual would still be eligible to receive a free
3  STD screening at a PPGOH facility; is that correct?
4      A.  If they qualified for zero on the
5  sliding fee scale.
6      Q.  And apart from eliminating the testing
7  kits that were previously provided by the Department
8  of Health, the law would not have any other impact on
9  the provision of STD screening specifically, right?
10      MR. WOLFSON:  Objection.
11      THE WITNESS:  It's providing the testing
12  kit and the processing fee with the lab.
13  By Ms. Richardson:
14      Q.  And what is the processing fee?
15      A.  That depends on lab to lab.  Right now
16  that's what ODH pays for.  They provide the kit and
17  the dollars associated with the processing.
18      Q.  Thank you.  And so -- thank you for that
19  clarification.  So apart from the testing and
20  medication that were previously provided by ODH,
21  there will be no other impact on PPGOH's provision of
22  STD screening services; is that correct?
23      A.  Yes.
24      Q.  And --
25      MR. WOLFSON:  Did you understand --

Page 200

1      THE WITNESS:  Actually, it does change
2  our internal processes because right now we're
3  sending those to ODH.  So we will have to contract
4  with a lab in order to accommodate that.  The service
5  itself will remain the same.
6  By Ms. Richardson:
7      Q.  And in fact, you already have a contract
8  separate and apart from the STD Prevention Program
9  with the same lab; is that correct?
10      A.  We do not have a contract with the same
11  lab at this time.  Our other processing is through a
12  different lab.
13      Q.  Okay.  So I may have misunderstood your
14  testimony previously.  I thought you mentioned that
15  STD screening tests that were applied in the surgical
16  centers were sent to the same lab that you used for
17  processing of the STD Prevention Program screening.
18  Did I misunderstood that?
19      A.  That is not correct.  You misunderstood
20  that.
21      Q.  So which lab currently processes the
22  testing that is provided under the STD Prevention
23  Program?
24      A.  I don't think that -- is that a
25  required --

1          MR. WOLFSON:  Go ahead and answer if you
2    can|
4    By Ms. Richardson:
5          Q.  And what lab processes the testing that
6    is sent out of the STD Prevention Program currently?
7          MR. WOLFSON:  Objection.
8          THE WITNESS:  I'm sorry?
9    By Ms. Richardson:
10         Q.  You testified earlier, I believe, that
11   the STD screening tests that are administered in the
12   surgical centers are not covered under the STD
13   Prevention Program currently; is that correct?
14         A.  That's correct.
15         Q.  And so what lab processes the testing
16   kits that are sent from the surgical centers?
17         MR. WOLFSON:  Objection.
18
19   By Ms. Richardson:
20         Q.  And is that not the same lab?
21         A.  No.  Center for Disease Detection, CDD,
22   is the ODH lab
23         Q.  Thank you for clarifying.
24         A.  Sorry.
25         Q.  And you mentioned previously that there

1    are two family planning centers that do not currently
2    participate in the STD Prevention Program; is that
3    correct?
4          A.  That's correct.
5          Q.  And that was Wooster and Mansfield.  Did
6    I recall that correctly?
7          A.  It was definitely Wooster.  Mansfield
8    actually has part of the treatment program, but not
9    the testing available.  And that was just an
10   oversight in the contracting process as of last
11   physical year, and they are small centers.
12         Q.  So the exclusion of both the Wooster and
13   part of Mansfield from the program was related to --
14   did you call it a contracting oversight?
15         A.  Correct.
16         Q.  And what do you mean by a contracting
17   oversight?
18         A.  There wasn't a contract sent to them and
19   it did not get included in the process.
20         Q.  And so I want to understand a little bit
21   more about the policies that relate to the office
22   visits that are charged.  And I believe you testified
23   earlier that the office visit would -- fee would
24   depend, based on the services that were administered;
25   is that correct?

1          A.  Correct.
2          Q.  And so if a patient comes in to a PPGOH
3    family planning center for the sole purpose of
4    receiving STD screening, what would that office
5    charge be?
6          A.  I don't know.  I don't know exactly what
7    that charge would be.
8          Q.  Can you give me just a general ballpark
9    as to what that fee would be?
10         A.  For the lab fee, itself, depending on
11   the sliding fee scale it was 8 to -- I believe 8 to
12   19 -- I'm sorry, 8 to $30, and that's a ballpark.
13   I'm sorry, I don't have that recollection.
14         Q.  And that's the lab fee, you said?
15         A.  That would be the lab fee associated
16   with that test.
17         Q.  Is that different than the office charge
18   that the patient would be charged?
19         A.  It could be.
20         Q.  What would the office charge be for a
21   patient who comes into a PPGOH center solely for the
22   purpose of receiving STD screening?
23         A.  We don't -- there currently isn't an
24   office charge associated with just the STD screening.
25   It would be incorporated with if they were coming in

1    for a full test.
2          Q.  And so -- what do you mean "a full
3    test"?
4          A.  A full well woman visit.
5          Q.  Thank you.  And so you mentioned that
6    women who come in for a well women visit are given
7    the option of receiving STD screening; is that
8    correct?
9          A.  Correct.
10         Q.  And so some women might elect not to
11   receive that, is that fair?
12         A.  It is.
13         Q.  And would the office charge for a woman
14   who receives STD screening as part of her well woman
15   visit differ from that of a woman who elects not to?
16         A.  No.
17         Q.  It would be the same fee regardless?
18         A.  Correct.
19         Q.  And do you recall generally in terms of
20   a ballpark for a well woman visit what the office
21   charge would be?
22         A.  I'm sorry, I don't.
23         Q.  But that would be provided in that same
24   fee structure document that you mentioned earlier?
25         A.  Yes.

Page 205

1      Q. And the lab fee that you mentioned, the
2  8 to $30 I believe you testified, is that assessed to
3  a patient who comes in and receives a testing kit
4  provided under the STD Prevention Program?
5      A. No.
6      Q. And so which patients would be assessed
7  the lab fee?
8      A. That would only be if the grant wasn't
9  available to us.
10     Q. And so currently in the two facilities
11 that are not fully participating in the STD
12 Prevention Program, how are patients charged for STD
13 screening in those locations?
14     A. If they would have the screening it
15 would be just included in their well woman visit fee.
16     Q. And what about for a patient who comes
17 in to the Wooster or Mansfield locations and only
18 receives STD screening, would they be assessed an
19 office charge?
20        MR. WOLFSON: Objection.
21        THE WITNESS: I don't believe that --
22 that doesn't generally occur.
23 By Ms. Richardson:
24     Q. Why not?
25     A. They would be -- it just doesn't

Page 206

1  generally occur.
2      Q. Which part doesn't happen, the
3  individuals do not come into the site to receive STD
4  screening?
5      A. To receive solely STD screening.
6      Q. And so outside of the context of the
7  well woman visit that you've described, what other
8  circumstances -- under what other circumstances would
9  a patient receive STD screening?
10     A. It's generally part of a well woman
11 visit or part of an overall visit.
12     Q. What about if someone comes in to
13 receive HIV testing, would they also be given an STD
14 screening as well?
15     A. Not necessarily.
16     Q. Would there be circumstances where they
17 might obtain both?
18     A. I don't know that.
19     Q. Any other circumstances where patients
20 would generally receive STD screening at any of your
21 family planning centers?
22     A. No.
23     Q. And in the case of a well woman visit,
24 the office charge that is assessed, how is that
25 processed by PPGOH?

Page 207

1        MR. WOLFSON: Objection.
2        THE WITNESS: As a medical charge
3  according to our Medicaid commercial insurance
4  billing.
5  By Ms. Richardson:
6      Q. Does it go into PPGOH's general fund,
7  general revenue fund?
8      A. It goes into our general health services
9  revenue.
10     Q. Now I'd like to ask you about a
11 hypothetical circumstance of a patient who comes in
12 and receives STD screening either as part of a whole
13 well visit or just for the STD screening. Are there
14 circumstances where she might be given a pregnancy
15 test?
16        MR. WOLFSON: Objection.
17        THE WITNESS: There could be.
18 By Ms. Richardson:
19     Q. And so let's say that a woman is there
20 for a whole woman exam and she indicates that she
21 might be pregnant. Would she be given a pregnancy
22 test as part of that visit?
23        MR. WOLFSON: Objection.
24        THE WITNESS: She would have to schedule
25 an appointment for a pregnancy test. That would be a

Page 208

1  part of the -- another part of the visit.
2  By Ms. Richardson:
3      Q. And so she would not be able to obtain
4  the pregnancy test as part of the general well woman
5  visit?
6      A. It would be a separate service.
7      Q. Could she receive that while she's there
8  that same day?
9      A. Potentially.
10     Q. And so what do you mean --
11     A. Hypothetically.
12     Q. When you say that that would be a
13 different service, do you just mean it would be coded
14 differently?
15     A. Yes.
16     Q. And what does -- what is the implication
17 or import of that coding?
18        MR. WOLFSON: Objection.
19        THE WITNESS: The coding is how each
20 individual service has an assigned medical code
21 that's correspondent with all of the medical coding,
22 so it would be a separate medical code.
23 By Ms. Richardson:
24     Q. And if the woman was given a pregnancy
25 test and it turned out that she was, in fact,

Page 209

1   pregnant, would she receive options counseling at
2   that time?
3           MR. WOLFSON:  Objection.
4           THE WITNESS:  If she requested options
5   counseling and did not have an intention as to her
6   intentions with the pregnancy, she would be provided
7   options counseling under our Title 10 requirements.
8   By Ms. Richardson:
9       Q.  And what does that entail?
10          MR. WOLFSON:  Objection.  What is what,
11  what is "that"?
12  By Ms. Richardson:
13      Q.  You mentioned that she would be provided
14  options counseling under your Title 10 protocol.  Did
15  I understand that correctly?
16      A.  Correct.
17      Q.  And so what does that options counseling
18  under the Title 10 program entail?
19      A.  It entails all options of continuing the
20  pregnancy, adoption services, and terminating the
21  pregnancy.
22      Q.  And would she also be given a list of
23  potential abortion providers as part of that options
24  counseling?
25          MR. WOLFSON:  Objection.

