## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **PLANNED PARENTHOOD OF** | : | |
| **GREATER OHIO**, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 1:16-cv-539 |
| | : | |
| v. | : | Judge Michael R. Barrett |
| | : | |
| **RICHARD HODGES**, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

## DEFENDANT OHIO DEPARTMENT OF HEALTH'S INITIAL TRIAL BRIEF

---

Respectfully submitted,

MICHAEL DEWINE (0009181)
Ohio Attorney General

*s/ Ryan Richardson*

RYAN L. RICHARDSON (0090382)
\* Lead and Trial Counsel
TIFFANY L. CARWILE (0082522)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
ryan.richardson@ohioattorneygeneral.gov
tiffany.carwile@ohioattorneygeneral.gov

*Counsel for Defendant Richard Hodges*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... ii

BACKGROUND ........................................................................................... 4

    A.    Ohio passes Ohio Revised Code § 3701.034. ............................. 4

    B.    Planned Parenthood sues to enjoin the statute in all its
        applications. ............................................................................. 5

    C.    The parties develop the factual record through expedited
        discovery. ................................................................................ 6

LEGAL STANDARD ..................................................................................... 10

Planned Parenthood must overcome a heavy burden to prove entitlement to final injunctive relief.  The burden is even more stringent, where, as here, a plaintiff seeks facial invalidation of a statute in all its applications. Planned Parenthood cannot satisfy this burden.

ARGUMENT .................................................................................................. 11

    I.    Ohio may constitutionally refuse to give public funds to those who
       provide abortions. .................................................................. 11

        A.    The funding law's conduct provisions satisfy constitutional
           review under binding precedent. ............................................ 11

The Supreme Court has repeatedly affirmed that states are free to "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds."  *Maher v. Roe*, 432 U.S. 464, 474 (1977); *Harris v. McRae*, 448 U.S. 297, 314 (1980); *Rust v. Sullivan*, 500 U.S. 173, 192 (1991). These cases and the reasoning on which they rely confirm that the Constitution permits the State to deny funding to organizations that provide abortions.  Ohio's funding law comports fully with due process, equal protection, and the First Amendment.

        B.    Because the conduct restrictions survive constitutional
           scrutiny, Planned Parenthood's request for permanent
           injunction should be denied. .................................................. 17

Planned Parenthood also challenges the funding law's separate restrictions on organizations that engage in certain speech (promoting abortions).  But it is unnecessary for the Court even to reach the speech aspect of this case.  As abortion providers, Planned Parenthood would be disqualified from receiving funding under the law, irrespective of the funding law's speech provisions.  This Court should therefore deny Planned Parenthood's request for permanent

injunction without issuing an unnecessary advisory opinion on the constitutionality of the funding law's speech provisions.

II.     Ohio may constitutionally refuse to give public funds to those who
        promote abortions. ............................................................................................... 18

To the extent the Court does reach the funding law's separate speech provisions, those provisions too are constitutional. The Supreme Court has specifically held that the government may place funding conditions on abortion-related speech. Consistent with Ohio's lawful decision to favor childbirth over abortion, the funding law refuses public health care and education program funds to organizations that promote abortion. Requiring Ohio to select abortion providers to deliver its state-funded and approved messages would distort and garble Ohio's message encouraging childbirth over abortion, particularly in light of facts demonstrating that Planned Parenthood's provision of even non-abortion services are inextricably intertwined with its abortion business.

III.    Ohio has a strong public interest in the policy decisions of its
        elected representatives. ........................................................................................ 24

The balance of harms and public interests also weighs in Ohio's favor and against permanent injunctive relief. Invalidating Ohio's properly-enacted law, as Planned Parenthood invites this Court to do, would conflict with the strong public interest in maintaining the policy choices of its democratically-elected legislature, as well as federalism and separation of powers considerations. Ohio's legislature is the appropriate forum for resolving sensitive policy issues like those implicated in this case. It chose to favor childbirth over abortion when distributing money for health related programs, and that choice deserves deference.

IV.     This Court's temporary restraining order and analysis does not
        support final permanent relief. ............................................................................. 26

This Court's expedited temporary restraining order does not compel relief at this final permanent stage of the proceedings. Based on the full record and further consideration, the State respectfully asks the Court to deny Planned Parenthood's request to permanently enjoin Ohio's funding law in its entirety.

CONCLUSION ..................................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Society Int'l., Inc.,*
    133 S.Ct. 2321 (2013) ................................................................................13, 20, 22, 23

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    135 S. Ct. 2652 (2015) ..........................................................................................25

*BellSouth Telecomms., Inc. v. Farris,*
    542 F.3d 499 (6th Cir. 2008) ...............................................................................18

*Bowman v. Tenn. Valley Auth.,*
    744 F.2d 1207 (6th Cir. 1984) .............................................................................18

*Brandenburg v. Housing Auth. of Irvine,*
    253 F.3d 891 (6th Cir. 2001) ...............................................................................24

*Conn v. Gabbert,*
    526 U.S. 286 (1999)..............................................................................................24

*Connection Distrib. Co. v. Holder,*
    557 F.3d 321 (6th Cir. 2009) ...............................................................................10

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) (Stevens, J., dissenting).......................................................20

*FCC v. Beach Comm'n, Inc.,*
    508 U.S. 307 (1993)........................................................................................15, 16

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010)..............................................................................................18

*Harris v. McRae,*
    448 U.S. 297 (1980)..................................................................................... *passim*

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010)..................................................................................................22

*Liberty Coins, LLC v. Goodman,*
    748 F.3d 682 (6th Cir. 2014) ...............................................................................15

*Maher v. Roe,*
    432 U.S. 464 (1977)..................................................................................... *passim*

*Maryland v. King,*
    133 S. Ct. 1 (2012)................................................................................................25

iv

**Cases**                                                        **Page(s)**

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) .................................................................................................16

*Pearson v. Callahan*,
   553 U.S. 223 (2009) .............................................................................................17

*Planned Parenthood Ass'n of Hidalgo Cnty. Texas, Inc. v. Suehs*,
   692 F.3d 343 (5th Cir. 2012) ........................................................13, 20, 21, 22

*Planned Parenthood Ass'n of Utah v. Herbert*,
   No. 15-4189, Slip Op. (10th Cir. July 12, 2016) ...............................................14

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
   699 F.3d 962 (7th Cir. 2012) ...........................................................14, 17, 27, 28

*Regan v. Taxation with Representation of Wash.*,
   461 U.S. 540 (1983) .......................................................................................19, 28

*Roe v. Wade*,
   410 US 113 (1973) ...................................................................................... *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .................................................................................19, 21, 22

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*,
   547 U.S. 47 (2006) ...................................................................................17, 19, 20

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ..................................................................................... *passim*

*State Farm Mut. Auto. Ins. Co. v. Sharon Woods Collision Ctr., Inc.*,
   No. 1:07cv457, 2007 WL 4207158 (S.D. Ohio Nov. 26, 2007)...........................10

*Tri-County Wholesale Distribs., Inc. v. The Wine Group, Inc.*,
   No. 2:10-cv-693, 2010 WL 3522973 (S.D. Ohio Sept. 2, 2010)...........................25

