## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

Planned Parenthood of         :
Greater Ohio, et al.,         :
                              :
        Plaintiffs,           :
                              :
    vs.          : Case No. 1:16-cv-539
                              :
Richard Hodges, et al.,       :
                              :
        Defendants.           :

- - -

DEPOSITION
of 30(b)(6) witnesses Jerry Lawson and Lee Bower,
taken before me, Valerie J. Grubaugh, Registered
Merit Reporter, and a Notary Public in and for the
State of Ohio, at the offices of Gerhardstein &
Branch, 441 Vine Street, Suite 3400, Cincinnati,
Ohio, on Wednesday, July 6th, 2016, at 9:00 a.m.

- - -

ARMSTRONG & OKEY, INC.
222 East Town Street, Second Floor
Columbus, Ohio 43215-4620
(614) 224-9481 - (800) 223-9481
FAX - (614) 224-5724

- - -

## Page 2

1   APPEARANCES:
2       Gerhardstein & Branch
        By Jennifer L Branch, Esq
3       441 Vine Street, Suite 3400
        Cincinnati, Ohio  45202
4       Jbranch@gbfirm com
5       Wilmer, Cutler, Pickering, Hale
         and Dorr, LLP
6       Alan E  Schoenfeld, Esq
        John Sprangers, Esq
7       7 World Trade Center
        250 Greenwich Street
8       New York, New York  10007
        Alan schoenfeld@wilmerhale com
9
            On behalf of the Plaintiffs
10
        Michael DeWine, Esq
11      Ohio Attorney General
        By Ryan L  Richardson, Esq
12      Tiffany L  Carwile, Esq
        Constitutional Offices Section
13      30 East Broad Street, 16th Floor
        Columbus, Ohio  43215
14      ryan richardson@ohioattorneygeneral gov
        tiffany carwile@ohioattorneygeneral gov
15
            On behalf of the Defendants
16
            - - -
17
18
19
20
21
22
23
24
25

## Page 3

1              Wednesday Morning Session,
2                  July 6th, 2016.
3                      - - -
4                  STIPULATIONS
5          It is stipulated by and between counsel
6   for the respective parties that the deposition of
7   30(b)(6) witnesses Jerry Lawson and Lee Bower, called
8   by the Defendants under the applicable Rules of Civil
9   Procedure, may be reduced to writing in stenotype by
10  the Notary, whose notes thereafter may be transcribed
11  out of the presence of the witnesses; and that proof
12  of the official character and qualification of the
13  Notary is waived.
14                     - - -
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                      INDEX
2                      - - -
3   WITNESSES:                          PAGE
4   Jerry Lawson
        Examination by Ms. Richardson        5
5       Examination by Mr. Schoenfeld      204
    Lee Bower
6       Examination by Ms. Richardson      206
7                      - - -
8   DEPOSITION EXHIBITS            IDENTIFIED
9   1 - Notice of Rule 30(b)(6)          22
10  2 - Plaintiff responses to interrogatories   84
11  3 - Post-Defunding Plan             115
12  4 - 2015 Annual Report              166
13  5 - Lawson Notes                    131
14  6 - 8/5/2015 Email                  179
15  7 - 10/26/2015 Email                181
16  8 - Declarations of Jerry Lawson    184
17
                       - - -
18
19
20
21
22
23
24
25

Page 5

1          Jerry Lawson,
2  being by me first duly sworn, as hereinafter
3  certified, deposes and says as follows:
4                    EXAMINATION
5  By Ms. Richardson:
6      Q.  Good morning, Mr. Lawson.
7      A.  Good morning.
8      Q.  We met off the record just a few moments
9  ago, but for the record my name is Ryan Richardson,
10  and I work at the Ohio Attorney General's office, and
11  I'm here on behalf of the Defendant in this case, the
12  Department of Health.  Have you ever been deposed
13  before today?
14      A.  Once for ten minutes.
15      Q.  Okay.
16      A.  Years ago in the '80s.
17      Q.  Today might last a little longer than
18  ten minutes, but we'll try to keep it as short as
19  possible.  I will just briefly kind of remind you of
20  some of the ground rules for the deposition.
21          As you know, I'll be asking you
22  questions over the course of the day today.  You are
23  here with your counsel who will be objecting.  Unless
24  your counsel specifically instructs you not to answer
25  a question, the objection is just for the record and

Page 6

1  so you'll go ahead and answer my question.
2          If at any point in time you don't
3  understand something I've asked, just let me know and
4  I will rephrase the question.  If, however, you do
5  answer a question that I've posed, then I will assume
6  that you understood it.  Is that fair?
7      A.  That's fair.
8      Q.  We can take breaks throughout the day at
9  any time that you need one.  All that I ask is that
10  we wait until you've answered the pending question
11  before we take a break.  Fair?
12      MR. SCHOENFELD:  You need to give a
13  verbal answer.
14      THE WITNESS:  I did.  You didn't hear
15  it, she did.
16      MS. BRANCH:  I didn't hear it either.
17      THE WITNESS:  I will speak up.
18  By Ms. Richardson:
19      Q.  And so as to the Court Reporter rules,
20  we do have a Court Reporter here so we just need to
21  make sure we speak slowly, which is always a
22  challenge for me, and that we make sure we don't
23  speak over each other so that she can get down what
24  we say today, and make sure we speak audibly and
25  loudly enough for her to hear.

Page 7

1      Are you taking any medications or is
2  there any other reason that you would not be able to
3  answer truthfully and completely today?
4      A.  No.
5      Q.  Any questions before we start?
6      A.  No.
7      Q.  So to begin, I'd like to just go over
8  some of your background.  First of all, can you just
9  state for the record what your current position is?
10      A.  I'm the President and Chief Executive
11  Officer of Planned Parenthood Southwest Ohio Region.
12      Q.  And how long have you been in that
13  position?
14      A.  About four-and-a-half years.
15      Q.  How long have you been employed with
16  Planned Parenthood Southwest Ohio?
17      A.  Four-and-a-half years.
18      Q.  So you began as President and CEO?
19      A.  I did.
20      Q.  And if you would, if you could just walk
21  me through briefly, starting with college, what your
22  educational background is.
23      A.  Okay.  I graduated from Indiana
24  University, undergraduate with a major in government.
25  And then I graduated from Columbia Law School with a

Page 8

1  law degree.
2      Q.  And what did you do when you graduated
3  from Columbia Law School?
4      A.  I went to work for a law firm here in
5  Cincinnati.
6      Q.  And which firm was that?
7      A.  Taft, Stettinius & Hollister.
8      Q.  And how long were you at Taft?
9      A.  Three years.
10      Q.  And what was the time frame for this?
11      A.  A long time ago.  '65 -- no, '68 to '71
12  I was at the Taft firm.
13      Q.  And what did you do after you left Taft?
14      A.  I went to work for the Appalachia
15  Research and Defense Fund in West Virginia, in
16  Charleston.
17      Q.  And how long were you there?
18      A.  One year.
19      Q.  What was your role there?
20      A.  I was a staff attorney.
21      Q.  And what did you do after you left?
22      A.  I came back to Cincinnati and started
23  working for the Legal Aid Society of Cincinnati.
24      Q.  And how long were you at Legal Aid?
25      A.  I was there '72 to '77.

1    Q.   And was that as a practicing lawyer?
2    A.   I was a Deputy Director.
3    Q.   Where did you go after you left Legal
4  Aid?
5    A.   I went to the Peninsula Legal Aid
6  Center, is the name of it, in Newport News, Hampton,
7  Virginia as the Executive Director, and I was there
8  for two years.
9    Q.   And so I'm sorry, forgive me for my
10  math, but what does that bring us up to?
11    A.   '79.
12    Q.   Where did you go then?
13    A.   I came back to Cincinnati to work again
14  for the Legal Aid Society of Cincinnati.
15    Q.   And how long were you there during that
16  time frame?
17    A.   I was there from '79 until '88.
18    Q.   And then if you would just sort of
19  briefly kind of describe from '88 until you started
20  with Planned Parenthood.
21    A.   I was the Executive Director.  Then they
22  changed the title to President, CEO, of the Center
23  for Resolution of Disputes, which was essentially a
24  mediation service.  And I did that from '88 until
25  2012, so I was still doing that part-time when I

1  started at PPSWO.
2      And then after I'd been at PPSWO for, I
3  can't precisely remember this, maybe a
4  year-and-a-half, I went full-time at PPSWO and gave
5  up my mediation practice, and went inactive on my law
6  license.
7    Q.   So you do not serve in any type of legal
8  capacity at Planned Parenthood?
9    A.   Right.
10    Q.   Can you just describe generally what
11  your responsibilities are as the President and CEO
12  Southwest Ohio?
13    A.   I'm the Chief Executive Officer, so as
14  such I'm responsible for the overall operation of the
15  organization.  Ultimately responsible for the work
16  product, the hiring, every aspect, but it's not
17  directly my responsibility, just everybody there
18  reports to me.
19    Q.   And how many full-time employees do you
20  have that work directly for PPSWO?  Is that what you
21  say?
22    A.   PPSWO is the term we use.  Full-time,
23  about a hundred.
24    Q.   What about part-time?
25    A.   About ten.  This varies slightly from

1  time to time, both the total and the mix of part-time
2  and full-time.
3    Q.   And where are the -- are these staff
4  members all in kind of one building?  Do you have a
5  headquarters, so to speak?
6    A.   We have a headquarters here in
7  Cincinnati, but we have seven sites -- six sites.
8  Sorry.
9    Q.   And where are those six sites?
10    A.   Well, the headquarters and two health
11  centers are located here in Cincinnati on Auburn
12  Avenue.  We have an administrative -- sort of a
13  subadministrative office and health center in Dayton,
14  and we have health centers in Springfield,
15  Springdale, west side of Cincinnati, and Hamilton.
16    Q.   And so the six sites includes the
17  headquarters, that's included within that?
18    A.   Yeah, it does.
19    Q.   And the 100 employees that you
20  mentioned, is that for all of these sites combined
21  then?
22    A.   Yes.
23    Q.   I'd like to understand a little bit more
24  about the corporate structure for PPSWO.  I
25  understand from the papers you filed in this case

1  that PPSWO is an affiliate of Planned Parenthood
2  Federation of America.  Am I stating that correctly?
3    A.   Yes.  And yes, we are an affiliate.
4    Q.   What does that mean?
5    A.   It means that in return for complying
6  with all of the national PPFA standards and
7  guidelines for all phases of the operation, that we
8  are accredited by PPFA.  We get various kinds of
9  support, training, education, public affairs help,
10  marketing, communication.
11      We're entitled to use the Planned
12  Parenthood brand, which is a national brand.  I think
13  there are now 59 affiliates.  We pay dues.
14    Q.   And do you receive any type of funding
15  from PPFA?
16    A.   Yes.
17



Page 17

Page 20

9     Q.  And then I'd like to also understand
10   what PPSWO's relationship is with "PPGOH" or "PPGOH".
11   Is that what it's called?  How are you related to
12   that organization?
13     A.  We have no legal relationship.  PPGOH is
14   another PPFA affiliate just like we are.
15     Q.  And are they distinguished then
16   primarily by the coverage area that they would be
17   responsible for?
18     A.  Yes.
19     Q.  How is coverage area defined for an
20   affiliate?
21     MR. SCHOENFELD:  Objection.
22     THE WITNESS:  It's -- PPFA defines the
23   service areas.  They have a process under which they
24   do it.  I don't know any more about it than that.
25   By Ms. Richardson:

Page 21

1    Q.   Thank you.  In terms of day-to-day
2  decisionmaking and operations, is that something that
3  you would have responsibility for locally, or would
4  PPFA be involved in those day-to-day decisions?
5    A.   Local.
6    Q.   Local.  Are there bylaws or policies
7  that help distinguish the responsibilities of the
8  local affiliate as they relate to the PPFA
9  responsibilities?
10    MR. SCHOENFELD:  Objection.
11    THE WITNESS:  Could ask you that again?
12  By Ms. Richardson:
13    Q.   Sure.  So in other words, would it be in
14  writing somewhere, an explanation of what PPFA is
15  responsible for versus what PPSWO or other local
16  affiliates would have the ability to dictate locally?
17    MR. SCHOENFELD:  Objection.
18    THE WITNESS:  I don't know.
19  By Ms. Richardson:
20    Q.   And based on your work as the CEO, how
21  do you know what you are -- what you have the
22  authority to decide locally versus what you would
23  have to consult with PPFA on?
24    MR. SCHOENFELD:  Objection.
25    THE WITNESS:  I'm going to try to answer

Page 22

1  this.  PPSWO is an independent Ohio nonprofit
2  corporation.  So PPSWO has all of the authority that
3  such corporations have, and I report to a board of
4  directors under the Ohio nonprofit law.
5  By Ms. Richardson:
6    Q.   And for clarity for the record, that's
7  the PPSWO board of directors?
8    A.   PPSWO board of directors.
9    Because we are accredited by and
10  affiliated with PPFA, there is an extensive set of
11  standards and requirements for the way we operate
12  that PPFA expects us to meet if we are going to
13  continue to be an affiliate in good standing.
14    Q.   I'm going to hand you now what we'll
15  mark as Exhibit 1 to this deposition.
16    (EXHIBIT MARKED FOR IDENTIFICATION.)
17  By Ms. Richardson:
18    Q.   And this is the Notice of Deposition.
19  Feel free to take a moment to look that over.  Just
20  let me know when you're ready.
21    A.   I'm ready.
22    Q.   Have you seen this document prior to
23  today?
24    A.   I have.
25    Q.   And is it your understanding that you

Page 23

1  are here today as a 30(b)(6) representative of the
2  Planned Parenthood Southwest Ohio organization?
3    A.   That is my understanding.
4    Q.   And is it your understanding then that
5  your answers today on the topics set forth in this
6  notice will be answers of PPSWO for this litigation?
7    MR. SCHOENFELD:  Objection.  Just to be
8  clear, Mr. Lawson is designated on topics 1 through 6
9  and 8 through 10, not topic 7.
10    MS. RICHARDSON:  Thank you for the
11  clarification.
12    THE WITNESS:  Do you need to clarify the
13  question?  Say it again.
14  By Ms. Richardson:
15    Q.   Is it your understanding -- what your
16  counsel was just clarifying is that you're only here
17  to speak about some of the topics, and we're going to
18  look at these topics more closely here in a minute.
19    A.   That's correct.
20    Q.   For those topics that you are here to
21  talk about today, is it your understanding that
22  you'll be answering on behalf of PPSWO?
23    A.   Yes.
24    Q.   And so apart from No. 7, which I
25  understand you will not be talking about today, are

Page 24

1  you prepared to talk about all of the topics that are
2  set forth in this notice?
3    A.   Yes.
4    Q.   Any that you're not prepared to talk
5  about today?
6    A.   No.
7    Q.   And so I'd like to talk just a little
8  bit about what you've done to prepare for the
9  deposition today.
10    Can you just describe your preparation?
11    A.   I read, more than once, several of the
12  documents such as the complaint, my declarations, the
13  memo -- the legal memo in support of the TRO, the
14  interrogatory responses that we submitted to your
15  interrogatories.  I met with counsel by phone last
16  Friday, and in person yesterday.
17    Q.   Apart from counsel, did you speak to
18  anyone else with PPSWO in order to prepare for
19  today's deposition?
20    A.   Yes.
21    Q.   Who did you meet with?
22    A.   Our COO, who is also our CFO, and our
23  Vice-President of Education.
24    Q.   And did you ask them specific questions
25  about the topics that are set forth in this notice?

Page 25

1     A.  Yes.
2     Q.  On a general level can you describe what
3  areas you consulted with them about?
4     A.  With the COO there was not much
5  conversation, but what there was was financial.  And
6  for the Vice-President of Education the discussions
7  were about the VAWA program, Violence Against Women
8  Act, and PREP, Personal Responsibility Education
9  Program, and the HIV community testing program, which
10  she oversees.
11     Q.  Did you speak with anyone else either
12  inside or outside the organization to prepare for
13  your deposition today?
14     A.  Counsel.
15     Q.  Apart from counsel?
16     A.  No.
17     Q.  And aside from the documents that you've
18  already mentioned, which I think were all related to
19  this litigation, did you review any other documents
20  to prepare for today's deposition?
21     A.  No.
22     Q.  And so I'd like to then just start going
23  through some of these topics.
24        Corporate structure we have just been
25  talking about, so I'd like to move to No. 2 that's

Page 26

1  listed here on this notice, and that relates to
2  PPSWO's provision of services.
3        And I'd like to walk through each of the
4  programs that are outlined in the statute that is
5  being challenged in this case.
6        And so just to make sure that we're on
7  the same page in terms of terminology and how we
8  refer to those, can you just give me your
9  understanding of the programs that are outlined or
10  affected by the statute that's being challenged in
11  this case?
12     A.  You mean a list?
13     Q.  Yes, just so I want to make sure we have
14  got the same terminology as we go forward.
15     A.  The STD Prevention Program.  The Breast
16  and Cervical Cancer Program.
17     Q.  And if I refer to that as BCCP, will we
18  have --
19     A.  That's fine.  It's better.  The HIV
20  Community Outreach Testing Program, "HIV".  The
21  Personal Responsibility Education Program, PREP, and
22  Violence Against Women Act funded program, we refer
23  to as VAWA.
24     Q.  Great.  Thank you.  And so let's start
25  with the STD Prevention Program.  Can you just

Page 27

1  describe very generally for me what services PPSWO
2  provides under the STD Prevention Program?
3     A.  We provide testing for gonorrhea and
4  chlamydia, and treatment for people who test
5  positive.
6     Q.  And at which locations of those that
7  you've described earlier are those services provided?
8     A.  At all six of our family planning health
9  centers.
10     Q.  And so I want to just make sure that I
11  understand.  Earlier we were talking about, I
12  thought, a total of six locations that included some
13  administrative offices and headquarters.  Are these
14  six family planning health centers different from
15  those?
16     A.  No.  I'm coming at it a different way.
17     Q.  Okay.
18     A.  I'll explain it.  We have a family
19  planning health center on Auburn Avenue, Cincinnati,
20  west side Cincinnati, Hamilton, Ohio, Springdale,
21  which is a suburb of Cincinnati as you know, Dayton,
22  and Springfield.  Those are our family planning
23  health centers.
24     Q.  And so are those centers also some of
25  the same administrative and other facilities that we

Page 28

1  talked about earlier?  In other words, are they both
2  family planning centers and administrative --
3     A.  The administrative office, the main
4  administrative office, is located at the same
5  location as the family planning health center on
6  Auburn.
7     Q.  Okay.
8     A.  And we have a subadministrative office
9  with fewer people and some administrators at the same
10  location as the family planning center in Dayton.
11     Q.  So it's still accurate to say that there
12  are a total of six locations?
13     A.  Yes.
14     Q.  How long has PPSWO been providing
15  services under the STD Prevention Program?
16     A.  I'm trying to remember.  Twenty-four
17  years, I think.
18     Q.  And so in terms of the grant that comes
19  from ODH, I want to understand sort of how that
20  process works for PPSWO.
21        This is one program where PPSWO
22  contracts directly with ODH; is that right?
23        MR. SCHOENFELD:  Objection.  Assumes a
24  fact not in evidence.
25  By Ms. Richardson:

1    Q.  Does PPSWO contract --
2         THE WITNESS:  I didn't hear what you
3    said.
4         MR. SCHOENFELD:  It assumes a fact not
5    in evidence.  She referenced a grant.
6    By Ms. Richardson:
7    Q.  Do you receive a grant from ODH for the
8    provision of services under the STD program?
9    A.  Not exactly.
10    Q.  Can you explain?
11    A.  We have a contract for each of our
12    health centers with ODH which establishes our
13    entitlement to participate in the STD program based
14    on our positive rates for chlamydia at our health
15    centers.
16         That contract means that for people who
17    qualify for the STD program -- the qualifications are
18    established by ODH -- can get free lab tests.  We get
19    testing kits, and then we do the samples and they are
20    sent to a lab in Texas that has a contract with ODH,
21    not with us.
22         And we also have the ability, because we
23    have the contract, to get free treatment medications
24    like Zithromax that we can use to treat eligible
25    patients who test positive when we get the lab

1    results back.
2    Q.  And that's a great point for
3    clarification.  So I used the term "grant" broadly.
4    But some of the programs that we're going to talk
5    about today including this one do not --
6    A.  Grants, per se?
7    Q.  Grants, per se, in the form of money
8    directly.  So in this case it is lab tests and in
9    some cases medication that would be provided?
10    A.  That's correct.
11    Q.  And so I'd like to understand a little
12    bit about how this works sort of on the ground.  I
13    understand the positivity rates that make you
14    eligible to receive these tests.  But if a patient
15    walks in the door, how does that work?
16         So if a patient calls PPSWO and says
17    they'd like to be tested, how would you respond, and
18    how would that relate to the receipt of this -- of
19    the testing kits from ODH?
20         MR. SCHOENFELD:  Objection.
21         THE WITNESS:  If a patient -- if a
22    patient calls and said I think I might have a -- we
23    actually use the term STI, it's the current term.
24         If a patient calls and says that he or
25    she might have an STI, they make an appointment to

1    come in to one of the health centers, family planning
2    health centers, and the intake staff would determine
3    if the person meets the eligibility requirement under
4    that program.
5         It's focused on younger people.  I can't
6    tell you exactly what the range is.  If they do meet
7    the requirements then we advise the patient that
8    under this program we have the ability to give them a
9    free test, and if they test positive for gonorrhea or
10    chlamydia, we have the ability to give them some free
11    medications.  There's a limited formulary, but it's
12    the ones you need, it's the antibiotics.  And so then
13    the patient gets to participate in that program.
14    By Ms. Richardson:
15    Q.  And when you refer to the eligibility
16    requirement, are you referring to the eligibility
17    requirements that ODH sets for the program?
18    A.  Yes.
19    Q.  Are there any additional eligibility
20    requirements that PPSWO would set?
21    A.  No.
22    Q.  And as we start getting into some of
23    these programs I just want to emphasize a point.
24    None of my questions are intended to elicit any
25    personal identifying information about any patient.

1         So if there is a question that I ask
2    that seems to require that in an answer, please stop
3    and let me know and we will figure out a way to
4    rephrase.
5    A.  Thank you.  I will do that.
6    Q.  And so if a patient is not eligible
7    under the eligibility requirements, how would PPSWO
8    handle that patient; the same patient indicates that
9    he or she thinks he or she might have an STI, but
10    they are not eligible to receive the free testing or
11    medication under the ODH program.
12    A.  We would still test them to see if they
13    have an STI, and we would prescribe or give them
14    medication for treatment.  It would be paid for by
15    them, or if they have a third-party payer like an
16    insurance company, or Medicaid, we could pay for it
17    by the third-party payer.
18    Q.  And how do you determine -- we'll start
19    with a self-payer.  How do you determine what the
20    charge is for that patient?
21    A.  We have a fee structure.
22    Q.  Is that based on ability to pay, or are
23    there other factors?
24    A.  No.  We do not have an ability to pay
25    system at PPSWO.

Page 33

1     Q.  So what factors would go into
2 determining what their appropriate fee would be under
3 the fee structure?
4     A.  I'm not the best person to answer that
5 question.
6     Q.  Who would be the person to answer that
7 question?
8     A.  Lee Bower, the COO/CFO, because he
9 oversees the fee schedule in its development and
10 regular review.
11    Q.  And to go back for a moment to the
12 patient that is eligible to receive the free testing,
13 would there be any charge for that patient?
14    A.  Yes.
15    Q.  What charges would be assessed for that
16 patient?
17    A.  Two possibilities. There's a $10 charge
18 for specimen collection, and that is applied to
19 people who do qualify for the STD program.
20       There may also be charges for other
21 services that the patient comes in for in addition to
22 the STI test problem, and they would be charged for
23 those services.
24    Q.  And what other services might that
25 patient be receiving?

Page 34

1     A.  Birth control consult, annual exam,
2 infection check, meaning an infection like a vaginal
3 infection versus an STI, pap smears, pregnancy tests.
4 I may be missing something.
5     Q.  And that kind of leads me to my next
6 question. We have been talking so far about a
7 patient who makes an appointment to come in for STI
8 testing. Are there other circumstances where you
9 would have protocols in place where you're
10 automatically checking someone for an STI?
11    A.  I don't know.
12    Q.  What about if a patient is receiving an
13 abortion, would that be a circumstance where you
14 might also test for an STI?
15    A.  Yes.
16    Q.  And under what circumstances would you
17 do that?
18    A.  We test all abortion patients for the
19 STI.
20    Q.  Is that automatic?
21    A.  Yes. It's part of our medical protocol.
22    Q.  And would some of those patients be
23 patients who would qualify for the pretesting under
24 the STD Prevention Program?
25    A.  We don't provide the STD Prevention

Page 35

1 Program to our abortion patients.
2    Q.  And why is that?
3    A.  Two reasons. I don't know if you're
4 familiar with electronic health records. Okay. We
5 do not have electronic health records in our surgery
6 center, so the process with the lab that the Ohio
7 Department has contracted with is very cumbersome.
8 It's manual, basically.
9       Whereas in the other health centers
10 where we do have electronic health records there's
11 what's called a bridge and you can send stuff
12 electronically. That's the one reason.
13       The other reason is we decided that we
14 didn't want to have the STD program connected to our
15 abortion services.
16    Q.  And so how do you ensure that the
17 testing kits that you receive pursuant to the STD
18 Prevention Program are not used for patients who
19 receive abortions?
20    A.  We use a completely different lab for
21 all of our other STI. CDD is the lab under the STD
22 program. ██████████████████████████
23 ██████
24    Q.  And is that policy set forth in writing
25 in a manual or in some other form?

Page 36

1     A.  I don't think so. It may be in the ops
2 manual, but if it is, I don't know.
3    Q.  And you refer to the ops manual. What
4 are you referring to?
5    A.  It's sort of an operational manual that
6 the health centers all follow for the different kind
7 of services and processes that are involved in our
8 health care.
9    Q.  Now, you mentioned that the STD
10 prevention services are provided at all family health
11 centers, am I --
12    A.  Family planning.
13    Q.  Family planning centers. Which of those
14 family planning centers also provide abortion
15 services?
16    A.  None.
17    Q.  None. Okay.
18    A.  We have one surgical center. All the
19 others are family planning, and none of the family
20 planning provide abortion services.
21    Q.  And at the family planning centers do
22 all of those centers offer the free test that would
23 come in through the STD Prevention Program from ODH?
24    A.  Yes. We have ODH contracts with each of
25 our health centers. That's the way ODH sets it up.

Page 37

1  Q. Approximately how many STD detection --
2 STI detection tests would be offered in a typical
3 year for not just those that are eligible under the
4 program, but as a whole?
5  A. I can't remember.
6  Q. And feel free to just give me a ballpark
7 number.
8  A. 12- to 13,000.
9  Q. And approximately how many free tests do
10 you receive from ODH pursuant to the contract we have
11 been talking about?
12  A. Counting both gonorrhea and chlamydia,
13 about 8,000.
14  Q. And the 12- to 13,000, did that also
15 include both gonorrhea and --
16  A. Yes.
17  Q. Now, you are aware that there was a
18 statute that was passed that discusses the programs
19 that we're talking about right now, correct?
20  A. You're referring to what we call the
21 defunding law?
22  Q. Correct.
23  A. Yes.
24  Q. And that is the statute that you're
25 challenging in this case?

Page 38

1  A. Yes.
2  Q. And in preparation for enactment of the
3 law that's being challenged in this case, what steps
4 did PPSWO take specifically with respect to the STD
5 Prevention Program?
6  A. We alerted our managers of our health
7 centers that if the law became effective, that we
8 would no longer be offering any of the free STD tests
9 because we would no longer have access to that
10 program.
11  And by alerting, I mean we gave them
12 advance notice, but then as we got closer to the
13 effective date we kept them on alert, watch for, you
14 know, an e-mail.
15  Q. And if the challenged law takes effect,
16 what impact will that have on your provision of
17 services under the STD Prevention Program
18 specifically?
19  A. We would no longer be able to provide
20 those free tests or medications to those patients who
21 currently qualify.
22  Q. And so you would still provide testing
23 for chlamydia and gonorrhea, correct?
24  A. Yes, but not free.
25  Q. What would be PPSWO's policy for

Page 39

1 charging patients going forward if the challenged law
2 takes effect?
3  A. Say it again.
4  Q. Sure. So you indicated that you would
5 have to charge for the provision of these tests if
6 the challenged law becomes effective. Is that a fair
7 characterization of your testimony?
8  A. Yes.
9  Q. So what would that charge be?
10  A. It would be the same as the charge for
11 people currently who do not qualify for the STD
12 program.
13  Q. Can you describe for me any expenses
14 that are associated with the provision of STD testing
15 for PPSWO?
16  MR. SCHOENFELD: Objection. Are you
17 taking inside or outside the program, or both?
18 By Ms. Richardson:
19  Q. Let's start with inside the program.
20  A. Repeat the question.
21  Q. Sure. So we have been talking about
22 some of the charges and other things related to the
23 provision of STD prevention. Now I'd like to
24 understand any expenses that PPSWO would experience
25 in providing these services.

