**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

PLANNED PARENTHOOD OF
GREATER OHIO, and
PLANNED PARENTHOOD
SOUTHWEST OHIO REGION,

       Plaintiffs,

     v.

RICHARD HODGES, in his official capacity
as Director of the Ohio Department of Health,
et al.,

       Defendants.

Civil Action No. 1:16-cv-00539

**<u>ORAL ARGUMENT REQUESTED</u>**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE MERITS AND A PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    A.    PPGOH and PPSWO's Service to Ohio ..................................................................2

    B.    Section 3701.034.....................................................................................................3

    C.    Programs Affected by Section 3701.034 ................................................................5

        1.    The Infertility Prevention Project/STD Prevention Program.......................5

        2.    The Minority HIV/AIDS Initiative And HIV Prevention Program .............7

        3.    Personal Responsibility Education Program.................................................9

        4.    Breast and Cervical Cancer Prevention Program......................................11

        5.    Ohio Infant Mortality Reduction Initiative ...............................................11

        6.    Violence Against Women Act ....................................................................13

SUMMARY OF ARGUMENT ............................................................................................13

ARGUMENT ........................................................................................................................14

    I.    Section 3701.034 Violates The First Amendment................................................14

    II.    Section 3701.034 Violates The Due Process Clause ...........................................19

    III.    Section 3701.034 Violates The Equal Protection Clause ....................................23

    IV.    Plaintiffs Are Entitled To A Permanent Injunction ............................................26

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ACLU of Ky. v. McCreary Cnty.*,
607 F.3d 439 (6th Cir. 2010) ............................................................29

*Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*,
133 S. Ct. 2321 (2013) ..............................................................15, 16

*Bible Believers v. Wayne Cty., Mich.*,
805 F.3d 228 (6th Cir. 2015) (en banc) ..............................................18

*Bigelow v. Virginia*,
421 U.S. 809 (1975) ......................................................................16

*Birth Control Ctrs. v. Reizen*,
743 F.2d 352 (6th Cir. 1984) ..........................................................24

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) ..........................................................26

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) ......................................................................19

*Citizens for Cmty. Values, Inc. v. Upper Arlington Pub. Library Bd. of Trs.*,
No. 08-223, 2008 WL 3843579 (S.D. Ohio Aug. 14, 2008) ...........................26

*Cole v. City of Memphis*,
108 F. Supp. 3d 593 (W.D. Tenn. 2015)..............................................29

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*,
274 F.3d 377 (6th Cir. 2001) .....................................................26, 28

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) ..........................................................14

*Goldman-Frankie v. Austin*,
727 F.2d 603 (6th Cir. 1984) ..........................................................24

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966)......................................................................23

*Kallstrom v. City of Columbus*,
136 F.3d 1055 (6th Cir. 1998) .........................................................26

*Koontz v. St. Johns River Water Mgmt. Dist.*,
133 S. Ct. 2586 (2013)..................................................................19

*Liberty Coins, LLC v. Goodman*,
  748 F.3d 682 (6th Cir. 2014) ................................................................ 28-29

*LULAC v. Bredesen*,
  500 F.3d 523 (6th Cir. 2007) ..................................................................... 23

*McGuire v. Ameritech Servs.*,
  253 F. Supp. 2d 988 (S.D. Ohio 2003) ................................................ 23, 24

*NAACP v. Ala. ex. rel. Patterson*,
  357 U.S. 449 (1958) ................................................................................... 17

*O'Toole v. O'Connor*,
  802 F.3d 783 (6th Cir. 2015) ..................................................................... 24

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ................................................................................... 14

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
  822 F.2d 1390 (6th Cir. 1987) ................................................................... 29

*Planned Parenthood Ass'n of Utah v. Herbert*,
  No. 15-4189, 2016 WL 3742008 (10th Cir. July 12, 2016) ............... 1, 17, 20-21

*Planned Parenthood Ass'n of Hidalgo County, Texas, Inc. v. Suehs*,
  692 F.3d 343 (5th Cir. 2012) ..................................................................... 18

*Planned Parenthood of Cent. & N. Ariz. v. Arizona*,
  718 F.2d 938 (9th Cir. 1983) ................................................................ 16, 17

*Planned Parenthood of Cent. N.C. v. Cansler*,
  877 F. Supp. 2d 310 (M.D.N.C. 2012) .................................................. 17, 20

*Planned Parenthood of Cent. Tex. v. Sanchez*,
  280 F. Supp. 2d 590 (W.D. Tex. 2003) ...................................................... 20

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. Dep't of Health*,
  699 F.3d 962 (7th Cir. 2012) ..................................................................... 20

*Planned Parenthood of Kan., Inc. v. City of Wichita*,
  729 F. Supp. 1282 (D. Kan. 1990) ............................................................. 17

*Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*,
  167 F.3d 458 (8th Cir. 1999) ..................................................................... 17

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ................................................................................... 19

iii

*Planned Parenthood of Sw. & Cent. Fla. v. Philip*,
No. 16 Civ. 321, 2016 WL 3556568 (N.D. Fla. June 30, 2016).......................1, 17, 20, 21

*Planned Parenthood Se., Inc. v. Bentley*,
141 F. Supp. 3d 1207 (M.D. Ala. 2015) ..........................................................................30

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972)............................................................................................................24

*R.S.W.W., Inc. v. City of Keego Harbor*,
397 F.3d 427 (6th Cir. 2005) ..........................................................................................19

*Rosenberger v. Rector & Visitors of. Univ. of Va.*,
515 U.S. 819 (1995).........................................................................................................19

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006).....................................................................................................17, 19

*Rust v. Sullivan*,
500 U.S. 173 (1991).........................................................................................................15

*United States Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973).........................................................................................................24

*Village of Willowbrook v. Olech*,
528 U.S. 562 (2000).........................................................................................................26

*Whole Woman's Health v. Hellerstedt*,
136 S. Ct. 2292 (2016).....................................................................................................23

*Women's Med. Prof'l Corp. v. Baird*,
438 F.3d 595 (6th Cir. 2006) ....................................................................................23, 26

# CONSTITUTION

U.S. Const. amend I ................................................................................................ *passim*

U.S. Const. amend XIV .......................................................................................... *passim*

# STATUTES

Ohio Rev. Code § 3701.034.................................................................................... *passim*

# OTHER AUTHORITIES

Crockett, *The potentially disastrous consequences if John Kasich defunds
Planned Parenthood in Ohio*, Vox.com (Feb. 12, 2016),
http://www.vox.com/2015/11/30/9821440/ohios-potentially-disastrous-
proposal-to-defund-planned-parenthood..........................................................................10

Sanner, *Canton Among Ohio Cities Grappling With Planned Parenthood Restrictions*, Canton Repository (May 19, 2016), http://www.cantonrep.com/article/20160519/NEWS/ 160519130/....................................8

**INTRODUCTION**

On May 23, 2016, this Court temporarily restrained the enforcement of Ohio Revised Statutes § 3701.034, a newly enacted Ohio law disqualifying abortion providers from receiving government funds for non-abortion preventive health and education services. The Court found that Planned Parenthood of Greater Ohio ("PPGOH") and Planned Parenthood Southwest Ohio Region ("PPSWO") were likely to prevail on their claims that Section 3701.034 violates the First Amendment to the United States Constitution, as well as the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, because the statute conditions the receipt of non-abortion-related government funds on Plaintiffs' abandonment of their constitutionally protected rights to advocate for and perform lawful abortions. The Court further concluded that the balance of harms weighed in favor of temporarily restraining enforcement of the law, as the Ohio Department of Health ("ODH") has no interest in enforcing a likely unconstitutional statute and Plaintiffs and their patients would be irreparably injured were the law to take effect.