Page 210

1           THE WITNESS:  Not necessarily, no.
2   By Ms. Richardson:
3       Q.  If she indicated she might be interested
4   in receiving abortion services, would she be provided
5   with a list of referrals?
6           MR. WOLFSON:  Objection.
7           THE WITNESS:  There are a list of
8   referrals that's included in all the -- along with
9   prenatal referrals and adoption referrals as well.
10  By Ms. Richardson:
11      Q.  And does that include the PPGOH surgical
12  facilities as well?
13          MR. WOLFSON:  Objection.
14  By Ms. Richardson:
15      Q.  In other words -- let me rephrase that.
16  Does the referral list include PPGOH surgical
17  facilities?
18      A.  I don't know that specifically.  I
19  haven't seen the list of -- I don't have the list of
20  referrals in my memory at this moment.
21      Q.  And who would have that information?
22      A.  It would be included in the options
23  counseling.
24      Q.  Is that in writing somewhere?
25      A.  The review of the option is part of the

Page 211

1   Title 10 guidelines.
2       Q.  Is that publicly available?
3       A.  I don't know that.
4       Q.  And so who within your organization
5   would know the list of referrals that are provided in
6   the sheet that you would give a patient as part of
7   the options counseling?
8           MR. WOLFSON:  Objection.  And if you --
9   don't use a name if you can avoid it.
10          THE WITNESS:  Representatives in the
11  health center will have that list available.
12  By Ms. Richardson:
13      Q.  What representatives?
14      A.  The health care -- health care
15  associates or the clinicians in the health center
16  would have that list available.
17      Q.  But sitting here today as the person
18  ultimately responsible for the provision of the
19  health care department, you don't know whether the
20  PPGOH surgical center would be included among the
21  various agencies to which the woman might be
22  referred?
23          MR. WOLFSON:  Objection.
24          THE WITNESS:  I can't say with certainty
25  that the actual communication is listed.  I think

Page 212

1   that the person would be instructed to call our
2   customer contact center, which is our centralized
3   appointment scheduling, and they would get that
4   information.
5   By Ms. Richardson:
6       Q.  And the information that would be
7   provided from the customer contact information would
8   include information about the PPGOH surgical center
9   at that point, is that fair?
10      A.  That's fair.  That's correct.
11      Q.  And if -- we talked about the -- the
12  context of a woman coming in and determining that
13  she's pregnant as part of or following a well woman
14  visit, would the protocol be any different if a woman
15  came in to a family planning center and only received
16  STD screening, and it was determined as part of that
17  visit that she was pregnant, would she similarly
18  receive the options counseling that you just
19  described?
20          MR. WOLFSON:  Objection.
21          THE WITNESS:  It would only be
22  associated with an actual pregnancy test.
23  By Ms. Richardson:
24      Q.  And so if a woman comes in to receive
25  STD screening and indicates that she might be

Page 213

1  pregnant, would she be provided with a pregnancy
2  test?
3       A. She would request a pregnancy test. If
4  she requested a pregnancy test.
5       Q. If she requested a pregnancy test one
6  would be provided to her; is that correct?
7       A. Correct.
8       Q. And if it was determined as a result of
9  that pregnancy test that she was in fact pregnant,
10 would she receive the same options counseling that we
11 just described?
12      A. If she was uncertain of what she wanted
13 to do at that point, she would receive that as part
14 of our Title 10 guidelines as she would if she
15 received the pregnancy test or STI testing at any
16 Title 10 provider, including our Health Departments.
17      Q. Who within the family planning centers
18 would actually administer the STD test to a patient,
19 or STD screening, if that's more accurate?
20      A. This would be part of the health
21 center -- it would either be the L.P.N. -- one of the
22 support individuals, either the L.P.N. or the health
23 care associate.
24      Q. Would the nurse practitioner have a role
25 in administering that test?

Page 214

1       A. The nurse practitioner has a role in the
2  treatment and followup of the results.
3       Q. Do the nurse practitioners and L.P.N.s
4  who are employed by PPGOH have to be supervised in
5  some capacity by the physicians who are employed by
6  PPGOH?
7       A. The nurse practitioners are supervised
8  by our two lead regional clinicians, and ultimately
9  the medical director, Dr. Tim Kress.
10      Q. The two regional clinicians. And I'm
11 sorry, where are those clinicians housed?
12      A. We have one for northeast Ohio and one
13 for central Ohio.
14      Q. And are those also the doctors who are
15 employed in the surgical centers?
16      A. No, those are the nurse practitioners,
17 are the regional nurse practitioners, and ultimately
18 our medical director, Dr. Tim Kress.
19      Q. And PPGOH only has one medical director,
20 correct?
21      A. That's correct.
22      Q. And ultimately he oversees both the
23 surgical centers and the family medical -- and the
24 family planning centers, is that correct?
25      A. That's correct.

Page 215

1       Q. Is the same true for the two clinicians,
2  do they supervise both at the family planning centers
3  and the surgical centers?
4       A. Only the family planning centers.
5       Q. Are nurse practitioners permitted to
6  operate independently in the provision of services,
7  or does their work have to be supervised by a medical
8  doctor?
9       A. They operate under the standing orders
10 of the nurse practitioner laws in the State of Ohio.
11      Q. And forgive me for not knowing exactly
12 what that means. Does a doctor have to supervise
13 them, or are they permitted to provide care without
14 the supervision of a doctor?
15      A. The advanced practice nursing laws are
16 always under change in the State of Ohio, but they
17 have standing orders that they can operate under as
18 any medical office in the advance practicing.
19          So it's not the day-to-day supervision,
20 but there are certain protocols that are required for
21 them to practice.
22      Q. And so as part of those are they
23 required at various points in time to report to the
24 doctors that are employed by PPGOH?
25          MR. WOLFSON: Objection.

Page 216

1          THE WITNESS: Report what?
2  By Ms. Richardson:
3       Q. In other words, do the doctors who are
4  employed by PPGOH have any type of role in
5  supervising or overseeing the nurse practitioners who
6  are employed by PPGOH?
7          MR. WOLFSON: Objection.
8          THE WITNESS: We provide standard risk
9  and quality management chart review, overall review,
10 and abide by our standards and our medical protocols.
11 By Ms. Richardson:
12      Q. And that would be chart reviewed by the
13 doctors who are employed by PPGOH?
14          MR. WOLFSON: Objection.
15          THE WITNESS: Some, yes. There is chart
16 review by the doctors as well.
17 By Ms. Richardson:
18      Q. And those doctors also work in the
19 surgical facilities; is that correct?
20      A. That's our medical director. The chart
21 review would be the medical director and the risk and
22 quality management team.
23      Q. The medical director directly reviews
24 the charts and provides the other supervision; is
25 that correct?

Page 217

1    A. Yes.
2    Q. And are there circumstances where the
3 doctors who are employed, apart from the medical
4 director, would have any role in overseeing or
5 interacting with the nurse practitioners at the
6 family medical center?
7        THE WITNESS: No.
8        MR. WOLFSON: Objection.
9 By Ms. Richardson:
10    Q. And what if the nurse practitioner
11 encounters a situation in the family planning center
12 that is beyond her medical skill set, are there
13 circumstances where she would need to consult with or
14 seek advice from one of the doctors?
15       MR. WOLFSON: So once again I would
16 object to this entire line of questioning, but go
17 ahead.
18       MS. RICHARDSON: Thank you. Your
19 objection is noted.
20 By Ms. Richardson:
21    Q. You can answer.
22    A. The nurse practitioner would consult
23 what the medical director.
24    Q. And so I'd like to understand a little
25 bit more. I think you mentioned earlier that

Page 218

1 discontinuing the STD Prevention Program would have a
2 financial impact, and I wanted to understand what you
3 mean by that.
4        So what would be -- under the STD
5 Prevention Program, ODH did not provide any monetary
6 grants to PPGOH; is that correct?
7    A. ODH paid for the lab processing and test
8 kit fee. The lab then bills Medicaid and commercial
9 insurance, and billed the remainder back to ODH.
10 That was revenue in kind to us because we didn't have
11 to pay the remaining balance. So the cost to us
12 would be for that remaining balance.
13    Q. And in some circumstances you've
14 indicated that you'll be passing that remaining
15 balance on to patients; is that correct?
16       MR. WOLFSON: Objection.
17       THE WITNESS: Patients would be charged
18 based on their ability to pay.
19 By Ms. Richardson:
20    Q. And so have you done an analysis to
21 determine the overall net financial impact of
22 discontinuing services under the STD Prevention
23 Program? And again by you, I mean the organization
24 as a whole.
25    A. From a preliminary impact it would -- we

Page 219

1 have not been -- secured an additional contract as of
2 yet to indicate what that amount would be
3 specifically. The gross exposure is the $400,000
4 assigned to that.
5    Q. But that certainly would be offset by
6 any potential savings, right? That's not the net
7 impact that discontinuing the program would have on
8 PPGOH, right?
9        MR. WOLFSON: Objection.
10       THE WITNESS: It's difficult to
11 determine the net impact at this time.
12 By Ms. Richardson:
13    Q. And what information would you need to
14 be able to determine the net impact?
15    A. We have to look at ultimately the
16 contract to be secured for the lab processing, and
17 ultimately the cost of -- of those people that would
18 continue to receive the services. We have built in a
19 conservative amount into our budget this year, which
20 would be at least half of the amount.
21    Q. And half of what amount?
22    A. Of the 400,000.
23    Q. And so have you built -- what precisely
24 is the amount that you have built into your budget as
25 an estimate of the net impact?