*United States v. Alvarez*,
   132 S. Ct. 2537 (2012) (Breyer, J., concurring) ................................................15

*United States v. Edward Rose & Sons*,
   384 F.3d 258 (6th Cir. 2004) ..............................................................................26

*United States v. Elkins*,
   300 F.3d 638 (6th Cir. 2002) ..............................................................................18

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   135 S. Ct. 2239 (2015).........................................................................................19

**Cases**                                                                                   **Page(s)**

*Wash. State Grange v. Wash. State Republican Pty.*,
    552 U.S. 442 (2008)....................................................................................................10

*Women's Med. Prof. Corp. v. Baird*,
    438 F.3d 595 (6th Cir. 2006) ..................................................................................10

**Statutes**

Ohio Rev. Code § 3701.034(B)-(G) ............................................................................5

Ohio Revised Code § 3701.034 ..................................................................................4

This case asks whether the Constitution *requires* Ohio to distribute public funds for government programs to entities that provide and promote abortions.  Longstanding Supreme Court precedent supplies the answer:  No.  Over the last forty years, the Supreme Court has repeatedly affirmed that states are free to "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds."  *Maher v. Roe*, 432 U.S. 464, 474 (1977); *Harris v. McRae*, 448 U.S. 297, 314 (1980); *Rust v. Sullivan*, 500 U.S. 173, 192 (1991).  And that is precisely what Ohio did when it passed the funding law challenged in this case.  That law prohibits giving public funds for six government programs (under which the State administers certain health services and education through various service providers) to organizations that provide or promote abortions.  Consistent with its unquestionably "strong and legitimate interest in encouraging normal childbirth," *Maher*, 432 U.S. at 478, Ohio has an interest in ensuring that the service providers who deliver its government-funded health services and messages to the public do not provide and promote abortion.  Planned Parenthood now asks this Court to override the policy choice of Ohio's elected representatives and permanently enjoin the law in its entirety.  This Court should decline to do so.  Ohio's funding law represents a constitutional exercise of the State's funding discretion.

*First*, the Constitution permits the State to deny funding to organizations that provide abortions.  States are constitutionally allowed to have their own views about abortion.  And the Supreme Court has repeatedly *refused* to hold that a State's unwillingness to subsidize abortion places an unconstitutional burden on women's abortion rights.  If refusing to provide *direct* funding to a woman for abortion places no unconstitutional burden on the woman's right to an abortion, it necessarily follows that a funding decision *further removed from this right* (refusal to provide indirect funding to abortion providers by paying for separate services) also is

1

constitutional.  This conclusion resolves this dispute.  Planned Parenthood unquestionably provides abortions; thus, it cannot obtain relief.

To be sure, the Constitution sets outer boundaries to the States' funding discretion.  But the critical divide is between "*direct* state interference with a protected activity" (where increased scrutiny applies) and "state encouragement of alternative activity" through funding choices (where deference to legislative policy applies).  *Id.* at 475 (emphasis added).  Here, Ohio's recently-passed funding law comes within the constitutional, encouragement side of that divide.  The law does *not* prohibit, or even regulate, any conduct, and it does *not* prohibit, or even regulate, any speech.  Instead, Ohio has simply decided, when exercising its lawful discretion to select the ambassadors of its state-administered programs, to use financial incentives consistent with the State's reasoned judgment favoring childbirth over abortion.  And Planned Parenthood now concedes, as it must, that Ohio's law does not unduly impede the organization's performance of abortions.

Perhaps recognizing that the Supreme Court's precedent plainly permits the states to impose restrictions on abortion providers, Planned Parenthood devotes much of its argument and analysis to the funding law's separate restrictions on organizations that engage in certain speech (promoting abortions).  But it is unnecessary for the Court even to reach the speech aspect of this case.  As abortion *providers*, Planned Parenthood would be disqualified from receiving funding under the law, irrespective of the funding law's speech provisions.  Under these circumstances, addressing the constitutionality of the funding law's speech provisions would amount to an unnecessary advisory opinion.

*Second*, even if the Court does go further, the funding law's application to those who engage in certain speech (promoting abortions) similarly survives constitutional scrutiny.  The

State may place reasonable conditions on public funding, including conditions relating to speech. And the Supreme Court has specifically held that the government may place funding conditions on abortion-related speech. Consistent with Ohio's decision to favor childbirth over abortion, the funding law refuses public health care and education program funds to those who, like Planned Parenthood, promote abortion. Requiring Ohio to select abortion providers to serve as the public face of its state-administered programs would distort and garble Ohio's message.

*Third*, the balance of harms and public interests also weighs in Ohio's favor. Ohio has a strong interest in maintaining the policy choices of its democratically-elected legislature. Invalidating Ohio's law would go against this public interest. This case involves both federalism and separation of powers. In providing federal funding for the relevant programs, *Congress gave* the states discretion in choosing how to spread funds. Ohio, in turn, exercised this discretion by favoring childbirth over abortion when distributing money for health-related programs. The Court should refrain from "decid[ing] whether the balance of competing interests" reflected in Ohio's law "is wise social policy." *McRae*, 448 U.S. at 326. "Indeed, when an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature." *Maher*, 432 U.S. at 479. The appropriate forum here is Ohio's legislature, which has already acted.

*Fourth*, this Court's expedited preliminary ruling in this matter does not justify permanent relief. Planned Parenthood bears a far heavier burden at this stage to support converting this Court's temporary order into full and final relief—one that they cannot overcome in light of Supreme Court precedent upholding funding restrictions relating to abortion. And the factual record, developed after the preliminary ruling, further supports the State. Based on the

full record and further consideration, the State respectfully asks the Court to deny Planned Parenthood's request to permanently enjoin Ohio's funding law in its entirety.

At bottom, what Planned Parenthood ultimately seeks here is a *constitutional guarantee* to public funding. A guarantee that *forces* Ohio, against its own value judgment, to give public money to subsidize the State's top abortion providers. The Constitution contains no such guarantee. The funding law is constitutional; the State is entitled to judgment in its favor.

## BACKGROUND

### A.     Ohio passes Ohio Revised Code § 3701.034.

The Ohio General Assembly enacted the funding law at issue here in February 2016. Sub. H.B. 294 (2016) (creating Ohio Rev. Code § 3701.034). The law regulates funding for six programs involving education, women's health, and/or sexual health services: the Violence Against Women Act ("VAWA"), the Breast and Cervical Cancer Mortality Prevention Act ("BCCP"), the Infertility Prevention Project (now the STD prevention program), the Minority HIV/AIDS Initiative ("HIV prevention program"), the Infant Mortality Reduction/Infant Vitality Initiative ("OIMRI"), and the Personal Responsibility Education Program ("PREP"). Ohio Rev. Code § 3701.034. These programs are supported through a combination of state and federal funds administered and distributed by the State. *See, e.g.*, Turner Aff. ¶¶ 1-4; Norton Aff. ¶¶ 5-6, 8; Dennison Aff. ¶¶ 4-6; Bickert Aff. ¶¶ 2, 4-5.