Page 40

1  A. Under the program?
2  Q. Under the program, we'll start first.
3 And let me step back for a minute. If any of these
4 are areas that will be covered later today, let me
5 know if you're not the person --
6  A. That's what I'm thinking about.
7  Q. And in consultation with counsel, if
8 it's your representation that that's covered under
9 what the other witness will be talking about this
10 afternoon, I can move on.
11  MR. SCHOENFELD: If you feel comfortable
12 testifying on this.
13  THE WITNESS: I don't. I think our COO
14 is in a better position to answer that question.
15 By Ms. Richardson:
16  Q. We may come back to this more a little
17 bit later, but I'd like to move on to some of the
18 other programs. Let me know if you'd like to take a
19 break before we move on, or if you're okay to keep
20 going.
21  A. I'm okay.
22  Q. Okay. Great. So let's move now to the
23 HIV program. And we'll be referring specifically to
24 the HIV program that is outlined in the law that is
25 being challenged in this case.

Page 41

1      Can you describe what you receive, if
2  anything, from ODH related to that program?
3      A.  We receive one grant directly from ODH,
4  and two grants that come from ODH through the County
5  level; one, Hamilton County, and the other one,
6  Montgomery County/Dayton for Butler and Warren.
7      Q.  And you understand that there have been
8  some changes recently, but I'd like to talk about
9  PPSWO's policies and how this program worked prior to
10  recent changes.
11      MR. SCHOENFELD:  Objection.  I think
12  where relevant, can you specify what you're talking
13  about?
14  By Ms. Richardson:
15      Q.  Sure.  And we can go backwards in time.
16  Have there been some changes recently to how PPSWO
17  contracts with respect to the HIV program, and
18  specifically with respect to Hamilton County?
19      A.  Yes.
20      Q.  Can you describe those changes?
21      A.  Hamilton County terminated the contract
22  with PPSWO and relet the contract or regranted to
23  another organization.
24      Q.  And is it your understanding that that
25  other organization is now providing HIV services

Page 42

1  pursuant to this program?
2      A.  Yes.
3      Q.  And that company's name is Caracole?
4      A.  Caracole.
5      Q.  And did Caracole also hire staff that
6  was previously employed by PPSWO for the provision of
7  HIV services?
8      A.  Yes.
9      Q.  Did they hire the entire staff that was
10  previously employed by PPSWO?
11      A.  No.
12      Q.  How many employees did they hire?
13      A.  Three.
14      Q.  And that's three out of how many?
15      A.  Three-and-a-half.
16      Q.  Three-and-a-half?
17      A.  Three out of three-and-a-half.
18      Q.  So that the half did not get
19  re-employed?
20      A.  The half did not get re-employed.
21      Q.  And when you say "half," what are you
22  referring to?
23      A.  Half time.
24      Q.  A part-time employee?
25      A.  Part-time employee.

Page 43

1      Q.  And is it your understanding that
2  Caracole has now assumed for Hamilton County all of
3  the provision of services that PPSWO previously
4  provided?
5      A.  I don't know.
6      Q.  And so prior to Caracole taking over
7  these responsibilities, how did PPSWO handle the
8  provision of services under the HIV program?
9      MR. SCHOENFELD:  Objection.
10      THE WITNESS:  Can you clarify the
11  question a little bit?  How did we handle the
12  provision of services?
13  By Ms. Richardson:
14      Q.  So we'll focus a little more
15  specifically.  You mentioned a total of three
16  different grants that you receive, one from ODH and
17  two originating with ODH but through counties.  Is
18  that a fair characterization?
19      A.  Yes.
20      Q.  And let's talk about the grant that you
21  received directly from ODH.  Can you describe that?
22      A.  It's in the neighborhood of $75,000 a
23  year.
24      Q.  And what do you receive that $75,000
25  for?

Page 44

1      A.  For confidential anonymous testing for
2  HIV, and some education and counseling that goes
3  along with that.  I can't honestly remember what the
4  territory is that the ODH grant covers.
5      Q.  And do you remember, is there a title
6  for the grant, or a common name used to refer to that
7  grant?
8      A.  I think we call it the ODH HIV grant.
9      Q.  And is it your understanding that that
10  grant has been impacted by the law that you're
11  challenging in this case?
12      A.  No.
13      Q.  And so is it fair to say that you are
14  still receiving funds through that grant?
15      A.  Yes.
16      Q.  And to your understanding, is that true
17  irrespective of the litigation that you're involved
18  in that we're here for today?
19      A.  Yes.
20      Q.  And so with respect to the law that's
21  being challenged in this case, is it fair to say that
22  we're just talking about the two grants that come
23  through the counties from ODH?
24      A.  It's our understanding that only those
25  two -- it's our understanding that ODH's position is

Page 45

1 that only those two are affected by the law.
2    Q.   And so let's focus on those two for
3 right now.  And again, now, these are the one that
4 comes through Hamilton County and one that you said
5 relates to Butler and Warren; is that fair?
6    A.   Yes.
7    Q.   What services specifically did PPSWO
8 provide pursuant to those two grants?
9    A.   The team of employees that we have just
10 talked about implemented a community-based
11 confidential anonymous HIV testing program in the
12 areas covered by those grants, focused heavily on men
13 who have sex with men, and other high-risk
14 populations.
15       So they were -- the staff members were
16 out in the community going to gay bars at night,
17 going to other -- going to neighborhoods where the
18 target populations might be found.
19       We had a van that could be parked in
20 front of a location where you could -- where the
21 staff members could talk to people coming by and
22 asking them if they would be interested in coming in
23 and being tested.  So it was really an outreach
24 program.
25    Q.   Thank you.  And was this a grant where

Page 46

1 you received a lump sum of money from Hamilton
2 County?
3    A.   Yes.
4    Q.   Thank you.  And what was the amount of
5 that grant?
6    A.   I don't know.  That would be a good
7 question for Lee Bower.
8    Q.   Okay.  Do you know whether it was a
9 fixed amount, or did it change?
10    A.   Fixed.  Well, fixed a year at a time.
11    Q.   Thank you.
12    A.   There could be a variation from year to
13 year.
14    Q.   And did you receive that at the
15 beginning of the program, or was it a form of
16 reimbursement?
17    A.   I don't know.
18    Q.   And do you know whether the terms of the
19 grant dictated the particular services that you would
20 provide, or were those decisions that you made at
21 PPSWO?
22       So, for example, you described the van
23 and the various outreach programs.  Were those things
24 that were specified as conditions of the grant, or
25 were those decisions that PPSWO made?

Page 47

1    A.   The scope of services would be defined
2 in the contract.  The specific sort of strategies
3 like where to go, who is going to go, what time are
4 we going to go, defined by PPSWO.
5    Q.   And do you know what costs were
6 associated with this program for PPSWO?
7    A.   The primary cost would be the personnel,
8 the van.  There would be some materials cost for
9 testing, materials cost for information that would be
10 given to patients who wanted to be tested.  You'd
11 have rent and other expenses like that.
12    Q.   And what would the rent expenses be?
13    A.   We had our people housed in another
14 neighborhood and we paid rent at the facility for the
15 space that they were renting.
16    Q.   But the three-and-a-half staff members
17 that you mentioned earlier, were those staff members
18 devoted exclusively to this program?
19    A.   Yes.
20    Q.   And they were housed in this
21 neighborhood?
22    A.   Rented space, north side.
23    Q.   Were there other employees who would
24 have also worked out of that location?
25    A.   Not our employees.

Page 48

1    Q.   And I want to skip ahead to present time
2 again for a moment.  The van that PPSWO previously
3 used, that has been transferred over to Caracole; is
4 that correct?
5    A.   No.
6    Q.   Okay.  Can you explain who has
7 possession of the van now?
8    A.   It was sold.
9    Q.   It was sold.  Okay.  And do you know who
10 it was sold to?
11    A.   Some guy.
12    Q.   So is it fair to say it was not then
13 sold for the provision of services similar to what --
14    A.   No.
15    Q.   And what about the building that you
16 rented to house these staff members, what is the
17 current status of that building?
18    A.   It's still there, and the employees who
19 were employed by Caracole work out of that building.
20    Q.   And who pays the rent for that building
21 now?
22    A.   Caracole.
23    Q.   And so was the lease transferred over to
24 Caracole?
25    A.   It's Caracole's building.

1    Q.   And so factoring in rent and all of the
2   other -- personnel and van and Caracole expenses that
3   you described, do you know generally what the cost of
4   providing this program was for PPSWO?
5    A.   I don't.
6    Q.   Do you know whether it was more than the
7   grant that you received from --
8    A.   Yes, definitely more than the grant.
9    Q.   Do you know by how much?
10    A.   I don't.  Good question for Lee Bower.
11    Q.   Thank you.  And can you -- do you know
12   what Caracole is?  In other words, what is their
13   primary business?
14    A.   Caracole is really a social service
15   agency.  Its primary business, as I understand it, is
16   to provide housing and other various kinds of social
17   service support for people who have HIV.
18    Q.   Previously before Caracole took over the
19   contract, was Caracole involved with PPSWO in
20   providing the services that you've described?
21    A.   Only in leasing us the space in the
22   Caracole building for housing the staff, and cross
23   referrals.
24    Q.   And what do you mean by "cross
25   referrals"?

1    A.   Well, if we had a person who was tested
2   and turned out to be positive for HIV, the staff
3   member who was talking to that person about their
4   status as HIV positive would, among other things,
5   make sure that they were aware of the services that
6   Caracole could provide in the way of housing support
7   and other support.
8    Similarly, if somebody walked into
9   Caracole who was concerned, because Caracole is seen
10   as kind of a go-to place for people with HIV, that
11   person might be referred to PPSWO for the testing.
12    Q.   Thank you.  And has PPSWO been involved
13   in monitoring or overseeing the provision of services
14   by Caracole under the new Caracole contract?
15    A.   No.
16    Q.   But to your knowledge, those services
17   are being provided by the same full-time staff that
18   were previously employed by PPSWO for those services?
19    A.   Minus one half.
20    Q.   Minus the one half.  And I think you
21   testified about this already, but for those people
22   that you interacted with as part of the outreach or
23   the tests that you provide, were there any charges
24   for those patients?
25    A.   No.

1    Q.   All of it was completely free?
2    A.   Free.
3    Q.   If the law that is being challenged in
4   this case goes into effect, would there be any
5   further changes to PPSWO's provision of HIV services?
6    A.   If the law goes into effect would there
7   be other changes?
8    Q.   Yes.  Let me ask it a different way.
9   Now that Caracole has taken over the contract through
10   Hamilton County, is PPSWO currently providing any
11   other HIV services under the grant program that it
12   previously received through Hamilton County?
13    A.   No.  We do provide HIV testing services
14   on a regular basis for our other patients.
15    Q.   And that would fall outside of the
16   program for which you receive the grant?
17    A.   Outside the program, confidential, but
18   not anonymous, a different approach.  And we would
19   continue that if the law went into effect.
20    Q.   Those services were not impacted by the
21   law, to your knowledge?
22    A.   No.
23    Q.   I'd like to move now to PREP.  Can you
24   describe to me what your understanding, just on a
25   very general level, is of the PREP program?

1    A.   Yes.  PREP stands for Personal
2   Responsibility Education Program.  It's a program
3   that ODH has put in place in the State with eight
4   regional -- the State's divided into eight regions.
5    The PREP program focuses on training
6   people, staff people, professional people, to work
7   with young people who are in the foster care system
8   in some way, or in the juvenile justice system in
9   some way, educating those people who work with young
10   people to then deliver this program, a curriculum, to
11   the young people who come through their foster care
12   system or their juvenile justice system.
13    Q.   And how long has PPSWO been providing
14   services under the PREP program?
15    A.   I can't remember.
16    Q.   And this is a program where --
17    A.   I think ten years.
18    Q.   Ten years?
19    A.   I think.
20    Q.   And this is a program where PPSWO
21   contracts directly with ODH; is that correct?
22    A.   Yes.  This is a grant.
23    Q.   Thank you.  And is this a grant where
24   you are reimbursed for services, or where you're
25   provided money up front?

1    A. It's structured as a reimbursement
2 program, but sometimes ODH gives money up front.
3    Q. Do you know what circumstances those
4 would be where you would get the money up front?
5    A. I don't.
6    Q. And can you describe generally the
7 services that PPSWO provides specifically? So we
8 have talked about generally what the program is.
9 What does PPSWO's program consist of under PREP?
10    A. It's kind of a training the trainers
11 program. Our customers, if you will, are the staff
12 members and professional people who work with the
13 young people. Their customers are the young people.
14    So we train, and then we follow up to
15 provide support for effective delivery of the
16 program. The support is given to the trainers that
17 we have trained.
18    Q. And for the training that you provide do
19 you receive funding from sources other than the ODH
20 PREP program?
21    In other words, is PREP sort of a
22 standalone program for which you receive PREP
23 funding, or is it part of the overall training that
24 PPSWO provides for which it might receive funding
25 from multiple sources?

1    A. The funding from ODH for PREP is not
2 enough to cover the cost of PREP, so we subsidize
3 that program with general funds. There's no other
4 grant source that comes in specifically for PREP.
5    Q. And do you have employees at PPSWO that
6 are devoted specifically to these training programs?
7    A. Not exclusively to PREP, but an employee
8 might be assigned partly to PREP and partly to
9 something else.
10    Q. Approximately how many staff members
11 would you say work on training under the PREP
12 program?
13    A. Four. But not all full-time.
14    Q. Are any of those devoted full-time to
15 PREP?
16    A. I don't know.
17    Q. In preparation for the law challenged in
18 this case, what steps did PPSWO take with respect to
19 the PREP program?
20    A. We alerted the Vice-President of
21 Education and the education staff members who worked
22 on PREP that defunding could occur, and we worked --
23 I worked with the Vice-President of Education and the
24 Manager of Training and Education who reports to the
25 Vice-President, to analyze the financial aspects of

1 PREP, and VAWA I would add, and look at possible
2 alternatives to PREP that would be implemented by our
3 education staff.
4    One of our two primary missions is
5 education, so we provide reproductive health care and
6 education, and that was the impetus for those
7 discussions.
8    Q. And as a result of those discussions,
9 what did you conclude about possible alternatives to
10 PREP?
11    A. We concluded that a program could be
12 developed if we could afford it.
13    Q. What type of program did you
14 contemplate?
15    A. It would have been a -- it would be a
16 sex education program that is focused on schools;
17 elementary, middle, and high school, and possibly
18 college.
19    Q. And what did you conclude about whether
20 you would be able to afford the program?
21    A. We concluded we would be -- we would be
22 able to afford it if we increased our deficit.
23    Q. What do you mean by that?
24    A. Well, we operate at a deficit. Most
25 recent year the deficit is about a million dollars.

1 So if we add a program, just to be clear, that
2 doesn't have a grant to support it, then it has to
3 come out of the general fund and that increases the
4 deficit.
5    Q. And did you determine that you would
6 provide this program going forward if the law takes
7 place -- takes effect? I'm sorry.
8    A. We haven't decided that yet.
9    Q. Has a determination been made about
10 whether PPSWO could afford to increase its deficit by
11 the amount of the program?
12    MR. SCHOENFELD: Objection.
13    THE WITNESS: Could afford to increase
14 its deficit? I would say yes.
15 By Ms. Richardson:
16    Q. Do you know when a decision will be made
17 about whether PPSWO will provide the alternate
18 education program?
19    A. When we know whether this program is
20 going to be defunded or not.
21    Q. And by "program", you're referring to
22 PREP?
23    A. To PREP, yeah.
24    Q. And do you know whether alternate
25 providers have been identified to provide the

Page 57

1   services that PPSWO previously provided under PREP?
2       A.   Sort of.
3       Q.   What do you mean by that?
4       A.   Alternate providers -- from what I
5   understand, alternate providers have sort of been
6   identified.
7       Q.   And what do you base that understanding
8   on?
9       A.   Communication that our VP of Education
10  has had with ODH, the people at ODH who run the
11  program, and also activity that she has been asked to
12  participate in designed to transition the program to
13  others.
14      Q.   Do you know what those activities are?
15      A.   What I know is that there were some
16  meetings held in which we participated along with the
17  other providers who were being asked to pick up the
18  program.
19      Q.   Are these meetings with ODH that you're
20  referring to, or just meetings with your VP of
21  Education and the other providers?
22      A.   I believe ODH participated.
23      Q.   We're going to go over some of the
24  discovery responses later, but I believe if my memory
25  serves me, that the VP of Education was one of the

Page 58

1   positions that you indicated could be terminated in
2   the event this law takes place; is that correct?
3       A.   That's correct.
4       Q.   Is that still something that's being
5   considered?
6       A.   Yes.
7       Q.   Do you know whether -- did you say it's
8   a she?
9       A.   She.
10      Q.   Do you know whether she would be hired
11  by one of the other alternate providers to continue
12  providing these PREP services?
13      A.   I have no idea.
14      Q.   You don't know whether there were
15  already plans in place for her to provide services
16  under another program?
17      A.   Not that I was aware of.
18      Q.   If PPSWO were to offer the alternate
19  education program that you've described, would the VP
20  of Education be retained to provide services under
21  that alternate program?
22      A.   No.
23      Q.   Who would be responsible for providing
24  those services for PPSWO?
25      A.   The program would be directed by the

Page 59

1   current manager of education and training.
2       Q.   The materials that you described for
3   PREP, are those training materials or brochures?
4       A.   It's a curriculum.
5       Q.   And so what does that consist of?
6       A.   There's three components, if I remember
7   this correctly.  Healthy relationships, job seeking,
8   getting, and financial management are the three
9   components that ODH decided to put into the PREP
10  program in Ohio.
11      Q.   And does PPSWO create any of its own
12  materials or brochures or presentations pursuant to
13  PREP, or does it rely slowly on ODH materials?
14      A.   I'm not aware that they create any --
15  that they create any materials of their own.
16      Q.   And so --
17      A.   They use the curriculum.
18      Q.   So you're not aware that PPSWO would
19  create any materials of its own?
20      A.   I'm not aware that PPSWO creates any
21  materials of its own.
22      Q.   Thank you.  I just wanted to make sure I
23  was understanding the "they" to be PPSWO.
24      A.   Yes.
25      Q.   So as far as you know, they simply use

Page 60

1   the ODH curriculum?
2       A.   Right.
3       Q.   Okay.
4       A.   As far as I know.
5       MR. SCHOENFELD:  Ryan, are you almost
6   done with PREP?
7       MS. RICHARDSON:  Yes, actually.  Is now
8   a good time to take a break?
9       MR. SCHOENFELD:  If you're almost done
10  with PREP.
11      MS. RICHARDSON:  That was my last
12  question.  It's 10:23, so ten-minute break, does that
13  work?  Come back at 10:35?
14      MR. SCHOENFELD:  Yes.
15      (Recess taken.)
16  By Ms. Richardson:
17      Q.   Before the break we were walking through
18  some of the programs that are outlined in the law
19  that's being challenged in this case, and I wanted to
20  ask -- you mentioned a number of different programs.
21  One that I don't think you mentioned is
22  the OIMRI, or healthy moms, healthy babies program.
23  Are you familiar with that?
24      A.   We don't have that program.
25      Q.   Thank you.  That was exactly my

15  (Pages 57 to 60)

Page 61

1    question. And so I'd like to move then to what we
2    agreed we'd call the BCCP program. And can you
3    describe generally what services PPSWO provides under
4    the BCCP program? And I apologize to the Court
5    Reporter.
6         A. Breast and cervical cancer screenings.
7         Q. And is this a program where you contract
8    directly with ODH, or do you contract with
9    subgrantees like the counties?
10        A. We contract with ODH.
11        Q. And is this a grant program?
12        A. No.
13        Q. How does the program work with ODH?
14        A. This is my understanding. ODH runs the
15   BCCP sort of eligibility center, and so when someone
16   who's eligible for the program gets cleared by the
17   center, they are referred to a provider. The patient
18   is referred to the provider.
19            The patient arrives with a voucher. We
20   provide the service, and then we use the voucher to
21   bill.
22        Q. And what do you mean you use the voucher
23   to bill?
24        A. We take the voucher and we turn it in
25   for money.

Page 62

1         Q. Turn it into ODH?
2         A. Yeah, or to the BCCP, which I think is
3    ODH.
4         Q. Thank you. And do you receive
5    dollar-for-dollar compensation with that voucher?
6         A. I'm not sure what you mean by
7    dollar-for-dollar.
8         Q. It was a very bad question. I
9    apologize. So what is the cost to PPSWO to provide
10   services under the BCCP program?
11        A. I don't know.
12        Q. Does the voucher carry a particular
13   monetary amount?
14        A. I think so.
15        Q. Do you know what that amount is?
16        A. I don't.
17        Q. And who would I ask about that?
18        A. Lee Bower would probably know.
19        Q. And so if a patient receives a referral
20   through the BCCP eligibility center, do you know how
21   the BCCP center determines which provider to send the
22   patient to?
23        A. I don't.
24        Q. And from PPSWO's perspective, when a
25   patient comes in with a voucher, what happens next?

Page 63

1         A. Well, we know because they come with a
2    voucher that they have been cleared and what they are
3    seeking is breast and/or cervical cancer screening.
4    And that's what the clinician then in the health
5    center that they come to gives them, a breast exam, a
6    pap, a pelvic, whatever the specific medical service
7    is needed to accomplish the breast and cervical
8    cancer screening.
9         Q. Are those services dictated by the
10   program, or would PPSWO determine what specific
11   testings need to be run to screen for cervical or
12   breast cancer?
13        A. I don't know.
14        Q. And which centers provide services under
15   the BCCP program?
16        A. All of them could.
17        Q. Do you know whether they all do?
18        A. All of the family planning centers can
19   do it.
20        Q. Thank you. Do you know whether they all
21   do provide those services?
22        A. I don't.
23        Q. Do the PPSWO locations provide breast
24   and cervical cancer screenings to people outside of
25   the BCCP eligibility program?

Page 64

1         A. Yes.
2         Q. And under what circumstances would the
3    locations provide those tests?
4         A. It could be by patient request. More
5    likely it's by clinical determination; that is
6    looking at signs and symptoms by the clinician who
7    then might decide gee, I believe this person needs a
8    colposcopy to determine whether there's signs of
9    cancer, or something like that.
10            A breast, obviously you'd be looking for
11   breast masses. If someone gets an annual exam they
12   get all of that.
13        Q. And what about patients who are
14   receiving abortion services, are there circumstances
15   where they would receive these screenings?
16        A. No.
17        Q. Why not?
18        A. That's not a service we provide in our
19   surgical center.
20        Q. Are there patients who might be treated
21   or receive these screenings, the cervical and breast
22   cancer screenings, who would be referred to your
23   surgery center for abortion services?
24            MR. SCHOENFELD: Objection.
25            THE WITNESS: It's possible.

Page 65

By Ms. Richardson:
Q. And under what circumstances would that occur?
A. A patient might be referred by BCCP, come in, be determined to be pregnant or already knows that she is pregnant, and the staff members in the health center would do what we call options counseling, and if the patient thought that she might want an abortion, would be given a list of abortion providers including us, and could end up making an appointment at the surgical center.
Q. And the options counseling, where does that take place?
A. It actually takes place -- it could take place in both -- let me start over.
Your question. It could take place in the health center that the patient comes to to begin with, and it would also take place on the first day in the surgical center, when the first day appointment is made.
Q. And so to go back to the example we were using about the patient who comes in with a BCCP voucher and is determined to be pregnant, first of all, would the patient have to ask for a pregnancy test, or is that something you would do

Page 66

automatically?
A. They usually ask. There might be a situation where a clinician looking at clinical signs, as I said, would say I think -- or history might say, you know, pregnancy test.
Q. Is a pregnancy test a medical prerequisite for any of the screening tests that would be provided?
A. Not that I know of.
Q. And so who -- starting with the BCCP services, the screening tests -- and again, we're -- hypothetical patient who comes in with a voucher, who would provide the breast and cervical cancer screening test for that patient?
A. The clinician. Our clinicians are advanced practice nurses, also called nurse practitioners.
Q. And in the case of a patient who is determined to be pregnant either because she asks for a pregnancy test or one is suggested to her, who would provide the options counseling to her?
MR. SCHOENFELD: Objection.
THE WITNESS: It would most likely be the L.P.N. or the health care assistant. It could in some cases be the nurse practitioner in the family

Page 67

planning health center.
By Ms. Richardson:
Q. And that would be the nurse practitioner who is otherwise providing the screenings and --
A. Yeah, she's the clinician in charge.
Q. And what would that options counseling entail?
A. It basically consists of three possibilities that a pregnant woman could consider; carry to term, adoption, or abortion. So we say you could do this, or you might decide I will. You might want adoption; here is a list of adoption agencies. Here is a list of available abortion services.
Q. And that's where you said that would include the PPSWO's surgical center among others?
A. Yes.
Q. And so are there particular materials that are routinely provided to a patient receiving options counseling?
A. I don't think so in the family planning health centers.
Q. What about in other locations?
A. Well, the option counseling also takes place on the first day in the abortion center, if the patient is at all uncertain about the choice that she

Page 68

wants to make, and we have the staff there who do that, and may give some materials.
Q. And is the options counseling that a patient would receive at the surgical center the same substantively as what a patient would receive in one of the family planning centers?
A. Basically.
Q. Going back to the BCCP patient with the voucher, would that patient be charged anything outside of the voucher? In other words, would PPSWO assess a charge to that patient for the services?
A. Not for that service.
Q. And you clarify not for that service. Are there other services they might be charged for?
A. Well, a patient could come in and say I need a breast and cervical cancer review, but I also want to get this, this, or this, or this, and so if a patient, for example, had a vaginal infection, the patient could be charged for that.
Q. And would that be subject to the same fee structure or fee process that you described earlier?
A. Yes.
Q. And we have been talking about the fee charge. You mentioned that some patients have

17 (Pages 65 to 68)

Page 69

1    insurance. How does it work differently, if at all,
2    if a patient actually has insurance?
3              MR. SCHOENFELD: Objection.
4              THE WITNESS: The people doing the
5    intake either at the call center or in the health
6    center, determine whether someone does have
7    insurance, whether they have Medicaid, and if they do
8    have Medicaid or insurance -- if it's insurance we
9    also have to determine co-payments and deductibles,
10   and so then the third party payer is billed for the
11   service. And if there's a co-payment or deductible,
12   the patient is asked to pay it.
13   By Ms. Richardson:
14        Q. And are there circumstances where a
15   patient with a BCCP voucher would have to pay a
16   co-pay in order to receive the BCCP services?
17        A. I don't think so.
18        Q. But again, if that patient is receiving
19   other services, they might have to pay a co-pay in
20   connection with those; is that accurate?
21        A. I don't know. And let me tell you why I
22   don't know. BCCP patients, as I understand it, are
23   nonMedicaid, people who don't have Medicaid, and so
24   if they don't have Medicaid I don't know whether
25   there's a rule that they also can't have insurance.

Page 70

1    I just don't know.
2         Q. That's a fair point. Thank you for that
3    clarification.
4              So in other words, it may be part of the
5    eligibility of the BCCP program?
6         A. Yeah.
7         Q. And I believe you said in terms of the
8    cost to PPSWO, you're not sure what the expense would
9    involve for providing those BCCP screenings; is that
10   correct?
11        A. I'm not sure.
12        Q. Do you know whether it costs more than
13   the amount that PPSWO receives from ODH with a
14   voucher?
15        A. I do not know.
16        Q. If a patient has a BCCP voucher and they
17   are referred to PPSWO, do they have to call and make
18   an appointment to come in, or is that something they
19   can do on a walk-up basis?
20        A. We take patients both on an appointment
21   call and a walk-in basis. So there could be
22   circumstances in which someone could walk in. It's
23   more likely that that patient is going to call
24   because that's what the BCCP people are going to tell
25   them to do.

Page 71

1         Q. Okay. And typically how long would it
2    take for a BCCP patient to get an appointment at
3    PPSWO?
4         A. We generally can get people with
5    appointments within five days, sometimes less.
6         Q. And you mentioned that the clinician or
7    the nurse practitioner would most likely be the
8    person providing the actual screening to the patient.
9              I think you also mentioned some health
10   assistants and a few other acronyms. What other
11   PPSWO personnel would interact with the BCCP patient
12   from the time she enters the building?
13        A. Well, we have a category of employee
14   called health center assistant, and they are the
15   people who do a variety of things at the front desk,
16   greeting the patient, checking them in, checking them
17   out when they are finished.
18             We also have licensed practical nurses
19   who primarily work in what we call the back end,
20   which is where the clinician is. So you would
21   interact, if you were a patient BCCP, with health
22   center assistants, maybe two or three of them, an
23   L.P.N. almost certainly, and the clinician.
24        Q. How many clinicians would be -- well,
25   first of all, how many clinicians does PPSWO employ?