Since this Court's order, two other federal courts have enjoined similar actions by States to disqualify abortion providers from vital health care programs unrelated to abortion. *See Planned Parenthood Ass'n of Utah v. Herbert*, No. 15-4189, 2016 WL 3742008 (10th Cir. July 12, 2016); *Planned Parenthood of Sw. & Cent. Fla. v. Philip*, No. 16 Civ. 321, 2016 WL 3556568 (N.D. Fla. June 30, 2016). Those decisions, and the evidence produced in discovery in this case, confirm the correctness of this Court's preliminary order and demonstrate that the Court should declare Section 3701.034 unconstitutional and permanently bar its enforcement. Discovery has yielded concrete evidence of the harms that would befall Plaintiffs and the Ohioans who depend on their services in the event of defunding. By contrast, ODH's inability in discovery to provide any details about its plans for transitioning services under most of the

affected programs underscores that the public would suffer harm were Section 3701.034 allowed to take effect. The Court should therefore enter a permanent injunction.

## STATEMENT OF FACTS

### A.     PPGOH and PPSWO's Service to Ohio

For decades, Plaintiffs have provided high-quality health care services and education programs to men and women in Ohio. Decl. of Paul R.Q. Wolfson ("Wolfson Decl.") Ex. 1 ("Harvey Decl.") ¶ 12; Wolfson Decl. Ex. 2 ("Lawson Decl.") ¶ 11. At their 28 health centers across the state, Plaintiffs provide well-woman exams, contraception and contraceptive counseling, testing and treatment for sexually transmitted diseases, and life-saving screenings for breast and cervical cancer and HIV. Harvey Decl. ¶ 9; Lawson Decl. ¶ 8. More than 40% of PPGOH's patients and 75% of PPSWO's patients are low-income, Harvey Decl. ¶ 19; Lawson Decl. ¶ 10, and many live in communities that the U.S. Department of Health and Human Services has classified as Medically Underserved Areas, Harvey Decl. ¶ 11; Lawson Decl. ¶ 10.[1] By offering those services at little or no cost to patients, Plaintiffs ensure that thousands of Ohioans who would otherwise lack access to health care, or experience great difficulty obtaining such care, receive high-quality service. Harvey Decl. ¶ 11; Lawson Decl. ¶ 10. And unlike many providers, Plaintiffs offer this care six days per week, on evenings and weekends, through bilingual staff, and without substantial wait times. Harvey Decl. ¶¶ 19-20, 26; Lawson Decl. ¶¶ 18-19.

Plaintiffs also engage in public education initiatives designed to promote personal responsibility and sexual health. Harvey Decl. ¶ 14; Lawson Decl. ¶ 13. For example, through a program funded by the federal government, Plaintiffs provide health-education services to hard-

---

[1] Medically Underserved Areas are communities that have too few primary care providers, high infant mortality rates, high poverty rates, or large elderly populations. Harvey Decl. ¶ 11.

to-reach populations in the foster-care and juvenile-justice systems.  Harvey Decl. ¶ 47; Lawson Decl. ¶ 35.  *See also infra* pp. 11-13 (discussing Ohio Infant Mortality Reduction Initiative and Violence Against Women Act programs).

Plaintiffs also provide abortion services and advocate for safe and lawful abortion.  They advocate for a woman's right to abortion through their own public awareness campaigns and public education activities and through support of their affiliated advocacy organization, Planned Parenthood Advocates of Ohio.  Harvey Decl. ¶¶ 13-15; Lawson Decl. ¶¶ 12-14; Wolfson Decl. Ex. 19 at 8 (describing PPGOH's advocacy initiative to "reduce the negative stigma around abortion").  Plaintiffs are also affiliates of Planned Parenthood Federation of America ("PPFA"), the nation's leading advocate for safe and lawful abortion as well as the nation's leading provider of information and education about reproductive health.  Harvey Decl. ¶ 16; Lawson Decl. ¶ 15.  Plaintiffs' affiliation with PPFA is critical to their core mission of ensuring access to reproductive health care.  Harvey Decl. ¶¶ 13-16; Lawson Decl. ¶¶ 12-15.

### B.	Section 3701.034

As relevant here, Plaintiffs receive federal funds and material assistance disbursed by ODH and Ohio county health departments under six health and education programs.  Plaintiffs have been chosen to provide services under these programs for many years, in several cases having been selected over other entities for competitive grants.  Harvey Decl. ¶ 12; Lawson Decl. ¶ 11.  These programs have nothing to do with abortion, and yet the challenged statute requires ODH to cut off funds to Plaintiffs solely because of their provision of and advocacy for lawful abortions.  *See* Wolfson Decl. Ex. 8 (ODH Response to Plaintiffs' Request for Admission No. 1).

The Ohio Legislature enacted Section 3701.034 in January 2016.  The law targets Plaintiffs because of their involvement with abortion services.  As Senator Peggy Lehner explained in her floor speech, the law was

necessary only because Planned Parenthood has chosen—you like the word choice—they have chosen to be the leading abortion provider in this nation. You say, but oh, but that's only three percent of what they do. Well if it's only three percent, then perhaps they should be looking to say, let's drop abortion, and concentrate on all those other things. … [W]e have an obligation … to say … to Planned Parenthood, until you get out of the business of termination of pregnancy, the destruction of human life, we are not going to choose to fund you.

Senate Floor Debate, Statement of Sen. Peggy Lehner (Jan. 27, 2016), 01:44:57-01:48:20.[2]

Discovery has revealed that ODH assisted the Legislature in identifying programs specifically for the purpose of defunding Planned Parenthood.[3]

The statute identifies the six affected programs by name and directs ODH to ensure that program funds "are not used to do any of the following":

(1) Perform nontherapeutic abortions;

(2) Promote nontherapeutic abortions;

(3) Contract with any entity that performs or promotes nontherapeutic abortions; [or]

(4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions.

---

[2]    Plaintiffs have manually filed a DVD of the January 27, 2016 session of the Ohio Senate, which includes the cited excerpt, with the Court. *See* Dkt. 32.

[3]    *See, e.g.*, Wolfson Decl. Ex. 20 (legislative request asking for information regarding "all funding distributed to Planned Parenthood since 1995"); Wolfson Decl. Ex. 21 (legislative request regarding "what funding goes to Planned Parenthood in Ohio"); Wolfson Decl. Ex. 22 (inquiry regarding "how any PP activity you have is funded"); Wolfson Decl. Ex. 23 (ODH email addressing "numerous legislative requests" to specify programs that "provide[] funds to Planned Parenthood and other subgrantees"); Wolfson Decl. Ex. 24 (noting in connection with "Rep. Antonio's inquiry" that "ODH HIV/STD Prevention Program managers confirm that they do have subgrants with Planned Parenthood of Southwest Ohio"); Wolfson Decl. Ex. 25 (internal ODH email regarding "SPECIAL PROJECT" addressing "Planned Parenthood … Contracts," stating "[w]e have researched the Sub-grant Programs and found the following Agencies have contracted or may contract with Planned Parenthoods"); *see also* Wolfson Decl. Ex. 21 (email from 2012 noting that "ODH received a legislative request from Senator Jordan's office to find out what funding goes to Planned Parenthood in Ohio" and requesting information on its connection to programs ultimately defunded by Section 3701.034).

Ohio Rev. Code § 3701.034(B)-(G). ODH interpreted the statute—in particular subsections (3) and (4)—as imposing an absolute bar on Plaintiffs' eligibility for grants or contracts under these programs.

As a direct result of Section 3701.034, PPGOH will lose $640,000 in annual grant funds and $420,000 worth of diagnostic testing and treatment. Harvey Decl. ¶ 5. PPSWO will lose $469,460 in grant funds each year. Lawson Decl. ¶ 5.

### C. Programs Affected by Section 3701.034

#### 1. The Infertility Prevention Project/STD Prevention Program

The STD Prevention Program is a federal program that subsidizes diagnostic tests and treatments for certain sexually transmitted diseases ("STDs") through the provision of testing kits, diagnostic testing, and medications to qualified providers. A provider's eligibility for participation in the program is determined by the rates of chlamydia in its service area. *See* Wolfson Decl. Ex. 16 ("PPSWO Dep.") 29:7-15. The free testing and treatment provided under this program ensures that contagious infections are detected early and managed as effectively as possible. Wolfson Decl. Ex. 15 ("PPGOH Dep.") 196:15-197:6.