Page 220

1    A. Approximately 200,000.
2    Q. And who did that financial analysis?
3    A. Myself.
4    Q. And you said that is reflected in a
5 budget; is that correct?
6    A. That would conservatively be reflected
7 in the -- a contingency going forward.
8    Q. And do you know whether that budget was
9 provided to us in response to our request for
10 production of documents?
11    A. The '17 budget was not provided. This
12 would be the future budget.
13    Q. And so this would be the budget where
14 you have recorded what you would estimate to be the
15 actual net financial impact of discontinuing the STD
16 Prevention Program, correct?
17    A. Correct.
18    Q. Is there anywhere else where that net
19 impact would be recorded?
20    A. No.
21    Q. And have you done an estimate of the
22 number of overall STD screening tests that you would
23 likely provide going forward if the STD Prevention
24 Program is discontinued?
25    A. Yes. Because the trend has been pretty

1  consistent, we would hope to be able to continue at
2  approximately the same level.
3      Q. And so would that mean that you would
4  expect to provide approximately 90,000 STD screening
5  tests? Did I remember the correct number?
6      A. Correct.
7      Q. And have you done an analysis of how
8  many of those tests you would expect to be offered
9  free of charge?
10      A. Yes. We would not be able to offer
11  anything free of charge except for those that fall at
12  the zero percent on the Title 10 scale.
13      Q. And do you have an estimate as to how
14  many people would qualify for that zero percent under
15  the Title 10 scale?
16      A. I'm sorry, I can't recall that exact
17  number that calculated into our percentage right at
18  it moment.
19      Q. But that's a number that you have
20  calculated; is that correct?
21      A. It was a number we took into
22  consideration when we considered the cost analysis
23  that would be required.
24      Q. And where is that analysis or estimate
25  provided?

1      A. That would be in the projected budget
2  for fiscal year '17.
3      Q. Is that a document you could obtain to
4  continue this deposition today and be able to answer
5  the questions that I'm asking about these estimated
6  impacts?
7      MR. WOLFSON: Objection.
8      THE WITNESS: At this very moment? I'm
9  sorry, obtain now?
10      MS. RICHARDSON: Yes. And at this point
11  I would actually approach counsel about this. This
12  is very clearly requested both in our request for
13  production of documents and within the scope of the
14  notice today, and the witness is not able to provide
15  these numbers from memory.
16      So we would ask either that that
17  document be provided, we'd have an agreement to
18  provide that document, or that she be able to obtain
19  that so that she can refer to it and provide these
20  numbers.
21      MR. WOLFSON: And I don't know for sure
22  we haven't provided it. If we haven't we'll look
23  into that. I'll have to look into that. I'm not
24  going to, you know, have the witness, you know, go
25  get a document right now. We can continue the

1  deposition.
2      MS. RICHARDSON: Okay. We can go back
3  to that issue on a break then to determine how best
4  to proceed.
5  By Ms. Richardson:
6      Q. And so sitting here today, you don't
7  even remember a ballpark estimate of the number of
8  free STD screening tests that you would expect to
9  administer going forward if the STD Prevention
10  Program is discontinued; is that correct?
11      A. Fourteen percent of our patients fall
12  somewhere on the sliding fee scale for self pay. I
13  don't have the breakdown of that as to how much are
14  zero, 20, 40, 60 percent of how the sliding fee scale
15  works.
16      Q. And so 14 percent of the 90,000 would be
17  entitled to some type of reduction under your sliding
18  scale, is that correct?
19      MR. WOLFSON: Objection.
20      THE WITNESS: No, because the 90,000,
21  that would not be the total impact because the 90,000
22  encompasses all of the STI testing, not just the
23  60,000 of STI testing associated -- the 64,000
24  associated with this program.
25  By Ms. Richardson:

1      Q. And so I'm asking going forward, if the
2  STD Prevention Program is discontinued, I believe
3  that you testified that you would estimate that PPGOH
4  would still provide 90,000 total STD screening tests;
5  is that correct?
6      A. Correct.
7      Q. And so I'm trying to figure out what
8  percentage of those would be provided free of charge.
9  And you said 14 percent of patients fall on the
10  sliding scale. Is that all patients for any service?
11      A. Yes. And the complexity of the
12  calculation is why I don't want to quote necessarily
13  answers, because we're talking about Title 10
14  patients. Some of the 90,000 tests are not provided
15  to Title 10 patients, and there's a lot of -- it's
16  not a simple calculation, which is why I can't
17  provide that to you by memory.
18      Q. But just so I understand, that
19  calculation has been done, you just don't recall
20  specifically what it is sitting here today, is that
21  fair?
22      A. Correct.
23      Q. And so I'd like to turn to HIV testing
24  for a moment. And I understand that the HIV
25  Prevention Program that is outlined in the law that's

1  being challenged here is handled primarily through
2  the education department; is that correct?
3      A.  Correct.
4      Q.  But it's also my understanding that the
5  family planning centers also provide HIV testing in
6  circumstances not covered by the educational HIV
7  prevention program; is that correct?
8      A.  Correct.
9      Q.  And so under what circumstances does
10  PPGOH provide HIV testing to patients?
11     A.  If they would -- the program is an
12  outreach program, the education program.  If they
13  would schedule an appointment for an HIV testing in
14  one of our health centers, they could receive HIV
15  testing throughout -- at our other health center
16  locations.
17     Q.  And so I understand that, pursuant to
18  the outreach program there is an HIV screening
19  specialist; is that correct?
20         MR. WOLFSON:  Objection.  That may not
21  be -- I think that's Mr. Espino's domain, not
22  Ms. Singhaus.
23  By Ms. Richardson:
24     Q.  Is that something that you're familiar
25  with?

1      A.  Only to the extent of -- of the grant
2  program.
3      Q.  And so the reason I'm asking, my
4  understanding from the testimony earlier today is
5  that there's an HIV screening specialist who travels
6  to various health centers and provides HIV screening
7  at the health centers.  Is that correct?
8      A.  Only to those health centers associated
9  with the geographic area.
10     Q.  And so for those centers, would the
11  center provide HIV testing outside of the context of
12  the HIV prevention program?
13     A.  No free of charge.
14     Q.  And so how would a patient be charged
15  for an HIV test in a family plan center outside of
16  the scope of the HIV Prevention Program?
17     A.  According to their ability to pay.
18     Q.  Is there a circumstance in which one of
19  the health centers might refer a patient to the
20  health screening specialist?
21     A.  They were available at that time and
22  not in an outreach situation.
23     Q.  And the ability to pay, is this the same
24  ability to pay sliding scale that we have been
25  discussing for the other services?

1      A.  Yes.
2      Q.  And so would there be some patients then
3  under that sliding scale that would qualify for free
4  HIV testing under that scale?
5      A.  Yes.
6      Q.  Do you know approximately how many free
7  HIV tests that PPGOH provides outside of the scope of
8  the HIV Prevention Program?
9      A.  I don't know how many free tests we
10  provide.  I know that it represents about 25
11  percent -- the program represents about 25 percent of
12  all of the HIV tests that we provide.
13     Q.  And so let me make sure I understand
14  that correctly.  Twenty-five percent of all HIV tests
15  PPGOH administers are covered under the HIV
16  Prevention Program; is that correct?
17     A.  That's correct.
18     Q.  Do you know how many total HIV tests
19  PPGOH would provide, and we'll look at the most
20  recent year as an example?
21     A.  About 12,000 total.
22     Q.  And so approximately 25 percent of those
23  would be administered under the HIV Prevention
24  Program?
25     A.  Yes.

1      Q.  And then some amount beyond that would
2  also be free of charge under the sliding scale that
3  we have been talking about; is that correct?
4      A.  That's correct.
5      Q.  And going forward, PPGOH will continue
6  to provide its HIV screening in all of its family
7  centers, correct?
8      A.  That's correct.
9      Q.  And then I believe the other program
10  that you mentioned previously that is referenced in
11  the law that's being challenged here is what we
12  agreed to call the BCCP program; is that correct?
13     A.  Correct.
14     Q.  And can you describe to me generally how
15  the BCCP program works as it relates to PPGOH?
16     A.  I understand there are 11 regional
17  centers across the State where women can go, who then
18  refer to a provider.  Most recently I think that's
19  been reduced to five centers where they -- where the
20  regional centers that refer to the provider.
21         Providers can apply to be a provider of
22  this service, and we -- we only -- this service is in
23  our northeast Ohio centers, and we have had one
24  service in Toledo.  So it's primarily in the
25  northeast Ohio area.