Ohio's funding law states that the Ohio Department of Health "shall ensure that all funds it receives" for these programs "are not used to":

(1) Perform nontherapeutic abortions;

(2) Promote nontherapeutic abortions;

(3) Contract with any entity that performs or promotes nontherapeutic abortions;

4

> (4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions.

Ohio Rev. Code § 3701.034(B)-(G).  The law was scheduled to become effective in May 2016.

To prepare for the law's implementation, the Ohio Department of Health notified all providers in March 2016 that it would no longer contract with entities that perform or promote nontherapeutic abortions.  Doc. 17-1 (March 24, 2016 letter).  Additionally, it worked with county health districts and service providers to ensure that the funding law would *not* affect coverage for program services.  *See* Turner Aff.; Norton Aff.; Dennison Aff.; Bickert Aff.

### B.     Planned Parenthood sues to enjoin the statute in all its applications.

Two Planned Parenthood entities have sued to challenge the funding law: Planned Parenthood of Greater Ohio ("PPGOH") and Planned Parenthood Southwest Ohio Region ("PPSWO") (collectively "Planned Parenthood" or "entities").  It is undisputed that these entities both perform and promote nontherapeutic abortion, *see* Compl. ¶ 3, and in April 2016, the Ohio Department of Health specifically notified these entities that they would no longer be reimbursed for services relating to the above programs.  Doc. 17-2 (April 13, 2016 letter).

Planned Parenthood filed the current case on May 11, 2016.  *See* Compl. (Doc. 1).  It alleges that the funding law's application to those who provide and promote abortions violates due process, equal protection, and the First Amendment.  *Id.* at ¶¶ 108-13.  Notably, it does *not* allege that the funding law violates any requirement of the relevant programs or any condition relating to federal funding.  Planned Parenthood seeks a declaration that the funding law is facially unconstitutional and requests a permanent injunction against *any application* of the funding law to the Planned Parenthood entities.  *Id.* at Relief Requested.

At the same time it filed this case, Planned Parenthood moved for a temporary restraining order against the funding law.  TRO Mot. (Doc. 7).  The parties then engaged in expedited

briefing over the next week and a half.  TRO Opp'n (Doc. 17); TRO Reply (Doc. 18).  A few days later, this Court issued an Opinion and Order granting a temporary restraining order.  Op. & Or. (Doc. 19).  In examining the likelihood of success, the Court did not analyze the funding law's conduct and speech provisions separately.  *See id.* at 9-17.  Instead, the Court began its preliminary analysis with the First Amendment, concluding, under the unconstitutional conditions doctrine, that the funding law placed improper conditions on speech.  *Id.* at 9-12.

The Court then analyzed due process, once again applying the unconstitutional conditions doctrine.  *Id.* at 12-15.  While recognizing contrary Seventh Circuit authority, the Court held that Planned Parenthood was likely to succeed in showing that the funding law imposes an undue burden on abortion rights.  *Id.*  In reaching this conclusion, the Court relied primarily on the fact that Planned Parenthood allegedly provides a significant percentage of Ohio abortions.  *Id.* at 14. The Court also suggested that an improper purpose motivated the funding law.  *See id.* at 15.

Finally, the Court held that Planned Parenthood was likely to succeed on its equal protection claim.  *Id.* at 15-17.  Despite applying rational basis review, the Court stressed that the State failed to show the funding law was "*necessary* to prevent state funds from being used to fund abortion services."  *Id.* at 16 (emphasis added).

### C. The parties develop the factual record through expedited discovery.

Following the Court's initial ruling, the parties engaged in expedited discovery.  Four factual points stand out in particular.

#### 1. *Ohio's funding law will not affect Planned Parenthood's abortion services.*

Contrary to the Court's preliminary assumption, both Planned Parenthood entities unequivocally conceded that they will continue to provide and promote abortions regardless of whether the funding law takes effect.  PPSWO Depo. at 258:2-5, 22-25 ("Q. There are no plans sitting here today for PPSWO to close its doors in the event that this law takes effect, correct?

A. Correct. . . . Q. And you will still provide abortion services, correct? A. We would still provide abortion services."); PPGOH Depo. at 270:2-5 ("A. And it will continue providing abortion services in particular, correct, even if this law takes effect? A. Yes."). Even if Ohio's law takes effect, it will not alter Planned Parenthood's provision of abortions. PPGOH Depo. at 251:3-12 (Q. And similarly, then, discontinuing participation in the programs identified in the law that's challenged here will have no impact on PPGOH's provision of abortion services, correct? A. Correct."). Planned Parenthood will continue to provide abortions "in the same manner," they would have prior to passage of the law. *Id*. at. 251:13-17 ("Q. You will continue providing abortion services in the same manner that you have done so previously even if this law takes effect, correct? A. Correct.").

### 2. *Ohio's funding law will not have a significant, financial impact on Planned Parenthood.*

Factual discovery reveals that Ohio's funding law will not impose financial hardship on Planned Parenthood. Throughout the Complaint and briefing in support of their motion for temporary restraining order, Planned Parenthood highlighted only the total gross value of reimbursements and supplies they previously received under the programs affected by the funding law. *See, e.g.*, Compl. ¶¶ 68-69. Even in isolation, these numbers represent only a fraction of Planned Parenthood's overall revenues. *See* Ex. A at 4 (PPSWO 2015 Annual Report) (reflecting that the $469,000 in grants and supplies PPSWO allegedly received under the programs, represents less than four percent of their $12,592,000 in revenues for 2015); Ex. B at 9 (PPGOH 2015 Annual Report) (reflecting that the $1,060,000 in grants and supplies PPGOH allegedly received from the programs represented just five percent of their $21,111,815 budget).

More importantly, these amounts fail to reflect the net monetary impact on Planned Parenthood. In depositions, Planned Parenthood designees admitted that both entities operated

many of the programs at a financial loss or simply broke even.  For example, PPSWO President Jerry Lawson admitted that discontinuing several of the programs would actually save Planned Parenthood funds, as the expenses for three programs exceeded the grant creating a financial loss.  *See* PPSWO Depo. at 49:6-8, 232:13-23 (HIV prevention program), 54:1-4, 218:5-9 (PREP), 80:11-15, 224:6-10 (VAWA); *see also* PPGOH Depo. at 247:13-22 (stating that there would be no financial impact if PPGOH discontinues the BCCP program); 79:3-12, 90:13-14 (discontinuing PREP, OIMRI, and STD prevention program would either have no impact or would save funds); 98:19-99:1 (OIMRI grant did not cover all client incentives and did not produce any net income); PPSWO Depo. at 230:15-20, 233:13-17 (no financial impact if PPSWO discontinues the BCCP program or STD prevention program).    Ultimately, discontinuing programs outlined in the law would result in, at most, a slight financial impact for PPGOH with respect to one program.  If the STD prevention program is discontinued, PPGOH contends it will need to reallocate $200,000 received from other sources, PPGOH Depo. at 219:23-220:1, which represents less than one percent of their budget.