Page 72

1    Do you know that number?
2         A. We have one clinician at each health
3    center, and we have, I think now, three clinicians
4    that we call floats who fill in when the assigned
5    clinician to a health center is on vacation or sick,
6    or unable to be there.
7         Q. And then approximately how many L.P.N.s
8    are employed by PPSWO?
9         A. Approximately ten.
10        Q. And how is that staff distributed among
11   the various locations?
12        A. Well, the staffing levels vary depending
13   upon patient volume. So the busiest health centers,
14   family planning, would most likely -- ideally most
15   likely have two L.P.N.s working with the clinician
16   because the volume is high. The least busy family
17   planning health centers would have one.
18        Q. And then how many of the -- I'm going to
19   get this wrong.
20        A. Health center assistants.
21        Q. Yeah. Thank you.
22             -- do you employ and how many would be
23   at each location?
24        A. At the busiest centers you would have
25   three. Right. And at the least busy centers you

Page 73

1    would have two. So depending on the patient volume,
2    our health centers are basically staffed with either
3    four or six people.
4           Occasionally we have such volume at one
5    of our health centers that we have put two clinicians
6    in in order to handle the volume, and then you have
7    to add L.P.N.s and sometimes you have to add health
8    center assistants just to handle the volume.
9       Q. And which location is that?
10      A. Dayton is the busiest.
11      Q. And what does an L.P.N. do versus what
12   the clinician would do?
13      A. A clinician -- a clinician is an
14   advanced practical nurse, Master's Degree level, you
15   know, one step below a doctor. An L.P.N. is really a
16   clinician's assistant who has medical training, but
17   it's L.P.N. training, which I don't know how you
18   would describe L.P.N. training, but that's what it
19   is.
20      Q. Okay. Thank you.
21      A. So they get the room ready, they might
22   do some tests, get, you know -- things like that, but
23   not the actual BCCP work.
24      Q. Thank you. That makes sense. So the
25   L.P.N. might take blood pressure or those sort of

Page 74

1    basic things when you walk in, and then hand over to
2    the clinician; is that fair?
3       A. That's correct. Blood test, they might
4    do blood pressure, temperature, you know, standard
5    stuff.
6       Q. Makes perfect sense. Thank you. And so
7    in preparation for the law that is challenged here
8    what steps did PPSWO take with respect to BCCP,
9    specifically?
10      A. We alerted the health center staff
11   people, particularly the managers, that if the law
12   became effective we would no longer be able to take
13   BCCP patients or BCCP vouchers.
14      Q. And so PPSWO would continue to provide
15   breast and cervical cancer screening services; is
16   that correct?
17      A. Yes.
18      Q. But if a patient goes to the BCCP
19   eligibility center they would be sent somewhere other
20   than PPSWO; is that fair?
21      A. I think BCCP would take PPSWO off the
22   list.
23      Q. Of places to refer the patients to?
24      A. Yes.
25      Q. Any other changes that PPSWO would make

Page 75

1    if this challenged law goes into effect?
2       A. No.
3       Q. I think that brings us to VAWA, and I
4    know you mentioned that a little bit earlier, but
5    could you just generally describe what the VAWA
6    program is in terms of PPSWO's services?
7       A. VAWA is an educational program focused
8    on basically teenagers, and it is designed -- it's a
9    sex-ed program, but it's -- the term "sex-ed" has
10   broader meaning than you might think.
11          And it's basically focused on preventive
12   educational work to prevent violence, sexual
13   violence, again, healthy relationships, among that
14   population.
15      Q. Are there particular audiences that you
16   focus on -- you mentioned teenagers?
17      A. It's school-based.
18      Q. Are there particular schools that you
19   work with, or how do you determine who will receive
20   the training under the VAWA program?
21      A. There are particular schools. I don't
22   know how they are determined.
23      Q. Is the program offered through the
24   school, or is it -- do you know how --
25      A. I don't know.

Page 76

1       Q. Do you know whether PPSWO develops
2    particular training manuals?
3       A. There's a curriculum for VAWA that is
4    State approved.
5       Q. So you said State approved?
6       A. ODH.
7       Q. So PPSWO would develop it and submit it
8    to ODH for approval, is that --
9       A. I'm not sure exactly what the process
10   would be. There could be -- well, there are other
11   VAWA recipients, so there could be kind of a
12   collaborative development process between the
13   providers and like PPSWO and ODH. I just don't have
14   much information about that.
15      Q. And you mentioned there are other VAWA
16   recipients. Do you mean other service providers who
17   receive money to provide similar VAWA training? Is
18   that what you're referring to?
19      A. I believe there are others in the State.
20      Q. And so you weren't sure whether the
21   various VAWA recipients work together to come up with
22   a curriculum, is that --
23      A. Yeah, or whether they work with ODH to
24   decide on the curriculum. But the curriculum is
25   delivered as ODH approved.

Page 77

1    Q.  And apart from that State approved, the
2  ODH approved material, to your knowledge, PPSWO does
3  not develop any other supplemental training
4  materials?
5    A.  To my knowledge, that's correct.
6    Q.  How is staffing provided for the VAWA
7  program for PPSWO, specifically?
8    A.  The VAWA program is staffed by our
9  educator team.  So they are assigned a certain amount
10  of their time to implement the VAWA program based on
11  the amount of the grant funding that we get for that.
12    Most of them, not all, also work on the
13  PREP program.  So there's an allocation of time to
14  those two.  They both require trained educators.
15    Q.  Outside of the PREP program and the VAWA
16  program, are there other training programs that PPSWO
17  would use that education team for?
18    A.  Yes.
19    Q.  What would those consist of?
20    A.  One that I am aware of, we do what is
21  called a sex-ed boot camp every year, which is
22  training sex-ed educators.  It's a three-day program.
23    Q.  And that would be provided by the same
24  education team that you referred to?
25    A.  Yeah.

Page 78

1    Q.  How many total employees are part of
2  PPSWO's education team?
3    A.  I'm counting.  Four not including the
4  Vice-President of Education.
5    Q.  And where are they housed?
6    A.  They are in the field a lot because
7  that's how the training is delivered.  A couple of
8  them have offices in our Dayton building, and a
9  couple have offices at our Cincinnati building.  One
10  person has an office at each place, and one is
11  located in Springfield, but works out of Dayton.
12    Q.  And with the exception of the
13  Vice-President of Education, these other four
14  employees would continue to be employed by PPSWO if
15  the challenged law takes effect; is that correct?
16    A.  It's up in the air as to whether and how
17  long we could continue to employ the educator team.
18    Q.  And you mentioned this boot camp that's
19  provided.  How is that program funded?
20    A.  The participants pay for it.
21    Q.  And what's the charge for that?
22    A.  I don't know.
23    Q.  What other training programs -- well,
24  focusing specifically on this educator team, what
25  other responsibilities would they have or other

Page 79

1  programs would they be involved in?
2    A.  They handle internal training for staff
3  members such as customer service training.  We have a
4  fairly robust structured customers service training
5  that is done periodically throughout.
6    We have an annual staff retreat, all
7  staff.  They work on the program for that retreat.
8  They work with other staff who have training
9  responsibility, but are not so good at it, to improve
10  their training skills.  That's the sort of thing that
11  they do.
12    Q.  Do they have any role in providing
13  education or counseling to patients who receive
14  abortion services?
15    A.  No.
16    Q.  So apart from VAWA, PREP, and the boot
17  camp, are there any other external training programs
18  that they provide?
19    A.  This year I think in August we -- they
20  are putting on a sex-ed conference.
21    Q.  And who will be the audience for that
22  conference?
23    A.  People who already engage in sex-ed
24  work, and probably people who want to be; you know,
25  kind of a typical conference group.

Page 80

1    Q.  And will that be -- will there be a fee
2  charged for participants?
3    A.  Yes.
4    Q.  Do you know what that fee will be?
5    A.  I don't.
6    Q.  Is that something that you'll receive
7  any funding for, or will it be exclusively paid for
8  through the fees that the participants pay?
9    A.  I think it will be paid for exclusively
10  with the fees.
11    Q.  Going back to VAWA for a minute.  Do you
12  know what the costs or expenses are for PPSWO for
13  providing the VAWA training?
14    A.  No, other than that it is more than what
15  we get in the grant.
16    Q.  Do you know how much more?
17    A.  I don't.  I know how much the grant is.
18  That one is in my head.
19    Q.  And how much is the grant?
20    A.  65,000.
21    Q.  And so the expenses would exceed 65,000?
22    A.  Yes.  A year.
23    Q.  Thank you.  And if the challenged law
24  takes effect, what changes if any would PPSWO make to
25  the VAWA program?

Page 81

1      A.  We wouldn't have it anymore.
2      Q.  Would you provide any type of alternate
3  training source -- let me rephrase that.
4          Would you provide any type of alternate
5  training program where you would offer similar types
6  of training outside of the VAWA program?
7      A.  We are looking at the possibility of a
8  different sex-ed program.
9      Q.  Would that similarly be focused on
10  teenagers?
11      A.  The one we're looking at is focused on
12  school kids, so there's an elementary component, a
13  middle school component, and a high school component.
14      Q.  And so that would be essentially the
15  same audience that was previously covered by the VAWA
16  program; is that fair?
17          MR. SCHOENFELD:  Objection.
18          THE WITNESS:  Same demographic, but not
19  necessarily the same material.
20  By Ms. Richardson:
21      Q.  And has the decision been made to
22  provide this alternate training program?
23      A.  We're looking at trying to do it.  We
24  don't know how long.
25      Q.  You don't know how long it --

Page 82

1      A.  How long we could do it.
2      Q.  Okay.
3      A.  Because it falls into that deficit issue
4  again; how much can we add to the deficit in order to
5  continue providing a service like that in the absence
6  of the grant.
7      Q.  And do you have an estimate of how much
8  this alternate program would cost PPSWO?
9      A.  I can't remember what the estimate is,
10  but it has been estimated.
11      Q.  And was a determination made that PPSWO
12  could afford, at least in the near term, to offer
13  this training program?
14      A.  Near term.
15      Q.  And so is that yes, in the near term?
16      A.  Yes, in the near term.  Sorry.
17      Q.  That's okay.  And do you have a ballpark
18  estimate of how you would define "near term"?
19      A.  We have been thinking that we would at
20  least try to do it during the current -- for the rest
21  of the current fiscal year, which just started.  So
22  it could -- I mean, basically until June 30th of
23  2017, and we would be reviewing in the spring of '17
24  whether we could continue or not.
25      Q.  Okay.  So is it fair to say then that a

Page 83

1  determination has been made that PPSWO could afford
2  to provide this alternate program until June 30th,
3  2017, and then you will reevaluate from that point?
4          MR. SCHOENFELD:  Objection.
5          THE WITNESS:  The words that I'm
6  struggling with are "can afford".  I would say that
7  the determination has been made that if we lose this
8  program we would continue at least for the fiscal
9  year to have an education program, not because we can
10  afford it, but because we're committed to doing it.
11  By Ms. Richardson:
12      Q.  But you can continue operating with that
13  level of deficit through at least June 30th of 2017
14  and provide the program?
15      A.  Yes.
16      Q.  Thank you for that clarification.  And
17  so when will you begin providing services under the
18  alternate program?
19      A.  When we know that we no longer have the
20  VAWA and PREP grants for the current program.
21      Q.  And so are you prepared then -- if this
22  law is upheld and takes effect, are you prepared at
23  that point in time to begin offering services under
24  the alternate program?
25      A.  It would be a ramp up, but yes.

Page 84

1      Q.  I'm going to switch gears a little bit
2  here -- well, first of all, are there any other
3  programs that you believe to be impacted by the law
4  that's challenged here?
5      A.  We talked about HIV, we talked about
6  STD, we talked about BCCP, we talked about VAWA, we
7  talked about PREP.  Those are the five that the law
8  would effect for us.
9      Q.  And so apart from the various things
10  you've already described here today, are there any
11  other programs that would be affected at PPSWO if
12  this law takes effect?
13      A.  Grant programs?  I'm not quite sure.
14      Q.  Basically are there any other services
15  that PPSWO provides, or programs that it provides,
16  that would be impacted if this law takes effect apart
17  from what we have already talked about today?
18      A.  No other services or programs would be
19  affected.
20      Q.  And I'm going to hand you what we'll
21  mark as Exhibit 2, and I will represent to you that
22  these are the interrogatories that were completed by
23  PPSWO in this case.
24          (EXHIBIT MARKED FOR IDENTIFICATION.)
25  By Ms. Richardson:

1     Q.   And I'll give you a moment to take a
2   look at that if you need it.
3     A.   I was waiting for you to tell me what to
4   look at.
5     Q.   Okay.  Well, let me start here.  Have
6   you seen this document prior to today?
7     A.   Yes.
8     Q.   And is it your understanding that these
9   are interrogatories that PPSWO completed in this
10   litigation?
11     A.   Yes.
12     Q.   And if you look at the response to
13   Interrogatory No. 1, and it asks there who was
14   responsible for completing the interrogatory.
15     A.   Yes.
16     Q.   And that states your name there in
17   answer; is that correct?
18     A.   That is correct.
19     Q.   And did you in fact prepare the
20   responses to these interrogatories?
21     A.   Not totally by myself, but with counsel
22   help I did.
23     Q.   And outside of counsel, did anyone else
24   assist you in preparing responses to these
25   interrogatories?

1     A.   Other staff.
2     Q.   And who specifically would have assisted
3   you?
4     A.   ███████████, the VP of Education.
5   Lee Bower, COO.  I might have asked a couple of
6   questions of ███████, who is our director of
7   clinical services.
8     Q.   And what are the responsibilities of the
9   director of clinical services?
10     A.   She's responsible for oversight of the
11   whole health center operation.
12     Q.   And so would that include all of the
13   services that we have been describing today?
14     A.   It wouldn't include VAWA and PREP.  It
15   didn't include HIV.  It would include BCCP and STD.
16     Q.   And would that also include the abortion
17   services?
18     A.   Yes.
19     Q.   And do you have just one director of
20   clinical services?
21     A.   Yes.
22     Q.   And where is she located in terms of her
23   office?
24     A.   She's located at the administrative
25   office on Auburn.

1     Q.   We have talked a lot about various
2   employees.  As a general matter, how are payroll
3   expenses paid for by PPSWO?
4     A.   I'm not sure I understand the question.
5     Q.   Is there -- apart from just your general
6   fund, would there be any particular account or fund
7   that would be used to pay for payroll expenses?
8          MR. SCHOENFELD:  I mean, Mr. Lawson is
9   free to answer.  I think that's a question better
10   referred to somebody else.
11          MS. RICHARDSON:  Okay.  Thank you.
12   By Ms. Richardson:
13     Q.   And so I'm just -- I think we have
14   covered most of what is provided in these
15   interrogatories already today, but I just want to
16   walk through a couple of things.  If on any of these
17   either you or counsel want to let me know if it's
18   something that will be covered later this afternoon
19   with the COO testimony, just let me know.
20     A.   Okay.
21     Q.   In response to Interrogatory 2, if you
22   go down to the bottom of the Page 4.
23     A.   Okay.
24     Q.   Starting with the sentence, "Mr. Lawson
25   has knowledge of the PPSWO programs affected by

1   Section 3701.034, PPSWO's finances, and the impact
2   that Section 3701.034, if it's allowed to take
3   effect, would have on PPSWO and its programming, as
4   well as on the Ohioans who depend on PPSWO for
5   education and care."  Did I read that correctly?
6     A.   You did.
7     Q.   And is that a true statement?
8     A.   It's true that I have a level of
9   knowledge of it.
10     Q.   And I think we covered the impact of
11   Section 3701.034 today.  Is there anything else that
12   you would describe as falling kind of in that
13   category of alleged impact of 3701.034?
14          MR. SCHOENFELD:  Objection.
15          THE WITNESS:  I think before I answer
16   that one I would like to consult with counsel.  Can I
17   do that?
18   By Ms. Richardson:
19     Q.   Typically you cannot consult with
20   counsel on how to answer a question unless you are
21   concerned it may involve attorney/client privilege.
22          MR. SCHOENFELD:  Is the question meant
23   to get -- this specifies the effect that it would
24   have on PPSWO and its programming, as well as the
25   Ohioans.  Is it meant to get at the Ohioans, or PPSWO

Page 89

1    and its program?
2         MS. RICHARDSON:  That's a fair question.
3    By Ms. Richardson:
4         Q.  We'll start with PPSWO and its programs.
5    Anything factually beyond what you've described today
6    in terms of impact?
7         A.  Can you tell me what -- how you
8    interpret the word programming, programs?
9         Q.  This is your word or counsel's word, and
10   so that's what I'm trying to understand in terms of
11   this says you have knowledge of programming, and so I
12   think that probably relates to the things we have
13   already discussed today, but I'm just making sure
14   that I understand correctly this answer.
15

Page 90

1



Page 91

1

20        Q.  I'd like to turn then to Interrogatory
21   No. 3, and the response to that begins on Page 8.
22   Feel free to take a moment to review if you'd like.
23        A.  You're asking me to look at the response
24   to Interrogatory 3?
25        Q.  Correct.

Page 92

1         A.  Okay.  So the substantive part of it
2    begins on 8.
3         Q.  On 8.  Thank you for clarifying.  So the
4    interrogatory itself is on Page 7, and there are some
5    objections also listed on Page 7, and the substantive
6    response begins at the top of Page 8.
7         MR. SCHOENFELD:  Sorry, I may have
8    missed it.  Is there a question pending, or did you
9    just ask him to look at it?
10        MS. RICHARDSON:  I wanted to give him a
11   moment to review.
12        THE WITNESS:  I'm doing that.
13        (Pause.)
14        THE WITNESS:  Okay.
15   By Ms. Richardson:
16        Q.  And so I think, again, most of this we
17   have already talked about, I just want to make sure I
18   understand a couple of the points listed in here.
19        And so if you move down to about the
20   middle of the second full paragraph there, and it
21   begins with, "Second, PPSWO will no longer be
22   able..."
23        A.  I'm there.
24        Q.  Okay.  "Second, PPSWO will no longer be
25   able to provide testing and treatment for sexually

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Page 93

1  transmitted diseases without charge to the patients
2  who currently qualify under the STD Prevention
3  Program, or breast and cervical health services
4  without charge under the BCCP."
5      And so I just want to clarify, my
6  understanding based on what we have talked about
7  today is you would no longer be providing those
8  services under the programs, but PPSWO would continue
9  to provide testing and treatment for sexually
10 transmitted infections, correct?
11     MR. SCHOENFELD: Objection. I think
12 that misstates the interrogatory response.
13 By Ms. Richardson:
14     Q. I'll rephrase. So let me -- did I
15 correctly read the sentence that starts with "Second"
16 on Page 8?
17     A. I didn't hear "without charge".
18     Q. Let me read it again just so we can make
19 sure. "Second, PPSWO will no longer be able to
20 provide testing and treatment for sexually
21 transmitted diseases without charge to patients who
22 currently qualify under the STD Prevention Program,
23 or breast and cervical health services without charge
24 under the BCCP." Did I read that correctly?
25     A. You did read that correctly.

Page 94

1      Q. Okay. Thank you. And so as I
2  understand that in light of the testimony that's been
3  provided today, you will no longer be able to provide
4  services without charge under the specific programs
5  we have talked about that are outlined in the
6  challenged law; is that correct?
7      A. Yes.
8      Q. But PPSWO will continue to provide STD
9  treatment and testing even if this law takes effect;
10 is that correct?
11     A. Yes, but not without charge.
12     Q. And patients would be charged under the
13 existing fee structure that PPSWO has in place for
14 these services; is that correct?
15     A. Yes.
16     Q. And same for BCCP, PPSWO will continue
17 to provide breast and cervical health services,
18 correct?
19     A. Yes.
20     Q. They simply will not be used as a
21 referral for those patients who receive a voucher
22 from the BCCP eligibility program; is that correct?
23     A. That's correct.
24     Q. And going down a little bit further
25 where it starts with, "Third."

Page 95

1      A. Yeah.
2      Q. "Third, PPSWO will have to cease - and
3  indeed has already ceased - providing HIV testing and
4  treatment to patients without charge under the HIV
5  Prevention Program." Did I read that correctly?
6      A. Yes.
7      Q. And again, just to clarify, that's
8  referring specifically to the HIV Prevention Program
9  that is outlined in the challenged statute, correct?
10     A. Yes.
11     Q. And as you've discussed today, those
12 services have now been transferred over to Caracole;
13 is that correct?
14     MR. SCHOENFELD: Objection. Misstates
15 prior testimony.
16 By Ms. Richardson:
17     Q. Is that a fair characterization of your
18 testimony?
19     A. I think what I -- I'm trying to
20 remember. I think what I said was I don't know for
21 sure what services they are providing, but the staff,
22 three of the three-and-a-half, have now been employed
23 by Caracole.
24     Q. And it's your understanding that
25 Hamilton County now contracts with Caracole for the

Page 96

1  provision of services under the HIV Prevention
2  Program, correct?
3      A. Yes, that is correct.
4      Q. And there are still other HIV programs
5  that PPSWO participates in, correct?
6      MR. SCHOENFELD: Objection.
7      THE WITNESS: We provide HIV testing
8  services to patients who are not participating in the
9  HIV Prevention Program.
10 By Ms. Richardson:
11     Q. And you will continue to do so
12 regardless of this law taking effect, correct?
13     A. Yes.
14     Q. And I believe you mentioned there are
15 also some other HIV related grants that are not
16 impacted by the challenged law in this case, correct?
17     A. No.
18     Q. Did I misunderstand? I thought your
19 testimony earlier was that there is a separate grant
20 program under which PPSWO receives funding that will
21 not be impacted by the provision of the challenged
22 law; is that correct?
23     MR. SCHOENFELD: Objection.
24     THE WITNESS: You are, I think,
25 referring to the ODH grant for HIV which we have been

1   told will not be affected by this law.
2   By Ms. Richardson:
3      Q.  Thank you.  Thank you.  Thank you for
4   clarifying that.
5      A.  And thank you for reminding me.
6      Q.  And then I'd like to direct your
7   attention to Page 9, the response to Interrogatory
8   No. 4.  And is it fair to say that this outlines
9   various steps that PPSWO took in anticipation of the
10   implementation of Section 3701.034?
11      A.  Yes.
12      Q.  And you listed here under this first
13   bullet, "Beginning to develop an alternative
14   education program to be implemented in the event that
15   the programs funded by PREP and VAWA were no longer
16   available."  Did I read that correct?
17      A.  Yes, you did.
18      Q.  And are those the alternate programs
19   that you've described here today?
20      MR. SCHOENFELD:  Objection.
21      THE WITNESS:  That refers to the program
22   that I described that was going to be focused on sex
23   education for elementary, middle, high school and
24   college.
25   By Ms. Richardson:

1      Q.  And then did I understand correctly that
2   there would also be another alternate education
3   program that's being considered as a replacement for
4   PREP?
5      A.  No.
6      Q.  Okay.  Is there -- and perhaps I just
7   completely got confused.  So aside from this sex
8   education program, is there another alternate
9   education program that's being considered by PPSWO?
10      A.  No.
11      Q.  So it's just this one program?
12      A.  Yes.
13      Q.  And then if you go down to the third
14   bullet point it states, "Eliminating one health
15   educator in the education department and laying off
16   the employee who had been in that position."  Who is
17   that referring to?  Who was laid off within the
18   education department?
19      A.  It was --
20      MS. BRANCH:  Do you need a name?
21   By Ms. Richardson:
22      Q.  You can give me a position or initial.
23      A.  It was a health educator.  That's the
24   category in the job -- in our job list, health
25   educator.

1      Q.  And would this be someone who would have
2   reported to the VP of Education?
3      A.  Actually she reported to Manager of
4   Training and Education.
5      Q.  And why was she selected to be laid off?
6      A.  Are you asking why was this particular
7   person, or why was this position?
8      Q.  Why was this position.  Thank you for
9   that clarification.
10      A.  Okay.  Because looking ahead at the
11   possibility that we would lose the VAWA and PREP, and
12   looking at how much additional money we were putting
13   in to sustain those programs, we decided now was the
14   time to reduce the staff so that the differential
15   between the grants and what we were spending would be
16   reduced.
17      Q.  And in the event that you're successful
18   in this lawsuit and the law is struck down, would you
19   rehire someone -- either this person or a replacement
20   for that position?
21      A.  No.
22      Q.  And then you mentioned in this last
23   bullet point, "Changing the job description of the
24   Grants Manager."  Did I read that correctly?
25      A.  Yes, you did.

1      Q.  What are you referring to in that bullet
2   point?
3      A.  The Grants Manager had a significant
4   allocation of her time to work in maintaining and
5   complying with VAWA, PREP, and HIV, and so in
6   anticipation that we might not have those programs
7   anymore, and knowing in fact that we didn't have the
8   HIV program anymore for Hamilton County, we revised
9   her job description to focus on finding other grant
10   opportunities for other aspects of our PPSWO
11   operation.
12      Q.  And is that something that she has been
13   successful in doing since you changed that
14   description?  In other words, has she successfully
15   located other sources of grants funding?
16      A.  No.  And she resigned as of July
17   the 5th.
18      Q.  And was that -- what was the basis of
19   that resignation?
20      A.  I don't know.  She made up her mind that
21   she resigned.
22      Q.  But it's not related to the law that's
23   being challenged in this case or any of the things
24   that we have discussed?
25      A.  Not to my knowledge.  Not to my

Page 101

1    knowledge.
2        Q.  I'll ask you to turn to Page 10, please.
3        A.  I've got it.  Okay.
4        Q.  And I'll ask you to skip ahead to the
5    third bullet point on Page 10.  And it says,
6    "Transferring HIV testing work previously done with
7    grant funding under the HIV Prevention Program to
8    another agency."  What are you referring to there?
9        A.  The transfer of the staff that was
10   working in the HIV program for us over to Caracole
11   when Hamilton County transferred the grant -- or
12   actually they rebid and then re-awarded the grant to
13   Caracole.
14       Q.  And is it your understanding that
15   Caracole will continue to operate under that grant
16   regardless of what happens in this litigation?
17       A.  That is my understanding.
18       Q.  And relatedly, the employees who
19   previously worked for PPSWO and now work for Caracole
20   will continue to work for Caracole regardless of the
21   outcome of this litigation; is that fair?
22           MR. SCHOENFELD:  Objection.
23           THE WITNESS:  Well, if they stop it
24   won't be because of this defunding bill.
25   By Ms. Richardson:

Page 102

1        Q.  Thank you.  In other words, there are no
2    plans in place to reemploy those employees who have
3    been transferred over to Caracole from PPSWO; is that
4    correct?
5        A.  That's a different question.  Are there
6    plans to transfer them back?
7        Q.  Correct.
8        A.  If the litigation is successful, I would
9    anticipate that we would be in discussions with both
10   Caracole and Hamilton County about the possibility of
11   returning the program to PPSWO, and that could mean
12   bringing the staff back.
13       Q.  And so what plans are currently in place
14   today for PPSWO to essentially retake back the HIV
15   Prevention Program?
16       A.  No plans.
17       Q.  And then the next bullet point here, the
18   second-to-last one under Interrogatory 4, "Evaluating
19   the financial impact of loss of funding to PPSWO."
20   Is that something that I should talk about with the
21   COO later today, or is that something you can discuss
22   today?
23

Page 103

1
2            There are other aspects obviously like
3    the one I mentioned about evaluating how long -- how
4    much money and for how long could we continue to
5    support the alternative education program.  That's
6    another financial aspect that we have been
7    evaluating.
8        Q.  Any other overall analyses of the
9    financial impact of the loss of funding?
10       A.  I don't think so.
11       Q.  And finally, the last bullet point here,
12   "Exploring opportunities for raising additional funds
13   from private donors."  What are you referring to
14   there, anything beyond what we have already discussed
15   today?
16       A.  Yeah.  There's some more.  We have a
17   development department and we have a director of
18   development who runs that department.  So we have had
19   discussions about how the development department
20   would approach raising additional money in light of
21   the possible defunding of all these programs.
22       Q.  And what determinations did you reach?
23       A.  We're going to do it.
24       Q.  What do you mean by that?
25       A.  I'm sorry.  What we decided is that as a

Page 104

1    strategy we would not try to raise money for specific
2    programs, like we're not going to go out and ask
3    donors if they will fund VAWA or HIV, but we will try
4    to raise additional financial support from donors in
5    a more general way, and one of the arguments or one
6    of the -- Let's call it an argument -- one of the
7    selling points to donors is defunding, particularly
8    around our education programs.
9        Q.  And so then have you been successful in
10   obtaining additional funding through this strategy?
11       A.  No.
12       Q.  Is that process ongoing?
13       A.  Yes.  The process of raising additional
14   money from donors is ongoing, and one of the issues
15   is the defunding problem.
16       Q.  And what do you mean "one of the
17   issues"?
18       A.  Well, we make a case to donors for why
19   you should double your contribution or give support,
20   and one of the pieces of the case for some donors has
21   been we are faced with this defunding threat, which
22   means we would lose X, Y, and Z, and would not be
23   able to do these things that we were doing before for
24   our patients.
25       Q.  And so when you say one of the issues is

Page 105

1    defunding, what do you mean?
2        MR. SCHOENFELD: Objection.
3        THE WITNESS: Well, I'm trying to
4    visualize one of these appeals. There's sort of a
5    positive side on an appeal that says these are the
6    services we provide, they don't fully support
7    themselves, and we need donor support, and we have a
8    robust fundraising effort.
9        So you appeal to people who want to
10   support the high quality reproductive health services
11   and educational services that we provide that are
12   known and respected in the community. So you have
13   the positive side of the story.
14       And then you have your negatives, and in
15   our case one of the negatives, big negatives, is this
16   defunding possibility that is carried by 3701.034.
17       And so when you're talking to people about
18   giving you money, you try to give them positive
19   reasons and then I wouldn't call them negative
20   reasons, but these are the things that are going
21   really well, we need more support, this is the
22   challenge we're faced with.
23       So the defunding is a challenge.
24   By Ms. Richardson:
25       Q. So is it fair to say, if I understand

Page 106

1    correctly, the fact that the challenged statute will
2    result in PPSWO not receiving some funding it
3    received previously, may be an incentive for donors
4    to increase their donation to PPSWO as well?
5        MR. SCHOENFELD: Objection.
6        THE WITNESS: Yes.
7    By Ms. Richardson:
8        Q. And when you said that some of those
9    donations haven't materialized yet, is that because
10   the law has not yet gone into effect?
11       A. Yes, it hasn't happened yet.
12

13
14
15
16
17
18
19
20
21
22
23
24
25

Page 107

1
6    By Ms. Richardson:
7        Q. And then I just want to quickly go over
8    a couple of things. At the bottom of Page 10 it
9    states, "A health educator was terminated in February
10   2016 in anticipation of the implementation of Section
11   3707.134." Is that the same health educator we just
12   discussed in response to the earlier interrogatory?
13       A. Yes.
14       Q. And so there was just a total of one
15   health educator who was terminated?
16       A. That's right.
17       Q. And then I'd like to direct your
18   attention to Interrogatory 6, and I'll give you a
19   moment to look at it, but it essentially asks for the
20   basis of the statistical estimate in the complaint
21   that PPSWO provides approximately 30 percent of
22   abortions in Ohio.
23       MR. SCHOENFELD: Objection.
24       THE WITNESS: I believe the 30 percent
25   number is based on the combination of PPGOH and

Page 108

1    PPSWO.
2        (Pause.)
3        THE WITNESS: So this is -- the 30
4    percent number was arrived with a combination of
5    PPSWO and PPGOH, and my understanding, when I was
6    putting this together, is that it was derived from
7    the reports that are given to ODH about the number of
8    abortions that are provided in the State by various
9    abortion providers, because we're all supposed to
10   report this stuff, and then the calculation was done.
11   By Ms. Richardson:
12       Q. And so it references a report that ODH
13   prepares called Induced Abortions in Ohio, and so
14   then it looks like -- and correct me if I'm getting
15   this wrong here. It looks like you essentially sort
16   of took what you viewed as the total number of
17   abortions from that report and took the abortions
18   that PPSWO provides as a percentage of that -- I'm
19   sorry, let me step back -- the combined abortions
20   that PPSWO and PPGOH provide as a percentage of the
21   overall abortions based on this report; is that fair?
22       A. Yes.
23       Q. And I want to make sure that I
24   understand, because the end of the last sentence here
25   says, "...with the sum of abortions in certain

1 counties and Ohio as whole and a report authored by
2 ODH." Do you know which counties specifically were
3 reviewed or used in making that calculation?
4     A.  I don't.
5     Q.  Do you know who performed this 30
6 percent calculation?
7     A.  No.
8     Q.  Was this something prepared in
9 connection with this litigation, or was it a number
10 that you would have pulled from something else?
11     A.  The calculation was prepared for this
12 litigation.  The data came from elsewhere.
13     Q.  Came from the reports that are described
14 here?
15     A.  Yes.
16     Q.  But you were not the one who conducted
17 that original calculation?
18     A.  I didn't do the calculation.
19     Q.  And you don't know who did the original
20 calculation?
21     A.  I don't.
22     Q.  Do you know, of the 30 percent
23 calculation, what percentage is attributable to PPSWO
24 versus PPGOH?
25     A.  I don't.