The STD Prevention Program allows Plaintiffs to provide more than 70,000 free STD tests to low-income Ohioans annually, Harvey Decl. ¶ 24; Lawson Decl. ¶ 22—more than half of the tests administered in Ohio under the STD Prevention Program. *See* Wolfson Decl. Ex. 26 (Planned Parenthood provides 52% of STD tests in Ohio under the STD Prevention Program and majority of medications); Wolfson Decl. Ex. 3 ("Harvey 2d Decl.") ¶ 2; Wolfson Decl. Ex. 4 ("Lawson 2d Decl.") ¶ 2. Plaintiffs also provide free medications to patients who test positive. Harvey Decl. ¶ 24; Lawson Decl. ¶ 22. The STD Program has allowed Plaintiffs to provide free care to low-income Ohioans for more than 15 years. Harvey Decl. ¶ 24.

If the law takes effect, PPGOH alone will lose the equivalent of $420,000 in testing kits, diagnostic testing, and treatment; PPSWO will lose supplies and lab tests to cover over 7,900 diagnostic tests and 1,100 treatments. Harvey Decl. ¶ 24; Lawson Decl. ¶ 5. Plaintiffs will no longer be able to offer free STD testing and treatment, and would have to begin charging patients for that care. PPSWO Dep. 32: 6-17; PPGOH Dep. 186:10-187:-22. Without this subsidy, Plaintiffs will have to charge patients as much as $60 for an STD test. Lawson 2d Decl. ¶ 2. Because patients who receive free testing and treatment generally cannot afford the costs of those services, many will forgo testing altogether. Harvey Decl. ¶¶ 26, 30; Lawson Decl. ¶¶ 24, 28.[4]

At the preliminary stage of this challenge, ODH claimed that there would be "minimal to no gaps" in service if Plaintiffs were barred from participating in the STD Prevention Program. Wolfson Decl. Ex. 9 ("Dennison Aff.") ¶ 8. Internal ODH emails confirm, however, that "defunding Planned Parenthood would create service gaps," because other providers in the areas served by Plaintiffs do not have the capacity to provide anywhere near 70,000 additional free tests annually.[5] *See* Wolfson Decl. Ex. 24 (ODH email stating that "ODH HIV/STD Prevention Program managers confirm that … defunding of Planned Parenthood would create service gaps"). In fact, ODH has admitted that at least three counties served by Plaintiffs will be without

---

[4] PPSWO has no other funds available to subsidize these services, and would have to charge for all STD tests. PPGOH has a grant under the federal Title X program, and, pursuant to that grant, could subsidize testing and treatment for some low-income patients under a sliding fee scale. PPGOH Dep. 187:14-22. But this sliding scale rarely results in cost-free free tests and treatments, and so most patients would have to pay something. As a result of that cost, fewer patients would seek out testing. *See id.* 223:6-15. Further, even where the Title X scale results in a reduced or no charge to patients, PPGOH would have to subsidize the testing and treatment with the finite funding it receives under the Title X program, and so PPGOH would be forced to reallocate funds from other valuable programs. Harvey 3d Decl. ¶ 8.

[5] *See* Wolfson Decl. Ex. 26 (email from ODH program manager for STD Prevention Program noting that "If we stop providing services at Planned Parenthood, we do not have sites that will be able to absorb … more than 29,000 tests[] per year[.]").

*any* qualified provider under the STD Prevention Program if Section 3701.034 takes effect.  *See* Wolfson Decl. Ex. 14 ("ODH Dep.") 111:10-113:9.

### 2.    The Minority HIV/AIDS Initiative And HIV Prevention Program

The Minority HIV/AIDS Initiative (in which PPGOH participates) is a federal program designed to provide HIV testing and education for communities that are disproportionately affected by HIV.  Harvey Decl. ¶ 32.  The HIV Prevention Program (in which PPSWO participated until the passage of Section 3701.034, and in which it wishes to continue to participate) is a comprehensive federal prevention program intended to reduce new infections, increase access to care, improve health outcomes for people living with HIV, and promote health equity.  Lawson Decl. ¶ 29.  Through these programs, Plaintiffs have provided confidential and anonymous HIV tests and referrals for treatment to low-income and minority Ohioans.  PPGOH receives $112,845 in annual grants to serve Canton, Cleveland, and Summit County.  Harvey Decl. ¶ 33.

Without these funds, Plaintiffs will no longer be able to provide (and PPSWO has already stopped providing) confidential, free HIV testing and treatment referrals to low-income Ohioans who are at particular risk for HIV.  Harvey Decl. ¶ 38; Lawson Decl. ¶ 34.  Plaintiffs will instead have to charge for the HIV tests they administer, putting the tests out of reach for many Ohioans who benefit from Plaintiffs' services under these programs.  The loss of this funding also means that PPGOH will have to stop (and PPSWO has already stopped) providing community HIV testing (*i.e.*, at bars and community events), which has allowed them to offer life-saving services to populations that would likely otherwise be out of reach.  *See* PPGOH Dep. 43:21-44:8 (describing "very popular" initiative in Canton in which PPGOH offers HIV testing in bars); PPSWO Dep. 45:7-24 (describing PPSWO testing staff "going to neighborhoods where the target populations might be found" to perform outreach and testing).

Moreover, without access to this federal grant money, Plaintiffs cannot pay the employees who deliver HIV prevention services. PPGOH will be forced to lay off one full-time and two part-time staff members, and PPSWO has already terminated one half-time staff member. Harvey Decl. ¶ 37; Lawson Decl. ¶ 34. Layoffs will make it more difficult to reconstitute the program if Plaintiffs ever become eligible again. Wolfson Decl. Ex. 5 ("Harvey 3d Decl.") ¶ 6; Wolfson Decl. Ex. 6 ("Lawson 3d Decl.") ¶ 8.

With minor exceptions, there is no evidence that ODH or county subgrantees have identified replacement providers for Plaintiffs' HIV prevention services.[6] Although ODH asserts that "at least three regions previously covered by impacted service providers have contracted with replacement providers" (Wolfson Decl. Ex. 7 (ODH Response to Plaintiffs' Interrogatory No. 6)), it has not identified any of those providers or specified which regions they are to cover. In fact, no contracts have been signed to provide services in two of the three regions served by PPGOH. *See* ODH Dep. 126:7-127:22. ODH has been unable to identify even a single replacement provider for the City of Canton. ODH Dep. 121:21-122:10.[7] Under Section 3701.034, then, thousands of patients in PPGOH's service area would be left without access to free HIV testing and treatment referrals. *See* Harvey Decl. ¶ 38 (PPGOH is the largest provider of HIV testing and treatment in Cleveland, Akron, and Canton.).

---

[6]     Hamilton County, which terminated PPSWO's contract before the effective date of Section 3701.034, shifted its HIV program to another provider. Lawson Decl. ¶ 32; Lawson Decl. Ex. D. In addition, on the day that the TRO issued, Summit County shifted its HIV program previously carried out by PPGOH to another provider. Harvey Decl. ¶ 35; Harvey Decl. Ex. D.

[7]     *See also* Sanner, *Canton Among Ohio Cities Grappling With Planned Parenthood Restrictions*, Canton Repository (May 19, 2016), http://www.cantonrep.com/article/20160519/NEWS/ 160519130/ (last visited July 18, 2016) (Wolfson Decl. Ex. 17) (Canton health commissioner states: "We have not been really able to find a suitable provider to take [PPGOH's] place.").

### 3. Personal Responsibility Education Program

The Personal Responsibility Education Program ("PREP") is a federal program designed to educate young people about abstinence and contraception, with the goal of reducing teen pregnancy and STD rates. Harvey Decl. ¶ 47; Lawson Decl. ¶ 35. The PREP curriculum includes an evidence-based pregnancy and STD prevention curriculum called Reducing the Risk ("RTR"), and covers topics related to health and adulthood, including healthy relationships, financial literacy, and preparing for careers. Ohio has nine regional grantees that provide PREP training to direct-care staff, who in turn educate young people on those topics. Harvey Decl. ¶ 47; Lawson Decl. ¶ 35.