Page 229

1    The woman comes to us and then it's
2 billed according to the regular -- literally the
3 Medicare/Medicaid CPT fee schedule to the regional
4 center for reimbursement.
5    Q. So you send the bill directly to the
6 regional center; is that correct?
7    A. Yes.
8    Q. And do they pay the full amount of that
9 bill?
10    A. They pay according to a fee schedule
11 that's attached to the contract itself. And again,
12 that's by service.
13    Q. Are there circumstances under which the
14 amount that the regional center pays for the visit is
15 less than what PPGOH has charged for those services?
16    A. No, it's paid on the predetermined
17 charge up front with the contract.
18    Q. So in other words, is it fair to say
19 that you charge the amount that is provided for under
20 the program and they reimburse you for that same
21 amount?
22    MR. WOLFSON: Objection.
23    THE WITNESS: We charge the amount
24 that's provided in the contract.
25 By Ms. Richardson:

Page 230

1    Q. And that's the amount that they
2 reimburse you for, correct?
3    A. Correct.
4    Q. And how does the amount that you charge
5 pursuant to the BCCP contract compare to what you
6 would charge for those same services outside of that
7 contract?
8    A. That contract stipulates the same
9 Medicaid, commercial insurance charges that we would
10 charge normally.
11    Q. And are there any fees assessed to the
12 patient who comes in to receive services under the
13 BCCP program?
14    A. Not for those services.
15    Q. What about for the office visit?
16    A. No.
17    Q. And are there circumstances where a
18 patient that comes in through the BCCP program would
19 be charged for other services?
20    A. Not at that visit.
21    Q. And so what circumstances would exist
22 where a patient who gets received through the BCCP
23 program might have to pay some kind of charge?
24    MR. WOLFSON: Objection.
25    THE WITNESS: That visit would be

Page 231

1 reimbursed by the BCCP.
2 By Ms. Richardson:
3    Q. And so let's say that a patient comes in
4 through the BCCP program, and my understanding is
5 that entitles her to breast cancer screening and
6 cervical cancer screening; is that correct?
7    A. Yes.
8    Q. And in the event that the -- during the
9 patient's visit at PPGOH she indicates a desire to
10 receive additional services, what would happen?
11    MR. WOLFSON: Objection.
12    THE WITNESS: I could only -- it would
13 require some sort -- it may require a follow-up
14 scheduling visit. That's an extensive visit that she
15 was scheduled to provide the breast cancer and
16 cervical cancer screening.
17 By Ms. Richardson:
18    Q. And so what if during the breast and
19 cervical cancer screening she asks to receive a
20 pregnancy test; what would the protocol -- what would
21 PPGOH's protocol call for in that circumstance?
22    MR. WOLFSON: Objection.
23    THE WITNESS: The likelihood of that
24 would be rather slim in that she would be -- it's
25 over 40 as well -- but she would have to schedule a

Page 232

1 pregnancy test beyond that.
2 By Ms. Richardson:
3    Q. And would that -- similar to the
4 circumstances we were discussing earlier in the
5 context of the STD screening, is that something that
6 could be provided immediately following her breast
7 and cervical cancer screening?
8    A. I think it would depend on the
9 circumstances.
10    Q. It might be that she would obtain those
11 immediately after, it would just be coded as a
12 different visit, is that accurate?
13    MR. WOLFSON: Objection. Go ahead.
14    THE WITNESS: It would definitely be a
15 totally separate visit.
16 By Ms. Richardson:
17    Q. And so it might -- as we understand the
18 term "visit" as a practical matter, it might all take
19 place during one time, one actual visit to the
20 center, but it would be coded as two separate visits;
21 is that correct?
22    A. That's correct.
23    Q. And would she be charged for that
24 pregnancy test in the event that she obtained one at
25 that point?

1    A.  The grant would not be charged for the
2  pregnancy test because it's not an eligible service.
3  She would be fee scaled according to her ability to
4  pay.
5    Q.  And if it was determined as a result of
6  that pregnancy test that she was in fact pregnant,
7  would she receive the same kinds of options
8  counseling that we discussed earlier in connection
9  with the STD screening?
10    MR. WOLFSON:  Objection.
11    THE WITNESS:  Again, the options
12  counseling would be if you -- is only provided if you
13  are unclear or unsure of your options.
14    In this particular instance, if she was
15  referred because of a specific cancer or cervical
16  cancer screening, in all likelihood there would have
17  to be some sort of followup -- this would be an
18  at-risk kind of situation -- followup that would be
19  outside of the Title 10 regulations.
20    Q.  And so what would the implication of
21  that be if it was outside of the Title 10
22  regulations?
23    A.  We would -- we will follow -- we
24  would -- we will provide referral follow-up services
25  for that individual for the breast and cervical

1  cancer screening and whatever her pregnancy related
2  option would be.
3    Q.  And what types of referral options would
4  she be given outside of the Title 10 options that we
5  have discussed earlier?
6    A.  Because her purpose was the breast and
7  cervical cancer screening and there's a follow-up
8  procedure associated with that grant specifically,
9  and the results accordingly with that, so we wouldn't
10  provide that kind of follow-up care.
11    Q.  And so what is the follow-up procedure
12  recommended?
13    A.  It would depend on the -- it would
14  depend on the circumstances of the individual.
15    Q.  Where is that follow-up procedure set
16  forth?  Is that in PPGOH's protocol or is that
17  something that would be part of the BCCP program?
18    A.  It's part of our -- it would be part of
19  our normal referral standard of care, but it would
20  also be part of the BCCP as well.
21    Q.  And is your referral standard of care
22  set forth in a particular document?
23    A.  No, it is dependent on the
24  circumstances, dependent on the medical needs of the
25  patient.

1    Q.  And so I believe -- I just want to make
2  sure that I understand.  You mentioned earlier that
3  in the case of someone who came in for breast or
4  cervical cancer screening and was determined to be
5  pregnant, that she might fall outside of Title 10.
6  Why is that?
7    MR. WOLFSON:  Objection.  Do you
8  understand the question?
9    THE WITNESS:  No.  Please say that
10  again.
11  By Ms. Richardson:
12    Q.  Sure.  And I apologize because I may be
13  misunderstanding your testimony earlier.  I thought
14  what you said is in the case of a patient who came in
15  to obtain cervical or breast cancer screening and
16  determined that she was pregnant, that there would be
17  a follow-up procedure that might be outside of the
18  scope of Title 10.  Did I misunderstand?
19    A.  The term follow-up procedure outside
20  Title 10 is unclear in that the pregnancy test would
21  be a separate service.  The fact that she's part of
22  the breast cancer and cervical cancer grant may
23  medically indicate different follow-up procedures
24  because of the fact -- because of the breast cancer,
25  cervical cancer awareness screening piece.

1  By Ms. Richardson:
2    Q.  Meaning that if she tested positive for
3  for indicia of cervical or breast cancer as part of
4  that screening, her followup for the pregnancy might
5  be different, am I understanding correctly?
6    A.  The medical necessity of any kind of
7  followup would be dictated by the results of that
8  grant.
9    Q.  And so can you just describe to me kind
10  of the range of options that might be available?
11    A.  That would -- that would follow the same
12  kind of protocol that we do for all our breast and
13  cervical cancer screening, and that's certainly a
14  medical --
15    Q.  And so let's -- let's say that this was
16  a patient who was determined to be pregnant and she
17  also -- the cervical cancer screening suggested a
18  need for followup or potential irregularities.  What
19  would the followup protocol be for that patient?
20    MR. WOLFSON:  Objection.
21    THE WITNESS:  We have -- she would be
22  referred to care for the -- for additional care for
23  oncology care or whatever her specific presentation
24  required.
25  By Ms. Richardson:

1    Q.  And I think you also mentioned that she
2  might be given referrals related to the pregnancy
3  itself.  What would that referral protocol consist
4  of?
5    A.  It would be continued -- it would be a
6  part of the entire situation, remembering this is for
7  individuals over the age of 40 years old.
8    Q.  And so would she be advised specifically
9  that she should consider an abortion as an option?
10    A.  It would be specific to this
11  individual's follow-up care.  This would definitely
12  be an at-risk situation, of which we do not provide
13  that type of follow-up care.
14    Q.  You don't provide at-risk pregnancy
15  follow-up care, is that what you're referring to?
16    A.  Yes.
17    Q.  And so would she be referred to another
18  provider then at that point for high-risk pregnancy
19  care?
20    A.  She'll be referred to whatever her
21  medical necessity would require given the entire
22  scope of the visit and the results of those tests.
23    Q.  And could that medical necessity
24  follow-up care include abortion services in your
25  view?

1    MR. WOLFSON:  Objection.
2    THE WITNESS:  She will be referred for
3  whatever medical care is required for her.
4  By Ms. Richardson:
5    Q.  Is that one potential option?
6    A.  She will be referred for whatever is
7  medically necessary outside of our evaluation.
8    Q.  Are there circumstances in your protocol
9  where you would, as a matter of course, refer someone
10  to an abortion center for abortion services?
11    MR. WOLFSON:  Objection.
12  By Ms. Richardson:
13    Q.  As a result of the testing that was done
14  for breast or cervical cancer?
15    A.  She will be referred for the best
16  medical care as a result of her breast and cervical
17  cancer system.
18    Q.  And so my question is, could that best
19  medical care include a referral to an abortion
20  service provider?
21    MR. WOLFSON:  Objection.
22    THE WITNESS:  Not from our respect of
23  the grant and the medical care as well.  She would be
24  referred for the results of those tests resulting
25  from the breast and cervical cancer center.