Apart from this relatively very small loss for one Plaintiff with respect to one program, discontinuing services would have no financial impact on either entity or, if anything, would save Planned Parenthood money.

### 3. *Ohio's funding law will not significantly affect Planned Parenthood's non-abortion services.*

Facts revealed during discovery demonstrate that the impact on Planned Parenthood's provision of non-abortion services is also slight.  Planned Parenthood admitted it will continue to provide breast and cervical cancer screening for patients in all of their respective family planning and health centers; it will continue to provide HIV testing; it will continue to provide STD screening and treatment; and it will continue to provide and participate in educational programs.

8

*See*, PPGOH Depo. at 198:14-17, 228:5-8, 248:1-14; PPSWO Depo. at 94:8-23; 258:6-21. Moreover, in some circumstances, Planned Parenthood will continue to provide services free of charge to low income patients who qualify for free services. PPGOH Depo. at 198:14-199:5, 248:1-14.

Ultimately, the only real impact the funding law will have on Planned Parenthood is to force them to stop providing services through the specific government sponsored programs outlined in the law. *See* Ex. C at 8 (PPSWO's An. to Interrog.); Ex. D at 11-12 (PPGOH's An. to Interrog.).

### 4. *Planned Parenthood's provision of abortions and abortion-related information is inextricably intertwined with its provision of non-abortions services.*

Finally, discovery confirmed that while Planned Parenthood may separate its abortion activities through a variety of accounting methods and department codes, it cannot, as a practical matter, fully separate its abortion and non-abortion services, including services provided under the government programs at issue in this case. For example, pregnant patients who go to Planned Parenthood to receive services under one of the programs could receive "options counseling," which includes discussing abortion as an option, and providing patients with abortion referrals. PPSWO Depo. at 66:18-67:13. The medical staff or health care assistants provide this counseling, and their salaries are part of the health centers operating expenses, which are partially paid for by the grant programs. *Id.* 66:23-67:1, 269:23-270:10. Further, until April 2016, PPSWO offered free STD testing under the state funded STD prevention program at the surgical center for patients receiving abortions. *Id.* at 194:11-16. For every STD test, PPSWO collected a $10 specimen fee from the patient. *Id.* at 33:17-19. This $10 fee goes to the center

where it was collected. *Id.* at 229:4-6. Therefore, right up until April 2016, money collected while conducting work for a state grant program was allocated to a PPSWO abortion facility.

Similarly, funds from BCCP and a specimen collection fee from Ohio's STD prevention program cover the expenses at the respective health centers. *Id.* at 233:13-23, 227:24-228:12. If a health center has an operating loss, it receives funds from the Planned Parenthood general fund, which otherwise could be used for other purposes such as promoting abortions. *Id.* at 269:9-15.

## LEGAL STANDARD

The burden in this case is on Planned Parenthood. A party seeking a permanent injunction has the burden of showing that it has "suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (quotation omitted). The standard for a permanent injunction "is essentially the same as that for the issuance of a preliminary injunction" except that "the plaintiff must show actual success on the merits, rather than a mere likelihood of success on the merits." *State Farm Mut. Auto. Ins. Co. v. Sharon Woods Collision Ctr., Inc.*, No. 1:07cv457, 2007 WL 4207158, *10 (S.D. Ohio Nov. 26, 2007).

Planned Parenthood appears to seek facial invalidation of the funding law in all of its applications. *See* Compl., Relief Requested. "A facial challenge to a law is no small matter." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009). "At stake is not an attempt to invalidate the law in a discrete setting but an effort to leave nothing standing, to invalidate the law in each of its applications, to take the law off the books completely." *Id.* (quotation and citation omitted). Facial challenges are disfavored for several reasons, including that they "short circuit the democratic process" by frustrating the intent of the people's elected representatives. *Wash. State Grange v. Wash. State Republican Pty.*, 552 U.S. 442, 451 (2008). Planned Parenthood cannot overcome this burden.

**ARGUMENT**

I. **Ohio may constitutionally refuse to give public funds to those who *provide* abortions.**

    A. **The funding law's conduct provisions satisfy constitutional review under binding precedent.**

Ohio's choice to refuse public funds to those who engage in certain conduct, providing abortions, is constitutional. Planned Parenthood's two Fourteenth Amendment theories, due process and equal protection, both lack merit. And Planned Parenthood fails to raise any First Amendment claim to the funding law's conduct provisions.

***Due Process***. Supreme Court precedent forecloses Planned Parenthood's due process claim. As a starting point, there is *no* due process right to government subsidies: "'the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" *Rust*, 500 U.S. at 201 (quoting *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 507 (1989)). Thus, the Court has uniformly "accorded the States a wider latitude in choosing among competing demands for limited public funds." *Maher*, 432 U.S. at 478.

This is equally true with abortion. The Supreme Court has repeatedly upheld abortion-related funding restrictions against due process challenges. *Id.* at 469-80; *McRae*, 448 U.S. at 311-18; *Rust*, 500 U.S. at 201-03. In *Maher*, only four years after *Roe v. Wade*, 410 US 113 (1973), the Court upheld a Connecticut regulation limiting abortion funding to only medically necessary abortions. 432 U.S. at 466. It explained that *Roe* "implies *no limitation* on the authority of the State" to make funding decisions relating to abortion. *Id.* at 474 (emphasis added). Three years later, in *McRae*, the Court upheld the federal Hyde Amendment, which prohibits public funding of abortions (including certain medically necessary ones). 448 U.S. at 302. The Court again disagreed that "a woman's freedom of choice carries with it a

11

constitutional entitlement to financial resources." *Id.* at 316. Finally, in *Rust*, the Court upheld regulations prohibiting federally funded programs from abortion counseling, promoting abortion, or being connected to abortions. 500 U.S. at 179-80. The Court reasoned based on its past decisions that it would "strain logic" to conclude that exclusion of abortion-related speech from "a federally funded *preconceptional* family planning program is unconstitutional." *Id.* at 202.

These cases confirm that a State may "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds." *Maher*, 432 U.S. at 474; *McRae*, 448 U.S. at 314; *Rust*, 500 U.S. at 192. Moreover, all of these cases highlight the "basic difference" between (i) "direct state interference with a protected activity," where States can expect increased scrutiny and (ii) "state encouragement of an alternative activity" through public funding (and corresponding discouragement of abortion), where deference to the legislature applies. *Maher*, 432 U.S. at 475; *McRae*, 448 U.S. at 315; *Rust*, 500 U.S. at 193.

These cases—and their reasoning—control here. When distributing funds for the public welfare, Ohio gets to make its own value judgment on abortion. Nothing in Ohio's funding law directly interferes with anyone's right to an abortion; nor does the funding law place any obstacle in a woman's path to an abortion. Ohio women remain free to receive abortions, and Planned Parenthood remains free to provide abortions (although an entity's provision of abortions is not itself a constitutionally protected right). Indeed, notwithstanding the law, Planned Parenthood concedes that it will continue providing abortions just as it did before the law. *See supra* at 7. The funding law simply refuses to subsidize abortion providers (and, at least indirectly, support the abortions they perform). Ohio can incentivize childbirth and discourage abortion. It follows that Ohio has a legitimate interest in not being seen as approving nontherapeutic abortion by selecting abortion providers to deliver state-funded health services and messages. In short, the

Constitution permits Ohio to do what it has done here—designate as service providers those organizations that do not provide and promote abortions as part of the State's right to encourage childbirth as its "preferred course of action." *Maher*, 432 U.S. at 476-77.