1     Q.  And who would know that information?
2     A.  I'm not sure anybody would know it,
3 because I'm not sure it's been separately calculated.
4 But it could be, because we know what our numbers
5 are, and we know what the total is.
6         The 30 percent was just putting two
7 numbers together and then against the total, and
8 that's how you got the 30 percent.  So I don't know
9 if anybody has that specific number, but it could be
10 calculated.
11     Q.  And again, it sounds like that was
12 probably a sum of certain counties in Ohio, but you
13 don't know which counties were selected or how those
14 were selected?
15     A.  I don't.
16     Q.  Do you know if that was a calculation
17 that was done by counsel as opposed to someone within
18 PPSWO?
19     A.  I don't know.
20     Q.  So there would really essentially be no
21 way to test the accuracy or the methodology in coming
22 up with this statistic; is that fair?
23     MR. SCHOENFELD:  Objection.
24 By Ms. Richardson:
25     Q.  In other words, if I wanted to replicate

1 this calculation, I wouldn't know how to do that?
2     MR. SCHOENFELD:  Objection.
3     THE WITNESS:  I don't know whether you
4 could test it or not.  I don't know.  You could do
5 the calculation, but I don't know how you would test
6 it as written.
7 By Ms. Richardson:
8     Q.  Thank you.  And so is it fair to assume
9 that the following interrogatories related to budgets
10 and financial statements are things I should reserve
11 for this afternoon?
12     MR. SCHOENFELD:  I'm not sure which ones
13 you're talking about.
14     MS. RICHARDSON:  So Interrogatory No. 8,
15 total revenues.
16     THE WITNESS:  Is this a question for me
17 or for counsel?
18 By Ms. Richardson:
19     Q.  Do you know the answers to these
20 questions?
21     A.  I would have an answer to these
22 questions.  No, I mean I would have an answer to the
23 question of who has this information.
24     MR. SCHOENFELD:  There's no question on
25 the table.

1     MS. RICHARDSON:  So my question is
2 basically in terms of the 30(b)(6) topics today, is
3 this something that I should cover with Mr. Lawson or
4 is this something that will be handled by the witness
5 who is coming this afternoon?
6     MR. SCHOENFELD:  So the 30(b)(6) is
7 topic 7.  That's for Mr. Bower this afternoon.
8 You're talking about specific interrogatories where
9 we gave you 33(D) responses, so I have no idea what
10 the questions are so I can't tell you who is better
11 situated to respond to that.
12     MS. RICHARDSON:  I can walk through and
13 read each one of them in.
14     MR. SCHOENFELD:  To the extent any of
15 these interrogatories relate more to topic No. 7,
16 that's appropriate for Mr. Bower.  I'm not sure what
17 you're planning on asking about these, so I can't
18 tell you specifically on a question-by-question
19 basis.
20     MS. RICHARDSON:  So my general
21 impression is that questions related to budgets and
22 revenues and percentages of revenues, and we can walk
23 through the specific ones and I can read them into
24 the record if we think that's useful, my sense is
25 that that would be covered under topic 7 which I

Page 113

1 understand that Mr. Bower will be discussing later
2 today.
3     MR. SCHOENFELD: Correct.
4     MS. RICHARDSON: So I'm just confirming
5 that that understanding is correct.
6     MR. SCHOENFELD: My only point is I
7 don't know what questions you have and these are
8 33(D) responses, so I wasn't sure how to answer the
9 question. To the extent they relate to topic 7,
10 revenues, expenses, losses, whatever, that's for
11 Mr. Bower.
12     MS. RICHARDSON: And is Mr. Lawson going
13 to be present still while Mr. Bower testifies this
14 afternoon, so that if it turns out that something is
15 actually within the -- within Mr. Lawson's coverage
16 area we can call him back as necessary to cover those
17 areas?
18     MR. SCHOENFELD: Correct.
19     MS. RICHARDSON: Perfect. Thank you.
20 Then I won't subject you, Mr. Lawson, to the misery
21 of going through all these financial questions.
22     THE WITNESS: Thank you.
23     MS. RICHARDSON: I am going to switch
24 gears a little bit then. What do we think in terms
25 of -- do we want to take a lunch break now or do we

Page 114

1 want to move forward? I'm going to start going
2 through some of the handwritten notes that were
3 supplied yesterday.
4     MR. SCHOENFELD: It's up to you.
5     THE WITNESS: How long do you think that
6 will take?
7     MS. RICHARDSON: I don't think it will
8 take probably more than about a half hour, would be
9 my best guess.
10     MR. SCHOENFELD: And is that it for
11 Jerry?
12     MS. RICHARDSON: That won't be it.
13     THE WITNESS: Then I'd say let's break
14 for lunch.
15     (Luncheon recess taken.)
16     - - -
17 By Ms. Richardson:
18     Q. Thank you, Mr. Lawson. We are back on
19 the record. And what I'd like to do now is go over
20 some documents which I will represent you to have
21 been produced to us by your counsel in this
22 litigation.
23     MS. RICHARDSON: And before I do that, I
24 would just put on the record that the documents that
25 I am just getting ready to go through, which I will

Page 115

1 try to identify by Bates number for clarity as we go,
2 have been produced subject to a protective order that
3 was entered by the court over our objection. So
4 these will be entitled to protection under that
5 order.
6     And to start, it's Bates No.
7 PPOH_0000470, titled "Education Department
8 Post-Defunding Plan". And we'll get you some copies
9 of that if you don't mind bearing with us for a
10 minute. And I'll mark this as Exhibit 3.
11     (EXHIBIT MARKED FOR IDENTIFICATION.)
12 By Ms. Richardson:
13     Q. Mr. Lawson, for these and the next
14 several documents that we're going through that
15 contain some of your handwritten notes, I don't want
16 to go through all of these documents in detail, but
17 I'm hoping that you can help me to just understand
18 what these documents are and the context in which
19 they were created.
20     So we'll start with this one, Education
21 Department Post-Defunding Plan. Did I read that
22 title correctly?
23     A. Yes.
24     Q. Can you tell me what this document is?
25     A. It's a planning outline produced by the

Page 116

1 education department folks at PPSWO.
2     Q. And what was the purpose for this
3 document?
4     A. The purpose was to get in writing, I
5 would say both the impact on the education department
6 from the defunding bill, and some proposed or
7 possible reactions or steps that could be taken given
8 the impact.
9     It also raised a number of questions
10 that were in play that we needed to address.
11     Q. Do you know who prepared this document?
12     A. I don't.
13     Q. Do you know by title or even department
14 who would have prepared this document?
15     A. It would have been the education
16 department. I'm thinking it would have been the
17 Vice-President for education, and probably also the
18 Manager of Training and Education who reports to the
19 Vice-President.
20     Q. And do you know who -- for whom this
21 document was prepared? Was it prepared to submit to
22 you, or do you know that?
23     A. It was probably prepared with the idea
24 that it would be submitted to me, but not for that
25 exclusive purpose.

Page 117

1      Q.  Do you know what the intended audience
2  would have been for this?
3      A.  It would have been senior leadership,
4  internal decision makers at the staff level,
5  including me.
6      Q.  And who else would you include among
7  senior leadership?
8      A.  Well, the senior team, that's the term
9  we use, includes me, the director of clinics, the
10  medical director, the director of communication, the
11  VP of Education, and the COO.  That's the senior
12  team.
13         I'm not saying that I think that all of
14  the senior team members would be seeing and grappling
15  with this, but the potential would be there, I just
16  don't remember exactly what process we followed.
17      Q.  And let me just go over it -- well,
18  first of all, there are some handwritten notes on
19  this document.  Do you see that?
20      A.  Yes.
21      Q.  And at the top it looks like it says
22  "With Lawson Notes"?
23      A.  Yes.
24      Q.  Are those in fact your notes?
25      A.  Yes.

Page 118

1      Q.  You recognize that as your handwriting?
2      A.  I do.
3      Q.  And do you know when you would have made
4  your handwritten notes to this document?
5      A.  I don't know when I got this document,
6  but I would have made the notes within a few days of
7  having received it.
8      Q.  And do you know when you received it?
9      A.  No.
10      Q.  And I note at the top it says,
11  "Timeline: March 2016".  Do you know when the
12  document itself would have been created?
13      A.  No.
14      Q.  What do you understand Timeline: March
15  2016 to mean?
16      A.  Well, looking at Timeline: March 2016,
17  and then looking at Timeline: April-August 2016, and
18  then Timeline, September to June, I would say these
19  are timed phases in the plan.
20         So the first phase would be what would
21  happen in March, or what do we need to do in March,
22  and then the next phase what do we need to do April
23  to August, September to June.
24      Q.  Thank you.  And so for this first page
25  then it would relate to action items that were being

Page 119

1  discussed to take place in March 2016, is that fair?
2      A.  Or questions that needed to be addressed
3  in March of 2016.
4      Q.  Thank you.  And so looking at A, it
5  says, "Which programs are affected?"  "Hamilton
6  County HIV funding moves to Caracole in April."  Did
7  I read that correctly?
8      A.  Yes.
9      Q.  And does that refer to what we discussed
10  earlier in terms of the transition of the HIV
11  Prevention Program to Caracole?
12      A.  Yes.
13      Q.  And can you tell me what -- looking at
14  your handwritten notes underneath this paragraph, can
15  you tell me what that says?
16      A.  "If we can keep these funds wouldn't it
17  mean that the partners are okay."  That's what it
18  says.
19      Q.  And what do you understand that to mean?
20      A.  Well, the Item b, ii above, "If these
21  funds can stay with us, determine how others are
22  affected (will those organizations be in jeopardy of
23  losing funds to do agreements with us?)."
24         I think what the comment means is if we
25  don't lose the funds then they won't be in jeopardy,

Page 120

1  because the jeopardy for our partners under the
2  defunding law has to do with affiliating with an
3  organization that provides or promotes abortion.  I
4  think that's what that meant.
5      Q.  And apart from what you've already
6  described today, do you know whether any actions were
7  in fact taken along the lines of what's discussed
8  here in Section A?
9         MR. SCHOENFELD:  Objection.
10         THE WITNESS:  Well, the Hamilton County
11  HIV funds move to Caracole the first of April.  Other
12  HIV funds, we got noticed from Dayton/Montgomery
13  County that they were going to terminate our funds
14  because of 3701.034.  Those are the only two sort of
15  action questions I guess I see in that section there.
16  By Ms. Richardson:
17      Q.  And that raises a good point, because we
18  have talked a lot about what happened under the
19  Hamilton County contract, but you had mentioned
20  previously that there's a separate contract that
21  related to Butler and Warren County; is that correct?
22      A.  Yes.
23      Q.  Is that what is being referred to here
24  in reference to Montgomery County?
25      A.  I believe so.

1     Q.   And so what -- what has happened with
2  the Montgomery County contract for Butler and Warren
3  area?
4     A.   They notified us that it was going to be
5  terminated, but that was -- the TRO stopped it.
6     Q.   And so is PPSWO continuing to provide
7  HIV services through Montgomery County?
8     A.   No.
9     Q.   Who is providing those services now?
10    A.   I don't know.
11    Q.   Do you know why PPSWO is not providing
12 those services?
13    A.   It's so little money that we can't
14 really put a program together.  It's $6,000, if I
15 remember correctly.  There's just not enough money to
16 even fund the basic staff that you would need for
17 that.
18    Q.   So is it fair to say then PPSWO elected
19 not to continue providing those services?
20         MR. SCHOENFELD:  Objection.
21         THE WITNESS:  Yes, in the sense that
22 there wasn't enough money to continue the program.
23 By Ms. Richardson:
24    Q.   And do you know whether Montgomery
25 County has entered into a contract with someone else?

1     A.   I don't know.
2     Q.   But at this point in time PPSWO is not
3  providing services under the HIV Prevention Program
4  to either Hamilton or the Montgomery County areas?
5     A.   Right.
6     Q.   B, if we look at this next section here,
7  B, and then little b -- Actually, let's look at B,
8  little a.  It says, "We retain 1 staff position to
9  work on ODH and Montgomery County HIV work."  Did you
10 in fact retain a staff member to work on ODH and
11 Montgomery County work?
12    A.   For about 30 days.  That was the
13 half-time person that didn't make it.
14    Q.   Okay.  And do you know -- so the
15 half-time person, is he or she still employed by
16 PPSWO or has that person --
17    A.   He is not.
18    Q.   Do you know where he is employed?
19    A.   I don't.
20    Q.   Do you know whether he is continuing to
21 provide HIV Prevention Program services?
22    A.   He isn't.
23    Q.   And how do you know that?
24    A.   Because our education leadership has
25 been in touch with him and has told me.

1     Q.   And so what is he doing instead?
2     A.   Looking for a job.
3     Q.   And moving then to the next line, B,
4  little b, it references, "Sell the RV to Caracole,
5  sell it outright or lease to Caracole."  Is that the
6  van that you were mentioning earlier?
7     A.   Yes.
8     Q.   And it sounds like, based on your
9  earlier testimony, that the van was not in fact sold
10 or leased to Caracole; is that correct?
11    A.   It was not.
12    Q.   And that was the van you said was sold
13 to an individual?
14    A.   Yes.  The van was in the shop more than
15 it was on the road.
16    Q.   Okay.  And is that the reason that it
17 was not then sold or leased to Caracole?
18    A.   Yes.
19    Q.   Do you know if Caracole purchased or
20 leased a van or RV to continue providing those
21 services?
22    A.   I do not know.
23    Q.   And then B, little c, it says, "ODH will
24 determine timeline for cuts, but we have no date at
25 this point."  What cuts were you referring to there?

1     A.   I'm not sure.  I think that it was the
2  cuts related to the ODH funding for HIV, which at the
3  time this was done, looking at this timeline thing,
4  we did not know what was going to happen.  We did not
5  know at that point, for example, that ODH didn't
6  consider that funding source to be covered by the
7  defunding bill.
8     Q.   So I'm sorry, can you repeat that again?
9  What was the question?
10    A.   Well, subsequent to this we heard from
11 ODH that they did not consider the ODH grant that we
12 got for HIV, the one that came directly from ODH,
13 they do not consider it covered by the defunding
14 grant.
15         At the time we didn't know that they
16 were thinking that, so we're kind of waiting for the
17 other shoe.
18    Q.   Okay.  And so that's the HIV grant we
19 talked about earlier that comes directly from ODH?
20    A.   Yes.
21    Q.   Separate from the HIV Prevention Program
22 that comes through Hamilton County, Montgomery
23 County, correct?
24    A.   Yes.
25    Q.   Okay.  And then I'm going to down to F,

Page 125

1  "Are there other options?"  And can you read to me
2  what your handwritten notes there say?
3      A.  "Would have to be complete separation, I
4  believe."
5      Q.  And what did you mean by that?
6      A.  What I meant was that the family
7  planning services would have to be completely
8  separated from the abortion services, and -- within
9  PPSWO, so we would have to basically dissolve PPSWO
10  as it exists.  And also that the family planning
11  services would have to completely separate from PPFA.
12      Q.  And why did you believe that to be the
13  case?
14      A.  Because of the language of the defunding
15  law which said nobody who provides, promotes
16  abortions, or is affiliated with an organization that
17  provides or promotes abortions, can receive any of
18  this funding.
19      Q.  And that was your personal
20  understanding?
21      A.  Well, with the help of counsel.
22      Q.  Thank you.  And obviously I will not ask
23  you to divulge any communications from counsel.
24      A.  Right.
25      Q.  But in other words, that was PPSWO's

Page 126

1  internal understanding rather than something that was
2  told to PPSWO by ODH or another organization; is that
3  fair?
4      A.  That's correct.  This was our analysis.
5      Q.  And then I want to turn to Phase 2 on
6  the next page.
7      A.  Okay.
8      Q.  And it says there, "Timeline:  April to
9  August 2016."  And then it says, "Cost:  $107,459
10  (above other fixed costs)" minus "$6,000 earned
11  income," equals "$101,459."  Do you see that?
12      A.  Yes.
13      Q.  What does that mean?
14      A.  It means that the cost from April
15  through August would be $107,459, of which under this
16  planning document the hope or expectation is that
17  $6,000 in fee income for services could be obtained,
18  leaving the net contribution from the general fund at
19  101,459.
20      Q.  And are those costs your estimate of
21  what it would take to implement the various suggested
22  action items here in Phase 2?
23      A.  It was the estimate by somebody in the
24  education department about what the cost would be to
25  implement these steps.

Page 127

1      Q.  Okay.  And so I want to walk through
2  this in a little more detail.  So if we look at B,
3  "Order curricula for new programs (OWL and Get
4  Real)."  What does that mean?
5      A.  I can't remember what the -- these are
6  acronyms for, but OWL is a sex-ed curriculum for
7  elementary school, and Get Real is a sex-ed
8  curriculum for middle and high school.
9          And this planning was around no longer
10  being able to provide the services that we'd been
11  providing under PREP or VAWA to the populations
12  targeted under those two grant programs, and
13  substituting a plan to provide the OWL and Get Real
14  curricula to elementary, middle, and high school
15  students in our service area.
16      Q.  So in general, is it fair to
17  characterize this Phase 2 as the planning steps for
18  the alternate education program that you described
19  earlier?  Is that accurate?
20      A.  Yeah, alternate -- I've been using the
21  word "alternate".  I think different is probably a
22  better word because alternate almost sounds like it's
23  a substitute for VAWA and PREP, and it really isn't.
24  It's a different program.
25      Q.  Is it PPSWO's intention to provide this

Page 128

1  program regardless of what happens in this
2  litigation?
3      A.  No.
4      Q.  It would only be provided in the event
5  that the law takes effect?
6      A.  Yes.
7      Q.  Is that accurate?
8      A.  Yes.
9      Q.  And do you know whether these cost
10  estimates have been evaluated or -- and I don't know,
11  this may not be in your area, but do you know, do
12  these remain accurate estimates of what the program
13  will cost?
14      A.  I don't know if they were ever accurate,
15  and I don't know if they still are.
16      Q.  Okay.  Thank you.  And then this last
17  page here, "Post Defunding", September 2016 to June
18  30th, and then it says, "Cost:  $271,774 (above other
19  fixed costs) (includes $257,143 staff costs)" minus
20  "$35,000 estimated earned income" equals "$236,774."
21  Did I read that correctly?
22      A.  Yes.
23      Q.  And what do those numbers or estimates
24  relate to?
25      A.  I assume, by the nature of the document,

Page 129

1 that these reflect the cost of what would be
2 happening with the different programs between
3 September of 2016 and the end of June in 2017.
4        And in this case the 35,000 is the
5 estimated fee income that might be earned during that
6 period, comparable to what was the number before, the
7 6,000 that we talked about before.
8     Q.    And same question for these cost
9 estimates.  Have you ever evaluated those to
10 determine whether they are accurate estimates?
11    A.    I have not.
12    Q.    And as of today have any of these steps
13 been taken towards implementing the different
14 education programs?
15    A.    We have, I believe, purchased the two
16 curricula for the OWL and Get Real programs.
17    Q.    Any other steps?  Have any other steps
18 be taken yet?
19    A.    Not that I know of.
20    Q.    And I believe you already testified to
21 this, in which case I apologize, but has PPSWO
22 received any funding related to the different
23 education programs?
24    A.    Nothing specifically designated for
25 that.

Page 130

1     Q.    And is that because, as you mentioned
2 earlier, the strategy is shifting away from seeking
3 funding for specific programs?
4     A.    Yes.
5     Q.    Thank you.  And so I have a number of
6 handwritten notes.  I'm trying to think of the best
7 way to -- I think what I will do, I'm going to hand
8 you a series of notes, and if it's okay I'm going
9 wait until the end to mark them, and I'll mark them
10 together which I think will speed it up.
11        And again, my hope is I won't have to go
12 through them in detail, but that you can help me
13 understand what these documents are and the context
14 in which they were concreted.  And we'll start with
15 what's been marked as PPOH0023857.
16        MR. SCHOENFELD:  And you want to mark
17 these together?
18        MS. RICHARDSON:  Together at the end.
19 Thank you.  And actually I think it goes through --
20 are they separate in there.
21        MS. CARWILE:  Some are separate and some
22 are together.
23        MS. RICHARDSON:  I tried to keep them
24 connected the way they were prepared.  So it should
25 be, I guess, just 23857.

Page 131

1        (EXHIBIT MARKED FOR IDENTIFICATION.)
2 By Ms. Richardson:
3     Q.    Do you recognize that document?
4     A.    Yes.  And let me say earlier when you
5 asked me -- much earlier today when you asked me
6 about my preparation for this, and I listed the
7 things I had read, I failed to mention that I had
8 looked at some documents.
9        I don't know if they are the same ones
10 that you're showing me, but I had looked at some and
11 I forgot to mention that.
12    Q.    And do you know what documents those
13 were?
14        MR. SCHOENFELD:  Objection.  I think he
15 can describe generally what types of documents, but I
16 think the specific selection of documents is work
17 product.
18        MS. RICHARDSON:  Well, I think we're
19 entitled to explore the basis of the knowledge that
20 he's offering today.  I'm fine with basic
21 descriptions.  I don't think -- I mean, I don't think
22 we need Bates numbers, and if we get too specific we
23 can talk about that later, but I do think we are
24 entitled to explore the source of his knowledge
25 today.

Page 132

1        THE WITNESS:  I looked at a small number
2 of e-mail chains.  I think maybe one document similar
3 to this, a handwritten note.  That was it.
4 By Ms. Richardson:
5     Q.    And the handwritten note that you
6 reviewed, can you tell me what that related to?
7     A.    I can't remember.
8     Q.    Okay.  Well, let's start with this
9 document in front of you now, 23857.  Can you tell me
10 what this document is of?
11    A.    It is a note made by me about various
12 aspects of defunding based on a conversation that I
13 had with █████████████, that's, "Meet with
14 █████," who at the time was our Vice-President of
15 patient services.
16    Q.    What does the VP of patient services do?
17    A.    We don't have a VP of patient services
18 any longer.  But the VP of patient services was in
19 charge of the overall health care delivery system
20 which the director of clinics is now in charge of.
21    Q.    Okay.  And so the elimination of that
22 position is not related to this lawsuit?
23    A.    No.
24    Q.    And do you know when these notes were
25 taken?

Page 133

1      A.   The date says 10-12-15, which I assume
2  is the date that I had this discussion with ███ and
3  made these notes.
4      Q.   And do you know why you were meeting
5  with ███?
6      A.   We were anticipating that some defunding
7  bill was going to be passed and we were starting to
8  look at the potential implications.
9      Q.   And can you describe to me generally
10 what you understand the overall import of these notes
11 to mean, to be?
12     MR. SCHOENFELD:  Objection.
13     THE WITNESS:  These notes all relate to
14 the STD prevention project.
15 By Ms. Richardson:
16     Q.   And there's a note over on the left-hand
17 side that says "340B," and then can you read to me
18 those next words?
19     A.   "All family planning sites are testing
20 and treating," treating being "TX".
21     Q.   Okay.  And the next line?
22     A.   "Surgery is testing only."
23     Q.   And what does that mean?
24     A.   That means that the contract that ODH
25 approved with our surgical site did not include free

Page 134

1  medications, it only included free lab tests for
2  STDs.
3      Q.   And so surgery center, is that the
4  facility that you mentioned previously where abortion
5  services are provided?
6      A.   Yes.
7      Q.   And so there was free testing equipment
8  used at the surgery site?
9      A.   The free lab testing was available at
10 the surgery site under -- because we had a contract
11 with ODH for that site.
12     Q.   And you said you only have one surgery
13 center; is that correct?
14     A.   We have one surgery site.
15     Q.   And that's what this is referring to is
16 the one PPSWO surgery site?
17     A.   Yes.  And what this means is that they
18 weren't providing free medications.
19     Q.   So they were not providing free
20 medications, but they were providing free lab testing
21 under one of the STD Prevention Program contracts
22 with ODH; is that correct?
23     A.   Yes.
24     Q.   And then if you can just read to me that
25 next line there.

Page 135

1      A.   "CDD Lab," that's the name of the lab,
2  "for all testing, only for those patients who
3  qualify."
4      Q.   And what does that mean?
5      A.   It means that under the STD Prevention
6  Program, ODH had a contract with CDD Labs.  So all of
7  the lab tests under that program for people who
8  qualified were sent to CDD Labs.
9      Q.   And this next line, "Treatment is free,
10 meds are paid for by ODH"?
11     A.   Yes.
12     Q.   What is that referring to?
13     A.   That refers to the other part of the STD
14 Prevention Program which is the free meds in
15 partnership with the free labs.
16     Q.   And so in the -- would that be for the
17 surgical center, or for the other sites?
18     A.   It would be for the others, because the
19 surgical center did not have a contract for free
20 meds.
21     Q.   And so stepping back for a minute, if a
22 patient then went to the surgical center for an
23 abortion, she could also be tested with the -- for an
24 STD -- or STI, I apologize, correct?
25     A.   Yes.

Page 136

1      Q.   And then that could be -- that would be
2  an -- eligible for the free testing under the STD
3  Prevention Program, correct?
4      A.   Yes.
5      MR. SCHOENFELD:  Objection.
6  By Ms. Richardson:
7      Q.   And if that test came back positive and
8  demonstrated she had an STI, what would happen for
9  that patient?
10     A.   She would either get medication or get a
11 prescription for medication, but she would have to
12 pay for it because we could not use the free
13 medication for somebody who was eligible through
14 surgery, okay?
15     Q.   Thank you.  And this next line, each
16 center -- I'm not sure what that next word is?
17     A.   "Each center orders."
18     Q.   "their meds," is that what that says?
19     A.   Yes.
20     Q.   And "Center" is double underlined there.
21 Do you know why you would have double underlined
22 that?
23     A.   I have no idea.
24     Q.   And what does center refer to?
25     A.   A health center.

1    Q.  Is a health center the same as a family
2  planning center?
3    A.  Yes.
4    Q.  Would it include a surgical center?
5    A.  No, because the surgical center didn't
6  get the meds.
7    Q.  And then I don't even have a guess as to
8  that next line.
9    A.  "Zithromax, Rocephin and Metronidazole."
10  Those are the meds.  And I don't know what that last
11  word is myself, the one that starts with "C".
12    Q.  And then the next line is?
13    A.  ███████ orders for patients who don't
14  qualify."
15    Q.  And what does that mean?
16    A.  ██████ is our purchasing director, and it
17  means that she orders medications for patients who
18  don't qualify under the STD Prevention Program.
19    Q.  And then it says, "Surgery doesn't
20  have --"
21    A.  Treatment.
22    Q.  "-- treatment" again.  "Part with meds,"
23  is that --
24    A.  Yeah, the treatment part with meds.  5.8
25  is a paragraph in the contract.