Plaintiffs have three of those regional grants—PPGOH serves Region 4; PPSWO serves Regions 2 and 3. Wolfson Decl. Ex. 10 ("Norton Aff.") ¶ 9. In addition, PPGOH is a subgrantee of Summit County Public Health and Cuyahoga County Board of Health to provide PREP programming in those counties. Harvey Decl. ¶ 48. Through those grants and subgrants—which total approximately $500,000, Harvey Decl. ¶ 48; Lawson Decl. ¶ 36—Plaintiffs provide training on STD and teen pregnancy prevention to staff who work with teens in the juvenile justice and foster care systems in 34 of Ohio's 88 counties. Harvey Decl. ¶ 48; Lawson Decl. ¶ 36. If Section 3701.034 took effect, PPGOH would have to lay off two health educators dedicated to the PREP program, in addition to a PREP educator who has already resigned because of the uncertainty created by Section 3701.034. Harvey Decl. ¶ 54; PPGOH Dep. 87:4-88:4. PPSWO has already laid off a health educator and would have to terminate others (including its Vice President of Education). Lawson Decl. ¶ 39.

ODH went to great lengths in discovery to have Plaintiffs concede that the education programs they might offer instead of PREP would be comparable (if not preferable), and therefore that Plaintiffs would be uninjured. That is plainly not the case. Only the PREP

program affords Plaintiffs access to foster care and juvenile justice programs and providers. Harvey 3d Decl. ¶ 7; Lawson 3d Decl. ¶ 9. If terminated from the program, Plaintiffs could no longer reach those underserved target populations, and would no longer be able to help educate those young people about sexual and reproductive health, prevention of unintended pregnancies, and healthy relationships, as Congress intended when it funded the program. Harvey 3d Decl. ¶ 7; Lawson 3d Decl. ¶ 9. The PREP program and its beneficiaries will be harmed should Plaintiffs be eliminated from the program. Documents produced by ODH suggest that, contrary to their representation at the preliminary stage of this challenge (Norton Aff. ¶ 13), there will in fact be a "gap in services." *See* Wolfson Decl. Ex. 27 (April 19, 2016 email from ODH offering to "increase awards with a priority to those able to pick up some of the service area that will have a gap in services related to the loss of funds to Planned Parenthood"). And Plaintiffs' deep and broad experience with these communities makes them uniquely competent to provide these services. *See* Wolfson Decl. Ex. 28 (email from PREP program manager at ODH indicating that ODH would have to hire "the staff currently doing the program"—*i.e.*, Plaintiffs' employees—to continue providing PREP services). Without the benefit of Planned Parenthood staff, less experienced and adept providers will run less effective programs, leading to more people engaging in unhealthy relationships and more unintended pregnancies.[8]

---

[8] *See, e.g.*, Wolfson Decl. Ex. 29 (internal ODH email reflecting on a news article describing HB 294 and stating that based on this report, "the impact of the defund would be devastating to everything we do."); Crockett, *The potentially disastrous consequences if John Kasich defunds Planned Parenthood in Ohio*, Vox.com (Feb. 12, 2016), http://www.vox.com/2015/11/30/9821440/ohios-potentially-disastrous-proposal-to-defund-planned-parenthood (last visited July 18, 2016) (Wolfson Decl. Ex. 18) (quoting Kelli Arthur Hykes, the director of public health policy at Columbus Public Health as saying, "The bottom line is that in many communities, Planned Parenthood is the organization that can provide the best care and the best services at the best price for a taxpayer."). Indeed, Nationwide Children's Hospital, to which ODH plans to allocate some of PPSWO's PREP service area, is located in Columbus—a considerable distance from Cincinnati—and there is no indication that Nationwide could provide PREP services as well as a local provider. *See* ODH Response to Plaintiffs' Interrogatory No. 5. Further, Belmont County, one of the replacement PREP providers identified in Defendants' Interrogatory Response No. 5, informed ODH that it did not have the capacity to replace PPGOH. *See* Wolfson Decl. Ex. 28 (in response to

### 4. Breast and Cervical Cancer Prevention Program

The Breast and Cervical Cancer Prevention Program ("BCCP") is a federal program that subsidizes cancer screening and follow-up services for low-income and minority women. Plaintiffs have been BCCP service providers for more than 20 years. Harvey Decl. ¶ 28; Lawson Decl. ¶ 26. Through BCCP, Plaintiffs provide life-saving pap tests, breast exams, colposcopies, and cervical biopsies free of charge to eligible patients (low-income women over the age of 40 who are at risk for cancer but are not eligible for Medicaid), and then are reimbursed for the services they provide. Harvey Decl. ¶ 27; Lawson Decl. ¶ 25.

Should the law take effect, Plaintiffs will no longer be able to offer those services free of charge to qualifying women in their service areas. Harvey Decl. ¶ 30; Lawson Decl. ¶ 28. PPSWO and PPGOH patients who qualify for BCCP services will be required to visit other facilities to get free cancer screenings. Those facilities are unlikely to be able to offer the comprehensive services, without wait times, that Plaintiffs can provide, and the patients' continuity of care with a trusted, long-time provider will be disrupted—making it less likely that those women will seek and obtain vital health care services. Harvey Decl. ¶ 31.

### 5. Ohio Infant Mortality Reduction Initiative

The Ohio Infant Mortality Reduction Initiative ("OIMRI") is a federally funded neighborhood outreach and care coordination program that assists pregnant, at-risk African-American women and their families. PPGOH's Healthy Moms Healthy Babies initiative has received OIMRI grants for more than 20 years. Harvey Decl. ¶ 41. Presently, PPGOH has two OIMRI grants totaling approximately $350,000, which PPGOH uses to provide case

---

ODH's "suggested list of counties that would be transferred to other regions in the wake of the Planned Parenthood Defunding," Belmont County Health Department replied, "It looks like a lot … it would be too much travel for the staff that is here now").

management and care coordination services to low-income, African-American women before pregnancy, during pregnancy, and up to two years after birth, including education and assistance with health, housing, nutrition, and employment. Harvey Decl. ¶ 42. Many of the participating mothers do not have transportation for prenatal appointments, may not have health insurance, and/or may engage in high-risk activities. Harvey Decl. ¶ 42.

If Section 3701.034 takes effect, PPGOH will be forced to terminate Healthy Moms Healthy Babies. Harvey Decl. ¶ 45. PPGOH will be unable to provide the expectant and new mothers it serves with access to critical education and support. Harvey Decl. ¶ 45. PPGOH will also be forced to lay off six staff members dedicated to the program. Harvey Decl. ¶ 46.

There is no evidence that ODH could replace PPGOH as an OIMRI service provider, particularly in view of PPGOH's unique expertise delivering these services. ODH was unable to identify a provider who was prepared to absorb PPGOH's clients without delay—which is critical to social-work programs like Healthy Moms Healthy Babies.[9] ODH asserts that Mahoning County would simply deliver OIMRI services itself by hiring "the entire staff that had previously been employed by PPGOH to oversee the Healthy Moms Healthy Babies Program." ODH Response to Plaintiffs' Interrogatory No. 4. Even putting aside that a shift to a new provider, with services disrupted in the interim, would be harmful to the women who obtain those services (Harvey 2d Dec. ¶ 6), ODH is simply wrong. *See* PPGOH Dep. 94:9-95:2 (County required to post OIMRI positions internally and then to the general public instead of simply hiring PPGOH staff). And in any event, the fact that the State could provide OIMRI

---

[9]        *See* Wolfson Decl. Ex. 30 (email from ODH Affiant Dyane Gogan-Turner stating "[t]here is another home visiting program in Mahoning County—Resource Mothers. However, I do not think they would have capacity to absorb the clients the next day[.]"); *see also* Wolfson Decl. Ex. 31 (email from OIMRI provider noting that "[t]here is a gap between when our current contract with the Health Department ends in June and when we would start if we were awarded the grant" and proposing that Planned Parenthood staff could bridge the gap).

services only by hiring PPGOH employees confirms that PPGOH's expertise is vital to these programs.