1  By Ms. Richardson:
2    Q.  Referred to whom?
3    A.  Depending on her circumstances.
4    Q.  And so I'm just trying to understand.
5  So we have a patient who has -- there is some
6  indication of a potential problem as a result of the
7  breast or cervical cancer screening, and she is
8  pregnant.
9    And so I understand your testimony to be
10  that you would not -- you meaning PPGOH, would not be
11  responsible for the follow-up high risk pregnancy
12  care; is that correct?
13    A.  We aren't responsible for the oncology
14  follow-up as well, if that were the case.
15    Q.  And so what follow-up would you be
16  responsible for?
17    A.  Providing the follow-up referrals, and
18  according to the protocols, according to -- dependent
19  on the results of her tests.
20    Q.  And so I'm just trying to understand
21  what the range of the referral procedures and the
22  protocols that you're referencing are for PPGOH under
23  those circumstances.
24    A.  We have -- we have pro -- medical
25  professionals that we refer to that would -- when we

1  do a regular breast exam we have a list of
2  collaborating professionals within the -- each
3  individual community that we could refer for
4  followup, be it a breast exam for any of our regular
5  professionals -- and there are specific -- and
6  because this would have been a specific referral from
7  the grant, we would also include that -- those
8  protocols with the grant for the referral follow-up.
9    Q.  And so I think my question earlier was
10  whether or not among those referral services, a
11  patient who is pregnant and also shows signs of
12  problems as a result of the cervical or breast cancer
13  screening, would be referred specifically to an
14  abortion provider --
15    MR. WOLFSON:  Objection.
16  By Mr. Richardson:
17    Q.  -- for services?
18    A.  The cervical and breast cancer could
19  never be discoupled -- that would be the provider of
20  the follow-up.  That would be the follow-up provider
21  for the breast and cervical cancer services.
22    Q.  So she would be referred to someone to
23  continue testing for cervical or breast cancer?
24    A.  She would be referred with her test
25  results to someone that would -- to a medical

Page 241

1    professional dependent on her results for the breast
2    and cervical cancer.
3        Q.  And so separately with respect to the
4    pregnancy test, if it is determined that that
5    pregnancy test is possible, what referrals would she
6    be given related to the pregnancy?
7        A.  It would not be discoupled from the
8    reason for her -- the appropriate reason for her
9    visit to us.
10        Q.  And would abortion services be included
11    among the referral services that are given to the
12    patient under those circumstances?
13        MR. WOLFSON:  Objection.
14        THE WITNESS:  It would not be discoupled
15    from the breast and cervical cancer services, that
16    would be the followup required.  We do not provide
17    any -- our surgical centers do not provide at-risk
18    surgical service, and we wouldn't refer them to any
19    other one other than the medical professional to deal
20    with the breast and cervical cancers.
21    By Ms. Richardson:
22        Q.  Okay.  And so I apologize, because I
23    think I'm asking a slightly different question.  So
24    let me ask again.
25        If she tests positive on her pregnancy

Page 242

1    test, with respect to followup related specifically
2    to her pregnancy, whether coupled or decoupled from
3    the cervical and breast cancer screening, would
4    abortion services be discussed among the referral
5    options that she's given?
6        MR. WOLFSON:  Objection.  It's been
7    asked and answered many times.
8        MS. RICHARDSON:  It has not been
9    answered.  It has been asked.
10    By Ms. Richardson:
11        Q.  You may answer.
12        A.  There would never be a case where
13    that -- a referral would be made independent of the
14    reason for her breast and cervical cancer visit.
15        Any discussion beyond that would have to
16    be entwined with her medical care associated with the
17    breast and cervical cancer.
18        Q.  And so would abortion services be
19    provided among the services that are recommended as
20    treatment for her cervical or breast cancer services?
21        MR. WOLFSON:  Objection.
22        THE WITNESS:  That would be determined
23    on the follow-up.
24    By Ms. Richardson:
25        Q.  And would that be a follow-up with

Page 243

1    PPGOH?
2        A.  No.
3        Q.  Are there any circumstances related to
4    breast and cervical cancer screening where abortion
5    services would be discussed?
6        A.  The results of her breast and cervical
7    cancer screening would be determined of her entire
8    medical follow-up.
9        Q.  I understand that.  And so I'm asking a
10    yes or no question.  And that's where the disconnect
11    is.
12        Would abortion services ever be
13    discussed with a patient receiving breast and
14    cancer -- breast and cervical cancer screening?
15        MR. WOLFSON:  Objection.
16        THE WITNESS:  This would require --
17    there are several -- it's a hypothetical situation
18    that the same person that would be there would also
19    entertain a pregnancy test while she was there, and
20    the screening initially would have taken place from
21    the breast and cervical cancer treatment.  So that --
22    the circumstances of that are very unlikely.
23    By Ms. Richardson:
24        Q.  And so my question was a yes or no.
25    Would there ever be a circumstance where abortion

Page 244

1    services would be provided?
2        MR. WOLFSON:  Objection.
3    By Ms. Richardson:
4        Q.  And I would be thrilled to move on, but
5    I just want to understand the answer to the question
6    that I've asked.
7        A.  You just asked if the abortion services
8    would be provided.
9        Q.  Would be discussed.  Would abortion
10    services ever be discussed with a patient who comes
11    to PPGOH to receive cervical and breast cancer
12    screening?
13        A.  Planned Parenthood of Greater Ohio does
14    not provide at-risk abortion services to an
15    individual.  The circumstances would be very unlikely
16    that this would occur, and if it occurred, we would
17    encourage -- we would include in the follow-up the
18    fact that she had a positive pregnancy test.
19        If you want -- so in the entire positive
20    pregnancy test as well as all of the breast and
21    surgical cancer screening would be included in the
22    followup to the next medical professional.
23        Q.  Would she receive a discussion of
24    options about what to do with respect to her
25    pregnancy?

1        MR. WOLFSON:  By whom?
2    By Ms. Richardson:
3        Q.  By PPGOH.
4        A.  Her options would be to seek
5    professional care related to her -- her medical
6    determination based on the breast and cervical
7    cancer.
8        Q.  And would she be advised that her
9    pregnancy test was positive?
10        A.  She would be given the results of her
11    pregnancy test.
12        Q.  And so earlier you described three
13    different options that would be communicated to the
14    patient in the event that she was determined to be
15    pregnant.
16            Would she receive those general options,
17    would she be advised that -- I think you mentioned
18    carry her pregnancy to term, she could terminate the
19    pregnancy, or she could seek adoption service, are
20    those the three options generally provided?
21        A.  You are talking -- this would -- those
22    are the options under the Title 10 guidelines not
23    related to -- not tied specifically to the breast and
24    cervical cancer project.
25        Q.  And so would a patient receiving

1    services under the breast and cervical cancer
2    prevention project receive those same options
3    counseling?
4        A.  It would not be appropriate to the
5    service that they were intended to be there for.
6    Medical care would dictate that the breast and
7    cervical cancer screening would require the follow-up
8    care, if necessary, and that would be -- part of the
9    test would be part of that.
10        Q.  So let's approach it from a different
11    hypothetical.  Let's assume that someone comes in for
12    breast and cervical cancer screening pursuant to the
13    BCCP program, and that screening shows no signs of
14    cancer, so that the screening comes out negative for
15    those tests, and she indicates that she would like to
16    have a pregnancy test taken.
17            She might be given a pregnancy test that
18    day but it would be coded as a different visit as we
19    discussed previously, correct?
20        MR. WOLFSON:  Objection.
21        THE WITNESS:  Correct.
22    By Ms. Richardson:
23        Q.  And in the event that she was determined
24    to be pregnant, would she receive the options
25    counseling that you described earlier?

1        A.  If she were unsure of her -- if she was
2    unsure what she wanted to do, and that's when the
3    options counseling is appropriate, and she actually
4    fell under the Title 10 guidelines as well, if she
5    were unsure of the counseling, she could be provided,
6    hypothetically.
7        Q.  And in the event that the law that's
8    being challenged in this case takes effect, Planned
9    Parenthood of Greater Ohio will continue to provide
10    breast and cervical screening in its family planning
11    centers, correct?
12        A.  Yes.
13        Q.  And have you done any type of impact of
14    the overall net -- sorry.  Have you done any
15    financial analysis of what the net impact of
16    discontinuing the BCCP program would have
17    specifically on PPGOH?
18        A.  Because we provide that service and we
19    would charge accordingly with the CPT code, it would
20    not have a financial impact, it would have a service
21    impact for those women that may want to have come to
22    us and be comfortable in coming to us.
23        Q.  But there would not be a financial
24    impact, did I understand that correctly?
25        A.  Correct.