Planned Parenthood cannot escape this result by simply reframing the due process issue under the "unconstitutional conditions" doctrine. Although "the doctrine's contours remain unclear despite its long history," *Planned Parenthood Ass'n of Hidalgo Cnty. Texas, Inc. v. Suehs*, 692 F.3d 343, 349 (5th Cir. 2012), the central question of the doctrine is whether the government is denying benefits on a basis that infringes on constitutionally protected rights, *Agency for Int'l Dev. v. Alliance for Open Society Int'l., Inc.*, 133 S.Ct. 2321, 2328 (2013) ("*AID*"). Ohio does not do so here.

*Maher* and *McRae* have *already answered* this question in Ohio's favor. These cases held that restrictions on abortion funding, even when made *on the basis* of the State's value judgment against abortion, do "*not* impinge upon the fundamental right recognized in *Roe*." *Maher*, 432 U.S. at 474 (emphasis added); *see also McRae*, 448 U.S. at 317. Such laws do *not* amount to "unduly burdensome interference," *Maher*, 432 U.S. at 474, or "unwarranted interference," *McRae*, 448 U.S. at 317-18, with the right to abortion *Roe v. Wade* created. *Maher* also refused to apply heightened scrutiny: "We think it abundantly clear that a State is not required to show a compelling interest for its policy choice to favor normal childbirth . . . ." 432 U.S. at 477. And *McRae* refused to find any "affirmative funding obligation" under due process just because the government could "not prohibit" the conduct. 448 U.S. at 318. Thus, *Maher* and *McRae* both upheld abortion funding restrictions that encouraged something indirectly (by prohibiting funds for abortion) that the State would have been unable to do directly (i.e., prohibit abortion) because of protected rights.

13

The Supreme Court's *Rust* decision further reflects that *Maher* and *McRae* resolve the question for due process analysis. The Court in *Rust* considered an "unconstitutional conditions" argument in the First Amendment context (a context unaddressed in *Maher* and *McRae*). 500 U.S. at 196-97. But *Rust* did not need to engage in such an unconstitutional-conditions analysis when analyzing due process. *Id.* at 201-03. In discussing due process, *Rust* found it "*evident* from the line of cases beginning with *Maher* and *McRae*" that "the regulations do not impermissibly burden" a woman's right to abortion. *Id.* at 201 (emphasis added).

The Supreme Court's reasoning in these cases naturally extends to a State's refusal to fund abortion providers.[1] *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 988 (7th Cir. 2012) (holding Planned Parenthood's unconstitutional-conditions claim—challenging Indiana's refusal to fund abortion providers—was unlikely to succeed). If the government can *directly refuse* to fund abortion without unduly burdening abortion rights, then it is difficult to see how action further removed from such rights (refusing to fund abortion providers for *non-abortion* services) results in any undue burden. *Id.* It "would strain logic" to find a due process violation here. *Rust*, 500 U.S. at 202.

Finally, even if it were appropriate to transform the undue burden analysis into a purely factual question (despite contrary Supreme Court precedent), the record reflects that the funding

---

[1] The Tenth Circuit's decision regarding funding to Planned Parenthood does *not* change the analysis here. That case involved executive action by Utah's governor to terminate grants specifically with Planned Parenthood. *Planned Parenthood Ass'n of Utah v. Herbert*, No. 15-4189, Slip Op. at 8-9 (10th Cir. July 12, 2016). Although the case involved similar claims, the analysis is inapplicable here. For equal protection, Planned Parenthood brought a class-of-one claim that the court held was unlikely to succeed. *Id.* at 14-25. For unconstitutional conditions, the court looked to whether "the condition acts retrospectively in a *discretionary* executive action that terminates a government-provided benefit . . . in retaliation for prior protected speech or association." *Id.* at 27. To the extent this is a proper unconstitutional-conditions framework, any such test is inapplicable here because this case involves a duly-enacted statute as opposed to any discretionary executive action in retaliation for prior speech.

14

law will have no practical effect on abortions. Both Planned Parenthood entities testified that the law will not constrain their provision of abortion. They *will* continue providing abortions even if the law takes effect. PPSWO Depo. at 258:2-5, 22-25; PPGOH Depo. at 270:2-5.

***Equal Protection***. Planned Parenthood's separate equal protection claim likewise fails. Ohio has a legitimate and strong interest in promoting childbirth over abortion and not being compelled to select abortion providers to serve as the face of its publicly funded health care and education programs. Ohio's refusal to give public funds to abortion providers is, at a minimum, rationally connected to these interests.

"[W]here a regulatory scheme neither implicates a fundamental right nor creates a suspect classification, rational basis review applies." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 693 (6th Cir. 2014). Rational basis review "is a paradigm of judicial restraint." *FCC v. Beach Comm'n, Inc.*, 508 U.S. 307, 314 (1993). Under this review, the challenged law "bear[s] a strong presumption of validity" and the challenger has "the burden to negative every conceivable basis which might support it." *Id.* at 314-15 (quotation omitted). If the Court finds any "conceivable" or "plausible reasons" for a law, review "is at an end." *Id.* at 314. Indeed, rational basis entails "near-automatic approval." *United States v. Alvarez*, 132 S. Ct. 2537, 2552 (2012) (Breyer, J., concurring).

Here, Ohio's funding law satisfies equal protection. To begin, rational basis review applies. The funding law is unrelated to any suspect class. *See Maher*, 432 U.S. at 470-71 (rejecting "indigent woman desiring an abortion" as a suspect class); *McRae*, 448 U.S. at 323 ("[P]overty, standing alone is not a suspect classification."). And, although women have a right to an abortion under *Roe v. Wade*, funding restrictions fail to implicate that right. *Maher*, 432 U.S. at 474; *McRae*, 432 U.S. at 322 ("[W]e have already concluded that the Hyde Amendment

violates no constitutionally protected substantive rights.").  Tellingly, both *Maher* and *McRae* applied rational basis review to similar funding choices.  *Maher*, 432 U.S. at 478-80 (holding that Connecticut's funding regulation satisfied rational basis review); *McRae*, 448 U.S. at 324-26 (holding the same for the Hyde Amendment).

Under rational basis review, the appropriate standard is not one of necessity, and the law fails only if the connection between means and ends is "so attenuated as to render the distinction arbitrary or irrational."  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).  Furthermore, a court is required to consider any "conceivable basis" for a law, regardless of a legislature's actual motivations.  *Beach*, 508 U.S. at 314.