1    Q.  And then the next line says, "5.9 on
2  surgery."  Do you know what that means?
3    A.  I think it refers to another paragraph
4  in the contract.
5    Q.  Which contract?
6    A.  The contract with ODH for the STI
7  Prevention Program with the surgical center.
8    Q.  And then, I'm sorry, that last line
9  there -- well, actually in the same line, 5.10?
10    A.  That's another reference to another
11  paragraph.
12    Q.  Do you know what those next words are?
13    A.  No.
14    Q.  On hand, maybe?
15    A.  I don't know about the one that looks
16  like it starts with "H".
17    Q.  Okay.  And then the last line there?
18    A.  It says, "e - also missing."  I have no
19  idea what that means.
20    Q.  And then we'll turn to the next set of
21  notes, and these were -- I'm sorry, these were
22  produced with several pages, I will represent to you,
23  starting with PP0H_0023858, and going through
24  0023865.  Is that what you have in front of you as
25  well?

1    A.  Oh, down at the bottom?
2    Q.  Yes.
3    A.  Say it again, I wasn't looking.
4  0023858?
5    Q.  So 0023858?
6    A.  I have that.
7    Q.  Through 0023862.
8    A.  Yes.
9    Q.  And are these also your handwritten
10  notes?
11    A.  Yes.
12    Q.  And it looks like at the top it says
13  10-30-15?
14    A.  Yes.
15    Q.  Is that the date you would have taken
16  these notes?
17    A.  Yes.
18    Q.  Do you recognize this document?
19    A.  Yes.
20    Q.  Can you tell me what this is?
21    A.  These are notes that I made in the
22  process of meeting with our VP of Education and
23  our -- the Manager of Training and Education about
24  what might happen under the different program for
25  education.

1    Q.  And so I think this says, "Education
2  Dream education program"; is that right?
3    A.  Yes.
4    Q.  Do you know what that means?
5    A.  This is sort of the -- the wish list.
6    Q.  And a wish list for an alternate?
7    A.  In the event that we lost the funding
8  from VAWA and PREP.
9    Q.  And whose dream list does this
10  represent?
███  ███  ██████████████
███  █  ██████████████████
███  █  ███████
███  ███  █████████████████████████
16    Q.  So as of October 30th, 2015, these were
17  items or components of what they viewed as an ideal
18  education program; is that fair?
19      MR. SCHOENFELD:  Objection.
20      THE WITNESS:  Yes.
21  By Ms. Richardson:
22    Q.  And there's a graph there.  Is that a
23  fair characterization?
24    A.  Yeah.
25    Q.  What does that represent?

1   A.  It's a pie chart that basically showed
2 three components that they envisioned for the
3 educational department; community education,
4 training, and I'm not sure what PPSWO trainers --
5 that's what it says.  I'm not sure what it means.
6   Q.  And so it looks like the -- according to
7 this pie chart, in their ideal training program,
8 whatever this PPSWO training component is, would
9 represent about half of the focus of the program; is
10 that a fair characterization?
11   MR. SCHOENFELD:  Objection.  Misstates
12 prior testimony and the document.
13 By Ms. Richardson:
14   Q.  And I'm not trying to characterize your
15 prior testimony, I'm just asking if that's an
16 accurate description?
17   A.  That's roughly what I thought when I put
18 the pie chart together.
19   Q.  And then down at the bottom here it
20 says, "18 to 19 year olds higher pregnancy rates", is
21 that --
22   A.  Yes.
23   Q.  I'm sorry.  What is that referring to?
24   A.  It refers to the fact that when you have
25 a group of young people where you have some incidence

1 of unintended pregnancy, the peak unintended
2 pregnancy age group is 18 and 19 years old.
3   Q.  And so are each of those components
4 here -- I see a 7 to 12, K through 6, 18 to 19.  Is
5 it just describing the components for each of those
6 age groups?
7   A.  The 7 to 12 and the K to 6 would be
8 descriptions of components.  The 18 to 19 year old is
9 the cases to be made for including college students,
10 not just elementary, middle, and high.
11   Q.  Okay.  Thank you.  And then over in the
12 margins, can you read what that says there right next
13 to the marking?
14   A.  I think it says "not related".
15   Q.  Do you know what that means?
16   A.  No.
17   Q.  Okay.  And then semi in the margins a
18 little lower in the page, do you know what that note
19 says?
20   A.  "Orientation, Greek, residence --".  I'm
21 not sure, it looks like whole, but I don't think
22 that's what it is.
23   Q.  Is this referring to college --
24   A.  Opportunities at college.
25   Q.  Thank you.  Is this entire document

1 similarly related to components of sort of the dream
2 education plan?
3   MR. SCHOENFELD:  Objection.  Misstates
4 prior testimony.
5 By Ms. Richardson:
6   Q.  And again, I'm not trying to
7 characterize your testimony, it's just my question of
8 your understanding of the document.
9   A.  I'm going to review it.
10   Q.  Sure.  Take your time.
11   A.  Yes.
12   Q.  And then I just wanted to ask you then
13 about one more notation here on 23860, which I think
14 is the third page of this grouping.
15   A.  Okay.
16   Q.  Third line it looks like it says "PPSWO
17 internal doing a lot now."
18   A.  Yes.
19   Q.  What was that referring to?
20   A.  ▮▮▮▮▮ were making the case
21 for keeping the full complement of staff, and one
22 argument they were making was that the staff is doing
23 a lot of internal training at PPSWO of the kind we
24 talked about earlier today.
25   Q.  And then it says "PS" something?  Do you

1 see that?
2   A.  "Patient services."
3   Q.  And then half person?
4   A.  Yeah.
5   Q.  Is that our same half person?
6   A.  No.  No, the other half person was HIV.
7 This is education.  And this is really not about
8 keeping or losing, it's about how many people you
9 need for these different pieces.
10   Q.  And then down here the, "Teen Clinic,
11 SF, Dayton, West --" something.
12   A.  Western Hills.
13   Q.  Western Hills.  And then "Elsewhere".
14 What is that referring to?
15 ▮▮▮▮▮

Page 145



Page 147

By Ms. Richardson:
2     Q.  Yes.
3        A.  The education team has taken a more
4  active role in managing, monitoring, overseeing, the
5  internal education, including NEO on 23860, which is
6  New Employee Orientation.
7        Q.  Thank you.  Any other steps that have
8  been taken that are outlined in these pages that we
9  have just gone over?
10       A.  No.
11       Q.  Thank you.  Okay.  Now we'll move to a
12  grouping that includes 23863 through 23865, I
13  believe.  And do you recognize that document?
14       A.  Yes.
15       Q.  What is this?
16       A.  These are notes that I made from my own
17  research conducted, it looks like on November 20th of
18  '15, about federally qualified health centers.
19       Q.  What is a federally qualified health
20  center?
21       A.  It's a health center that has certain
22  features that is entitled -- or if you meet the
23  standard features you're entitled to special federal
24  grants to help you operate.  And you also get special
25  pricing -- well, special reimbursement rates for

Page 148

services.
2         I think they get Medicare rates for
3  Medicaid patients.  Normally there's a difference.
4        Q.  And does PPSWO qualify?
5        A.  No.  That's what I was looking at.
6        Q.  In other words, these are notes that
7  relate to whether PPSWO could be a federally
8  qualified health center?
9        A.  Yes.
10       Q.  And what did you conclude?
11       A.  I concluded no.
12       Q.  Why did you conclude that?
13       A.  The requirements would be way too
14  onerous for us to make that change.
15       Q.  And do you recall specifically which
16  requirements you believed would be onerous?
17       A.  Yes, I recall some.  An FQHC has to
18  provide primary care health care, cradle to grave,
19  including permitting health services on site or by
20  arrangement with out providers, and must also provide
21  dental, mental health, substance abuse,
22  transportation, and hospital and specialty care
23  either directly or by contract, and that would be a
24  huge change for us because our field is reproductive
25  health care.  We don't to cradle to grave.  We don't

16       Q.  Are any of the other items that are
17  listed here as components of the dream education
18  program -- let me ask that differently.
19          Has PPSWO implemented any of the other
20  components of this dream education program since
21  October 30th, 2015?
22          MR. SCHOENFELD:  Objection.
23          THE WITNESS:  Let me think here for a
24  minute.  I told you that we had purchased the
25  curricula.

1 provide all these services.
2 Q. What is a Look-a-Like? Am I reading
3 that correctly?
4 A. You are. A Look-a-Like FQHC is a
5 category under the law that says you meet all the
6 criteria for FQHC, but we aren't giving you any
7 money.
8 Q. And why would someone who otherwise
9 meets the criteria not be eligible, as you understand
10 it?
11 A. I think they can get the preferred
12 reimbursement rate, for example. I'm not sure what
13 all the other advantages would be.
14 Q. Would PPSWO qualify as a Look-a-Like?
15 A. Not without doing all that stuff.
16 Q. You would still have to go through the
17 same stuff you just identified?
18 A. We still would.
19 Q. And so you can set that aside for now.
20 And we're going to move to the next grouping, which
21 includes 23866 through 23868.
22 A. Okay.
23 Q. And do you recognize this document?
24 A. Yes.
25 Q. What is this document?

1 A. These are my notes from another
2 conversation with ███████████████, this one I
3 believe on December 15th, looking at the defunding
4 bill that we knew was in the works, and looking at
5 our various programs and where they stand
6 contractually.
7 Q. And it looks like this document was
8 created on December 15th; is that correct?
9 A. Yes.
10 Q. Of 2015?
11 A. Yes.
12 Q. And then there's another date here,
13 5-1-15. What does that refer to?
14 A. I have no idea.
15 Q. Okay. And it looks like it says here,
16 "PREP done end of July"; is that correct?
17 A. Our PREP grant in contract ended --
18 would end -- will end July 31st of 2016.
19 Q. And then does that say, "Competitive RFP
20 2/16"?
21 A. Yes.
22 Q. What does that relate to?
23 A. I'm not sure.
24 Q. And then it says, "We are at the end of
25 the 5-year cycle, grant year end 7-31-15"; is that

1 correct?
2 A. I think competition -- competitive --
3 RFP meant that a new request for proposals would be
4 coming out from ODH for PREP going forward in
5 February.
6 Q. And was that something that PPSWO
7 intended to apply for at that time?
8 A. Yes.
9 Q. Do you have an understanding as to how
10 that competitive process would operate in February of
11 2016?
12 A. The difference between a competitive and
13 noncompetitive process, if it's not competitive the
14 only people who are considered are people who already
15 have grants.
16 If it's competitive it means that -- and
17 this is what we were anticipating. It means that
18 other organizations can apply and a decision will be
19 made by the grantor, ODH, as to which organizations
20 receive the grants.
21 So at that time I think this note means
22 we were anticipating that there would be a
23 competitive grant RFP in February.
24 Q. And so was it your understanding then
25 that it was possible that you might not receive the

1 grant as part of that process in February of 2016?
2 A. At the time I think that would have been
3 what we thought.
4 Q. And did you develop contingency plans or
5 other plans to prepare for the possibility that you
6 might not get the grant in February of 2016?
7 A. No.
8 Q. Why not?
9 A. We didn't know for sure what it was
10 going to be, and it turned out to be noncompetitive.
11 Q. And so what is your current
12 understanding of what that process will look like?
13 A. It's already under way. When the RFP
14 came out ODH identified who could receive the grant.
15 This was later, I'm thinking March, maybe. And we
16 were not listed as eligible.
17 And we applied anyway, and we have an
18 application pending in hopes that the defunding bill
19 will be held unconstitutional and we can receive that
20 grant.
21 Q. And how long would that extension last
22 until?
23 A. I'm not absolutely sure, but I think
24 it's a year. So I think it would begin August 1st
25 and go through July of '17.

1    Q.  And is it your understanding that at
2  some point there will be another competitive bid
3  process to determine eligibility for these grants?
4    A.  Probably.
5    Q.  Do you know when that will take place?
6    A.  I don't.
7    Q.  And then there's a, "We submit for
8  reimbursement --"
9    A.  Quarterly.
10   Q.  And is that referring to how you receive
11 payments under the PREP program?
12   A.  Right.
13   Q.  And you're talking about submitting to
14 ODH?
15   A.  Yes.
16   Q.  And then it says, "No one else can --"
17 and after that I don't even have a guess.
18   A.  "No one else can pick up our PREP
19 region."
20   Q.  What are you referring to there?
21   A.  ODH has set up regions in the State, and
22 under our PREP grants we cover two regions.  This was
23 probably ██████ opinion about what would happen if
24 we weren't there to provide PREP services in those
25 regions.

1    Q.  And this was as of probably December
2  15th that was her opinion?
3    A.  Yeah.
4    Q.  Do you know whether ultimately ODH was
5  able to find other providers who could take on that
6  region for PREP?
7    A.  I believe that what they have done is
8  reduced the number of regions from eight to six.
9  This is what ODH was planning for implementation to
10 defunding, and are seeking providers who are not
11 disqualified because of the defunding bill to take
12 over the regions.
13   Q.  And so moving on to the next thing,
14 VAWA, I believe it says, "End of January - by
15 12-31-15 we will know if we get money through
16 1-31-17."  Did I read that correctly?
17   A.  Yes, you did.
18   Q.  And then it says, "Not in every part of
19 state like PREP"?
20   A.  Right.
21   Q.  "PPGOH may have VAWA"?
22   A.  "May not have VAWA."
23   Q.  I was so close.  And what do you
24 understand that to mean?
25   A.  Well, our contract for VAWA expired at

1  the end of January of '16, and we were anticipating
2  we would get a decision by the end of December as to
3  whether we get renewed or we get renewed through
4  January of '17, and we were.
5        So our current VAWA contract expires
6  January 31st of '17.  PREP is a statewide program,
7  every part of the State is in one of those regions.
8  There is not a VAWA program in every part of the
9  State the way there is with PREP.  And PPGOH does not
10 have PREP -- does not have money."  That's what that
11 meant.
12   Q.  And then moving to the next page, 23867,
13 "If we weren't grant bound they would lose the plan."
14 Is that what that says -- or "they like the plan"?
15   A.  They like the plan.  I'm not sure what
16 that means.
17   Q.  You don't know that refers to?
18   A.  I'm not sure.
19   Q.  Do you know who the "they" is that's
20 referenced there?
21   A.  I'm guessing it's ██████████████.
22   Q.  Do you know what plan is being referred
23 to?
24   A.  The different plan that we previously
25 discussed.

1    Q.  So is that suggesting that if you
2  weren't bound by the PREP program they would prefer
3  to pursue this alternate or different education
4  program?
5        MR. SCHOENFELD:  Objection.
6        THE WITNESS:  I don't know about
7  "prefer".  They like.
8  By Ms. Richardson:
9    Q.  They like?
10   A.  They like.
11   Q.  And it says, "We can market the other
12 plan while still doing the grant funded work"; is
13 that correct?
14   A.  Yes.
15   Q.  Is that also referring then to the
16 different education plan that we have been
17 discussing?
18   A.  Yes.
19   Q.  And do you understand that to mean that
20 PPSWO could begin implementing the alternate plan
21 even if it was also providing services under PREP?
22        MR. SCHOENFELD:  Objection.
23        THE WITNESS:  Yes.  At this point we
24 were working in a world of uncertainty about what was
25 going to happen because the defunding law had not

Page 157

1 even been passed yet, so we're trying to straddle and
2 figure out -- I am as the CEO -- and how we're going
3 to get through this period of uncertainty.
4 By Ms. Richardson:
5      Q.   And so at least as of December of 2015
6 the thought at least from the standpoint of ███
7 █████████
8
9      Q.   I'm sorry.  Thank you.
10          -- was that PPSWO could pursue the
11 different education plan even if PREP was being
12 provided?
13          MR. SCHOENFELD:  Objection.
14          THE WITNESS:  They were either
15 suggesting that, or I was reaching that conclusion.
16 By Ms. Richardson:
17      Q.   Do you recall which?
18      A.   I don't.  And I'm not sure from the note
19 that I can tell.
20      Q.   Do you recall whether it was your view
21 that PPSWO could implement the different plan even if
22 it was also providing the PREP program?
23      A.   I don't remember what I thought.
24      Q.   Have you at any point in time had the
25 thought that PPSWO could implement the different

Page 158

1 education plan even if PREP services were also being
2 provided?
3          MR. SCHOENFELD:  Objection.
4          THE WITNESS:  I have thought that we
5 could make progress toward the different plan given
6 the uncertainty about whether we were going to be
7 able to continue with the grant funded programs.
8          So there could be a transition, sort of
9 limbo period where we're trying to figure out what
10 we're going to do.
11 By Ms. Richardson:
12      Q.   And to some degree that uncertainty
13 always exists, correct?
14          MR. SCHOENFELD:  Objection.
15          THE WITNESS:  Until the defunding bill
16 came along we had great confidence that we would
17 continue to be a provider of services under PREP and
18 VAWA.  The PREP people have been especially
19 complimentary of the work done by our staff.
20 By Ms. Richardson:
21      Q.   And yet the education people, ███████
22 ███████ -- is that the folks involved in the
23 education group -- believed that PPSWO should be
24 pursuing this dream education plan even if it
25 continued to provide PREP, correct?

Page 159

1          MR. SCHOENFELD:  Objection.
2          THE WITNESS:  No.
3 By Ms. Richardson:
4      Q.   That's not a fair characterization?
5      A.   No.  The best way to think about this,
6 it's all contingency planning so that we as leaders
7 of this organization committed to a strong education
8 component faced with the uncertainty of are we going
9 to have these grants because of this defunding bill,
10 are trying to plan ahead and be proactive in order to
11 maintain our strong presence in the community and our
12 strong educational programs.
13      Q.   And they point out that if PPSWO wasn't
14 grant bound, meaning bound by the terms of PREP, is
15 that your understanding?
16          MR. SCHOENFELD:  Objection.
17 By Ms. Richardson:
18      Q.   They would like their ideal --
19          MR. SCHOENFELD:  Objection.  Asked and
20 answered.
21 By Ms. Richardson:
22      Q.   You can answer.
23      A.   They liked the plan that they had
24 developed.  They were not telling me that they want
25 that instead.

Page 160

1      Q.   So what does it mean, "if we weren't
2 grant bound"?
3          MR. SCHOENFELD:  Objection.  Asked and
4 answered.
5          THE WITNESS:  Meaning if we didn't have
6 the grants that were determining what the nature of
7 the program is, they like this other approach.
8 By Ms. Richardson:
9      Q.   Did they have some belief that the terms
10 of the PREP grant would prevent them from
11 implementing their ideal education plan?
12      A.   They understand we could not do both.
13      Q.   And did you reach a different
14 conclusion?
15      A.   No.  I also believed we could not do
16 both.
17      Q.   And why is that?
18      A.   Because we don't have the funding to
19 support the other plan over the long haul.  So if the
20 grants for VAWA and PREP went away we would be in the
21 hole essentially, having to deficit fund the other
22 program.
23      Q.   And so just so I understand, why would
24 that prevent you from doing both PREP and the
25 different education plan?

Page 161

1    A.  Well, first, PREP and VAWA don't pay for
2  themselves, so we're already putting in extra money
3  in order to support those programs and the HIV.
4       So we just simply, as an organization,
5  would not have the financial wherewithal to subsidize
6  VAWA and PREP, and at the same time pay for an
7  entirely different program.
8    Q.  So because of the supplemental funding
9  that PPSWO has to provide for VAWA and PREP, it could
10  not also fund this alternative education plan?
11    A.  That's right.
12    Q.  So this next paragraph, something "to
13  get into schools"?
14    A.  Barriers.
15    Q.  Barriers.  And 1 is PP?
16    A.  Yes.
17    Q.  What does that mean?
18    A.  It means that we recognize that some
19  schools would be reluctant to contract with Planned
20  Parenthood.
21    Q.  And No. 2, "Cannot pay"?
22    A.  We recognize that the schools who want
23  to get in also don't have money to pay for the
24  program.
25    Q.  And this next line I'm not sure about.

Page 162

1  Can you tell me what that says?
2    A.  "If we remove "cannot pay" it will open
3  up," meaning if it were free the schools would be
4  more amenable to having us come in.  PP would still
5  be a barrier.
6    Q.  And then does it say case law or -- I
7  won't even guess, I'll let you tell me.
8    A.  "Consider name change.  Could be the
9  larger barrier."
10    Q.  And that's referring to what you had as
11  No. 1?
12    A.  Yes.
13    Q.  And then it looks like under the block
14  that's been redacted it says, "Works with CHF"?
15    A.  Yes.
16    Q.  What is CHF?
17    A.  The Community Health Foundation, which
18  is a community foundation in Springfield.
19    Q.  And so is that indicating that there was
20  an individual that you could work with on these
21  priorities?
22    A.  We had a subcontract under the PREP
23  program, subcontracting out part of the PREP program
24  to CHF, which has its own educators.
25    Q.  And how did that subcontract work?

Page 163

1    A.  CHF was identified as an organization
2  that could implement the PREP program in Clark County
3  where CHF is located, and so we would then enter into
4  a contract with them for part of the PREP money that
5  we're getting from ODH, and they would deliver under
6  our support or oversight.
7    Q.  And did PPSWO have any other
8  subcontractors under PREP?
9    A.  We did; we had one other one.
10    Q.  And who was that?
11    A.  I can't remember.
12    Q.  Do you know the coverage area or --
13    A.  I don't.
14    Q.  And what about for the other programs
15  that we have talked about that are identified in the
16  challenged law, did any of those involve
17  subcontractors that PPSWO would have delegated
18  services to?
19    MR. SCHOENFELD:  Objection.
20    THE WITNESS:  No.
21  By Ms. Richardson:
22    Q.  And then it looks like the next
23  paragraph says, "Selling our progress"; is that
24  right?
25    A.  "Program".

Page 164

1    Q.  And does that say -- well, I'll just --
2  I'll let you tell me.  What does that say and then
3  what does it mean?
4    A.  It says, "Selling our programs $30,500
5  to 34,000 for fiscal year 2016."  That's the fiscal
6  year ending June 30 which has happened.  My question,
7  "Are we on track" with that projection.
8    Q.  And so what does -- what do you mean by
9  selling our programs?
10    A.  Fee for service.
11    Q.  For which programs?
12    A.  The nonVAWA and nonPREP programs.
13    Q.  So does this indicate that you expected
14  to receive somewhere between 30,500 and 34,000 in
15  revenues from the nonVAWA and nonPREP programs?
16    A.  That was the budget target.
17    Q.  And how would you obtain those revenues?
18    A.  Because we have sex education programs
19  including professional training and programs that are
20  directed right at the young people.
21       Our educators try to make up some of the
22  loss that we run on VAWA and PREP by offering fee for
23  service programs for schools, that sort of thing, and
24  try to get them to agree to pay.
25    Q.  And would that include like the

Page 165

1    conferences and things that you talked about earlier?
2        A.   That would include the conferences, it
3    would include a school district that might say we
4    really like your curriculum that you can offer us
5    different from VAWA or PREP, come in and do this for
6    eight weeks and then they pay you a fee.
7        Q.   And did you determine that you were on
8    track to bring in, you said 30,500 to 34,000 in
9    fiscal year 2016, related to those programs?
10       A.   No.
11       Q.   What did you determine?
12       A.   We were not on track.
13       Q.   What were you --
14       A.   I don't remember, but we were far
15    from -- at that point we were far from seeing results
16    that would have produced that total by the end of the
17    fiscal year.
18       Q.   And that was as of December of 2015?
19       A.   Yes.  So you were six months into the
20    year, halfway into the year, or five months,
21    probably.
22       Q.   And did that -- did those forecasts
23    change over the course of fiscal year 2016?  In other
24    words, do you know what the ultimate revenues were?
25       A.   I don't know what the ultimate revenues

Page 166

1    were.  And we don't change the budget, so if we're in
2    the middle of the year and we see that we have a
3    budgeted target and we're not meeting it, we don't
4    produce a new budget.
5         So by the end of the year the same
6    budget would be in place and we would have actual
7    results to match that.
8        Q.   And so on the actual results then, do
9    you compare anticipated or budgeted revenues and
10    expenses compared to actual revenues and expenses?
11       A.   Yes.  And it forms what you put in the
12    budget for the next year.
13       Q.   Right.  And would that be reflected in
14    like an Annual Report, or where would that final
15    analysis of anticipated versus actual numbers appear?
16       A.   The end of the year report is where it
17    would show up.
18       Q.   And that's the annual financial report?
19       A.   Yeah.  Yes, annual financial report.
20            MS. RICHARDSON:  And I won't go into
21    this now because I was planning to -- I will go over
22    this later this afternoon, but I will -- I'm going to
23    go ahead and mark this for reference.
24            (EXHIBIT MARKED FOR IDENTIFICATION.)
25    By Ms. Richardson:

Page 167

1        Q.   So I'm just going to show you here what
2    we'll mark as Exhibit No. 4, which is the 2015 Annual
3    Report.
4        A.   Okay.
5        Q.   Are you familiar with that document?
6        A.   Yeah.  Yes.
7        Q.   Do you assist in preparing that
8    document?
9        A.   I have sort of a financial review role.
10    I don't participate in developing it.
11       Q.   And so the kind of final financial
12    report that you were just talking about, would that
13    appear somewhere other than this annual report?
14            It looks to me, based on my review, that
15    there are a few financial numbers that are
16    summarized, there doesn't appear to be a detailed
17    analysis.
18       A.   Right.  Yes.  At the end of the year,
19    June 30th, we have the full year's report.  So each
20    month we have the month and year-to-date, and then as
21    you get closer to the end, year-to-date gets to be
22    year-to-date.
23            So you have a final 12-month report
24    which is developed for other purposes like the Board,
25    and is much more detailed than what you see in this

Page 168

1    Annual Report.
2        Q.   And this annual report that we have
3    marked as Exhibit 4, who does that go to?
4        A.   It's mainly put together for donors and
5    supporters.
6        Q.   And the report that you just described
7    that's more detailed, the more -- we'll call it the
8    final financial report or yearly financial report; is
9    that fair?
10       A.   Yes.
11       Q.   Beyond the Board, is that distributed to
12    anyone else?
13       A.   No, it's an internal report, "internal"
14    meaning within the organization which includes the
15    Board, and not even the whole staff gets it.
16       Q.   And does that -- would that include
17    program-specific estimated revenues and expenses?
18       A.   No.
19       Q.   How would it break down, if you know?
20       A.   Broader categories, but this is a
21    question that you should reserve for --
22       Q.   This afternoon?  Thank you.  I will do
23    so.
24            Okay.  So turning back on then to
25    0023867.  This last paragraph here says something --

Page 169

1  I think, "All health educators are not 100 percent on
2  grants"; is that correct?
3      A.  Yes.
4      Q.  What does that mean?
5      A.  It means that the grants that come into
6  our education department are not sufficient to cover
7  a hundred percent of the staff that works in
8  education.
9      Q.  And so then it says, "10 to 40 percent
10 of people --"
11     A.  Unfunded.
12     Q.  Unfunded?
13     A.  Meaning not grant funded.
14     Q.  Everyone is a little unfunded?
15     A.  Yes.
16     Q.  And so does that mean then that the
17 funds that come in from grants do contribute in part
18 to the salaries of the educators?
19     A.  Yes.
20     Q.  Approximately what percentage of the
21 educators' salaries are covered by grants?
22     A.  I don't know the overall percentage.
23 According to this it would be anywhere from 60 to 90
24 percent depending on the particular staff person.
25     Q.  And would those be the VAWA and PREP

Page 170

1  grants specifically?
2      A.  At the time we were doing this it would
3  have been the HIV, the VAWA, and the PREP.
4      Q.  And how would it differ today?
5      A.  The HIV people now work for Caracole, so
6  we no longer have the HIV program.
7      Q.  And similarly, you no longer have the
8  employees who were previously funded through the HIV
9  program, correct?
10     A.  Right.
11     Q.  And so the remaining employees then
12 receive funding for their salaries from the grant and
13 VAWA programs?
14     A.  Yes.
15     Q.  And then this next line on the next
16 page, 0023868, "They are doing more and more internal
17 work"?
18     A.  Internal work.
19     Q.  Is that what we were referring to?
20     A.  That's the internal training.
21     Q.  "Add security training"?
22     A.  We were talking about something
23 additionally that they could do internally.
24     Q.  And is that something that has in fact
25 been added since this time?

Page 171

1      A.  No.
2      Q.  And then this last sentence says, "We
3  have a good understanding --"
4      A.  Relationship.
5      Q.  "We have a good relationship with PPFA";
6  is that correct?
7      A.  Yes.
8      Q.  What were you referring to specifically
9  there?
10     A.  I have no idea.
11     Q.  Okay.  We don't have too many more of
12 these.
13         MR. SCHOENFELD:  How much more do you
14 have with Jerry overall?  You've been at it for about
15 an hour-and-a-half.
16         MS. RICHARDSON:  I have a few more of
17 the handwritten notes and a couple of the e-mails
18 that were produced yesterday, and probably a couple
19 of wrap-up questions.
20         MR. SCHOENFELD:  So you think like a
21 half hour?
22         MS. RICHARDSON:  I would say half hour
23 to an hour.
24         MR. SCHOENFELD:  Okay.  So why don't we
25 take a break.

Page 172

1          MS. RICHARDSON:  Ten minutes?
2          MR. SCHOENFELD:  Fine.
3          (Recess taken.)
4  By Ms. Richardson:
5      Q.  So we have a few more of these
6  handwritten notes to get through.  I appreciate your
7  patience.
8      A.  Sure.
9      Q.  This next one is, I believe, just a
10 two-page, it's 23873 through 23874.  And actually I'm
11 wrong, it looks like it goes through 876.  Does
12 everyone agree that that's the grouping?
13     A.  Yes.
14     Q.  So looking at this front page, 23873,
15 this appears to be more handwritten notes, and in
16 fact at the top it says "Lawson Notes".  Do you see
17 that?
18     A.  Yes.
19     Q.  And are these in fact your handwritten
20 notes?
21     A.  Yes.
22     Q.  And can you tell me what these notes are
23 related to?
24     A.  Can I look at them for a second?
25     Q.  Sure.  Take your time.