### 6. Violence Against Women Act

The Violence Against Women Act ("VAWA") Sexual Violence Prevention Program is a federally funded program that aims to reduce sexual violence through primary prevention and education. Lawson Decl. ¶ 40. PPSWO has received VAWA funds for 10 years. Lawson Decl. ¶ 42. Presently, PPSWO has a $65,000 grant to provide training to middle and high school students in four counties on healthy relationships, recognizing unhealthy relationships, bullying and sexual assault recognition, and bystander intervention skills. Lawson Decl. ¶ 42-43.

Without this $65,000 grant, PPSWO would stop providing VAWA training programs entirely. Lawson Decl. ¶ 45. As a result, the 700 middle and high school students who currently participate will no longer have access to this vital educational programming. Lawson Decl. ¶ 43. Moreover, PPSWO has already laid off one health educator who serves both the PREP and VAWA programs, and will also likely have to lay off one additional staff member if Section 3701.034 goes into effect. Lawson Decl. ¶ 45. ODH has not even attempted to show that it could replace PPSWO as a VAWA service provider.

### SUMMARY OF ARGUMENT

Section 3701.034 is unconstitutional because it requires, as a condition of receiving government funds, that recipients abandon their rights to engage in constitutionally protected activity—engaging in free speech protected by the First Amendment, and providing abortion services protected by the Due Process Clause. A long line of precedent confirms that the State may not seek to leverage its control of public funds to coerce funding recipients to relinquish their constitutional rights in this manner. In addition, Section 3701.034 violates the Equal

Protection Clause because it discriminates against entities—like Plaintiffs—that engage in such constitutionally protected activity.

The law's unconstitutionality is a sufficient reason to permanently enjoin it. The traditional equity factors favor the same outcome. Discovery has conclusively shown that Section 3701.034 will cause significant and irreparable harm to Plaintiffs, as well as Ohioans served by Plaintiffs. Thousands of Ohioans, particularly minorities and those with low incomes, will be deprived of a trusted and longtime provider of critical health and education services. Plaintiffs will be forced to close down vital health care and education programs and terminate employees. ODH has defended the law by speculating that it could transition services with "minimal to no gaps." But discovery has shown that is emphatically not the case. With respect to the vast majority of programs and service areas, ODH has identified no adequate replacement providers. And even where ODH has managed some stopgap measures, the harm to Plaintiffs and the public from ceasing Plaintiffs' seasoned, expert programs would be profound. By contrast, ODH would suffer no cognizable harm from an injunction. The Court should therefore enter a permanent injunction against enforcement of Section 3701.034.

## ARGUMENT

### I.     Section 3701.034 Violates The First Amendment

The Supreme Court has long made clear that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "[E]ven though a person has no 'right' to a valuable governmental benefit," *id.*, "a state actor cannot constitutionally condition the receipt of a benefit … on an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression," *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994). "[I]f the government could deny a

benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which it could not command directly.'" *Rust v. Sullivan*, 500 U.S. 173, 212-13 (1991).

The government may, of course, insist that public funds be expended only for certain purposes and not for others, and thus it may limit the topics on which funding recipients may speak when they are administering a government-funded program. But the government violates the unconstitutional-conditions doctrine when it places a speech restriction "on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the [publicly] funded program." *Rust*, 500 U.S. at 197. As the Supreme Court recently explained in *Agency for International Development v. Alliance for Open Society International, Inc.*, 133 S. Ct. 2321, 2328 (2013) ("*AOSI*"), "the relevant distinction … is between conditions that define the limits of the government spending program—those that specify the activities [the government] wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." The former may be constitutionally permissible; the latter—which is what Ohio has done here—is not.

As implemented by ODH, Section 3701.034 bars any entity from receiving certain government funds if it "promot[es]" "nontherapeutic abortions"—meaning that the entity "advocate[s] for, assist[s] with, encourage[s], or popularize[s] [abortion] through advertising or publicity." Ohio Rev. Code § 3701.034(A)(8). It is indisputable that Ohio could not, consistent with the First Amendment, directly prohibit Plaintiffs from "promoting" safe and lawful abortion, as defined in the statute. Advocacy for safe and lawful abortion is protected by the

First Amendment, as are engaging in public education about abortion and providing the public with truthful information about the availability of abortion services. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 825-29 (1975); *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 944 (9th Cir. 1983). But the law disqualifies from government funds any organization that engages in such constitutionally protected activity—even where, as here, the programs have nothing to do with abortion and the funds received are not used to "promote" abortions. *See* ODH Response to Plaintiffs' Request for Admission No. 1; Harvey Decl. ¶ 3; Lawson Decl. ¶ 3.[10]

Indeed, the law goes even further; it also disqualifies from funding any entity that *affiliates* with organizations that engage in constitutionally protected speech. The law bars participation of any entity that "affiliat[es]" with any organization that performs or promotes nontherapeutic abortions, and defines "affiliate" to include sharing a "brand name, trademark, service mark, or other registered identification mark" with an organization that provides or "promotes" abortion. Ohio Rev. Code § 3701.034(A)(1)(c). This provision of the law—which directly targets Planned Parenthood affiliates—would render Plaintiffs ineligible for government funding based on their association with PPFA alone. Put another way, the "affiliate" provision would disqualify Plaintiffs from receiving funding even if they ceased all abortion-related activities, solely because they share their name with entities that advocate for safe and legal abortion.

---

[10] ODH has conceded that the funding conditions imposed by Section 3701.034 are unrelated to abortion services. *See* ODH Memorandum in Opposition to Motion for TRO ("Opp.") (Doc. 17) 11, PageID # 258 ("The funding preference law at issue here does not even relate directly to abortion services, but rather regulates how Ohio will spend public funds related to non-abortion services."). There is thus no dispute that Section 3701.034 is intended to and does condition funding on Plaintiffs' renunciation of constitutionally protected activity occurring "outside the contours of the [state] program," and on their own "time and dime." *AOSI*, 133 S. Ct. at 2328, 2330.

That "affiliate" provision violates the First Amendment as well. The First Amendment protects Plaintiffs' right "to engage in association for the advancement of beliefs and ideas" and thus to affiliate with organizations that advocate for safe and lawful abortion. *NAACP v. Ala. ex. rel. Patterson*, 357 U.S. 449, 460-61 (1958). Ohio may not leverage government funds to accomplish the unconstitutional aims that it could not achieve directly—namely, coercing Plaintiffs to abandon their constitutionally protected speech and association rights, and penalizing them for exercising those rights. *See Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006).

As courts have emphasized in rejecting similar efforts to disqualify Planned Parenthood affiliates from public funds, "the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Planned Parenthood of Utah*, 2016 WL 3742008, at *10; *see also Planned Parenthood of Sw. & Cent. Fla.*, 2016 WL 3556568, at *4 ("[T]he Florida legislature … can prohibit the use of state funds for abortion services but cannot prohibit a recipient of state funds from separately providing abortion services."); *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 319-20 (M.D.N.C. 2012) ("[T]he State may not condition participation in a government program or receipt of a government benefit, such as [State health department]-administered contracts and grants, upon an applicant's exercise of protected rights, such as the right to advocate for and provide abortion-related services.") (internal quotation marked and alterations omitted).[11]

---

[11] *See also Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 463 (8th Cir. 1999) (explaining that a statute would impose unconstitutional conditions by barring recipients of government funds from promoting abortion outside the scope of a government-funded program or affiliating with entities that provide abortions ); *Planned Parenthood of Cent. & N. Ariz.*, 718 F.2d at 944-45 (the fact that an entity "engage[s] in abortion-related activities [including advocacy] disfavored by the state" was not a constitutional basis for denying funding); *Planned Parenthood of Kan., Inc. v. City of Wichita*, 729 F. Supp. 1282, 1289 (D. Kan. 1990) (concluding that the State would likely violate the First Amendment by denying funding to plaintiff based on its stance on abortion).