1        Q.  And for those women who want to receive
2    screening from PPGOH, they could still receive breast
3    and cervical cancer screening in your family planning
4    centers, correct?
5        A.  It would not be provided -- they would
6    have to be charged, it would not be provided for them
7    through the grant program.
8        Q.  And they would be subject to the same
9    sliding scale that we have been discussing today,
10    correct?
11        A.  Correct.
12        Q.  And so for some of them they might not
13    have to pay anything for those services, correct?
14        A.  For some.
15        MR. WOLFSON:  Can we take a break?
16        MS. RICHARDSON:  Sure.  Fine.
17        (Recess was taken.)
18    By Ms. Richardson:
19        Q.  I'd like to ask you now to take a quick
20    look at the document that we have marked as Exhibit
21    2.  Feel free to take a moment to review.  Are you
22    ready for me to ask questions?
23        A.  Yes.
24        Q.  Thank you.  And is it your understanding
25    that these are responses to interrogatories that we

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

1  have sent to you in connection with this litigation?
2      A. Yes.
3      Q. And if you take a look at the response
4  to interrogatory No. 1, and that is on Page 4.
5      A. Yes.
6      Q. It asks there to identify each person
7  answering these interrogatories, and is your name
8  listed among those who completed these responses?
9      A. Yes.
10     Q. And did you in fact contribute to the
11  completion of these responses?
12     A. Yes.
13     Q. And so the good news is I think we have
14  covered everything in here, I think I have just a
15  couple of quick questions. I'd like for you to turn
16  to interrogatory No. 13 which begins on Page 19, and
17  the response begins on the top of Page 20.
18     A. All right.
19     Q. And on Page 19 the interrogatory asks,
20  "State what funds received from each of the programs
21  identified in Section 3701.034 contribute directly or
22  indirectly to the provision, performance, or
23  promotion abortion." Did I read that correctly?
24     A. Yes.
25     Q. And the answer listed here following an

1  objection is, "None of the funds received from each
2  of the programs identified in Section 3701.034
3  contribute directly or indirectly to the provision,
4  performance, or promotion of abortion." Did I read
5  that correctly?
6      A. Yes.
7      Q. And was that an answer that you
8  contributed to completing?
9      A. Yes.
10     Q. And is it your understanding that this
11  is an accurate answer to that question?
12     A. Yes.
13     Q. How do you know that none of the funds
14  received from the programs identified in the law
15  that's challenged here contribute directly or
16  indirectly to the performance or promotion or
17  abortion?
18     A. We have a very sophisticated cost
19  allocation methodology that is audited and reviewed
20  by our independent auditors and by the Title 10
21  reviewers.
22        We allocate every single one of our
23  costs to between our health centers and isolating the
24  surgical centers, including all of our administrative
25  costs and our medical director's costs, so those

1  funds and the costs associated with those are
2  allocated very carefully.
3      Q. And so is it fair to say then that none
4  of the funds that have been provided to PPGOH through
5  these programs are relied on by PPGOH to provide
6  abortion services?
7      A. Yes.
8      Q. And similarly, then, discontinuing
9  participation in the programs identified in the law
10  that's challenged here will have no impact on PPGOH's
11  provision of abortion services, correct?
12     A. Correct.
13     Q. You will continue to provide those
14  abortion services in the same manner that you have
15  done so previously even if this law takes effect,
16  correct?
17     A. Correct.
18        MS. RICHARDSON: At this time I think I
19  have no further questions for you. I would ask --
20        MR. WOLFSON: We'll talk about that off
21  the record, whatever you have -- further information
22  you may want, okay?
23        MS. RICHARDSON: Perfect. That sounds
24  good and I actually was not going to relate to that,
25  I was just going to reserve the right that in the

1  event -- I think we only have one topic left, but in
2  the event that there's an issue that comes up that I
3  believe the next witness will be discussing that
4  she's not in fact prepared, I would just reserve the
5  right to call either of the two witnesses back.
6        MR. WOLFSON: I have a few questions for
7  you.
8            - - -
9        EXAMINATION
10  By Mr. Wolfson:
11     Q. So Ms. Singhaus, Ms. Richardson asked
12  you a few questions involving the breast and cervical
13  cancer project, and those questions involved a
14  hypothetical situation where a woman comes to a
15  Planned Parenthood facility for screening under the
16  BCCP project, and also asks for and receives a
17  pregnancy test and is determined to be pregnant. Do
18  you remember those questions?
19     A. Yes.
20     Q. To your knowledge has that situation
21  ever happened?
22     A. Not to my knowledge.
23     Q. Has any of your staff ever told you that
24  such a situation has ever happened?
25     A. No.

Q. Have you ever seen any documents indicating that such a situation has ever happened?
A. No.
Q. Okay. Thank you. I'd like to then ask you a couple of questions about the infertility prevention project, or STI project, however you want to call it.
And I think you mentioned that you had -- that PPGOH had been offering approximately 90,000 STI tests per year, including both those offered under the infertility prevention project and outside the project; is that right?
A. Yes.
Q. And I think you indicated that if the project were discontinued because the law were to go into effect, some of the people who were previously receiving free SDI testing would have to pay a charge for it, is that correct?
A. Correct.
Q. And I think you said that charge would be somewhere between 8 and $30 approximately?
A. Yes.
Q. So in your experience would that -- would that charge deter some people from -- from asking for and receiving that STI testing?

MS. RICHARDSON: Objection.
THE WITNESS: That -- based on our experience with our patients, that could deter them from receiving the opportunity and asking for that test.
By Mr. Wolfson:
Q. And what experience do you base that on?
A. The patient collection experience and the intake experience that we review with each of our clients.
Q. And what is the intake experience you're referring to?
A. The financial interview and their willingness to provide -- add a preventive service to their bill, which is as a low income woman.
Q. I think Ms. Richardson also asked you a few questions about the possibility that some -- some people might nonetheless be able to receive zero fee SDI testing under the Title 10 guidelines; is that right? Do you recall that?
A. Yes.
Q. If you were -- if PPGOH were to do that, were to provide some patients with zero fee SDI testing under the Title 10 guidelines, would that require PPGOH to reallocate Title 10 resources from

other project purposes?
MS. RICHARDSON: Objection.
THE WITNESS: Yes, it would require -- the Title 10 grant is a finite grant. It would require reallocating from other programs.
MR. WOLFSON: Okay. Thank you.
\- - -
FURTHER EXAMINATION
By Ms. Richardson:
Q. I have just a few follow-up questions related to that. First of all, your counsel, Mr. Wolfson, asked you whether or not with respect to a BCCP patient you were aware of a particular patient who had ever come in to receive BCCP services and also received a pregnancy test and was determined to be pregnant; is that correct?
A. If I were aware of that? Yes.
Q. And you indicated that sitting here today you can't personally recall a specific incident, correct?
A. That's correct.
Q. And did you review individual patient files or records in preparing for your deposition today?
A. No.

Q. And with respect to your testimony about reallocating funding -- that you might have to reallocate funding under Title 10 if patients are able to receive STI testing free of charge, you indicated that you might have to reallocate from our programs. Did I understand that correctly?
A. Correct.
Q. Is that an estimate that you have calculated sitting here today?
A. The $4 million is a finite pot of money, it would not grow to serve additional patients, so any amount would have to be reallocated.
Q. And you testified a little bit earlier, I believe, that you have already put together your budget for 2017 estimating projected expenses and revenues; is that correct?
A. That's correct.
Q. And does that budget contain any line item reflecting a need to reallocate funding related to the STI prevention program?
A. It reflects the increase in the STI program in the same amount of Title 10 funding, so yes, it does.
Q. And so what is the estimated impact financially that that would have according to the

Page 257

1  estimates that you have incorporated into your 2017
2  budget?
3      A. It's approximately $200,000.
4      Q. So that any reallocation under Title 10
5  or elsewhere would be subsumed in the $200,000
6  estimate you provided earlier, correct?
7      A. Yes.
8      MS. RICHARDSON: No further questions.
9      MR. WOLFSON: All right. Thanks.
10     (Recess was taken.)
11         - - -
12         Iris Harvey,
13  being by me first duly sworn, as hereinafter
14  certified, deposes and says as follows:
15         EXAMINATION
16  By Ms. Richardson:
17     Q. Ms. Harvey, we just met, but for the
18  record again, my name is Ryan Richardson, and I'm an
19  attorney at the Ohio Attorney General's office. I am
20  here today representing the defendant in this case,
21  the Ohio Department of Health.
22     A. Okay.
23     Q. Have you ever been deposed prior to
24  today?
25     A. I have.