As in *Maher* and *McRae*, Ohio's funding law meets this standard.  "The State unquestionably has a strong and legitimate interest in encouraging normal childbirth" rather than abortion.  *Maher*, 432 U.S. at 478; *see also McCrae*, 448 U.S. at 324.  "*Roe* [*v. Wade*] itself explicitly acknowledged the State's strong interest in protecting the potential life of the fetus," *Maher*, 432 U.S. at 478, and, further, that this interest suffices to overcome a right to an abortion as a pregnancy progresses.  The funding law is rationally related to these interests.  Refusing to give public funds to those who are providing abortions is a closely-related, natural component of Ohio's decision to favor childbirth over abortion.  *See McRae*, 448 U.S. at 425 ("Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life.").

Planned Parenthood cannot lessen the significant deference owed to the legislature by merely asserting (on the basis of a single quote from a legislator) that improper motives underlie the passage of the funding law.  Even putting aside the impropriety of relying on isolated statements from particular legislators to infer motive, discouraging abortion is not an improper

legislative objective. Though *Roe v. Wade* recognized a woman's right to an abortion, it also recognized that the State had a countervailing and "strong interest in the potential life of the fetus." *Maher*, 432 U.S. at 478 (citing *Roe*, 410 U.S. at 162-63). Given this interest, "the government need not be neutral between abortion providers and other medical providers" when crafting laws, and this is "particularly well-established in the context of governmental decisions regarding the use of public funds." *Planned Parenthood of Ind., Inc.*, 699 F.3d at 988. The fact that a legislator expressed a viewpoint disfavoring abortion during debate is therefore an insufficient basis for concluding that the funding law violates equal protection.

Ultimately, decisions relating to the funding of abortion providers are "fraught with judgments of policy and value over which opinions are sharply divided." *Maher*, 432 U.S. at 479. Casting aside one side of this divide as irrational would be incorrect and inappropriate.

***First Amendment***. Planned Parenthood does *not* allege that prohibiting funding to those who *provide* abortions implicates the First Amendment. *See* Compl. ¶ 109. For good reason: the First Amendment applies to *speech*, not *conduct*. Providing abortions is *non-expressive conduct* outside the scope of the First Amendment. *See Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 66 (2006) ("[W]e have extended First Amendment protection only to conduct that is inherently expressive."). Thus, any potential First Amendment claim relating to those providing abortions would automatically fail.

### B. Because the conduct restrictions survive constitutional scrutiny, Planned Parenthood's request for permanent injunction should be denied.

Because Planned Parenthood cannot overcome the funding law's conduct provisions, this case ends. The doctrine of constitutional avoidance precludes further review.

It is well-established that courts should avoid answering constitutional questions unnecessary to resolving a case. *See, e.g.*, *Pearson v. Callahan*, 553 U.S. 223, 241 (2009)

(recognizing "the general rule of constitutional avoidance . . . the older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable" (quotations omitted)); *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts should avoid unnecessary constitutional questions."); *Bowman v. Tenn. Valley Auth.*, 744 F.2d 1207, 1211 (6th Cir. 1984) (declining "to decide questions of a constitutional nature unless absolutely necessary to a decision of the case").  In short, "[i]f it is not necessary to decide more, it is necessary not to decide more."  *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008) (quotations omitted).

Principles of constitutional avoidance counsel against resolving Planned Parenthood's speech-related claims as they are unnecessary to the ultimate outcome.  Even assuming for purposes of argument that the funding law's speech provision is unconstitutional, the conduct provision remain constitutional and prohibits funding to Planned Parenthood.[2]  Thus, under the conduct provision, Planned Parenthood cannot receive the injunctive relief it seeks.  Without any chance of relief, any decision on the speech provisions of the funding law would be an unnecessary advisory opinion.

## II.  Ohio may constitutionally refuse to give public funds to those who *promote* abortions.

But even if the Court reaches the funding law's speech (promoting abortions) provisions, those provisions similarly survive each of Planned Parenthood's three constitutional challenges.

---

[2] Relatedly, even if the Court were to strike down the "promoting nontherapeutic abortions" provisions, applying severability, the "providing nontherapeutic abortions" provisions would remain intact.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (quotations omitted)); *BellSouth Telecomms., Inc.*, 542 F.3d at 505 (outlining Ohio law on severability, including that Ohio statutes are presumptively severable).

***First Amendment***.  The State's refusal to subsidize those promoting abortions satisfies the First Amendment.  This review begins by recognizing that the State is free to attach reasonable conditions to public financial assistance.  *Rumsfeld*, 547 U.S. at 59 (citing *Grove City Coll. v. Bell*, 465 U.S. 555, 575-76 (1984)).  Prospective recipients are then "free to decline . . . funds" if they are displeased with the conditions.  *Id.*  The only thing such conditions *force* anyone to do is weigh potential pros and cons of accepting public funds.

Moreover, when using or distributing public funds, the State may convey its own message: "[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).  For example, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."  *Rust*, 500 U.S. at 193.  In other words, the State may make funding choices "to advance certain permissible goals" even when these choices "necessarily discourages alternative goals."  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015) (quotations omitted).  And critically, in delivering its message through public funding, the State may take "appropriate steps to ensure that its message is neither *garbled* nor *distorted* by the grantee."  *Rosenberg*, 515 U.S. at 833 (emphasis added).

These principles apply even when conditions impose some restriction on speech.  For instance, the Supreme Court has recognized that Congress may condition § 501(c)(3) tax-exempt status on refraining from lobbying activities to influence legislation.  *See generally Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983).

19

And these principles apply even when abortion is the topic. In *Rust*, the Supreme Court applied the same due process principles (discussed in detail above) to its First Amendment analysis of funding restrictions on abortion-related counseling, promotion, and affiliation. 500 U.S. at 192-93. Approving these restrictions, *Rust* stressed that, even under the First Amendment, a State is still free to "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds." *Id.* (quotation omitted). *Rust* also re-emphasized the distinction "between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* (quotation omitted).

This brings us again to the unconstitutional conditions doctrine. As many have recognized, this is a murky area. *See, e.g.*, *AID*, 133 S. Ct. at 2330 (recognizing that distinctions under the doctrine "are not always self-evident"); *Suehs*, 692 F.3d at 349 (noting "the unclear framework of the unconstitutional conditions doctrine"); *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) (Stevens, J., dissenting) ("[T]he 'unconstitutional conditions' doctrine has for just as long suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question."). Under the doctrine, the government cannot deny a benefit in a way that infringes on free speech. *Rumsfeld*, 547 U.S. at 59. But it can still require a recipient to make a "reasonable choice" when accepting funds. *Id.*

In 2012, the Fifth Circuit upheld a very similar Texas funding law despite an unconstitutional-conditions First Amendment claim. *Suehs*, 692 F.3d 343. Texas created a women's health program using state and government funds. *Id.* at 346. Like Ohio's law, Texas passed a law prohibiting the State from contracting with entities that "promote elective

abortions." *Id.* The court held that this was a permissible funding condition. *Id.* at 349-50. Following *Rust*, the Fifth Circuit stressed that Texas could properly make the policy decision to "disfavor abortion" and enact that policy when distributing public funds. *Id.* And even though Texas's funding condition applied to program *participants*, rather than just program *activities*, the court reasoned that this was a proper safeguard of Texas' message: "Texas's authority to promote that policy would be *meaningless* if it were *forced* to enlist organizations as health care providers and message-bearers that were also abortion advocates." *Id.* at 350 (emphasis added).