Page 173

Page 175

Page 174

```
 1        Q.   Thank you.  And you can set that aside
```
and we'll move to the next one which begins with
23877, and it looks like it goes through 23879.  And
are these additional handwritten notes that you
created?
    A.   Yes.
    Q.   And it looks like the date is 5-6-16; is
that correct?
    A.   Yes.
    Q.   Can you tell me what these handwritten
notes relate to?
    A.   Let me just look real quick.
    Q.   Sure.  Take your time.

Page 176

    Q.   Thank you.  And then you can set that
aside and we'll move to the handwritten notes
beginning with 23880.  And it looks like this is a
single page of notes.  Are these also your
handwritten notes?
    A.   These are my handwritten notes.
    Q.   Can you tell me what this relates to?
    A.   Let me read it real quick.  This relates
to the effort or the process by which Hamilton County
terminated our contract for HIV and issued a new RFP
to which -- for which Caracole applied.
        And so the first part, based on
conversations I had, or I don't know exactly what
because I don't remember when I wrote this, that I
had learned that Caracole was likely to get the grant
from Hamilton County.
        And then Caracole wants to hire.  That's
about what happened to the personnel who worked for
PPSWO.  And the rest of it relates to how we would
handle the departure of those staff people who ended
up working for -- so there's an issue about health
insurance so they wouldn't have a gap, and what would

1  the personnel file says, that kind of stuff.
2      Q.  Thank you.  You can set that aside and
3  we'll move to 23831 (sic), which is another single
4  page handwritten note page.
5          MS. BRANCH:  23881.
6          MS. RICHARDSON:  Thank you, Jennifer.
7  By Ms. Richardson:
8      Q.  Let me know when you're ready.
9

1
2
3
4
5      Q.  Is that on Page 23881, those notes in
6  the margin the ones you're referring to?
7      A.  The ones kind of scribbled down the
8  side.
9      Q.  And what does that say?
10     A.  "An affiliate in Florida, friendly
11 people in the State.  It's good that its IPP -- IPP
12 no longer exists.  It's not a 318 program."  It's
13 just my writing down stuff that people were saying,
14 basically.
15     Q.  What is an IPP?
16     A.  The IPP is the Infertility Prevention
17 Project which is what -- that's the term that's
18 actually used in the defunding letters that you have,
19 and I think in the Bill, I think in the law, the
20 Infertility Prevention Project.
21     Q.  And what did you mean when you said here
22 that it's good that its -- it's good that its IPP no
23 longer exists?
24     A.  Well, at this point, and I can't
25 remember when it was, I thought that the way the law

1  was written, might not be perfect because it referred
2  to Infertility Prevention Project, and I had been
3  told that that project ended two years ago.  That
4  turned out not to be as exciting as I thought it was.
5      Q.  Thank you.  I think that was the last of
6  the handwritten notes that I have here.  So thank you
7  for walking me through those.  I'm going to mark the
8  whole combination that we have been working through
9  here, and we will mark this as Exhibit 5.
10         And then I'm going to ask you to take a
11 look at what's been marked PP0H_0023946.  And we'll
12 mark this Exhibit 6.
13         (EXHIBIT MARKED FOR IDENTIFICATION.)
14 By Ms. Richardson:
15     Q.  Do you recognize this document?
16     A.  I don't remember this document, but I
17 can see that it was addressed to me and that I
18 responded or I forwarded it.  So even though I don't
19 remember it, there it is.
20     Q.  And it appears to me that there are
21 listed here a series of questions related to
22 potential impacts of various programs.  Is that a
23 fair characterization?
24     A.  It looks the same to me.
25     Q.  And it looks like the most recent e-mail

1  in the chain is from you to Lee Bower; is that
2  correct?
3      A.  Yes.
4      Q.  And you appear to be forwarding --
5      A.  In this chain.
6      Q.  You appear to be forwarding these
7  questions?
8      A.  Yes.
9      Q.  And asks you here, "Who should be
10 providing the answers," and you provide some options
11 there as potentials, correct?
12     A.  Yes.
13     Q.  Do you know if there was a response
14 either from Mr. Bower or from someone else to your
15 question about who should being providing answers?
16     A.  I don't know.
17     Q.  And do you know whether these answers
18 were -- do you know whether these questions were in
19 fact answered by anyone?
20     A.  I don't know.
21     Q.  Who would have that information?
22     A.  I don't know.
23     Q.  And sitting here today you don't recall
24 specifically whether this is the most -- let me ask
25 you, is this the most recent e-mail in this chain, or

Page 181

1    would there have ultimately been follow-up e-mails?
2        A.   I don't know.
3            (EXHIBIT MARKED FOR IDENTIFICATION.)
4    By Ms. Robinson:
5        Q.   And then I will ask you to take a look
6    at what's been marked as PPOH23958 which we marked as
7    Exhibit 7.  Do you recognize that document?
8        A.   I don't recognize it in sense that I
9    don't remember seeing it or reading it, but I can see
10   that it's addressed to me in part and I responded in
11   part.
12       Q.   And the particular individual has been
13   redacted, but it looks based on the e-mail address
14   like this would have been someone else at PPSWO.
15   Would you agree with that?
16       A.   Yes.
17       Q.   And so this would have been an e-mail
18   from you to someone else at PPSWO?
19       A.   Well, first the e-mail from somebody at
20   PPSWO to me and others, and then a response from me,
21   and then another response -- another e-mail to me,
22   and then another response from me.
23       Q.   Thank you.  And that's a great point for
24   clarification.  We'll start -- I was looking at the
25   most recent, but let's start with the original e-mail

Page 182

1    in the chain which appears to be listed on page
2    what's been marked as PP0H 23961.
3        A.   Right.
4        Q.   And it's unclear, both the from and to
5    e-mails have been completely -- have been redacted,
6    but it looks like there is the last part of your last
7    name.  Would you agree with me?
8        A.   Yes.
9        Q.   And so it appears that you were a
10   recipient of this original e-mail, would you agree?
11       A.   Yes.
12       Q.   And the subject line is, "How the new
13   legislation effects PPSWO"; is that correct?
14       A.   Yes.
15       Q.   And is it your understanding that the
16   legislation they are referring to is the law that's
17   challenged in this case?
18       A.   Yes.
19       Q.   And then it appears that the next e-mail
20   in that chain would have been from you to someone
21   else at PPSWO; is that correct?
22       A.   Yes.
23       Q.   And it looks like that was on Monday,
24   October 26th, 2015?
25       A.   Yes.

Page 183

1        Q.   And then there's an e-mail from someone
2    to you a little bit higher on Page 23959?
3        A.   Yes.
4        Q.   And then ultimately the last e-mail
5    reflected here at least is on Page 23958, and it
6    appears to be from you to someone else at PPSWO?
7        A.   Yes.
8        Q.   And it states here, "We actually think
9    we may be able to move the HIV outreach to another
10   organization (Caracole probably) so the program will
11   continue somewhere if not with us."  Did I read that
12   correctly?
13       A.   Yes.
14       Q.   And that's referring to what you've
15   already described today which is the HIV Prevention
16   Program services that were previously provided by
17   Planned Parenthood, by PPSWO, are now being provided
18   by Caracole?
19       A.   Yes.
20            MR. SCHOENFELD:  Objection.
21   By Ms. Richardson:
22       Q.   And I'm going to go back in time here to
23   the e-mail that begins on the bottom of 23959 dated
24   Monday, October 26th from you to, it appears someone
25   else at PPSWO, and it states there, "The most direct

Page 184

1    and certain impact will be on our education and HIV
2    programs."  Did I read that correctly?
3        A.   Yes.
4        Q.   And so again, you're referring to your
5    opinion as to what the likely impact would be of the
6    law that's challenged in this case; is that correct?
7        A.   Yes.
8        Q.   You can set that aside.
9        A.   Okay.
10       Q.   I'm going to ask you truthfully, very
11   briefly, just a couple of questions about the
12   declarations you submitted in this case.
13       A.   Okay.
14       Q.   As a lawyer you know you can never
15   really trust lawyer's estimates of time, but I will
16   be really brief here, I promise.
17            MS. RICHARDSON:  And we'll mark -- there
18   should be a Declaration and Supplemental Declaration,
19   and we'll a mark them together as Exhibit 8.
20            (EXHIBIT MARKED FOR IDENTIFICATION.)
21   By Ms. Richardson:
22       Q.   And, Mr. Lawson, the documents in front
23   of you now marked as Exhibit 8, Declaration of Jerry
24   Lawson, and then Second Declaration of Jerry Lawson.
25   Did you create these declarations?

Page 185

1    A.  Yes.
2    Q.  And is it your understanding that they
3  were submitted in connection with the litigation
4  we're here about today?
5    A.  Yes.
6    Q.  And I just want to ask you generally,
7  there are a number of statistics and numbers that are
8  offered in these declarations.  Can you just provide
9  me, generally, what information did you rely on in
10  preparing these declarations?
11    A.  Generally I relied on data from our
12  database about the number of people who received
13  different services of different kinds.  In general,
14  that's where it came from.
15    Q.  And your database, you're referring to a
16  PPSWO database?
17    A.  A PPSWO database, two parts.  One is
18  what I would call our patient management database,
19  another one being our health records database, and
20  the third being the billing database.
21        So to put this stuff together, you might
22  have to -- on any one item you might have to pull
23  from one or more of those bases to get to that.
24    Q.  And so there are -- there are three
25  different databases that PPSWO maintains; is that

Page 186

1  correct?
2        MR. SCHOENFELD:  Objection.
3        THE WITNESS:  I'm not sure that it would
4  be three different databases, but we have a -- there
5  is sort of a two-part electronic health record that
6  includes the electronic health records, but also
7  includes the patient management information.
8        The electronic health record is created
9  when the patient is in and being treated.  The other
10  part is intake, history, that kind of thing.
11        And then we also have a billing
12  database, because we have a billing department that
13  has that responsibility of billing Medicaid or health
14  insurance, or BCCP.
15        And so on any given piece of information
16  I don't decide where it's going to come from, I ask
17  somebody to give me the data, and somebody else
18  determines where they are going to get it, and then I
19  get it.
20  By Ms. Richardson:
21    Q.  And so the information that is contained
22  in these declarations, was this compiled for you by
23  someone else?
24    A.  Yes.  Knowing that we needed this
25  information, the request was made and it was compiled

Page 187

1  and given to me.  I didn't compile it myself.
2    Q.  And with reference to opinions that you
3  may have provided about potential impact on people
4  other than PPSWO, what were you relying on?
5    A.  Can you tell me what you're referring
6  to?
7    Q.  Sure.  So for example, on Page 8.
8    A.  Okay.
9    Q.  You mention, "Given the stigma
10  associated with STDs, some patients may forego
11  testing all together if testing through PPSWO is
12  unavailable."
13    A.  That kind of information actually comes
14  from the experienced staff who have to deal with
15  people, for example, who have STIs over the years,
16  and they know that a certain amount of not anonymity,
17  but -- well, kind of anonymity is important for
18  people to come forward and get the service that they
19  might need.  That doesn't come out of a database,
20  that comes out of the collective experience of the
21  health center staff.
22    Q.  And were there specific staff members
23  that you spoke to in preparing this declaration?
24    A.  There were.  Are you referring to this
25  specific statement that we just talked about?

Page 188

1    Q.  We can start there with respect to that
2  specific statement.
3    A.  I don't remember talking to a specific
4  staff person, but if I had it would have likely been
5  the director of finance, who has been with PPSWO for
6  14 years, started as a health center assistant,
7  became a manager, became a regional manager, and
8  became the director of finance.  She has a wealth of
9  experience around the issues of how patients respond
10  to different structures.
11    Q.  And sitting here today, you don't recall
12  specifically whether you spoke with her in preparing
13  your declaration?
14    A.  I don't.
15    Q.  Do you recall any other studies or
16  information that you would have reviewed in preparing
17  this declaration apart from data from PPSWO's
18  databases?
19    A.  I do not recall looking at any other
20  data or studies.
21    Q.  And is that true for the second
22  declaration as well?
23    A.  Let me look at the second declaration.
24  Yes, I would say that the second declaration, in the
25  sense that it responds to the affidavits from the ODH

Page 189

1  people, the information that I provide related to
2  that information comes from the collective experience
3  of our staff, including our really experienced staff,
4  but also the anecdotal information that we're hearing
5  in the health care community, and it's not based on
6  any studies.
7      Q.  And you mentioned the collective
8  experience of -- you're referring to PPSWO staff?
9      A.  Yes.
10      Q.  Do you recall talking to specific staff
11  members in preparing your second declaration?
12      A.  I don't.
13      Q.  And did you speak to any other
14  healthcare providers who may or may not be providing
15  services under any of these programs?
16      A.  Not in immediate proximity to this, but
17  I have, over time, had conversations with others.
18      Q.  But in preparing your --
19      A.  Not for preparation for this.
20      Q.  Thank you.  Okay.  You can set those
21  aside.  A few more questions.  I want to talk a
22  little bit about the abortion services that PPSWO
23  provides.
24      I believe you testified earlier that
25  abortion services are only provided in the single

Page 190

1  surgical center that PPSWO operates; is that correct?
2      A.  Yes, it is.
3      Q.  And I believe that you testified that in
4  some cases if a woman comes into one of the family
5  planning centers and ultimately she's determined to
6  be pregnant, she may receive option counseling; is
7  that a correct characterization?
8      A.  Yes.
9      Q.  And that would include abortion services
10  as one option; is that correct?
11      A.  It would include carrying to term,
12  adoption, or abortion, explaining that all are
13  available options to her.
14      Q.  And some of those women, if they
15  choose -- if they elect to have an abortion they
16  would receive a list of providers including the PPSWO
17  provider; is that correct?
18      A.  Yes.
19      Q.  And so we'll start now with someone who
20  initially went to one of the family planning centers
21  and then ultimately goes to the PPSWO surgical center
22  for an abortion.
23      Can you describe how that patient would
24  be counselled and what would happen to her when she
25  walks in the door at the surgical center?

Page 191

1      MR. SCHOENFELD:  Objection.
2      THE WITNESS:  We can -- we refer to the
3  first day that a patient comes to the surgical center
4  as either consult day or consent day, the terms are
5  sort of used interchangeably.
6      So the patient who comes in that first
7  day will have communicated first with a call center,
8  which determines what she wants in terms of an
9  appointment, maybe determine her financial
10  circumstances, makes the appointment for her at the
11  surgical center.
12      The first day is a fairly long day,
13  the -- I'm thinking through the steps.  The patient
14  registers.  The patient next step goes to the lab,
15  which means that she has her blood work done, her
16  blood pressure, all that sort of thing.
17      The next step is ultrasound to determine
18  how far along she is and to determine a fetal heart
19  beat number as required by Ohio law.
20      The next step is what we call education,
21  and this is the most -- this is the -- there's a
22  video that is shown about the abortion process, and
23  the patient meets with somebody, a trained staff
24  member, who talks to the patient about the abortion
25  process.

Page 192

1      If there's uncertainty on the part of
2  the patient, they will talk to the patient about the
3  options, gives the patient more information.  It's
4  more extensive, significantly more extensive, than
5  what would happen at a health center where you have a
6  patient who just turns up pregnant.
7      And then if through that part of the
8  process the patient has decided yes, I want to go
9  ahead and get an abortion, the physician comes in and
10  talks to the patient and the patient signs the
11  consent forms.
12      And the physician has to determine and
13  advise the patient about the fetal heart beat as
14  required by the law, and that is the end essentially
15  of day one for the patient who wants an abortion.
16      And then they get an appointment for day
17  two, which is what we call procedure day, and they
18  come in.  It's a shorter day.  They have an
19  appointment for a procedure.  They come in, they
20  check in, and then basically unless there's some
21  glitch in the process, they will end up in the
22  procedure room and have a procedure by a doctor to
23  terminate the pregnancy.
24  By Ms. Richardson:
25      Q.  And a woman who is at the surgical

1  center to receive abortion services, would she be
2  able to receive any other services at the surgical
3  center?
4        A.  We routinely do STI checks on everyone,
5  and we do -- gosh, what is it called?  It's to
6  determine whether the patient needs Rhogam which you
7  give a patient who is -- it's that weird disconnect.
8        Q.  In the blood type?
9        A.  Yes.  And I can't remember what it's
10  called.
11        Q.  I forget the terminology, but I'm very
12  familiar.
13        A.  Okay.
14        MR. SCHOENFELD:  RH factor.
15        MS. RICHARDSON:  There we go.
16        THE WITNESS:  But no other services than
17  those that we consider good medicine for -- well, the
18  RH factor is critical.  The STI is not critical, but
19  we consider to be good medicine for all patients who
20  are coming in for abortion.
21        No other services other than the
22  abortion are provided in the surgery center.
23  By Ms. Richardson:
24        Q.  And so with respect to the STI, I want
25  to make sure that I understand something, because I

1  was a little bit confused.
2        A.  Okay.
3        Q.  Under the STD Prevention Program, which
4  we have been talking about as one of the programs
5  outlined in the law that's being challenged here, I
6  think you testified just a little bit ago as we were
7  going through your handwritten notes, that a patient
8  at a surgical center might be eligible to receive the
9  free testing lab kit; is that correct?
10        MR. SCHOENFELD:  Objection.
11        THE WITNESS:  We had a contract, but we
12  don't any longer.  We had a contract with ODH through
13  June 30th that allowed us to provide testing under
14  the STD program in surgery.  We did that for a while,
15  but then -- under the contract, and then we
16  discontinued it around the first of April.
17  By Ms. Richardson:
18        Q.  Around the first of April of this year?
19        A.  Yeah.
20        Q.  And why did you discontinue that?
21        MR. SCHOENFELD:  Objection.
22        THE WITNESS:  We discontinued it for two
23  reasons.  One, we don't have electronic health
24  records in surgery, so the process of sending the
25  test to CDD Labs, which does that work for ODH is

1  quite complicated.  So it is very cumbersome for the
2  staff.
3        And the other reason we discontinued is
4  because we thought as a matter of judgment that it
5  would be best not to have one of the programs that
6  was being defunded attached to surgery.
7        So we don't provide STI testing or
8  medication under the STI program, but we continue to
9  provide it to patients as part of the abortion
10  process, and it's built into the abortion fee.
11  By Ms. Richardson:
12        Q.  But until April of 2016 a patient
13  receiving an abortion service could receive free STD
14  testing under the STD Prevention Program?
15        A.  Yes.  I think it started in the summer
16  of '15, and we implemented it and then discontinued
17  on April 1st.
18        Q.  And that was a voluntary decision that
19  PPSWO made in April of this year?
20        A.  Yes.
21        Q.  Did you alter the terms of your contract
22  or make any other changes that would preclude you
23  from offering free testing going forward?
24        A.  No.
25        Q.  And so why -- why is electronic -- why

1  are electronic medical records not provided at the
2  surgical center?
3        A.  It's a really, really difficult rollout,
4  because what you have to do is take your staff, and
5  in this case it's the physician staff who are used to
6  handwriting systems, and retrain them to do all of
7  their work on an electronic -- on a computer.  So
8  everything gets recorded on the computer.
9        And leading up to that you have to
10  develop what are called templates for use by the
11  staff in the surgery center, and we -- and it slows
12  everybody down, it puts a drag on the number of
13  people you can see, it takes the process much longer.
14  The staff people get real irritated.
15        And we rolled it out to our health
16  centers two years ago and have just decided up to
17  this point that we weren't ready to do it in surgery.
18        Q.  Are there plans in place to implement
19  electronic health records at some point in the
20  future?
21        MR. SCHOENFELD:  Objection.
22        THE WITNESS:  Yes, but not specifically
23  when.
24  By Ms. Richardson:
25        Q.  And who -- what employees would work at

Page 197

1  the surgical center?
2       A.  You have a group of people called
3  surgical assistants who are like the health care
4  assistants, except they work in surgery.  They are
5  the people who do intake and check out.  You have --
6  and there's overlap with some of these functions.
7       You have a group of people called
8  educators who are trained to meet with the patients
9  and do that education work, including the options
10 stuff that we talked about.
11      You have people who are usually L.P.N.s
12 who do the lab work.  You have ultrasound specialists
13 who are specifically trained and certified to do the
14 ultrasound tests to determine gestational age and
15 heart beat.
16      You have R.N.s who work mainly in the
17 recovery room, which actually is a little bit of a
18 misnomer because it's both pre-op and post-op.  Some
19 people are in and have to wait for a considerable
20 period of time because they are receiving a
21 medication that will ease the procedure.  And other
22 people are in after the procedure, much shorter
23 period of time as a rule.
24      You have the physicians who actually do
25 the procedures and the consents.  So it's a fairly

Page 199

1  you have in place to keep those separate?
2       A.  Well, you mentioned the array of
3  services that are provided.  So the services that are
4  provided in surgery are limited to surgical
5  procedures -- or services, versus other services that
6  would be provided at the family planning health
7  centers.
8       We have very scrupulous financial
9  accounting methods to make sure that revenue and
10 expenses are properly coded to the service that's
11 being provided, whether it's surgery or whether it's
12 something else.  We have different managers, so the
13 surgery manager does not manage elsewhere.
14      Q.  You mentioned coding.  What do you mean
15 by that?
16      A.  This would be a good question for Lee
17 Bower, but I can briefly answer it.  I'm not an
18 accountant and I don't quite fully understand this,
19 but in the general ledger you have all these account
20 codes, and so every expenditure and every revenue
21 item is coded according to a code.
22      And there are codes for surgery and
23 there are codes for the family planning health
24 centers, and so, you know, we follow that very, very
25 carefully.

Page 198



6       Q.  Do any of the L.P.N.s or nurse
7  practitioners or health care assistants who work in
8  the family planning centers also work in the surgical
9  center?
10      A.  No.
11      Q.  Would there be any employees that would
12 work both places?
13      A.  Not at the same time, I mean during the
14 same time period.
15      There might be a person, for example,
16 who has been working in a family planning center on
17 the west side who transfers into the surgery center,
18 but that person no longer works in the family
19 planning center, only works in the surgery.
20      Q.  And is that a policy that would be
21 documented somewhere in a handbook or elsewhere?
22      A.  I don't know.  But it's one of the ways
23 that we scrupulously separate our abortion services
24 from our family planning services.
25      Q.  And what other procedures or policies do

Page 200

1       Q.  And so using the example of a patient
2  who receives abortion services and STI screening at
3  the surgical center, how would that be coded?
4       A.  It's coded I think as just an abortion
5  service.
6       Q.  And I think I started this line of
7  questioning by talking about someone who initially
8  went to the family planning center and then
9  ultimately came to the surgical center.
10      Would there be any difference in the
11 procedures you've described for someone whose first
12 contact with PPSWO is the surgical center?
13      A.  The process that I described for
14 somebody who first went to family planning and then
15 went to surgery is the same process for that person
16 in surgery as if that's the place they started.
17      Q.  Okay.  Thank you.  Now earlier we talked
18 about someone who has a BCCP voucher and comes to the
19 planning center and is determined to be pregnant.
20      Would it be true also for someone who
21 comes into a family planning center for STD screening
22 whether under the STD Prevention Program or
23 otherwise, would that person regularly be given a
24 pregnancy test?
25      MR. SCHOENFELD:  Objection.

Page 201

1    THE WITNESS:  Not as a routine matter.
2  But if there are clinical indicators or information
3  that you get from the patient, or the patient thinks
4  that she might be pregnant, then a pregnancy test
5  would be offered and provided if she wanted it.
6    So somebody might come in and say I
7  haven't had a period for three months, and the
8  clinician is probably going to say let's do a
9  pregnancy test, for example.
10  By Ms. Richardson:
11    Q.  And if that patient -- so let's talk
12  specifically about someone who might have come in for
13  STD screening under the STD Prevention Program.  In
14  the scenario you just described she's given a
15  pregnancy test and that test is positive.  Would she
16  be given the same kind of options counseling you
17  described earlier?
18    A.  Yes.
19    MR. SCHOENFELD:  Objection.
20  By Ms. Richardson:
21    Q.  And are there circumstances in your
22  educational programs where someone might provide
23  options counseling to a person who is receiving or
24  participating in a training program?
25    A.  I'm not sure I understand that question.

Page 202

1    Q.  So would there ever be a circumstance
2  that you can think of that someone who is
3  participating in a PREP training program or a VAWA
4  training program, might receive the kind of options
5  counseling that you mentioned earlier?
6    A.  I think in the PREP programs the
7  curriculum includes an answer to the question, but
8  it's not an individual counseling session.
9    So if you are training a group of people
10  who work with kids in foster care or kids in the
11  juvenile justice system, part of the training of
12  those professionals would be how do you answer these
13  questions.  What if somebody says what if I'm
14  pregnant, what should I do.  I believe the curriculum
15  includes you should explain that these are the
16  options if you're pregnant.
17    But if someone said I think I'm
18  pregnant, the trainer is not going to go off in a
19  corner and counsel that person about what to do.
20  They might refer them, but the training is separate
21  and apart from the actual one-on-one delivery of
22  health services.
23    Q.  Thank you.  And is there a set protocol
24  for your trainers for what happens if they are in
25  VAWA, for example, where they are interacting with

Page 203

1  youth and someone comes up and says I'm pregnant?  Do
2  they have specific policies for what kinds of
3  referrals they make or what they should say to that
4  individual?
5    MR. SCHOENFELD:  Objection.
6    THE WITNESS:  I don't believe there is
7  such a policy.  The VAWA curriculum does not have
8  anything about abortion in it, but that doesn't mean
9  that if you were training people to deliver the VAWA
10  program that you wouldn't say here are some things
11  you might hear because you're going to be training
12  high school kids, and here is how you would want to
13  respond to it.
14    The VAWA curriculum, just to be real
15  clear, is not a sex-ed curriculum, it's a violence
16  prevention curriculum.  So it's less likely to come
17  up in a VAWA setting than, say, a PREP setting.
18  By Ms. Richardson:
19    Q.  That makes sense.  And what about the
20  same question with respect to PREP, would there be
21  any specific protocol or policy for what someone
22  should do if --
23    A.  Options would be what would you talk
24  about if the topic came up in a PREP session.  But
25  remember, the PREP sessions are generally training

Page 204

1  people who work with kids, not working directly with
2  the kids.  So you would -- and those are 14 to 19
3  year olds.
4    So it's transferring the information
5  from our really expert people to these people who are
6  directly on the line, so to speak.  And then they
7  work with the kids so you would, probably in
8  training -- I mean, all kinds of questions come up in
9  the training, and I'm -- I'm guessing not everything
10  is covered by the protocol.  But our experienced
11  trainers probably have heard it all and know how they
12  would respond.
13    Q.  And I apologize, I may have asked this
14  earlier, but does PPSWO create any training materials
15  or protocol with respect to the PREP or the VAWA
16  programs?
17    A.  No.
18    MS. RICHARDSON:  If we can take just a
19  five-minute break, I may be done.
20    (Recess taken.)
21    MS. RICHARDSON:  No further questions.
22  Thank you for your time, Mr. Lawson.
23    - - -
24    EXAMINATION
25  By Mr. Schoenfeld:

Page 205

1    Q.   I just have a few questions relating to
2  your testimony.  Mr. Lawson, do you recall giving
3  testimony about the education program PPSWO was
4  considering implementing in the event that the PREP
5  and VAWA funds are no longer available?
6    A.   Yes.
7    Q.   And do you recall describing those
8  programs being different under the PREP and VAWA
9  funds?
10   A.   Yes.
11   Q.   In what way would the program that PPSWO
12 has considered implementing in the event that the
13 funding statute takes effect be different from the
14 program offered under the PREP and VAWA programs?
15   A.   The different program that is under
16 consideration is an evidence-based sex education
17 program that would be delivered in the schools who
18 would take it.
19         Distinguishing that from PREP, PREP is a
20 sex-ed curriculum on which the State has built these
21 three other units; financial management, job search,
22 and healthy relationships.
23         That program is specifically focused on
24 training people who work with foster kids, kids in
25 the foster system in one way or another, or in the

Page 206

1  juvenile justice system.  And the new program would
2  not have access to those kids because that access
3  comes from the fact that the State sponsors the PREP
4  program.  So that would be a significant shift in
5  terms of the target.
6          The main difference between VAWA is the
7  new curriculum, or the different program might have
8  some aspects that relate to violence prevention
9  around healthy relationships, that sort of thing, but
10 that would not be the thrust of it.
11         So the VAWA program as currently
12 designed as a violence prevention program, not a
13 sex-ed program, and the way I understand what the
14 educators were telling me about the different
15 curriculum that they wanted to implement if we lost
16 VAWA and PREP was not focused on violence prevention.
17         MR. SCHOENFELD:  Nothing further.
18         MS. RICHARDSON:  No further questions.
19 Thank you.
20         (Recess was taken.)
21             - - -
22             Lee Bower,
23 being by me first duly sworn, as hereinafter
24 certified, deposes and says as follows:
25             EXAMINATION

Page 207

1  By Ms. Richardson:
2    Q.   Hello, Mr. Bower.  We just met off the
3  record, but for the record my name is Ryan Richardson
4  and I work at the Ohio Attorney General's office, and
5  I'm here on behalf of the defendant in this case, the
6  Ohio Department of Health.  Have you ever been
7  deposed before today?
8    A.   No.
9    Q.   Okay.  So I will just briefly go over a
10 couple of the ground rules for today.  As you
11 probably know, I'm going to be asking you a series of
12 questions.  Your attorney will be objecting, but
13 unless he specifically instructs you not to answer
14 you will go ahead and just answer my question.
15         If at any point in time you don't
16 understand the question I've asked, just let me know
17 and I'll be happy to rephrase.  If you do answer the
18 question that I've asked I'm going to assume that you
19 have understood it.  Is that fair?
20   A.   Yes.
21   Q.   And if you need to take a break at any
22 point in time just let me know, that's completely
23 fine.  All that I ask is that you answer the question
24 that is pending before we take a break.
25   A.   Okay.