ODH has argued that Ohio may favor childbirth over abortion in its government

programs, and so the State may act to ensure that its anti-abortion message is not "garbled" by

allowing Plaintiffs to provide services under those programs.[12]  That argument is severely

flawed.  The programs at issue—which are federally funded and have purposes defined by

federal law—have nothing to do with abortion, and they do not contain any message for or

against abortion.  The programs involve specific health care services (*i.e.*, testing for HIV,

testing for certain STDs, and screening for breast and cervical cancer) and precisely defined

education and outreach programs (*i.e.*, educating young people about violence against women,

helping expecting and new mothers to raise their children in a healthy way, and providing

adolescents with information about how to make successful life choices).  *See* Harvey Decl.

¶¶ 23, 27, 32, 40, 47; Lawson Decl. ¶¶ 21, 25, 29, 35, 40.  The contours of these programs are

highly structured according to federal and state specifications, and the debate over abortion does

not enter into them.  *See, e.g.*, PPGOH Dep. 124:3-20; *id.* at 128:12-14.  Thus, there is no "anti-

abortion message" present that might conceivably be garbled.[13]

---

[12]     For several reasons, the State's reliance on *Planned Parenthood Association of Hidalgo County, Texas, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012), is unavailing.  First, as Plaintiffs have previously explained in their TRO briefs (Mem. in Support (Doc. 7) 13-14, PageID # 67-68), that decision—which held that Texas could deny participation in a state family-planning program to organizations that "promote" "elective" abortions—cannot be squared with the Supreme Court's decision in *Rust* and does not survive the Court's more recent decision in *AOSI*.  In addition—as this Court explained in issuing the temporary restraining order (Doc. 19) (TRO 11, PageID # 318)—Section 3701.034 is quite different from the regulation at issue in the Fifth Circuit case.  Moreover, even the Fifth Circuit recognized that a "restriction on *affiliation* is [constitutionally] problematic because it is not a direct regulation of the content of a government program."  692 F.3d at 351 (emphasis added).

[13]     Section 3701.034 also violates the First Amendment because it amounts to viewpoint discrimination.  The State has targeted only organizations that speak in *favor* of access to safe and lawful abortion.  Section 3701.034 leaves ODH free to fund organizations that speak against abortion by, for example, trying to persuade women that they should not have abortions or trying to persuade the public that abortion should be banned.  The Constitution does not permit such "odious viewpoint discrimination" because "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc), *cert.*

## II.     Section 3701.034 Violates The Due Process Clause

Just as the State may not require Plaintiffs to abandon their First Amendment rights to qualify for funding under the affected programs, it likewise is precluded by the Due Process Clause of the Fourteenth Amendment from requiring Plaintiffs to cease "perform[ing]" "nontherapeutic" abortions as a condition of funding.

The relevant legal principles here are well settled.  First, the unconstitutional-conditions doctrine protects rights secured under the Due Process Clause, just as it protects First Amendment rights.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013) (unconstitutional-conditions doctrine applies in a "variety of contexts" to "vindicate[ ]" constitutional rights); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) (holding that the doctrine "prohibit[s] the government from conditioning benefits on a citizen's agreement to surrender due process rights.").  Second, Ohio could not pass a law directing otherwise qualified abortion providers not to perform "nontherapeutic" abortions.  *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992).  It necessarily follows, then, that Ohio cannot do what it has attempted to do here—requiring abortion providers to abandon a constitutionally protected activity as a condition of receiving public funds unrelated to abortion. *See Rumsfeld*, 547 U.S. at 59 (a funding condition is "unconstitutional if [the legislature] could not directly require" it consistent with the Constitution).

Other states have tried this gambit before, and courts have consistently stopped them. Very recently, for example, both the Tenth Circuit and the Northern District of Florida ruled that a state may not constitutionally single out abortion providers for exclusion from government

---

*denied,* 136 S. Ct. 2013 (2016).  "Discrimination against speech because of its message is presumed to be unconstitutional."  *Rosenberger v. Rector & Visitors of. Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) ("[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

programs having nothing to do with abortion.  *See Planned Parenthood of Utah*, 2016 WL 3742008, at \*14; *Planned Parenthood of Sw. & Cent. Fla.*, 2016 WL 3556568, at \*2 (noting that "a government cannot prohibit indirectly—by withholding otherwise-available public funds— conduct that the government could not constitutionally prohibit directly").[14]

In its briefing on the TRO, ODH relied on the Seventh Circuit's divided decision in *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012), to argue that Section 3701.034 does not impose an unconstitutional condition because "a ban on funding abortion providers for unrelated services does not burden a woman's right to obtain an abortion."  Opp. 11, PageID # 258.  According to ODH, a funding condition cannot violate the constitutional right to abortion protected by the Due Process Clause, because a condition on a program that does not involve abortion services can never create an "undue burden" on a woman's right to terminate her pregnancy, as articulated in *Casey*.

ODH's argument, if accepted, would essentially eliminate the unconditional-conditions doctrine in the context of the constitutionally protected right to abortion.  To the extent the Seventh Circuit's decision might be read to adopt such a position, that decision was erroneous (as Plaintiffs explained in their TRO briefs, *see* Mem. in Support (Doc. 7) 17-18, PageID # 71-72 & Reply (Doc. 18) 7-8, PageID # 287-288), and it has been fatally undermined by the Supreme Court's intervening decisions in *AOSI* and *Koontz*, which reaffirm that (1) the unconstitutional-conditions doctrine prevents the government from forcing a recipient to abandon constitutionally protected activity *outside* the scope of funding programs, and (2) the doctrine is not limited to the

---

[14]     *See also Planned Parenthood of Cent. N.C.*, 877 F. Supp. 2d at 319-20 ("[T]he State may not condition participation in a government program or receipt of a government benefit … upon an applicant's exercise of protected rights, such as the right to … provide abortion-related services" (internal quotation marks omitted)); *Planned Parenthood of Cent. Tex. v. Sanchez*, 280 F. Supp. 2d 590, 609 (W.D. Tex. 2003) ("[W]hile refusal to fund abortion does not impose an unconstitutional restriction on abortion, refusal to fund entities because they provide abortions with private funds presents a different situation.").

First Amendment, but rather protects the full range of constitutional rights. Recent decisions in similar cases confirm both points. *See Planned Parenthood of Utah*, 2016 WL 3742008, at *14 (unconstitutional conditions claim likely to succeed where plaintiff established that Utah defunding action punished plaintiff for exercising Fourteenth Amendment abortion rights); *Planned Parenthood of Sw. & Cent. Fla.*, 2016 WL 3556568, at *6 (Florida defunding law unconstitutionally conditions state funding on relinquishment of Fourteenth Amendment abortion rights).

In short, Section 3701.034 violates the Due Process Clause because it requires those who would receive government funds to renounce their right to engage in constitutionally protected activity—here, the provision of abortion services. The Court is not required to examine whether Plaintiffs would, in fact, succumb to the pressure of Section 3701.034 and would cease providing abortions as a result of that law; the unconstitutional-conditions doctrine prevents the State from forcing Plaintiffs into that position. And in this case, Section 3701.034 disqualified Plaintiffs from funding because they had provided abortions *in the past*; when ODH terminated Plaintiffs' contracts in the middle of their contract terms, it effectively imposed a penalty on Plaintiffs for engaging in constitutionally protected activity. *See* ODH Response to Plaintiffs' Interrogatory No. 7 (ODH simply reviewed "publicly available information" about which organizations performed abortions before ordering the cancellation of their contracts).

In any event, as explained below, the record evidence is unequivocal that, if Plaintiffs were to cease providing abortions as the required price of accepting government funds, women will be prevented from obtaining abortions. Plaintiffs provide a substantial proportion of the abortions in the areas that they serve, and the remaining clinics—if Plaintiffs' patients could reach them—have limited capacity to absorb Plaintiffs' patients.