Page 258

1      Q. How many times have you been deposed?
2      A. Once.
3      Q. Then I'll just very briefly hopefully
4  remind you of a few basic ground rules.
5      A. Okay.
6      Q. As you know, I will be asking a series
7  of questions. Your counsel may object for the record
8  to some of those questions, but unless he
9  specifically instructs you not to answer, I would ask
10  that you go ahead and answer the questions.
11     A. Okay.
12     Q. If you don't understand anything that I
13  have asked, please let me know and I will rephrase
14  the question.
15     A. Okay.
16     Q. If you do answer the question I've
17  asked, I'm going to assume that you have in fact
18  understood it. Is that fair?
19     A. Fair.
20     Q. Any reason today that you would not be
21  able to answer questions completely and truthfully?
22     A. I don't think so.
23     Q. Any questions before we begin?
24     A. No.
25     MR. WOLFSON: Can I ask you to sit back

Page 259

1  a little bit so I can see you? Talk to hear, but I
2  want to be able to see.
3  By Ms. Richardson:
4      Q. And I'll apologize in advance and ask
5  you to bear with us since we have been going a lot
6  longer than you have today. So if my questions start
7  coming out tongue tied, just let me know.
8      A. Okay.
9      Q. What is your current position at Planned
10  Parenthood of Greater Ohio?
11     A. Okay. I'm the President and CEO of
12  Planned Parenthood of Greater Ohio.
13     Q. And you took on that role relatively
14  recently; is that correct?
15     A. Yes.
16     Q. When specifically did you take on that
17  role?
18     A. April the 4th.
19     Q. And prior to that what did you do?
20     A. Prior that, for seven years I was the
21  Vice-President of University Relations for Kent
22  State.
23     Q. And in your current role for Planned
24  Parenthood of Greater Ohio, which we have been
25  referring to as PPGOH today, what are your

Page 260

1  responsibilities?
2      A. As President and CEO my primary
3  responsibilities are leadership of the organization.
4  Obviously fiscal security and the financial health
5  and sustainability of the organization. Development
6  of supporters, donors.
7      Making sure that we stay in compliance
8  with our federation requirements, Planned Parenthood
9  Federations of America, and that we have an ethical
10  medical operation.
11     Q. Thank you. And I'm going to skip ahead
12  and ask you to take a look at what we have marked as
13  document 1, which was right in front of you. Is it
14  still here? And please feel free to take a moment to
15  review that.
16     (Pause.)
17     A. Okay.
18     Q. And this is a notice of Rule 30(b)(6)
19  deposition for the record. Is this a document that
20  you have seen prior to today?
21     A. It is.
22     Q. And is it your understanding that you
23  are here today testifying on behalf of Planned
24  Parenthood of Greater Ohio in your answers?
25     A. Yes.

1    Q. And it's my understanding that you are
2  planning only to talk about, I believe one of the
3  topics set forth in Schedule A to this document; is
4  that correct?
5    A. That is correct.
6    Q. And is that the item listed as item 9 on
7  the last page of the schedule?
8    A. Yes.
9    Q. And that states, "Press statements or
10  releases referencing or relating to Section 3701.034,
11  or Substitute House Bill 294." Did I read that
12  correctly?
13    A. Yes.
14    Q. And are you in fact prepared to talk
15  about that topic today?
16    A. I am.
17    Q. Can you just describe for me first what
18  you did to prepare for today's deposition?
19    A. I met with my attorney, and obviously
20  met with my staff as we prepared the work.
21    Q. And which staff members did you
22  specifically meet with? And feel free for purposes
23  of this question to refer to them by their job title
24  or position.
25    A. Well, obviously my chief operating

1  officer, Barbara Singhaus, and Diego Espino, who is
2  education VP.
3    Q. And did you speak to any other staff
4  members to prepare for today's deposition?
5    A. No.
6    Q. Did you review any documents to prepare
7  for today's deposition?
8    A. Yes.
9    Q. What documents did you review?
10    A. A variety of different documents.
11  Obviously information related to some of these other
12  areas. Nothing real specific, but generally
13  documents that reinforced some of the questions --
14  answered some of the questions. For instance, the
15  press releases, many of them predated me.
16    Q. And outside of the press releases were
17  there any general categories of documents that you
18  reviewed?
19    A. No, not for the deposition.
20    Q. Have you reviewed the complaint that was
21  submitted in this case? And if you need it for
22  reference, it's actually marked as Exhibit 3 in front
23  of you.
24    A. I have looked at this.
25    Q. And did you review the complaint prior

1  to the time that it was filed in this case?
2    A. I don't believe so. I came on April
3  4th, so I don't believe I reviewed it before that.
4    Q. So is it fair to say then that you did
5  not contribute to the preparation of the complaint or
6  compiling the material that was referenced in the
7  complaint?
8    A. I don't think so.
9    Q. And I'd like to start by just asking you
10  to kind of walk through the process by which press
11  statements are prepared within PPGOH, and what your
12  role is?
13    A. Okay. So press statements -- and the
14  press statements that I am referring to are not press
15  statements prepared by PPGOH, they are press
16  statements that were prepared by Planned Parenthood
17  Advocates of Ohio.
18    Q. And what is Planned Parenthood Advocates
19  of Ohio?
20    A. Planned Parenthood Advocates of Ohio is
21  a 501(c)(4) social welfare organization.
22    Q. And what is their purpose?
23    A. The 501(c)(4)'s purpose is to protect
24  access to patients to Planned Parenthood's health
25  centers.

1    Q. And what do you mean when you say that
2  the press releases were press releases of -- can we
3  call them PPAO? Is that fair?
4    A. Yes.
5    Q. What do you mean when you say that the
6  press releases you reviewed were press releases
7  prepared by PPAO?
8    A. Okay. So the statements that are made
9  in the press release prior to me, were made by the
10  former CEO who was also, as I am, the CEO and
11  President of Planned Parenthood, Advocates of Ohio.
12  So both are related to the (c)(4).
13    And so in developing the press release,
14  the communication is written to do advocacy and to
15  educate the public on legislative actions, and so it
16  is a document that is written in a (c)(4) voice.
17    So if you read the documents, the
18  statements, whether they are mine or Stephanie, we
19  are referred to as President or CEO of PPAO.
20    Q. And what are your roles as President of
21  PPAO?
22    A. The role is to interface with a (c)(4)
23  board, but primarily is to do advocacy on behalf of
24  the patients and the public that wants to use Planned
25  Parenthood.

1    Q. And does this advocacy consist of
2 advocacy to legislative bodies, or is it just
3 primarily public in its focus?
4    A. No. Under (c)(4) the advocacy can
5 include advocacy related to legislators and
6 legislation.
7    Q. And is that something that you
8 personally would be involved in preparing?
9    A. Yes.
10    Q. Any other types of advocacy efforts
11 aside from communications with legislative bodies?
12    A. The (c)(4) -- under the (c)(4), as PPAO
13 representatives we can do advocacy, which another
14 area could be lobbying, grassroots organizing.
15    Q. Would you also be involved with
16 fundraising?
17    A. Fundraising under the (c)(4), yes, that
18 could be.
19    Q. And what types of fundraising
20 initiatives have you been involved in with respect to
21 PPAO?
22    A. The PPAO -- there have been two e-mail
23 broadcasts to our stakeholders to let them know of a
24 defunding.
25    Q. And who do you include among your

1 description of stakeholders?
2    A. Donors.
3    Q. Are these people who have already given
4 money, or people that you view as potential sources
5 of donations?
6    A. People who are -- have already been
7 donors, so they are in our database and indicated.
8    Q. I'm sorry, go ahead.
9    A. No, just donors.
10    Q. Would that include both individual and
11 entity donors?
12    A. No, just individual.
13    Q. When were these e-mail broadcasts sent
14 out to the donors?
15    A. There have only been two that I know of,
16 and one would have been probably in March or --
17 either February or March. It preceded me, but I do
18 know that one was sent out.
19    Q. And have there been e-mail broadcasts
20 sent out since you started in your role?
21    A. As PPAO, yes.
22    Q. And when was that e-mail sent, the
23 second e-mail?
24    A. In the last month, I believe.
25    Q. And were you involved in drafting that

1 e-mail?
2    A. My development people would draft it.
3 It did go out under my signature.
4    Q. And when you say your development people
5 now, are you referring to PPAO or PPGOH?
6    A. PPAO.
7    Q. And how many people would be included in
8 the development department or committee within PPAO?
9    A. There are actually no employees at PPAO.
10 There are employees of PPGOH, and their time, if they
11 work on a project, that time is allocated to the AO
12 appropriately.
13    Q. Thank you. And so approximately how
14 many PPGOH employees would spend time working on PPAO
15 projects?
16        MR. WOLFSON: Objection.
17        THE WITNESS: On the PPAO, probably in
18 this instance, development, two.
19 By Ms. Richardson:
20    Q. And what are their roles within PPGOH,
21 those two individuals?
22    A. Development.
23    Q. Development. How would the development
24 work that they do for PPAO compare or contrast with
25 what they do for PPGOH?

1    A. For PPAO they would be communicating the
2 issues related to, in this case, legislation changes.
3    Q. And with respect to PPGOH, who would the
4 audience be for those communications?
5    A. To GO?
6    Q. Yes.
7    A. Donors.
8    Q. Individual donors again?
9    A. Yes.
10    Q. And so that would be the same target
11 audience then that the communications from PPAO would
12 be sent to?
13    A. Donors, yes.
14    Q. And what was the overall message
15 provided in the two e-mail broadcasts that were sent
16 to stakeholders?
17    A. Factual truth about the legislation,
18 that it had passed, that it would prevent us from
19 continuing with the programs that we had contracts
20 on, and that that would create a financial difference
21 in our budget.
22    Q. And have you reviewed any of the
23 economic analyses to quantify the impact on budget?
24    A. From the standpoint I know the pieces of
25 the budget.

Page 269

1     Q.  Are you aware of what the net financial
2  impact would be on PPGOH?
3         MR. WOLFSON:  Objection.  Go ahead.
4         THE WITNESS:  I know there are two
5  parts; there's a grant part of like $640,000 that
6  would go away, and then there's the diagnostic
7  materials of like 400-and-some-thousand dollars, so
8  those are the two pieces from the GO standpoint that
9  I'm aware of.
10 By Ms. Richardson:
11    Q.  So then you're referring to the overall
12 amount of either cash or in-kind contributions that
13 come in through the grants as a whole?
14    A.  Related to, yes.
15    Q.  And was one of the themes of those
16 e-mails communicating to your stakeholders that
17 Planned Parenthood of Greater Ohio would continue
18 operating even if this all takes effect?
19    A.  Yes.
20    Q.  And in fact, Planned Parenthood of
21 Greater Ohio will continue even if this all takes
22 effect, correct?
23    A.  Yes.
24    Q.  And it will continue providing services
25 if this all takes effect, right?