Applying these principles to the funding law, Ohio's refusal to publicly fund those promoting abortion similarly passes First Amendment review. Ohio has made the permissible policy decision to encourage childbirth over abortion. Consistent with this message, Ohio has decided, when distributing funds for women's and sexual health programs, to refuse public funds to those promoting abortion. As was true in *Rust*, Ohio has not created a program to encourage "private speech but instead use[s] private speakers to transmit specific information pertaining to its own program[s]." *Rosenberger*, 515 U.S. at 833 (citing to *Rust*). For example, recipients of certain grants—such as the PREP—must use the Ohio Department of Health's curriculum for their training programs and may not develop their own curriculum. PPSWO Depo. at 59:2-21, 76:3-6; PPGOH Depo. at 84:21-85:2. Ohio has a particular message that it has approved, and the funding law now avoids confusing this message by eliminating the potential that someone offering a contrary message will be among Ohio's messengers. *See Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes," and it "may take legitimate and appropriate steps to ensure that its message is neither *garbled* nor *distorted* by the grantee." (emphasis added)).

Forcing Ohio to give public funds to abortion promoters would severely distort and confuse Ohio's message. At a minimum, providing an Ohio-blessed subsidy to abortion providers like Planned Parenthood would "garble[]" Ohio's message on abortion, *Rosenberger*, 515 U.S. at 833, if not render it "meaningless," by seemingly endorsing pro-abortion conduct and messages. *Suehs*, 692 F.3d at 350.

Moreover, as the Supreme Court has noted: "Money is fungible." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). Planned Parenthood of Southwest Ohio testified that one of its primary missions is education. PPSWO Depo. at 55:4-5. If Ohio's funding law takes effect, this entity hopes to implement an alternative sex education program. *Id.* at 55:8-18. Funding for any alternative program would "come out of [PPSWO's] general fund." *Id.* at 56:1-3. Therefore, without the funding law, Planned Parenthood is able to use state grants to fund one of its primary missions, thus freeing up other general funds to be used for other purposes, such as promoting abortions. Unlike in *AID*, where the government offered no support for its argument that government funds supplanted private funds, PPSWO here has admitted that it uses state grants to fund its education department, and that without those funds, it must use other money to cover the costs. *AID*, 133 S. Ct. at 2331.

Furthermore, as previously explained, all Planned Parenthood funds are, as a factual matter, inextricably intertwined with its abortion business. *See supra at* 10.

Additionally, and quite significantly, pregnant patients who go to Planned Parenthood to receive services under one of the funded programs here at issue could receive "options counseling," which includes discussing abortion as an option, and providing patients with abortion referrals. *See supra* at 10. Put differently, discovery here reveals that Planned

22

Parenthood uses public funds to provide government-funded services to patients who then, and in conjunction with that program, may be given abortion counseling and referrals.

Further reflecting the overlap of money and messages in this context, until April 2016—not coincidentally, the month in which Planned Parenthood was told it would no longer be eligible for public funds under the programs outlined in the funding law—PPSWO offered state-funded STD testing to patients as they were receiving abortion services in the surgical facility. *See supra* at 10. Money, including a $10 specimen fee, collected for the STD services would have been allocated to PPSWO's abortion facility. *Id.*

This fungibility and intertwining further garbles and confuses Ohio's message that it favors childbirth over abortion. The State should neither be required to designate abortion providers to serve as its messengers nor be required to have its funds intertwined with abortion services. And reliance of the Supreme Court's decision in *AID* does *not* change this reality. In that case, a federal statute permitted funding only if an organization adopted "a policy explicitly opposing prostitution and sex trafficking." *AID*, 133 S. Ct. at 2324 (quotation omitted). The federal law, therefore, not only endeavored "to enlist the assistance of those with whom it already agree[d]," it sought to compel "adopt[ion] of a particular belief as a condition to funding." *Id.* at 2330. In contrast, Ohio's funding law does *not* compel any speech. Nor does it require that program participants agree with Ohio's message. It only "prevent[s] recipients from using private funds in a way that would undermine" and confuse Ohio's message. *See id.* at 2332. No one has to "pledge allegiance" to Ohio's policy. *See id.*

Ohio can constitutionally favor childbirth over abortion and take measures to ensure that its message aligns with its policy. Ohio's funding law satisfies the First Amendment.

***Due Process***.  Planned Parenthood fails to claim that refusing to subsidize those who promote abortions violates due process.  *See* Compl. ¶¶ 110-11.  Even if it did, such a claim would lack merit.  "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process."  *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quotations omitted).  So if the First Amendment condones funding conditions relating to speech, it follows that they survive any substantive due process challenge based on the right to free speech.  *See Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891 (6th Cir. 2001) (holding due process claim was duplicative of First Amendment claim).

***Equal Protection***.  Planned Parenthood's equal-protection challenge to the speech provisions of the funding law fails for the same reasons as its equal-protection challenge to the conduct provisions.  *See supra* 15-18.  Ohio's funding law contains no suspect classification.  *See Maher*, 432 U.S. at 470-71; *McRae*, 448 U.S. at 323.  And, as already detailed in the First Amendment analysis, Ohio's funding law does *not* interfere with fundamental speech rights.  Thus, rational basis is the standard.  Under this standard, Ohio's decision to refuse public funds to those who promote abortion is rationally related to its interests in protecting potential life and disfavoring abortion.  By refusing to distribute public funds to those who oppose Ohio's interests in potential life by encouraging nontherapeutic abortions, Ohio is furthering those interests and preventing its message from being distorted.

## III.    Ohio has a strong public interest in the policy decisions of its elected representatives.

Because Planned Parenthood cannot demonstrate a constitutional violation, it should receive no relief.  But the remaining injunction factors, balancing potential harms against the public interest, also favor Ohio.  Of particular importance, Ohio has a strong interest in retaining the policy decisions of its elected representatives.

As Supreme Court Justices have recognized, "'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  Or, as this Court has stated, "giving effect to the Ohio General Assembly's valid and duly enacted laws generally furthers the public interest."  *Tri-County Wholesale Distribs., Inc. v. The Wine Group, Inc.*, No. 2:10-cv-693, 2010 WL 3522973, at *8 (S.D. Ohio Sept. 2, 2010).

This case implicates both federalism and the separation of powers doctrine.  The Constitution does *not* address "every social and economic ill" and "does *not* require a judicially imposed resolution" of every controversial issue.  *Maher*, 432 U.S. at 479-80 (quotation omitted) (emphasis added).  Rather, when evaluating States' decisions, the Court must generally "defer[] to state lawmaking" and allow States to act "as laboratories for devising solutions" to difficult problems.  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015).  And when laws involve "policy choices as sensitive" as funding decisions relating to nontherapeutic abortions, "the appropriate forum for their resolution in a democracy is the legislature."  *Maher*, 432 U.S. at 479; *McRae*, 448 U.S. at 326.  Weighing the competing interests is the role of the legislature.  *McRae*, 448 U.S. at 325-26.