Page 208

1    Q.   Are you taking any medications or is
2  there any other reason that you might not be able to
3  answer truthfully and completely today?
4    A.   No, but I have some back pain so I might
5  stand up occasionally.
6    Q.   Help yourself, absolutely no problem at
7  all.  And hopefully -- I shouldn't even say this now,
8  but I will try to be as brief as possible.
9          MS. BRANCH:  You just jinxed it.
10         MS. RICHARDSON:  I apologize.
11 By Ms. Richardson:
12   Q.   So my understanding is that you are here
13 today -- well, actually, let me step back and borrow
14 Exhibit 1.  I will hand you what has been marked as
15 Exhibit 1 to this deposition, and I'll give you a
16 moment to take a look at that.
17         MS. BRANCH:  Can we take a break for a
18 second?
19         (Recess taken.)
20 By Ms. Richardson:
21   Q.   Mr. Bower, have you seen the document in
22 front of you before today?
23   A.   I don't think so.  Can I read it?
24   Q.   Sure.  Absolutely.  And to save you some
25 time I'm going to focus your attention.  This is --

Page 209

1    A.  Wait.  Yeah, I have, sorry.  I didn't
2 recognize the first page.
3    Q.  And if we look at the first page it says
4 Notice of Rule 30(b)(6) Deposition.  And is it your
5 understanding that you are here today to testify on
6 behalf of PPSWO?
7    A.  Yes.
8    Q.  And if you take a look at item No. 7 on
9 Schedule A which is attached to document 1, and this
10 states financial -- "Your financial statements,
11 reports, plans, and other information for fiscal
12 years 2010 through 2015, including total revenues,
13 expenses, net income or losses, operating income or
14 expenses; revenues, expenses, net income and losses
15 attributable to services related to programs
16 identified in Ohio Revised Code 3701.034; revenues
17 received by, on behalf of, or related to patients
18 receiving abortion services; and budgets."  Did I
19 read that correctly?
20    A.  Yes.
21    Q.  Are you prepared to talk about the items
22 listed in No. 7 today?
23    A.  Yes.
24    Q.  Anything referenced in No. 7 that you're
25 not prepared to talk about today?

Page 210

1    A.  Some information from before I arrived
2 at Planned Parenthood.  I have been -- I have
3 reviewed some of the older documents in preparation,
4 though.
5    Q.  And so that's a good place to start.
6 First of all, can you just state for the record what
7 your current position is with Planned Parenthood?
8    A.  I'm the Chief Operating Officer.
9    Q.  And how long have you been in that
10 position?
11    A.  Since around December of '14.
12    Q.  And prior to that point were you
13 employed by Planned Parenthood?
14    A.  Yeah, I was the CFO.
15    Q.  And how long were you the CFO?
16    A.  From January 1 of '14.
17    Q.  When were you first employed by PPSWO?
18    A.  January 1 of '14.
19    Q.  So you started out as the CFO and then
20 became the COO?
21    A.  That's correct.
22    Q.  Prior to that point had you had any
23 involvement or employment with either PPSWO or any
24 other Planned Parenthood organization?
25    A.  I was a contractor for PPSWO.

Page 211

1    Q.  And what did you do as a contractor for
2 PPSWO?
3    A.  I was brought in as a contractor in, I
4 think late 2013, in a temporary role as a -- just to
5 have an on-site CPA.
6    Q.  And can you just briefly describe your
7 educational background and any certifications that
8 you have?
9    A.  Yeah.  I have an Associate's Degree from
10 Hinds Community College, a Bachelor's Degree from
11 Xavier University, and a Master's in accounting from
12 the University of Virginia.  And I'm an inactive CPA.
13    Q.  And what does it mean to be an inactive
14 CPA?
15    A.  It means I am not doing the CPE anymore,
16 so I make my status inactive.
17    Q.  And how long have you been inactive?
18    A.  I think I went inactive at the beginning
19 of '15.
20    Q.  Can you just briefly describe your
21 responsibilities as COO for PPSWO?
22    A.  Yeah.  I supervise multiple departments
23 that perform internal functions or support services
24 for PPSWO.
25    Q.  What is your role specifically as it

Page 212

1 relates to financial recordkeeping or preparation of
2 financial reports?
3    A.  I and my staff prepare the financial
4 reports for the agency, and I review them and present
5 them to the board of directors.
6    Q.  Before we start it might be helpful if
7 it's possible to just walk through the types of
8 reports that PPSWO would prepare on a regular basis,
9 financially speaking.
10    A.  Okay.
11    Q.  So can you just kind of describe for
12 me -- I assume that there would be like an annual
13 financial statement of some sort; is that correct?
14    A.  Yes.
15    Q.  And -- go ahead.
16    A.  There's an annual audit that's prepared
17 and presented to the Board.
18    Q.  And who performs that annual audit?
19    A.  RSM.
20    Q.  And so they audit your financial
21 statements?
22    A.  Yes.
23    Q.  And do you have an obligation to submit
24 those audited financial statements to any
25 governmental entity for review?

Page 213

1      A.  I don't know if it's a governmental
2  entity or not, but it goes to guide star.
3      Q.  What is GuideStar?
4      A.  GuideStar is a -- it's like the
5  equivalent of where you can get for-profit company
6  financial statements, it has nonprofit company
7  financial company statements.
8      Q.  And so are those audited financial
9  statements then available to the public through
10  GuideStar?
11      A.  Certain parts.
12      Q.  Which parts?
13      A.  Typically a 990.
14      Q.  And it's been a while since I've looked
15  at a 990, but can you remind me what information is
16  included on that?
17      A.  It's an informational tax return for
18  nonprofit agencies and it has details of all
19  operations of those entities.
20      Q.  Are there any other annual financial
21  statements that PPSWO would prepare?
22      A.  We prepare financial statements that
23  also just go to our board of directors.
24      Q.  Any other annual reports?
25      A.  None that I can think of.

Page 214

1      Q.  What about quarterly financial reports?
2      A.  We prepare quarterly financial reports
3  that also go to the board of directors.
4      Q.  Do you prepare formal budgets that are
5  presented to the Board or anyone else?
6      A.  Yes.
7      Q.  How often do you prepare budgets?
8      A.  Annually.
9      Q.  And what about with respect to
10  particular programs or projects, does PPSWO provide
11  any program-based financial analyses?
12      MR. SCHOENFELD:  Objection.
13      THE WITNESS:  In what context?
14  By Ms. Richardson:
15      Q.  So let's step back here for a moment.
16  Are you familiar with the subject of the litigation
17  that we're here for this deposition today?
18      A.  Yes.
19      Q.  And what's your understanding of this
20  litigation?
21      A.  That it defunds entities that provide or
22  promote abortions in the State of Ohio from receiving
23  certain funds from the federal government.
24      Q.  And I'm going to refer to the statute
25  that's being challenged in this case as just the

Page 215

1  challenged statute.  Can we agree that that's the
2  statute --
3      A.  Yeah.
4      Q.  -- that's at issue here?  Does that
5  statute set forth particular programs that are
6  impacted?
7      A.  Yes.
8      Q.  And can you just give me your
9  understanding of the programs that are affected?
10      A.  For PPSWO it's the PREP program, the
11  VAWA program, the HIV program, and the STD testing
12  program.
13      Q.  So let's focus on these specific
14  programs.  Does PPSWO provide any type of specific
15  financial analysis related to the PREP program?
16      MR. SCHOENFELD:  Objection.
17      THE WITNESS:  We look at expenses and
18  revenues for it.
19  By Ms. Richardson:
20      Q.  And do you record those expenses and
21  revenues specific to PREP?
22      A.  In our accounting software, yeah.  In
23  our accounting software.
24      Q.  What accounting software is that?
25      A.  We use AccuFund.

Page 216

1      Q.  And so let's start -- Let's just look
2  for a moment at the most recent fiscal year, which I
3  understand would be June 30th of 2015 -- sorry,
4  July 1st of 2015 through June 30th of 2016; is that
5  correct?
6      A.  Yes, that year is not closed.
7      Q.  Okay.  So let's look at the most recent
8  fiscal year that would be available then.  That would
9  be fiscal year '14?
10      A.  No, that's fiscal year '15.
11      Q.  I'm sorry.  What were the revenues
12  related to the PREP program for that fiscal year?
13      A.  That's in the audited financial
14  statements.  Do you have a copy of it?  I can --
15      Q.  I do not have a copy, but one of the
16  things that we're going to talk about here I believe
17  is whether or not it might be possible for you to
18  pull some of these numbers that we're going to talk
19  about from financial statements.  So is this a number
20  that you could obtain from an existing financial
21  statement or report?
22      A.  Yes.
23      Q.  And what report would that be in?
24      A.  That would be in our annual audit.
25      Q.  And that would have revenues related to

Page 217

1 the PREP program specifically?
2     A.  Yes, it would have revenues for the PREP
3 program.
4     Q.  Would it also have expenses related to
5 the PREP program?
6     A.  Only in aggregate with the other
7 education programs.
8     Q.  I understand that overall the grant
9 received from ODH with respect to the PREP program
10 was not sufficient to cover all of the expenses
11 related to PREP; is that correct?
12     A.  We spend more on PREP than we are
13 allowed to charge to the grant.
14     Q.  Do you know how much more?
15     A.  No, it's mostly a -- a time issue.  Some
16 of our staff spend more time than we are allowed to
17 charge to the grant on the grant.
18     Q.  So is it fair to say that that program
19 would result in a net loss from a financial
20 standpoint?
21         MR. SCHOENFELD:  Objection.
22         THE WITNESS:  The education
23 department -- it's more than just a financial impact
24 to lose a program like this.
25 By Ms. Richardson:

Page 218

1     Q.  Sure.  And I understand you're here to
2 testify specifically about the financial impacts; is
3 that correct?
4     A.  Yes.
5     Q.  And so my question is just specifically
6 with respect to the numbers, the financial numbers,
7 you would operate at a loss with respect to PREP
8 financially; is that correct?
9     A.  Yes.
10     Q.  Would you be able to find the precise
11 amount of that loss for, we'll say the last five
12 fiscal years?
13     A.  I don't think I could find it for all
14 five fiscal years.
15     Q.  Would you be able to find it for some
16 fiscal years?
17     A.  It would be an estimated loss in that
18 case.
19     Q.  And where would that estimated loss be
20 documented?
21     A.  It's not documented anywhere.  I would
22 have to develop it.
23     Q.  Is that something you're prepared to
24 talk about today?
25     A.  No, it's not.

Page 219

1     Q.  Is that something that you could provide
2 to us?
3     A.  It would take extensive preparation.  I
4 don't know.
5     Q.  What would you need to do to obtain that
6 number?
7     A.  I would have to meet with multiple
8 employees about the time that they spent on grants
9 not -- that we can't charge to the grants.
10     Q.  And this is not something then that you
11 were prepared to talk about coming in here today for
12 purposes of this deposition?
13     A.  This isn't something that we analyze on
14 a regular basis or anything like that.  We don't look
15 at loss by hour or anything like that for the grants.
16     Q.  And so let's just break it down for a
17 minute, and we'll stay focused on PREP.  Apart from
18 the money that comes in from ODH with respect to the
19 grant itself, are there any other revenues that would
20 come in associated with the PREP program?
21     A.  No.
22     Q.  And what about with respect to expenses,
23 can you just walk me through generally -- you
24 mentioned staff time.  What other expenses would be
25 related to the PREP program?

Page 220

1     A.  There's multiple expenses.  For example,
2 it gets charged -- the PREP program has rent
3 associated with it, supplies, benefits for employees.
4     Q.  And what is the rent associated with the
5 PREP program?
6     A.  It would be an allocated portion of rent
7 from any of the sites where a PREP person would be
8 working.
9     Q.  And which sites would that include with
10 respect to PREP, specifically?
11     A.  It would be -- I can't recall where some
12 of our PREP people work all the time.  Some of them
13 work out of Dayton and some of them work out of
14 Cincinnati.
15     Q.  And so do I understand then correctly
16 that you would allocate a portion of the rent for
17 those two locations to the PREP program?
18     A.  Yes, if -- if the location pays rent
19 then they would get an allocated part of the rent.
20     Q.  And the money that comes in from PREP,
21 how is that money maintained?  Does it go into a
22 general revenue fund, or how would it be recorded?
23         MR. SCHOENFELD:  Objection.
24         THE WITNESS:  All of the money that
25 comes in is coded to a specific account related to

Page 221

1 that program and the department that runs the
2 program.
3 By Ms. Richardson:
4     Q.  And so you mentioned rent.  So I take it
5 then that money that comes in through PREP would be
6 coded with whatever the PREP coding is.  Would that
7 also then be tied to the allocated portion of rent
8 for PREP?
9         MR. SCHOENFELD:  Objection.
10        THE WITNESS:  I'm sorry, can you repeat
11 that?
12 By Ms. Richardson:
13     Q.  Sure.  I'm just trying to understand
14 generally, and I'm sure I'm butchering terminology so
15 I apologize for that, but you mentioned that each of
16 these grants would be coded; is that fair?
17     A.  Yeah, they all have department codes
18 that they go to, and then a program code that they go
19 to for the revenue and expenses.
20     Q.  What do the department codes relate to?
21     A.  They are assigned to the departments of
22 Planned Parenthood.
23     Q.  Which would include what?
24     A.  The grants are all -- all go through the
25 education department of Planned Parenthood.

Page 222

1     Q.  And you're referring specifically to
2 PREP and VAWA grants, correct?
3     A.  And the HIV.
4     Q.  And HIV.  So they would be coded to the
5 education department?
6     A.  Yes.  And then have an additional
7 program code within the education department.
8     Q.  And is there a specific program code for
9 PREP, VAWA, and HIV?
10    A.  Yes, each one has a program code.
11    Q.  And then are expenses related to those
12 programs also coded with that same program code?
13    A.  The billable expenses are coded to the
14 grants program code.  If we have expenses that we are
15 not allowed to bill they do not get coded to the
16 program code.
17    Q.  How would those be coded?
18    A.  Those would be coded to the department
19 that they are in, education in this case, and then
20 the general expense code.
21    Q.  So we'll look at PREP for example.
22 Would you allocate a certain part of the PREP funding
23 to go towards rent or salaries or things of that
24 nature?
25    A.  Yes, that's -- on the grant budget

Page 223

1 that's all broken out.
2     Q.  And you mentioned the grant budget.
3 What are you referring to?
4     A.  Each year the agency applies for --
5 reapplies for the grant and they submit a proposed
6 budget to ODH.
7     Q.  So you're referring to the budget that's
8 submitted to ODH?
9     A.  Yes.
10    Q.  Apart from that budget are there any
11 other program-specific budgets or analyses that are
12 created?
13    A.  There is a tracking spreadsheet that is
14 used for grant billing purposes.
15    Q.  And what would be included on the
16 spreadsheet?
17    A.  All the categories from the grant
18 budget.
19    Q.  And so would you be able to determine
20 from that spreadsheet the amount of expenditures
21 associated with a particular program?
22    A.  You would be able to associate the
23 billable expenditures associated with the program.
24    Q.  But the expenditures beyond what can be
25 billed again would just go to the department, they

Page 224

1 wouldn't be reflected on this?
2     A.  Yeah, the department would have expenses
3 that are -- that can be related to the program that
4 are not being coded to the program because they are
5 either disallowed or in a different category.
6     Q.  So we mentioned PREP.  With respect to
7 VAWA, my understanding is that program also involves
8 more expenses than revenues; is that correct?
9     A.  Yes, that program also has excess
10 employee time that is not chargeable to the grant.
11    Q.  And sitting here today, can you tell me
12 how much that difference is?
13    A.  No, this comes from discussions with
14 staff members.  I don't have exact amounts.
15    Q.  And which staff members did you discuss
16 this with?
17    A.  People in the education department.
18    Q.  And you don't even need to give me exact
19 amounts, if you can just give me a ballpark of that
20 deficit as you understand it from discussions with
21 staff members.
22    A.  For example, our Vice-President of
23 Education, she does not have any time allocated to
24 the grant, but she supervises people who are on the
25 grant, and that takes up a portion of her time and I

1  don't know the exact amount.
2      Q.  And so again, if I wanted to quantify
3  the amount of the operating loss, is that a number
4  you could provide?
5      A.  No.
6      Q.  Do you have a ballpark as to what that
7  amount is?
8      A.  I can find out the total loss for the
9  education department.
10     Q.  And is that a number you could provide
11  us with?
12     A.  That is in the audited financials.
13     Q.  Total loss for the education department?
14     A.  Yeah, you can find it in the audited
15  financials.
16     Q.  And included within the department would
17  be VAWA, HIV, and PREP; is that correct?
18     A.  Yes.
19     Q.  Would there be other programs included
20  within the financials for the education department?
21     A.  What do you mean by "programs"?
22     Q.  So in other words, if I look at your
23  audited financial statements and I look at the
24  numbers for the education department, would that
25  include programs other than the three that I just

1  mentioned?
2      A.  There is other work that the education
3  department does that would be in that also.
4      Q.  Okay.  And what would that be?
5      A.  There's a conference that they put on
6  that has some fees associated with it that would show
7  up on the audited financial statements, not as a
8  separate line item though.
9      Q.  And so that would be subsumed in the
10  overall financial information for the education
11  department?
12     A.  Yes.
13     Q.  And the conference, would that be a net
14  gain, would be net income added in?  In other words,
15  it brings in more revenue than expenses?
16         MR. SCHOENFELD:  Objection.
17         THE WITNESS:  It brings in more revenue.
18  I would not characterize it as increase to net
19  income.
20  By Ms. Richardson:
21     Q.  What's the right way to characterize it?
22     A.  I would just say it reduces the
23  operating loss for the department.
24     Q.  So with the exception of the conference
25  that you mentioned, are there any other programs from

1  the education department that would reduce the
2  operating loss for the department?
3      A.  None that I can think of right now.
4      Q.  I'd like to talk about the STD
5  Prevention Program now for a moment.  Are you
6  familiar with that program at least as it relates to
7  the financials?
8      A.  It doesn't really relate to the
9  financials.
10     Q.  Why not?
11     A.  Because it's only a supplies program and
12  testing program.
13     Q.  And so would you have any expenses
14  related to the STD Prevention Program that are not
15  covered by the grant?
16         MR. SCHOENFELD:  Objection.
17         THE WITNESS:  Just the staff time
18  involved.
19  By Ms. Richardson:
20     Q.  And is that something that you would
21  record as it relates specifically to the STD
22  Prevention Program?
23     A.  No.
24     Q.  It's my understanding that a patient who
25  comes in and receives screening under the STD program

1  would be assessed a $10 fee, I think if I'm recalling
2  correctly.  Are you aware of that?
3      A.  That's the collection fee or the
4  specimen handling, yes.
5      Q.  And how is that collection fee handled
6  from a financial standpoint?
7      A.  That would be charged to the patient or
8  the payer for the patient.
9      Q.  And once that comes in, how is that
10  recorded or maintained by PPSWO?
11     A.  That would be part of the visit that the
12  patient pays so it would show up in the patient fees.
13     Q.  Are you aware of any other fees that the
14  patient would have to pay related to the STD
15  Prevention Program?
16     A.  No.
17     Q.  And how are patient fees recorded?
18  Where would that line item fall?
19         MR. SCHOENFELD:  Objection.
20         THE WITNESS:  Patient fees show up in
21  the financial statements under patient services
22  revenue.  Each -- patient fees also have -- they also
23  get coded to their department and program.
24  By Ms. Richardson:
25     Q.  And so what department would the STD

Page 229

1　Prevention Program fees be charged to?
2　　　A.　There aren't any fees for the STD
3　Prevention Program.
4　　　Q.　I'm sorry, the $10 collection fee.
5　　　A.　That would get coded to the -- to the
6　health center that it was taken at.
7　　　Q.　So would the health center be the
8　equivalent of the departments we talked about for
9　education, there's an education department?
10　　　A.　Yes, the health centers are.
11　　　Q.　Would it receive a program code in
12　addition to the department code?
13　　　A.　When you say "it," what do you mean?
14　　　Q.　We're talking now still about the $10
15　collection fee.
16　　　A.　A fee like that would not have a program
17　code, that would just be a patient services revenue.
18　　　Q.　Again, tied to the specific health
19　center where it was collected?
20　　　A.　Yes.
21　　　Q.　And I apologize if you already answered
22　this, but for staff time spent in connection with the
23　STD Prevention Program, would that receive a
24　particular department code or program code?
25　　　A.　The staff time associated with the

Page 230

1　program is -- is not categorized separately.  Since
2　there's no revenue we don't track the expense because
3　there is no expense for it either besides the staff.
4　　　Q.　So there's no expense, no revenue, it's
5　essentially a wash, is that fair?
6　　　MR. SCHOENFELD:  Objection.
7　　　THE WITNESS:  It's provided for the
8　benefit of patients.  And we get the supplies and the
9　medications from the State.
10　By Ms. Richardson:
11　　　Q.　Right.  I understand, and so I'm focused
12　just specifically on the financial documents and how
13　these things are maintained from a financial
14　accounting standpoint.
15　　　So is it your testimony then that with
16　respect to the STD Prevention Program there are no
17　expenses that would be recorded and no revenues that
18　would be recorded?
19　　　A.　Yeah, there's no money associated with
20　it from the State.
21　　　Q.　Okay.  And with respect to the HIV
22　Prevention Program are there expenses associated with
23　that program?
24　　　A.　There were expenses associated with that
25　program.

Page 231

1　　　Q.　And so let's talk about what expenses
2　that were associated with the program.  I understand
3　there were some changes recently that we'll talk
4　about in a moment.  Prior to those recent changes
5　what expenses were associated with the HIV Prevention
6　Program?
7　　　A.　Staff time.
8　　　Q.　I understand there was also rent of a
9　building associated with that program?
10　　　A.　Yes, there was rent for the building the
11　staff stayed at, or worked out of.
12　　　Q.　And a van or RV; is that correct?
13　　　A.　Yes.
14　　　Q.　What other expenses associated with that
15　program?
16　　　A.　Testing supplies.
17　　　Q.　And how would those expenses be
18　recorded?
19　　　A.　Those would also receive a program code
20　and be coded to the education department.
21　　　Q.　With a specific program code for the HIV
22　prevention?
23　　　A.　Yes.
24　　　Q.　And were there any revenues associated
25　with the HIV Prevention Program?

Page 232

1　　　A.　There were the grant payments from the
2　State and County.
3　　　Q.　Anything apart from the grant money that
4　came in, any other revenues associated with this
5　program?
6　　　A.　I believe there was funding from another
7　smaller agency to cover Hepatitis-C testing for that
8　program.
9　　　Q.　Do you know what agency that would have
10　been?
11　　　A.　I cannot recall the name of it right
12　now.
13　　　Q.　And my understanding is that the
14　expenses associated with the HIV Prevention Program
15　are also higher than the amount of money that came in
16　through the grant fund; is that correct?
17　　　A.　It's correct that the education
18　department as a whole has higher expenses than grant
19　funds coming in.
20　　　Q.　And the HIV Prevention Program would
21　have contributed to the net losses for the education
22　department?
23　　　A.　Yes.
24　　　Q.　Do you know the amount of that
25　contribution to the net losses?

Page 233

1    A.  I do not.  It's the same scenario as the
2  other grant funded programs.
3    Q.  Are you familiar with the BCCP program?
4    A.  Yes.
5    Q.  And is your understanding that that
6  refers to breast cancer and cervical cancer
7  screening?
8    A.  Breast and cervical cancer screening
9  programs.
10    Q.  Yes.  Thank you.  And we'll just call it
11  BCCP, if that's okay.
12    A.  That's fine with me.
13    Q.  And can you tell me what expenses, if
14  any, are related to the BCCP program?
15    A.  That would just be staff time and
16  supplies.  I view the BCCP program as another payer,
17  just like Medicaid or private insurer.
18    Q.  And so is there any financial recording
19  related to the BCCP program?
20    A.  Yes.  The BCCP program gets recorded --
21  it gets a program code because it's a payer, and then
22  it gets coded to the health center that the patient
23  was seen at.
24    Q.  Now, what about with respect to abortion
25  services, how are those coded for financial recording

Page 234

1  purposes?
2    A.  Those are also coded to their own
3  department and program.
4    Q.  And what department -- how would that be
5  reflected in terms of department?
6    A.  The surgery center is considered its own
7  department so it has its own department code, and the
8  expenses for that would not be coded anywhere else,
9  it would just be coded to that individual department.
10    Q.  And you said there are also different
11  program codes related to the surgery center; is that
12  correct?
13    A.  The surgery center has its own program
14  code.
15    Q.  And was there just one program code
16  related to the surgery center, or would there be
17  multiple program codes?
18    A.  I believe there's only one program code
19  in use right now.
20    Q.  And what is that program code?
21    A.  The program codes are just a three
22  string digit, and I don't know many of them off the
23  top of my head.
24    Q.  And so a patient who comes in and
25  receives abortion services would be coded with the

Page 235

1  department code which would be the surgery center,
2  and then whatever the one program code is?
3  ██  ████████  ███████████████████████████████
4  ██  ███████████████████████████████████
5  ██
6    Q.  And with respect to any revenues that
7  would come into PPSWO related to abortion services,
8  how would those be coded?
9    A.  Those would be coded by payer type and
10  to the surgery center specifically.
11    Q.  What do you mean by payer type?
12    A.  If it's self-pay or commercial
13  insurance.
14  ██  ████  ██████████████████████████████████████
15  ██  ████████████████████████████████████████
16  ██  ████  █████████████████████
17  ██  ███████  ██████████████████████████████
18  ██  █████  █████████████████████████████
19  ██  ██████████████████████████████████████
20  ██  ████  ██████████████████████
21  ██  ███████████████████████████████████
22  ██  ████  █████████████████████████████████
23  ██  █████████████████████████████████████
24  ██
25

23    Q.  And I want to talk a little bit about
24  the overall fee structure.  It's my understanding
25  that outside of some of the programs we have talked

1  about where patients may receive free testing,
2  typically they are charged under a fee structure; is
3  that correct?
4      A.  Patients have -- patients pay for the
5  services they receive, which comes from a fee
6  schedule.
7      Q.  And can you describe to me how that fee
8  schedule works?
9      A.  It's set up by service received or
10  service provided.
11     Q.  And so would all patients receiving
12  particular services pay the same amount?
13     A.  No, because patients have different
14  payers and different deductibles and different
15  co-pays.
16     Q.  So let's start first with a self-pay,
17  someone who does not have insurance.  How would that
18  patient be charged for services?
19     A.  They would pay a cash price.
20     Q.  And how is that cash price determined?
21     A.  From the fee schedule.
22     Q.  And is that fee schedule set forth in a
23  document somewhere or --
24     A.  I know it's uploaded into our EHR, which
25  is our electronic health record system.

1      Q.  Is that something we could --
2          MS. RICHARDSON:  I'm going to direct
3  this question to counsel.  Is that fee structure
4  something that we could be provided with so we don't
5  have to go through each item individually here?
6          MR. SCHOENFELD:  I'm not sure it's
7  something you have requested previously.  I
8  understand you to be making the request now.  I'd
9  have to talk with my colleagues and client about
10  whether we can provide that.
11         MS. RICHARDSON:  I do believe it's
12  included within the scope of the request that we have
13  made previously, but I am making that request again
14  and hopefully with the goal of not spending a ton of
15  the witness' time here to go through those.
16         MR. SCHOENFELD:  I mean, I obviously
17  can't give you an answer right now, but I'll --
18         MS. RICHARDSON:  Maybe we can talk about
19  that during a break to see if we can shorten some of
20  the testimony.
21         MR. SCHOENFELD:  Sure.
22  By Ms. Richardson:
23     Q.  So we have been talking about so far a
24  self-pay client.  Would all clients receiving a
25  particular service pay the same amount or be charged

1  the same amount?
2      A.  Do you mean every patient would receive
3  an annual exam and pay the same amount?
4      Q.  Right.
5      A.  That's correct.
6      Q.  And same question with respect to
7  someone who comes in and receives an STD screening
8  outside of the scope of the STD Prevention Program
9  we've talked about.
10         Would all patients receiving that STD
11  screening pay the same amount for that charge?
12     A.  All self-pay patients?
13     Q.  Yes.
14     A.  Yes.
15     Q.  And is there a PPSWO set fee structure
16  for clients who have insurance, or would that all be
17  determined through a contract with the insurance?
18     A.  That's all determined through the
19  contracts with insurance companies.
20     Q.  And so these fees that would come into
21  PPSWO related to these services, would those be
22  recorded in the same manner as the fees you talked
23  about earlier?
24     A.  Which fees do you mean?
25     Q.  That was a horrible question, I

1  apologize.
2          So let's talk about STD screening for
3  example, outside of the context of the STD Prevention
4  Program.  So a patient comes in, requests and
5  receives STD screening.  We'll talk about a self-pay
6  patient first.  The amount that the client pays PPSWO
7  for those services, how is that recorded?
8      A.  That's recorded in the health care
9  record system, and then each month at the close it's
10  given its department program code, and entered into
11  the general ledger system.
12     Q.  And would the department code again be
13  the location?
14     A.  Yes.
15     Q.  And what would the program code be, for
16  example, in the case of STD screenings outside of the
17  STD Prevention Program?
18     A.  I don't know what that specific code
19  would be.
20     Q.  But it would be given a particular code
21  that would help you identify that that was related to
22  STD screening?
23     A.  That would be -- that would most likely
24  be captured in the EHR.
25     Q.  Electronic health records?