These facts are undisputed: If Plaintiffs ceased providing abortions, there would be no other surgical abortion center in the Cincinnati area, and only one remaining abortion provider in the Columbus area. Henshaw Rep. ¶ 5. Accordingly, if PPSWO were to cease providing abortions, Cincinnati-area women needing an abortion would have to travel at least 50 miles to Dayton (to a provider with limited capacity to absorb new patients), 100 miles to Columbus, 200 miles to Toledo, 230 miles to Akron, or 250 miles to Cleveland. Henshaw Rep. ¶ 5; Haskell Dec. ¶ 9. And, if PPGOH were to cease providing abortions, the sole alternative provider in the Columbus area could not absorb the patients needing abortions there (let alone Cincinnati-area women who would be forced to seek care elsewhere), and thus Columbus-area women seeking abortions would have to travel elsewhere—70 miles to Dayton, 125 miles to Akron, 145 miles to Cleveland, or 145 miles to Toledo. Henshaw Rep. ¶ 8; Hubbard Decl. ¶ 8.

The lack of capacity at the remaining clinics and increased distances women would be required to travel would pose a substantial obstacle to women seeking an abortion in Ohio. An additional travel burden of 100 miles will deter 20 to 25 percent of women who would have otherwise sought an abortion. Henshaw Rep. ¶ 17. This effect is magnified in Ohio by the State's requirement that women travel to an abortion provider twice—each trip separated by at least 24 hours—before receiving an abortion. Henshaw Rep. ¶ 29. The financial and logistical difficulties are even greater for the many low-income women that Plaintiffs serve. Forty-nine percent of women who receive abortions live below the federal poverty level. Henshaw Rep. ¶ 31. And even if a woman seeking an abortion is able to make multiple trips to a distant city, she will likely face further delays as other abortion providers struggle to absorb PPGOH and PPSWO's patients—increasing the risks of the procedure, given that the risks of abortion increase as the pregnancy progresses. Henshaw Rep. ¶ 33.

Because other abortion providers in the Columbus and Cincinnati areas lack the capacity to absorb all of Plaintiffs' patients, the necessary effect of Plaintiffs' ceasing to provide abortions pursuant to the statute would be to impose significant travel burdens on women seeking abortions, extend wait times, and increase crowding at Ohio abortion providers—all of which will prevent women in Ohio from obtaining abortions. As the Supreme Court has recognized, such a law imposes an undue burden on women seeking an abortion. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2318 (2016) (finding undue burden based on anticipated increased travel times for women seeking abortions, overcrowded facilities, and the "shortfall in capacity" that would result from closing down a substantial number of abortion clinics) ; *cf. Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 605 (6th Cir. 2006) (law creates an undue burden when a "large fraction" of women seeking abortion would be unable to obtain one).

## III.    Section 3701.034 Violates The Equal Protection Clause

By singling out entities that perform or promote abortions and those who affiliate with such entities, Section 3701.034 also violates the Equal Protection Clause. The Equal Protection Clause prohibits "infringements on certain 'fundamental rights' basic to all Americans, whether or not such rights are explicitly guaranteed by the text of the Constitution." *McGuire v. Ameritech Servs.*, 253 F. Supp. 2d 988, 998 (S.D. Ohio 2003). Laws that burden those constitutional rights trigger heightened scrutiny. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."); *LULAC v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007) ("a classification warrants strict scrutiny if it burdens the exercise of a fundamental right").

Section 3701.034 on its face discriminates on the basis of the exercise of constitutionally protected rights. Specifically, Section 3701.034 targets for disfavored treatment entities that "promote" abortion, "perform" abortions, or "affiliate" with entities that do so, by rendering them ineligible to receive government funds. The law thus abridges the right to an abortion, *see Birth Control Ctrs. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984), as well as the right to engage in speech and association protected by the First Amendment, *see McGuire*, 253 F. Supp. 2d at 998; *cf. Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96-97 (1972) (invalidating law that burdened First Amendment freedom of speech under the Equal Protection Clause).

A law that burdens fundamental rights in this manner must be "narrowly tailored" to serve a "compelling [government] interest." *O'Toole v. O'Connor*, 802 F.3d 783, 789 (6th Cir. 2015); *see Goldman-Frankie v. Austin*, 727 F.2d 603, 605 (6th Cir. 1984) ("Pursuant to the fundamental rights strand of equal protection analysis, a State must prove that its limitation 'is necessary to serve a compelling interest'."). But ODH offers *no* constitutionally sufficient state interest—much less a compelling interest—to justify the denial of government funds to entities solely because they engage in constitutionally protected speech or conduct with *separate* funds. Accordingly, Section 3701.034 violates the Equal Protection Clause.

Even if rational-basis review applies instead, Section 3701.034 still violates the Equal Protection Clause because it discriminates against entities that provide and promote abortions without a rational reason for doing so. *See United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973). Barring Plaintiffs from participating in these programs cannot be justified by the State's interest in favoring childbirth over abortion, as these programs have nothing to do with abortion. *See supra* p. 16 n.12. Likewise, the State's interest in ensuring that government funds are not spent on abortion cannot justify the statute. Existing federal and state laws already

prohibit the use of government funds for providing abortions (TRO (Doc. 19) 10, PageID # 317), and Plaintiffs scrupulously separate government funds from any funds used to provide abortions. Harvey 3d. Decl. ¶ 3; Lawson 3d. Decl. ¶ 4; *see also* PPSWO Dep. 198:11-199:13, 260:2-262:18; PPGOH Dep. 250:13-251:7.

The true design of the law, as candidly acknowledged during its enactment, *see supra* p. 4, was to force Plaintiffs to forfeit their constitutional rights as the price of continuing to receive government funds. That is not a permissible governmental objective, as the Court has recognized (TRO 17, PageID # 324), and cannot justify Section 3701.034. Moreover, the specificity with which the State drafted Section 3701.034 confirms that the State intentionally singled out Planned Parenthood affiliates for disfavored treatment. The Legislature went to pains to identify specific programs to subject to the statute, and it is no coincidence that the programs named in the law are the very programs in which Plaintiffs participate. Emails between legislative staffers and ODH in the fall of 2015, when the bill was being drafted, demonstrate that in selecting these programs, the legislature was specifically targeting Planned Parenthood. *See supra* p. 4 n.4. That Plaintiffs were the intended target of the bill is confirmed by the fact that ODH has not sent termination letters to any other providers. ODH Dep. 192:20-194:19.

In drafting Section 3701.034, the State erected a barrier to Plaintiffs' participation in the affected programs that does not apply to any other service providers. Prior to 3701.034, providers were selected to receive government funding under the affected programs based on their ability to deliver services. Harvey 3d Decl. ¶ 5; Lawson 3d Decl. ¶ 7. With the passage of Section 3701.034, Plaintiffs must stop engaging in protected speech and conduct completely in order to be considered in the first instance. No other service provider is put to that choice. Because there is no legitimate reason for singling Plaintiffs out for disparate treatment in this

manner, Section 3701.034 violates the Equal Protection Clause.  *See, e.g.*, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (equal protection violation established where plaintiff "has been intentionally treated differently from others similarly situated" and "there is no rational basis for the difference in treatment").

## IV. Plaintiffs Are Entitled To A Permanent Injunction

Having established that Section 3701.034 violates their rights under the First and Fourteenth Amendments, Plaintiffs have also gone far in establishing their entitlement to a permanent injunction against enforcement of the law.  "Where the plaintiff establishes a constitutional violation after a trial on the merits, the plaintiff will be entitled to permanent injunctive relief upon showing (1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law."  *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998); *see also Women's Med. Prof'l Corp.*, 438 F.3d at 602 (same).  Plaintiffs easily satisfy those elements.  In addition, the injury to Plaintiffs from enforcement of the law would outweigh any damage that an injunction might cause to others, and the injunction will serve the public interest.  *See Citizens for Cmty. Values, Inc. v. Upper Arlington Pub. Library Bd. of Trs.*, No. 08-223, 2008 WL 3843579, at *16 (S.D. Ohio Aug. 14, 2008).