Page 270

1     A.  Some services, yes.
2     Q.  And it will continue providing abortion
3  services in particular, correct, even if this law
4  takes effect?
5     A.  Yes.
6     Q.  And PPGOH has also put out various
7  general press releases that it posts on its website
8  and in other locations, correct?
9     A.  Yes.
10        MR. WOLFSON:  Objection.  PPGOH -- was
11 that PPGOH?
12        MS. RICHARDSON:  Yes.
13 By Ms. Richardson:
14    Q.  Did you understand my question to refer
15 to PPGOH?
16    A.  So are you talking about -- there are
17 different press releases, so are you talking about
18 press releases related to the funding, or are you
19 talking about press releases relating to other stuff?
20 I'm not sure what you're talking about.
21    Q.  So I am referring to press releases
22 related to the law that's being challenged in this
23 case.
24    A.  No, PPGOH did not put press releases on
25 our website.

Page 271

1     Q.  Okay.  So the press releases that are
2  posted on PPGOH's website, are those PPAO repress
3  releases?
4     A.  The press releases that are posted on
5  the website would be press releases posted on the
6  PPAO webpage.
7     Q.  So let me ask you -- and now we're going
8  to get into technology, so I'm sure I'm going butcher
9  this, but if I were to go on to PPGOH's website and I
10 start looking at press releases, I have then been
11 sort of -- am I now on PPAO's website?
12    A.  If you are looking for educational
13 advocacy information related to legislative stuff you
14 would be sent to a PPAO webpage.
15    Q.  And similarly, does the PPGOH website
16 also directly link to the PPFA website?
17    A.  Yes.
18    Q.  Are there other websites that it would
19 directly take visitors to the website to?
20        MR. WOLFSON:  Objection.  If you know.
21        THE WITNESS:  I don't know.
22 By Ms. Richardson:
23    Q.  So as far as you know, then, just PPAO
24 and PPFA, users of the website might directly link
25 into their websites; is that correct?  If you

Page 272

1  remember --
2     A.  Can you repeat that?
3     Q.  Yes, I will try.  So just to make sure
4  that I understand correctly, someone who goes on to
5  PPGOH's website could link directly to either PPAO or
6  PPFA, is that correct?
7         MR. WOLFSON:  Again, if you know.
8         THE WITNESS:  Link directly, yes.
9  By Ms. Richardson:
10    Q.  And with respect to the press releases
11 in particular, if I were to go to the press release
12 page, I would actually technically be on PPAO's
13 website at that point, did I understand that
14 correctly?
15        MR. WOLFSON:  I think the question is --
16 go ahead.  I think the question is -- one question I
17 have is what is your knowledge of the webpage, and do
18 you have the knowledge to answer this question for
19 PPGOH, and if you can, answer to the best of your
20 ability.
21        THE WITNESS:  The press releases we were
22 talking about before are PPAO press releases and they
23 will be found on a PPAO page.
24 By Ms. Richardson:
25    Q.  Which is linked through the PPGOH

Page 273

1  website, correct?
2      A. Yes.
3      Q. And were you involved in preparing those
4  PPAO press releases that are available on the PPAO
5  webpage?
6      A. Say that again.
7      Q. Were you personally involved in
8  preparing those press statements?
9      A. Which ones?
10     Q. The PPAO press releases related to the
11 law that's challenged in this case.
12     A. Some of them.
13     Q. And did you rely on any particular
14 documents or analyses in preparing those press
15 releases?
16     A. Yes.
17     Q. What documents or analyses did you rely
18 on?
19     A. On the legislation.
20     Q. You reviewed the legislation
21 specifically?
22     A. The summary of it, yes.
23     Q. Did you review any other documents
24 related to data analysis or financial analysis in
25 preparing those press releases?

Page 274

1      A. No.
2      Q. And are you familiar with certain
3  statistics that have been offered in press releases
4  and also in documents in this litigation related to
5  the total number of abortions that PPGOH provides in
6  the State of Ohio?
7      A. I don't know that number exactly.
8      Q. Are you familiar with the fact that
9  there's been a number offered?
10     MR. WOLFSON:  Objection.
11     THE WITNESS:  Yes.  There are in some of
12 these documents, yes.
13 By Ms. Richardson:
14     Q. And do you know how that number was
15 calculated?
16     A. I don't know for sure.
17     Q. Do you know who calculated that number?
18     A. I don't know for sure.
19     Q. Do you know whether it was someone with
20 PPGOH who calculated that number?
21     A. The number that's in the complaint
22 you're talking about?
23     Q. Correct.
24     A. I believe they are submitted to the
25 State, so I don't know who in the department would

Page 275

1  calculate that.  But we submit regular data.
2      Q. And would those statistics have been
3  something that you reviewed?
4      A. No.
5      Q. And you have also submitted declarations
6  in this case as well, correct?
7      A. Yes.
8      Q. And what did you do to prepare those
9  declarations?
10     A. I --
11     MR. WOLFSON:  In answering that question
12 don't reveal the substance of any conversation you
13 had with lawyers, okay?
14     THE WITNESS:  Right.  I would review
15 with the responsible managers the data that answered
16 the question, and get a sense of did they feel there
17 was integrity in the data, was it accurate, and were
18 they prepared to submit it in response.
19 By Ms. Richardson:
20     Q. And I think you may actually be
21 referring to the interrogatories at this point; is
22 that correct?
23     A. Possibly one of these documents.
24     Q. And for reference, if you take a look at
25 the document that's been marked as Exhibit No. 2 in

Page 276

1  front of you.  And I'll represent that those are the
2  interrogatory responses that you provided through
3  counsel in response to our interrogatories.
4      A. Okay.  So is this what you're talking
5  about?
6      Q. Is this the document that you were just
7  describing?
8      A. Yes.
9      Q. And were you personally involved in
10 preparing these answers?
11     A. No, but I would work with the staff who
12 were preparing the answers.  So I didn't calculate
13 the numbers, no.
14     Q. And did I understand correctly that you
15 did review some data that is described in these
16 interrogatory responses?
17     A. Yes.
18     Q. And do you recall specifically what
19 types of data you would have reviewed?
20     A. Data related to our involvement, the
21 number of centers where we performed at the --
22 whether or not how many -- what would I call them,
23 procedures, breast cancer, how many patients we
24 serve, that type of data.
25     Q. And did you personally make any effort

Page 277

1  to verify those numbers, or did you just review the
2  fact that they had been submitted by various other
3  staff members?
4      A.  I relied on the integrity of the
5  managers, yeah.
6      Q.  And have you had any other role in
7  preparing documents that have been submitted in this
8  case?
9      A.  No, not developing any data, no.
10      MS. RICHARDSON:  I may be done.  I don't
11  want to get your hopes up quite yet, but if we can
12  take just a five-minute break, I'm either done on
13  very close to being done.
14      (Recess taken.)
15      MS. RICHARDSON:  Ms. Harvey, I have to
16  further questions at this time.
17      MR. WOLFSON:  And I have nothing further
18  either.
19      (Thereupon, the deposition concluded
20      at 5:27 p m.  Signature not waived.)
21          - - -
22
23
24
25

Page 278

1  State of Ohio        :
2                : SS:
2  County of         :
3
4      We, Diego Espino, Barbara Singhaus, and
5  Iris Harvey, do hereby certify that we have read the
   foregoing transcript of my deposition given on
   Friday, July 8th, 2016; that together with the
6  correction page attached hereto noting changes in
   form or substance, if any, it is true and correct.
7
8
9      _____
       Diego Espino
10      _____
       Barbara Singhaus
11      _____
       Iris Harvey
12
13      I do hereby certify that the foregoing
14  transcript of the deposition of Diego Espino, Barbara
   Singhaus, and Iris Harvey was submitted to the
15  witnesses for reading and signing; that after they
   had stated to the undersigned Notary Public that they
16  had read and examined their deposition, they signed
   the same in my presence on the _____ day of
   _____, 2016.
17
18
19      _____
       Notary Public
20
21
22  My commission expires _____, _____.
23          - - -
24
25

Page 279

1          CERTIFICATE
2  State of Ohio        :
                : SS:
3  County of Fairfield  :
4      I, Valerie J  Grubaugh, Registered Merit
5  Reporter and Notary Public in and for the State of
   Ohio, duly commissioned and qualified, certify that
   the within named Diego Espino, Barbara Singhaus, and
6  Iris Harvey was by me duly sworn to testify to the
7  whole truth in the cause aforesaid; that the
   testimony was taken down by me in stenotype in the
8  presence of said witness, afterwards transcribed upon
   a computer; that the foregoing is a true and correct
9  transcript of the testimony given by said witness
   taken at the time and place in the foregoing caption
10  specified and completed without adjournment
11      I certify that I am not a relative,
   employee, or attorney of any of the parties hereto,
12  or of any attorney or counsel employed by the
   parties, or financially interested in the action
13      IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my seal of office at Columbus,
   Ohio, on this 11th day of July, 2016.
15
16
17
18      _____
       Valerie J  Grubaugh,
19      Registered Merit Reporter
       and Notary Public in and for
20      the State of Ohio
21
22  My commission expires April 16, 2016
23
24
25

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481