Ohio's elected representatives have weighed the competing interests at stake and made a value judgment through Ohio's funding law about how *Ohio* wants to distribute public funds.  Importantly, the federal government has *its own* funding power (with no need for a judicial remedy), and Ohio law does not restrict or affect the federal government's authority to distribute funds.

Ohio has a strong public interest in making funding decisions through its "normal democratic process[]." *Maher*, 432 U.S. at 480. The funding law involves a considered policy choice in a much debated area. Overriding this legislative policy choice would discredit that ongoing public dialogue and the rational policy choices that are assigned to the domain of the General Assembly. *See* Op. & Or. 17. Reasonable minds can certainly disagree over the proper interaction between public funding and abortion. But, applying the deference that the legislature deserves (and that rational basis requires), prohibiting public funding to abortion providers and promoters is reasonably connected to Ohio's weighty interests.

## IV. This Court's temporary restraining order and analysis does not support final permanent relief.

Less than two weeks into this case, the Court, at Planned Parenthood's request, issued an emergency order temporarily restraining enforcement of the funding law on its effective date. *See generally* Op. & Or. This preliminary ruling has no binding effect—either legal or factual—at this trial stage. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). At this stage, Planned Parenthood must overcome a heavy burden to prove entitlement to final permanent relief, and, as the more fully developed legal and factual record confirms, it cannot do so.

First, as previously discussed, Supreme Court precedent precludes permanent injunctive relief in this case. In *Maher* and *McRae*, the Supreme Court upheld funding restrictions similar to those at issue here. But even beyond their precise holdings, these cases are also controlling because of their *reasoning*. Both rejected the argument (central to Planned Parenthood's Fourteenth Amendment claims) that prohibitions on public funding improperly interfere with abortion rights as defined by the courts. *Maher*, 432 U.S. at 471-77; *McRae*, 448 U.S. at 312-18. And *Rust* explained that these prior decisions remained critical to First Amendment analysis. 500 U.S. at 192-93.

These cases are dispositive here.  Only four years after *Roe v. Wade* recognized a right to an abortion, the Supreme Court held that it was constitutional—*despite such a right*—for the State to refuse to publicly fund abortions.  *Maher*, 432 U.S. 464.  It is not now unconstitutional —*by virtue of that same assessment*—for the State to refuse to publicly fund abortion providers for services *separate from abortion*.  *See* Op. & Or. 12-15.

Second, converting the Court's temporary relief into permanent relief would improperly conflate the funding law's conduct and speech provisions.  *See id.* at 9-17.  As detailed above, it is unnecessary for the Court to perform the First Amendment analysis.  Because Planned Parenthood engages in *conduct* (providing abortions), and because that conduct alone disqualifies Planned Parenthood from program funding under the law, this case can be resolved on narrower, easier grounds—with the help of binding Supreme Court precedent.

Additionally, further factual and legal development reveals that the due process analysis here is indistinguishable from the question analyzed by the Seventh Circuit in *Planned Parenthood of Indiana*.  *See* Op. & Or. 13-15.  In that case, the Seventh Circuit *upheld* an Indiana funding law that, like Ohio's funding law, prohibited public funding to abortion providers.  *Planned Parenthood of Indiana*, 699 F.3d at 967, 986-88.  It did so despite the same due process argument Planned Parenthood raises here.  *See id.* at 971 ("Planned Parenthood alleges that the defunding law imposes an unconstitutional condition on its receipt of public funds by forcing it to choose between performing abortions and receiving non-abortion-related public funding.").  In its preliminary ruling, this Court credited the Seventh Circuit's legal analysis, but distinguished the present case because it believed Planned Parenthood could show an undue burden on a woman's right to an abortion.  Op. & Or. 13-14.

The record at this stage of the proceedings now shows that Planned Parenthood cannot sustain its claim.  No material factual difference supports a different outcome in the two cases. The Seventh Circuit's decision reflects that Planned Parenthood has a similar presence in Indiana as it does in Ohio.  *Compare Planned Parenthood of Indiana*, 699 F.3d at 970-71, *with* Op. & Or. 14-15.  And the court there reasoned that granting relief would be irreconcilable with Supreme Court precedent: "If, as the foregoing cases hold, the government's refusal to subsidize abortion does not unduly burden a woman's right to obtain an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services—cannot *indirectly* burden a woman's right to obtain an abortion."  *Planned Parenthood of Indiana*, 699 F.3d at 988.

Moreover, contrary to Planned Parenthood's misleading suggestion, *this law will not affect Planned Parenthood's provision of abortion services*.  Designees for both providers repeatedly admitted that they will continue providing abortion services, even if the challenged funding law takes effect.  PPSWO Depo. at 258:2-5, 22-25; PPGOH Depo. at 270:2-5.  Thus, the funding law will *not* diminish or affect any patient's access to abortion services.  PPGOH Depo. at 251:3-17.

Nor will the law impose any financial hardship for Planned Parenthood that could be considered coercive or punitive.  In an effort to exaggerate the anticipated effect of the law, Planned Parenthood highlights only the value of reimbursements and supplies they previously received under the programs affected by the funding law.  Even in isolation, this number represents only a fraction of Planned Parenthood's overall revenues.  *See supra* at 8.

But more importantly, these amounts fail to reflect the *net monetary impact* of the relevant programs on Planned Parenthood.  As outlined previously, Planned Parenthood

designees admitted that both entities operated many of the programs at a financial loss and simply broke even for others.  *See supra* at 8-9.

Finally, the impact on Planned Parenthood's provision of non-abortion services is also slight.  *See* Ex. C at 8 (PPSWO's Answers to Interrogatories).   Again, Planned Parenthood admitted it will continue to provide breast and cervical cancer screening for patients in all of their respective family planning and health centers; it will continue to provide HIV testing; it will continue to provide STD screening and treatment; and it will continue to provide and participate in educational programs. *See supra* at 9.

The funding law's bottom line for Planned Parenthood is that it can no longer provide services *under the specific government-sponsored programs* outlined in the law.  And as already discussed, the State had the constitutional discretion to make the value judgment to ensure that state-administered health care services and messages are not delivered to the public through abortion providers.

In sum, nothing about Planned Parenthood's status or the specific facts in this case supplies a basis for overriding the legislative choices reflected in the funding law.

## CONCLUSION

For the reasons set forth above, Planned Parenthood is not entitled to any relief in this case.  Defendant respectfully asks the Court to deny the request for a permanent injunction and grant judgment in Defendant's favor.

Respectfully submitted,

MICHAEL DEWINE (0009181)
Ohio Attorney General

*s/ Ryan Richardson*
RYAN L. RICHARDSON (0090382)
        * Lead and Trial Counsel
TIFFANY L. CARWILE (0082522)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
ryan.richardson@ohioattorneygeneral.gov
tiffany.carwile@ohioattorneygeneral.gov

*Counsel for Defendant Richard Hodges*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, on July 18, 2016, and served upon all parties of record via the court's electronic filing system.

*s/ Ryan Richardson*
RYAN L. RICHARDSON (0090382)