1     A.   Yes.
2     Q.   How do the electronic health records
3  feed into or relate to your financial records?
4     A.   We use reports from the EHR system to
5  create our closing journal entries in the general
6  ledger system AccuFund.
7     Q.   And does the report that comes out
8  through that system, does it have line items for each
9  of the programs?
10     A.   When you say "programs", what are you --
11     Q.   So we have talked about these different
12  program codes.  Would it give you, for example, total
13  revenues related to each of the program codes that
14  have been entered?
15     A.   The EHR doesn't have programs, it's for
16  patient care.  The programs more refer to things like
17  in the education department.  In the reports that
18  come out of the EHR it's specifying who the payer is
19  or something like that.
20     Q.   And so for you as you're going in ready
21  to create, say a financial record, presumably what
22  you're interested in are the total revenues that
23  would have come in through those patients; is that
24  fair?
25     A.   Which patients are you referring to?

1     Q.   So I understand that the electronic
2  health records are tied to particular patients in the
3  patient records.  I'm trying to understand how you
4  use that information to create financial records for
5  PPSWO.
6     A.   We use monthly reports from the EHR that
7  break down the payer type and the department or
8  location where the patient was seen, and then make
9  the journal entries based on that.
10     So if a patient is seen at our Webster
11  Hill center that has a location or department code
12  and that feeds -- sorry, let me -- if a patient is
13  seen at Western Hills, that shows up in the monthly
14  report from the EHR in the totals for the patients
15  seen there by payer type.
16     And then that report is entered into
17  AccuFund, and that's how we would create the revenues
18  for -- not create, but record the revenues for that
19  location.
20     Q.   Thank you.  That's helpful.  I
21  appreciate that clarification.
22     (Recess taken.)
23  By Ms. Richardson:
24     Q.   Mr. Bower, I'm going to hand you what we
25  have marked as Exhibit 2 to this deposition, and I'll

1  give you a moment to take a look at it.  Have you
2  seen that document before?
3     THE WITNESS:  Do I keep this one.
4     MR. SCHOENFELD:  Just put it to the
5  side.
6     THE WITNESS:  Yes.
7  By Ms. Richardson:
8     Q.   And have you seen this document prior to
9  today?
10     A.   Yes, I have.
11     Q.   Do you understand these to be the
12  responses that PPSWO provided to interrogatories that
13  we sent in connection with this litigation?
14     A.   Yes, I do.
15     Q.   Were you involved in the preparation of
16  these responses?
17     A.   Yes, I was.
18     Q.   What was your role?
19     A.   I helped answer any questions put forth
20  to me by our counsel.
21     MS. RICHARDSON:  And I'm going to just
22  take a moment and put on the record the agreement
23  that we just reached on the break, that counsel will
24  provide us Bates numbers for the audited financial
25  statements for the five most recent fiscal years.

1     And what I'd like to do is just go
2  through a couple of the interrogatories related to
3  the finances and find out whether information would
4  be included in those audited financial statements or
5  in any other document that PPSWO maintains.
6  By Ms. Richardson:
7     Q.   And so I'll direct your attention to
8  Interrogatory No. 8 on Page 12.
9     A.   Okay.
10     Q.   And this asks for each fiscal year 2010
11  through 2015 state PPSWO's total revenues.  Is that
12  information that would be included in those audited
13  financial statements?
14     A.   Yes, that would be included.
15     Q.   And then with respect to Interrogatory
16  No. 9, that asks to state the percentage of PPSWO's
17  total revenues attributable to each of the programs
18  identified in Revised Code 3701.034.
19     Is that information that PPSWO would
20  maintain in any financial record?
21     A.   Not as a percentage.
22     Q.   How would it record that information if
23  not as a percentage?
24     A.   We would record it as revenue from the
25  grant, and then we would also have our total revenue

Page 245

1 somewhere else as part of the financial statement.
2     Q.   And where would revenues from the grant
3 be maintained?
4     A.   When you say "maintained", what do you
5 mean?
6     Q.   Recorded.  What document would provide
7 that information?
8     A.   The audited financials, I believe, have
9 a footnote related to it.
10     Q.   So the audited financial statements that
11 counsel has represented have been provided and that
12 they are going to provide Bates numbers for would
13 include a breakdown of revenues related to each of
14 the programs?
15         MR. SCHOENFELD:  Objection.
16         THE WITNESS:  I am not sure about some
17 of the older audits, but in the most recent year,
18 yes.
19 By Ms. Richardson:
20     Q.   Thank you.  And so then we'll move to
21 Interrogatory No. 10, which asked for each fiscal
22 year 2010 to 2015, describe the annual revenues,
23 expenses and net income or losses attributable to
24 each of the services you claim has been, is, or will
25 be impacted by Section 3701.034.  Did I read that

Page 246

1 correctly?
2     A.   Yes.
3     Q.   And is that information that PPSWO would
4 record in any financial document?
5     A.   The annual revenues and expenses would
6 show up on -- or are recorded in our general ledger
7 and show up on the audited -- well, the revenues show
8 up in the previously discussed audited financials,
9 and the expenses show up in aggregate on those
10 financials.
11     Q.   Is there anywhere that PPSWO would
12 maintain a breakdown of expenses related to the
13 particular programs?
14     A.   In the general ledger system.
15     Q.   Is that a document that could be printed
16 and provided?
17     A.   The general ledger system generates
18 reports that you can look at on the screen.  They are
19 exportable, but they are not a document that's ready.
20     Q.   But if you took a look at that screen
21 shot or on the screen it would give you a breakdown
22 of the expenses related to the programs that we have
23 talked about?
24     A.   It would give you a breakdown of the
25 expenses that we are allowed to charge to the grants.

Page 247

1     Q.   And is that set forth in the particular
2 grants from ODH?  In other words, who decides what
3 can be charged to the grant?
4     A.   When the grant is applied for, a grant
5 budget is proposed and approved -- or I guess not
6 approve -- by ODH, and then we are able to bill --
7 bill ODH for expenses associated with those grants
8 and we have to provide documentation to ODH for those
9 expenses.
10     Q.   And is there anywhere that you could
11 look to see the actual expenses associated with any
12 of these programs?
13     A.   There is no place that I could find the
14 expenses associated with a specific program that are
15 not chargeable to that program.  That only shows up
16 in the full department's income statement.
17     Q.   And so it would just show the total
18 expenses related to the department?
19     A.   Yes, that's correct.
20     Q.   What about the next item listed here,
21 net income or losses attributable to each of the
22 services that you claim has been, is, or will be
23 impacted by Section 3701.034?
24     A.   That would be -- the net income would be
25 just the -- net income is defined as revenue minus

Page 248

1 expenses; net loss is the same thing.
2         Again, those -- the -- the expenses that
3 we're unable to charge to the grant we do not record
4 for a specific grant, so that would just be -- that
5 would show up as just part of the financial
6 statement.
7     Q.   It would be the overall operating losses
8 or net losses for the program, is that fair?
9     A.   No, for the department.
10     Q.   The department.  Thank you.  And that
11 number would be included in the audited financial
12 statements?
13     A.   I believe that number is broken out in
14 each of the audited financial statements.  Some of
15 the older ones I'm not entirely sure it is.
16     Q.   And then if we turn to Interrogatory No.
17 11, it asks to state the percentage of your total
18 revenues for each fiscal year from 2010 to 2015
19 received by, on behalf of, or related to patients
20 receiving abortion services.  Is that a number that
21 you would record in a financial document of PPSWO?
22         MR. SCHOENFELD:  Objection.
23         THE WITNESS:  Not as a percentage.
24 By Ms. Richardson:
25     Q.   And is there a place where you would

1  record the overall revenues attributed to abortion
2  services?
3           MR. SCHOENFELD:  Objection.
4           THE WITNESS:  Sorry, say that one more
5  time.
6  By Ms. Richardson:
7       Q.  Sure.  You said not as a percentage.
8  What do you mean by that?
9       A.  We would just record the actual dollars
10 for abortion services.
11      Q.  And where would that number appear?
12      A.  That number would also show up in -- I'd
13 have to look at the financial statements broken out
14 from other patient services or not, but it has its
15 own department program code, so it would show up on
16 system reports as specific to the abortion department
17 or surgery department.
18      Q.  And you believe that information is in
19 the audited financial statements?
20          MR. SCHOENFELD:  I object to this whole
21 line of questioning as irrelevant to the case as set
22 forth in the interrogatory responses.
23 By Ms. Richardson:
24      Q.  And you can answer.
25      A.  Sorry, I forgot the question now.

1       Q.  Sure.  I was asking you whether the
2  total revenues related to abortion services would be
3  included in the audited financial statements?
4       A.  They would be included in the audited
5  financial statements.
6       Q.  And what would that line item be called
7  in that financial document?
8       A.  They may not have their own line item,
9  they could be included in patient services revenue,
10 but they are recorded separately.  The categorization
11 for audited financial statements can vary sometimes
12 based on the needs of the users.
13      Q.  And so if -- so would I be able to
14 identify specifically the amount of revenues
15 attributable to abortion services by looking at the
16 financial statements in the audited financial report?
17      A.  I would have to look at the audited
18 financial reports to answer.
19      Q.  But if they are not there, they are in
20 other financial statements that PPSWO maintains?
21      A.  Yes.  Other financial records.
22      Q.  You can set Exhibit 2 -- I think we were
23 just looking at, you can set that aside and I'll ask
24 you to turn now to what we marked as Exhibit 6.  Feel
25 free to take a moment and just let me know when

1  you're ready.
2       A.  Can I pull the staple out?
3       Q.  Sure.
4       A.  Okay.
5       Q.  Have you seen this document before
6  today?
7       A.  My name is on it.  I don't recall seeing
8  it before today.
9       Q.  And if we look at the front page which
10 is identified by the number down at the bottom
11 PP0H_0023946?
12      A.  Yes.
13      Q.  At the top of this page it looks like it
14 is an e-mail to you from Jerry Lawson; is that
15 correct?
16      A.  Yes.
17      Q.  And it says, "See questions below.  Who
18 should be providing the answers," and it lists some
19 individuals as possibilities.
20      A.  Uh-huh.
21      Q.  Do you know whether there was an answer
22 provided to that question?
23      A.  I do not know if there was an answer
24 provided to this question.
25      Q.  And if you look at the subject line it

1  says, "Questions on PPSWO's participation in Federal
2  Programs"; is that correct?
3       A.  Yes.
4       Q.  And if you turn to the original e-mail
5  in the e-mail chain which is forwarded a couple of
6  times in this document, is it your understanding that
7  this sets forth a number of questions related to
8  potential impact -- well, let me ask you, do you have
9  an understanding as to what those questions relate
10 to?
11      A.  I have an understanding of what some of
12 the questions relate to.  I'd have to think about
13 some of them.
14      Q.  And what's your understanding --
15      A.  That they relate to our effective -- the
16 effect on different -- our Planned Parenthood
17 affiliate from the defunding in 3701.
18      Q.  And do you know whether answers were
19 ever provided to these questions?
20          MR. SCHOENFELD:  Objection.
21          THE WITNESS:  I can't recall.
22 By Ms. Richardson:
23      Q.  Sitting here today do you know the
24 answers to any of these questions?
25      A.  I would know the answer to some of these

1 questions.
2          Q.   Which ones?
3          A.   B1.
4          Q.   It looks like there are two Bs here, one
5 under --
6          A.   Specifically to IPP.
7          [REDACTED]
13          Q.   Do you also know the answer to the next
14 question provided -- the next question under that
15 section?
16          A.   No, I don't.
17          Q.   Any other questions that you know the
18 answers to sitting here today?
19          A.   No.
20          Q.   Have you conducted or been involved in
21 any overall financial analyses of the impact of the
22 law that's challenged in this case?
23          A.   Yes.
24          Q.   What analyses have you conducted?
25          A.   What the revenue loss would be.

1          Q.   And what did you determine as a result
2 of that analysis?
3          A.   That we would lose all of the grant
4 funding through the State.
5          Q.   And did you also conduct an analysis of
6 what savings would result from not operating those
7 programs?
8          MR. SCHOENFELD:  Objection.
9          THE WITNESS:  I need to discuss with
10 counsel about privileged information.
11          MS. RICHARDSON:  You can consult with
12 counsel to determine if it's privileged.
13          MR. SCHOENFELD:  Sure, let's step
14 outside.
15          (Recess taken.)
16 By Ms. Richardson:
17          Q.   So, Mr. Bower, before the break I had
18 asked you what financial analyses you had done to
19 determine the impact on PPSWO of the law that's being
20 challenged in case financially.  And do you have an
21 answer for that question?
22          A.   Yeah, we looked at the revenue losses
23 from the grants.
24          Q.   Did you conduct any other financial
25 analyses?

1          A.   Yes.
2          Q.   What other analyses did you conduct?
3          A.   We looked at the cost for the grants.
4          Q.   And what did you determine?
5          A.   That the cost for the grants is the cost
6 for the education department in general.
7          Q.   What do you mean by that?
8          A.   The education department has expenses
9 and those are the costs to have the grants.
10          Q.   Did you conduct any analysis of the
11 overall net results of losing those revenues but also
12 losing those costs?
13          MR. SCHOENFELD:  Objection.
14          THE WITNESS:  Since we hadn't determined
15 a final plan we don't know what the actual net would
16 be.
17 By Ms. Richardson:
18          Q.   Do you have an estimate?
19          A.   No, because the plan is still in flux.
20          Q.   What plan are you referring to?
21          A.   What the education department would look
22 like in an unfunded environment.
23          Q.   And you testified earlier that the costs
24 associated with the programs at least in the
25 education department exceeded any revenues that came

1 in through the grants, correct?
2          A.   Yes.
3          Q.   And so losing the expenses associated
4 with those programs would more than offset any loss
5 in revenue, correct?
6          MR. SCHOENFELD:  Objection.
7          THE WITNESS:  I'm thinking.  Again, not
8 necessarily because we don't know the final plan for
9 the education department.
10 By Ms. Richardson:
11          Q.   But looking just specifically at those
12 programs, the net impact would be a lessening of the
13 operating losses for the education department,
14 correct?
15          MR. SCHOENFELD:  Objection.
16          THE WITNESS:  No, because we don't know
17 what the programs would look like or what the
18 education department would look like absent State
19 funding.
20 By Ms. Richardson:
21          Q.   So what could possibly turn that into --
22 what other things could impact that analysis that you
23 would need to know in the final plan?
24          A.   The staff of the education department,
25 how it would exist going forward.

Page 257

1    Q.  And so are there -- are there
2  discussions of adding staff members, is that what you
3  mean, or --
4    A.  There's discussions of how the education
5  department will function going forward, not
6  necessarily adding staff members.
7    Q.  Okay.  So sitting here today you can't
8  tell me what the net impact would be of not operating
9  the particular programs under the education
10  department that we have been discussing; is that
11  correct?
12    A.  No, because we don't know what the
13  education department will look like.
14    Q.  But you don't disagree that there were
15  greater expenses associated with those programs than
16  the grants brought in through revenues, correct?
17    MR. SCHOENFELD:  Objection.  Asked and
18  answered.
19    THE WITNESS:  Yeah, that's correct.
20  By Ms. Richardson:
21    Q.  In the event that the law that's being
22  challenged in this case goes into effect, PPSWO will
23  continue to operate, correct?
24    MR. SCHOENFELD:  Objection.
25    THE WITNESS:  I believe so.

Page 258

1  By Ms. Richardson:
2    Q.  There are no plans sitting here today
3  for PPSWO to close its doors in the event that this
4  law takes effect, correct?
5    A.  Correct.
6    Q.  And PPSWO will still financially be able
7  to provide STD screenings and breast and cervical
8  cancer screenings going forward if this law takes
9  effect, correct?
10    A.  We would not be able to provide
11  screenings for patients who -- who otherwise
12  qualified for free screenings.  We will not be able
13  to provide those.
14    Q.  But you will still provide STD
15  screenings, correct?
16    A.  We will still provide STD screenings.
17  Patients would be charged for them in every case.
18    Q.  And you'll still be able to provide
19  breast and cervical cancer screenings?
20    A.  Yes, we would still provide breast and
21  cervical cancer screenings.
22    Q.  And you will still provide abortion
23  services, correct?
24    A.  We would still provide abortion
25  services.

Page 259

1    MS. RICHARDSON:  If we can take just a
2  quick break, I think I am close to being done.
3    (Recess taken.)
4    MS. RICHARDSON:  Back on.
5  By Ms. Richardson:
6    Q.  So we talked about the BCCP program.
7  Does the BCCP voucher cover all costs associated with
8  the services that a patient would receive?
9    A.  That's not really how we look at that,
10  the services that we're providing.  So that's not
11  really a question I can answer.
12    Q.  So what is the value of the voucher?
13    A.  I don't actually know the specific
14  reimbursements off the top of my head for BCCP
15  services.  It covers a few different things, and I
16  don't know what it pays on specific services.
17    Q.  Do you know whether it covers -- whether
18  the value is equal to the value, financially
19  speaking, of those services?
20    A.  I haven't costed out our services this
21  year on an individual level, so I'm not sure.
22    Q.  For the staff members who work in the
23  family planning centers, how are their salaries paid?
24  Does that come from a particular account or source?
25    A.  Their salaries are coded to their

Page 260

1  department, and it's paid through the payroll system.
2    Q.  Is any of the grant money that PPSWO
3  receives used to cover the salaries of the staff
4  members that work in the family planning centers?
5    A.  No, that would be coded to a separate
6  department and program code.
7    Q.  It's my understanding that there are
8  certain financial protocols in place to separate out
9  money or financial information related to abortion
10  services from other services that PPSWO provides; is
11  that correct?
12    A.  Yes, that's just the coding system that
13  we previously discussed.
14    Q.  Okay.  So aside from that coding system
15  is there any other system in place to separate out
16  the financial information related to abortion
17  services from other services?
18    A.  We have an annual audit performed to
19  make sure that our financial statements are fairly
20  presented, which presumes that they would check the
21  accuracy of the coding between the different
22  departments.
23    Q.  And would money that -- revenues that
24  come in related to abortion services be maintained in
25  a separate physical account, or would it just be

1    coded differently on the financial statements?
2        A.   It's coded differently on the financial
3    statements.
4        Q.   But it would be maintained in the same
5    general revenue account for PPSWO?
6        A.   No, there's not a general revenue
7    account that exists.
8        Q.   Okay.  So how -- would it be maintained
9    together with other revenues that PPSWO receives?
10       A.   What do you mean maintained together
11   with other revenues?
12       Q.   So the revenues that come into PPSWO
13   related to abortion services, where are those held?
14       A.   Held?  What do you mean "held"?
15       Q.   Do they go into a bank account?
16       A.   Yes, they go into a bank account.
17       Q.   And are revenues received from other
18   services also kept in that same bank account?
19       A.   Before any money can go into the bank
20   account it has to be coded to a general ledger
21   account.  But it is in one bank account.
22       Q.   And what about expenses related to the
23   facility, the surgery facility, at which abortion
24   services are provided, do expenses related to that
25   building receive a different code?

1        A.   All the expenses for the surgical center
2    would receive the surgery center department code and
3    program code.
4        Q.   And apart from that coding that goes in
5    from the general ledger, would there be any other
6    protocols or procedures for keeping those expenses
7    separate?
8        A.   When expenses or bills come in or staff
9    is paid, someone is reviewing that to ensure that
10   things are coded correctly before it is -- it's not
11   coded automatically by the system, it's coded by
12   someone who is knowledgeable in coding, so that it
13   ensures that it is -- that expenses are coded to the
14   proper department.
15       Q.   And who would conduct that review of the
16   coding?
17       A.   It could be the payables person, the
18   accountant, or myself.  Yeah.
19       Q.   It's my understanding that under some
20   circumstances staff or employees at the family
21   planning centers would provide abortion or options
22   counseling to patients.  Under those circumstances
23   how would that be coded?
24           MR. SCHOENFELD:  Objection.
25           THE WITNESS:  That wouldn't be coded any

1    separate way because that's part of a health care
2    visit for a patient.
3    By Ms. Richardson:
4        Q.   And so for example, if a patient came in
5    with a BCCP voucher to receive breast and cervical
6    cancer screenings, and while she was there it's
7    determined that she's pregnant, she receives options
8    counseling including the abortion option, would she
9    receive just one code for that entire visit?
10       A.   When you say she received one code, what
11   do you mean?
12       Q.   Would all the expenses and revenues and
13   other financial information related to that visit be
14   coded with one code?
15           MR. SCHOENFELD:  Objection.
16           THE WITNESS:  No, because there's
17   multiple codes that can go into a visit depending on
18   the payer and the center.  I don't know that that's
19   ever even happened, a BCCP patient receiving a
20   pregnancy test.
21   By Ms. Richardson:
22       Q.   And so if I ask you to assume that it
23   has, and just follow me in my hypothetical, what
24   would be the proper way from a financial standpoint
25   to code that visit?

1            MR. SCHOENFELD:  Objection.
2            THE WITNESS:  That would just be a
3    health care visit and we would report the revenue by
4    payer and health center.
5    By Ms. Richardson:
6        Q.   So returning again to the BCCP program,
7    it's my understanding that the way that the program
8    works is that an eligible patient would go to the
9    BCCP eligibility center and would receive a referral
10   to a particular service center.  Is that your
11   understanding?
12       A.   That's my understanding, yes.
13       Q.   And so that could mean that they would
14   be referred to PPSWO, correct?
15       A.   Yes.
16       Q.   And that patient would bring in a
17   voucher for that visit; is that correct?
18       A.   That's correct.
19       Q.   And then that voucher would be basically
20   turned into ODH in exchange for money in return,
21   correct, reimbursement?
22       A.   I think that that's correct.
23       Q.   And how would the money that comes in
24   pursuant to that reimbursement be coded?
25       A.   That would be coded to the BCCP program

Page 265

1  by health center.
2      Q.   And would that money then be used to
3  help provide staff compensation, for example, in the
4  family planning centers?
5      A.   That money would be fee for service
6  money that would cover the services received by the
7  patient.
8      Q.   And so what do you mean by that?
9      A.   When a patient receives health care
10  there's a fee associated with it, so the
11  reimbursement from ODH for the BCCP would be payment
12  for services provided.
13      Q.   And so it directly offsets then the
14  costs that would be associated with those services,
15  am I understanding that correctly?
16      A.   No, that goes back to the cost
17  calculation by service which we haven't done for last
18  year.
19      Q.   So how do you know that the money that
20  comes into that voucher isn't used for staff or other
21  services unrelated to the particular services that
22  the patient received?
23      A.   Because it can only be related to the
24  services that the patient received because it was
25  earned by seeing that patient.

Page 266

1      Q.   And so I apologize, I think I'm just
2  getting confused, because I thought you said you
3  don't track the particular costs associated with
4  those services, correct?
5      A.   Yes.
6      Q.   So if the value of the voucher exceeds
7  the cost of the service, then that would be a surplus
8  that could go towards other things, correct?
9      A.   Yeah, that could go toward -- if there
10  was a surplus, that could go towards overhead.
11      Q.   And so how do you know that that's not
12  happening if you're not tracking the cost of the
13  services?
14      A.   That's how revenue is supposed to work;
15  it covers overhead, management in general,
16  administration for providing services and support
17  staff for those services.  That is what's supposed to
18  happen with revenue.
19      Q.   So the voucher -- the revenue that comes
20  in through the voucher then would apply towards
21  overhead, correct?
22      A.   It can if there's enough of it.
23      Q.   And if you don't track the costs there's
24  no way to know whether there's a surplus or not,
25  correct?

Page 267

1      A.   Well, there's not a surplus because we
2  operate at a loss.
3      Q.   With respect to the BCCP program
4  specifically?
5      A.   With respect to our entire agency.
6      Q.   And so do you track to determine whether
7  or not what portion of that loss is attributable to
8  the BCCP program specifically?
9      A.   No.
10      Q.   And so it's possible then that money
11  that comes in through this voucher is being applied
12  to overhead?
13          MR. SCHOENFELD:  Objection.  Asked and
14  answered.
15          THE WITNESS:  I'm sorry, I guess I'm
16  lost here.  I'm not understanding the question, I
17  guess.
18  By Ms. Richardson:
19      Q.   So my question is -- and I think we
20  agreed up to the point where we said if there is a
21  surplus -- if the amount coming into the voucher
22  exceeds the cost of the services, there would be a
23  surplus that would go to general overhead or
24  operating; is that fair?
25      A.   If there was operating income for a

Page 268

1  health center in general, it would go to covering the
2  health center's overhead.
3      Q.   And so clearly, overhead gets paid
4  presumably, right?
5          MR. SCHOENFELD:  Objection.
6          THE WITNESS:  When you say "gets paid",
7  what do you mean?
8  By Ms. Richardson:
9      Q.   Does PPSWO pay its rent for these
10  facilities?
11      A.   Rent for a health center is not
12  overhead.  Overhead is general administrative, it's
13  IT support, stuff like that.
14      Q.   And presumably you pay for your IT
15  support?
16      A.   Yes.
17      Q.   And rent, however it's categorized, you
18  would pay presumably?
19      A.   Yes.
20      Q.   And staff member compensation?
21      A.   Uh-huh.
22      Q.   And all of these other things that you
23  have to pay in order to stay in business, presumably
24  those get paid?
25      A.   Yes.

Page 269

1     Q.  So my question is in part, how do those
2  get paid?  Where do those come from?
3     A.  Covering overhead is the result of
4  having operating income at a health center.
5     Q.  So the health center has an overall
6  income, and you use that income to pay for the
7  various expenses we have talked about; is that fair?
8     A.  Yes.
9     Q.  What if one health center had an
10  operating income and another one had an operating
11  loss?
12        MR. SCHOENFELD:  Objection.
13        THE WITNESS:  Then the health center
14  that had an operating loss would be covered by
15  general funds.
16  By Ms. Richardson:
17     Q.  And how are those general funds coded or
18  maintained?
19     A.  The funds that come in that would cover
20  that would be the -- when I say "general funds", I
21  mean things like development and other revenue
22  generating departments.  Can you restate that
23  somehow?
24     Q.  So we started by talking about BCCP,
25  money comes in pursuant to that voucher program.

Page 270

1     A.  Yes.
2     Q.  And I'm just trying to sort of
3  understand the life cycle of that money.  Where does
4  it go and how is it recorded?
5     A.  So that money would be recorded to its
6  health center, and then expenses for the health
7  center would be paid from that money along with other
8  money that the health center is generating.  Anything
9  left would go towards overhead for Planned
10  Parenthood.
11     Q.  And so the revenues that come in through
12  that voucher program could contribute to the overall
13  operating revenues for that center, correct?
14     A.  Yes.
15        MS. RICHARDSON:  I think those are all
16  of the questions that I have subject to any redirect.
17        MR. SCHOENFELD:  No, none here.  I'll
18  designate the entire transcript confidential until
19  three days after we receive the final version from
20  the Court Reporter, and the designation will stay
21  binding until that point in time and we'll designate
22  in the interim.
23        MS. RICHARDSON:  And we would just state
24  for the record we do object to the designation as
25  confidential, but we would agree that that is what

Page 271

1  the court has ordered, and under the existing
2  protective order that the court put in place that
3  three days is the appropriate time, and we'll make
4  any appropriate objections after reviewing the
5  transcript.
6        (Thereupon, the deposition concluded
7        at 5:51 p.m.  Signature not waived.)
8        - - -

Page 272

1  State of Ohio          :
                       : SS:
2  County of              :
3
4        We, Jerry Lawson and Lee Bower, do
5  hereby certify that we have read the foregoing
   transcript of our deposition given on Wednesday, July
6  6th, 2016; that together with the correction page
   attached hereto noting changes in form or substance,
7  if any, it is true and correct.
8
9        _____
10                Jerry Lawson
        _____
11                Lee Bower
12        I do hereby certify that the foregoing
13  transcript of the deposition of Jerry Lawson and Lee
   Bower was submitted to the witness for reading and
14  signing; that after they had stated to the
   undersigned Notary Public that they had read and
15  examined their deposition, they signed the same in my
   presence on the _____ day of _____, 2016.
16
17
18        _____
                Notary Public
19
20
21  My commission expires _____, _____.
22        - - -
23
24
25

Page 273

1            CERTIFICATE
2    State of Ohio        :
                   :   SS:
3    County of Fairfield    :
4            I, Valerie J  Grubaugh, Registered Merit
     Reporter and Notary Public in and for the State of
5    Ohio, duly commissioned and qualified, certify that
     the within named Jerry Lawson and Lee Bower were by
6    me duly sworn to testify to the whole truth in the
     cause aforesaid; that the testimony was taken down by
7    me in stenotype in the presence of said witnesses,
     afterwards transcribed upon a computer; that the
8    foregoing is a true and correct transcript of the
     testimony given by said witnesses taken at the time
9    and place in the foregoing caption specified and
     completed without adjournment
10
            I certify that I am not a relative,
11   employee, or attorney of any of the parties hereto,
     or of any attorney or counsel employed by the
12   parties, or financially interested in the action
13           IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office at Columbus,
14   Ohio, on this 8th day of July, 2016
15
16
17

18           _____
             Valerie J  Grubaugh,
             Registered Merit Reporter
19           and Notary Public in and for
             the State of Ohio
20
21   My commission expires August 16, 2016
22
23
24
25