*First*, Plaintiffs—along with their patients and other Ohioans who benefit from the services they deliver—will suffer continuing, irreparable harm unless an injunction issues permanently barring enforcement of Section 3701.034.  The fact that the statute violates Plaintiffs' First and Fourteenth Amendment rights, by itself, establishes irreparable injury.  *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).  But the harm imposed by Section 3701.034 is not limited to violation of Plaintiffs' First and Fourteenth Amendment rights.  As an immediate consequence of the statute, in addition to the loss of funds and in-kind

assistance that enable them to provide critical services, PPGOH and PPSWO would have to lay off multiple employees, as no funding would be available for their services. *See* PPGOH's Response to ODH Interrogatory No. 3; PPSWO's Response to ODH Interrogatory No. 3. And it will be virtually impossible for Plaintiffs to reconstitute these programs and services in the event that the statute is later deemed unconstitutional. PPGOH Response to ODH Interrogatory No. 3; PPSWO Response to ODH Interrogatory No. 3.

Section 3701.034 will also undermine Plaintiffs' core mission: ensuring access to reproductive health care and education services. Harvey 3d Decl. ¶ 6; Lawson 3d Decl. ¶ 8. The programs and services affected by Section 3701.034 are important vehicles through which Plaintiffs deliver services to their communities. Harvey 3d Decl. ¶ 6; Lawson 3d Decl. ¶ 8. If they are cut off from funding under the statute, Plaintiffs would have to curtail vital health care services and education programs now offered to thousands of low-income and minority Ohioans. Without funding from the STD Prevention Program, Minority HIV/AIDS Initiative, and BCCP, Plaintiffs will have to begin charging for the life-saving tests previously provided through these programs, on terms that will differ in critical ways from the manner in which they delivered these services under the programs. Harvey 3d Decl. ¶¶ 6, 8; Lawson 3d Decl. ¶ 8. PPSWO will no longer be able to provide *any* free STD, HIV, and breast and cervical cancer screenings— which undermines its ability to provide continuous, comprehensive health care. Lawson 3d Decl. ¶ 8. Public health will suffer, too; Plaintiffs provide a large plurality of the free STD testing offered statewide under the STD program, Lawson 2d Decl. ¶ 2, and the harm from reducing access to free HIV testing could be catastrophic, Harvey Decl. ¶ 39.

In its affidavits in opposition to Plaintiffs' TRO, ODH asserted (providing no details) that there would be "minimal to no gaps" in service under any of the affected programs. *See, e.g.*,

Dennison Aff. ¶¶ 8, 17; Norton Aff. ¶ 13. But, as explained above, *see supra* p. 6-13, discovery has shown ODH's assertions to be deeply flawed. For most of the programs and service areas, ODH has identified no alternate providers capable of providing the services that Plaintiffs had provided or absorbing all of Plaintiffs' patients. *See id*. And while ODH strove mightily in discovery to disparage Plaintiffs' education programs as either a drag on Plaintiffs' resources or easily replaceable, the record makes plain that those programs are central to Plaintiffs' missions and that Plaintiffs are intimately familiar with the unique needs and challenges of the communities they serve and are highly qualified to provide these services.

*Second*, neither ODH nor any third party will suffer harm from a permanent injunction. As this Court recognized (TRO 18, PageID # 325), the State has no legitimate interest in enforcing an unconstitutional law, and thus "no substantial harm to [Defendant] can be said to inhere in [Section 3701.034's] enjoinment." *Deja Vu of Nashville*, 274 F.3d at 400. Nor would protecting Plaintiffs' constitutional rights cause any harm to third parties. *See id.*

ODH previously claimed that it would suffer harm from its lost time and effort identifying alternative providers. *See* Opp. 19, PageID # 266. But that is a result of the legislature's decision to pass an unconstitutional law—it is not a reason to withhold an injunction barring the law's enforcement. In two instances, before the Court issued its TRO, counties identified alternative providers for HIV services (*see supra* p. 8), but as Plaintiffs have previously made clear (*see* Reply 12-13, PageID # 292-293), they are not requesting such contracts be rescinded, even though it is plain that the loss of those contracts has harmed Plaintiffs.

*Third*, a permanent injunction is in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Liberty Coins, LLC v.*

*Goodman*, 748 F.3d 682, 690 (6th Cir. 2014), *cert. denied sub nom. Liberty Coins v. Porter*, 135 S. Ct. 950 (2015); *see* TRO 19, PageID # 326. Because Section 3701.034 is unconstitutional, "the public is certainly interested in the prevention of [its] enforcement." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

Moreover, the public would be *harmed* by permitting Section 3701.034 to go into effect. As the discussion above shows, the programs Plaintiffs have long operated are vital to the health and well-being of thousands of Ohioans. Notwithstanding the unsupported claims of ODH's witnesses at the TRO stage, discovery has revealed that ODH has been unable to obtain suitable replacements capable of providing services comparable in reach or quality to those provided by Plaintiffs. To take just one example, Plaintiffs conduct approximately 50 percent of the STD tests administered in Ohio each year. *See* Lawson 2d. Decl. ¶ 2; TRO 19, PageID # 326. And PPGOH is the largest provider of HIV testing in Cleveland, Akron, and Canton. *See* PPGOH Response to ODH Interrogatory No. 3. Eliminating Plaintiffs' STD and HIV testing and treatment programs would increase the risk of transmission of these highly communicable and potentially life-threatening diseases while simultaneously decreasing the availability of treatment, particularly in the low-income communities served by Plaintiffs. *See id.* Likewise, the increased likelihood of unintended pregnancy that would result from the cessation of Plaintiffs' education programs creates a public health concern. PPGOH Response to ODH Interrogatory No. 3; PPSWO Response to ODH Interrogatory No. 3.

*Finally*, no legal remedy can compensate Plaintiffs for the irreparable harm caused by the violation of their constitutional rights. *See ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 449 (6th Cir. 2010); *Cole v. City of Memphis*, 108 F. Supp. 3d 593, 607 (W.D. Tenn. 2015), *appeal filed*, (6th Cir. July 6, 2015). If Section 3701.034 were to take effect, Plaintiffs would have to

shut down the affected programs and lay off several staff members, and it would be virtually impossible to reconstitute the programs at a later date. *See supra* p. 26-27. Money damages would not fully compensate for that harm. Nor can the harm to Plaintiffs' patients' health and well-being that will result if Section 3701.034 goes into effect be remedied with money damages. *See Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207, 1225 (M.D. Ala. 2015) (harm to patient from absence of services, including loss of provider-patient relationship, is "an injury … clearly not susceptible to monetary relief"). Thus, an injunction barring the enforcement of Section 3701.034 is necessary to remedy the violation of Plaintiffs' constitutional rights.

## CONCLUSION

For the foregoing reasons, the Court should declare that Section 3701.034 violates the First and Fourteenth Amendments and grant Plaintiffs' motion for a permanent injunction.

Respectfully submitted,

Helene Krasnoff
Carrie Y. Flaxman
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, D.C. 20005
(202) 973-4800
(202) 296-3480 (fax)
helene.krasnoff@ppfa.org
carrie.flaxman@ppfa.org

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Trial Attorney for Plaintiffs*
Alphonse A. Gerhardstein # 0032053
GERHARDSTEIN & BRANCH CO. LPA
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com

Paul R.Q. Wolfson
Kimberly A. Parker
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
(202) 663-6363 (fax)
paul.wolfson@wilmerhale.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 937-7294
(212) 230-8888 (fax)
alan.schoenfeld@wilmerhale.com

kimberly.parker@wilmerhale.com

*Counsel for Plaintiffs Planned Parenthood of Greater Ohio and Planned Parenthood Southwest Ohio Region*

Date: July 18, 2016