**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

PLANNED PARENTHOOD OF
GREATER OHIO, and
PLANNED PARENTHOOD
SOUTHWEST OHIO REGION,

        Plaintiffs,

       v.

RICHARD HODGES, in his official capacity
as Director of the Ohio Department of Health,
and TIMOTHY INGRAM, in his official
capacity as Commissioner of Hamilton County
Public Health,

        Defendants.

Civil Action No. 1:16-cv-00539
Judge Michael R. Barrett

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE
MERITS AND A PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

Page

I.    Section 3701.034 Violates The First Amendment ...............................................................3

II.    Section 3701.034 Violates The Due Process Clause ........................................................11

III.    Section 3701.034 Violates The Equal Protection Clause .................................................15

IV.    Plaintiffs Are Entitled To Permanent Injunctive Relief...................................................18

CONCLUSION....................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aaron v. Durrani,*
No. 1:13-CV-202, 2014 WL 996471 (S.D. Ohio Mar. 13, 2014)........................................4

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
133 S. Ct. 2321 (2013) ................................................................... *passim*

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985)........................................................................18

*City of Cleveland v. State,*
5 N.E.3d 644 (Ohio 2014) .............................................................11

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,*
23 F.3d 1071 (6th Cir. 1994) ..........................................................3

*Harris v. McRae,*
448 U.S. 297 (1980).........................................................11, 12, 13, 16

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010)........................................................................8, 10

*Koontz v. St. Johns River Water Management District,*
133 S. Ct. 2586 (2013).............................................................10, 13, 15

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2001).........................................................................5

*Liberty Coins, LLC v. Goodman,*
748 F.3d 682 (6th Cir. 2014) .........................................................20

*LULAC v. Bredesen,*
500 F.3d 523 (6th Cir. 2007) .........................................................16

*Maher v. Roe,*
432 U.S. 464 (1977).........................................................11, 12, 16

*McGuire v. Ameritech Servs.,*
253 F. Supp. 2d 988 (S.D. Ohio 2003) ....................................15, 16

*O'Malley v. NaphCare, Inc.,*
No. 3:12-CV-326, 2014 WL 806381 (S.D. Ohio Feb. 28, 2014) ........................................4

*O'Toole v. O'Connor,*
802 F.3d 783 (6th Cir. 2015) .........................................................16

*Perry v. Sindermann*,
   408 U.S. 593 (1972)........................................................................................................3

*Planned Parenthood Ass'n of Utah v. Herbert*,
   No. 15-4189, 2016 WL 3742008 (10th Cir. July 12, 2016)..................................1, 2, 13, 14

*Planned Parenthood Association of Hidalgo County Texas, Inc. v. Suehs*,
   692 F.3d 343 (5th Cir. 2012) ........................................................................................4, 6

*Planned Parenthood of Cent. & N. Ariz. v. Arizona*,
   718 F.2d 938 (9th Cir. 1983) ...........................................................................................9

*Planned Parenthood of Cent. N.C. v. Cansler*,
   877 F. Supp. 2d 310 (M.D.N.C. 2012) ..........................................................................13

*Planned Parenthood of Indiana, Inc. v.*
   *Commissioner of Indiana Department of Health*,
   699 F.3d 962 (7th Cir. 2012) .....................................................................................14, 15

*Planned Parenthood of Sw. & Cent. Fla. v. Philip*,
   No. 16 Civ. 321, 2016 WL 3556568 (N.D. Fla. June 30, 2016)...................1, 2, 10, 13, 15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)..........................................................................................................6

*Rust v. Sullivan*,
   500 U.S. 173 (1991).................................................................................................. *passim*

## U.S. CONSTITUTION

U.S. Const. amend I ................................................................................................... *passim*

U.S. Const. amend XIV ..................................................................................................1, 11, 21

## STATUTES

Ohio Rev. Code § 3701.034.......................................................................................... *passim*

## REGULATIONS

42 C.F.R. § 59.5(a)(5)(ii) ..................................................................................................7

Just as in its brief filed prior to this Court's entry of a temporary restraining order ("TRO"), the Ohio Department of Health ("ODH") has no adequate response to Plaintiffs' argument that Section 3701.034 runs afoul of the First Amendment, the Due Process Clause, and the Equal Protection Clause. The constitutional flaw in Section 3701.034 is clear: By categorically disqualifying entities that "promote" or "perform" abortions (or "affiliate" with entities that do the same) from receiving public funds for health and education programs wholly unrelated to abortion, Section 3701.034 imposes unconstitutional conditions on those entities' speech and association rights under the First Amendment and provision of abortion services that are constitutionally protected by the Fourteenth Amendment. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2330 (2013) ("*AOSI*"); *Planned Parenthood Ass'n of Utah v. Herbert*, No. 15-4189, 2016 WL 3742008 (10th Cir. July 12, 2016) ("*PPAU*"); *Planned Parenthood of Sw. & Cent. Fla. v. Philip*, No. 16 Civ. 321, 2016 WL 3556568 (N.D. Fla. June 30, 2016) ("*PPSCF*"). Plaintiffs' claims have only become stronger with discovery, which has demonstrated that Section 3701.034 was enacted specifically to target Plaintiffs for their abortion-related activity. *See* Dkt 39 ("Pl. Br.") 4 n.3, PageID# 833. Discovery has also shown that Ohioans would be harmed by the loss of Plaintiffs' time-tested and high-quality services under the programs affected by Section 3701.034. *See* Pl. Br. 5-13, PageID# 834-42.

ODH does little to respond to Plaintiffs' claim that Section 3701.034 exacts a price on Plaintiffs' exercise of their First Amendment rights. ODH tries to cast this case as one about government speech, claiming that it has an interest in "not being seen as approving nontherapeutic abortion by selecting abortion providers to deliver state-funded health services and messages." Dkt. 36 ("ODH Br.") 12, PageID# 544. But ODH has failed to identify *any* message associated with the affected programs that could be garbled in this way, or to show that

there would even be an opportunity for Plaintiffs to garble any message in those highly structured programs.

As to Plaintiffs' due process claim, ODH stresses that the Supreme Court has held that the government has no constitutional obligation to subsidize abortion. That proposition is surely correct, but it is just as surely irrelevant here. This case is not about the *subsidization* of abortion; rather, it is about Ohio's effort to cut off Plaintiffs from public funds having nothing to do with abortion because they engage in constitutionally protected activity. The Supreme Court in *AOSI* rejected the very argument that ODH makes here, and drew a distinction between (a) conditions on the use of public funds in a government program, which the government may validly impose, and (b) the threat to deprive an entity of public funds unless it agrees to abandon its exercise of constitutional rights "outside the contours of the program," *AOSI*, 133 S. Ct. at 2328, which the government may not do. Recent decisions from the Tenth Circuit and the Northern District of Florida reinforce that it is unconstitutional for a State to withhold funding for programs unrelated to abortion based on entities' provision of abortion services with private funds. *PPAU*, 2016 WL 3742008, at *14; *PPSCF*, 2016 WL 3556568, at *2.

ODH fares no better in meeting Plaintiffs' equal protection argument. ODH insists that it need only prove that Section 3701.034 survives rational-basis scrutiny. That is wrong, because Section 3701.034 discriminates on the basis of the exercise of constitutionally protected rights, and thus is subject to heightened scrutiny. Indeed, discovery has also shown that Section 3701.034 was designed to target Plaintiffs based on their involvement in constitutionally protected activity. In any event, ODH cannot even meet the least demanding standard of review, as discriminating against entities that advocate for or provide safe and lawful abortions in the

distribution of *non-abortion-related funds* is not rationally related to the State's purported interest in ensuring that government funds are not spent on abortion.

Finally, ODH does not deny that the infringement on Plaintiffs' constitutional rights caused by Section 3701.034 constitutes irreparable harm. ODH nevertheless attempts to show that the harm of Section 3701.034 to Plaintiffs is slight by suggesting, strangely, that Plaintiffs are *better off* by being stripped of eligibility for programs that constitute a core part of Plaintiffs' missions and a substantial part of Plaintiffs' budgets. This argument has no more merit on closer inspection than it has at first glance. ODH also fails entirely to grapple with the harm to the community that Plaintiffs serve that will result from the loss of Plaintiffs' health care services and education programs.

For all of these reasons, the Court should declare Section 3701.034 unconstitutional and permanently enjoin its enforcement.

## I.      Section 3701.034 Violates The First Amendment

As this Court recognized in granting Plaintiffs' motion for a TRO, Section 3701.034 "allows ODH to leverage its control over government funds to prevent recipients of government funds from engaging in constitutionally protected speech and association, even if that speech is undertaken with private funds." Dkt. 19 ("TRO") 10, PageID# 317. In doing so, Section 3701.034 violates the First Amendment by "deny[ing] a benefit to [Plaintiffs] on a basis that infringes [their] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994). ODH insists that legal conclusion has been undermined by the facts adduced in discovery, but that is incorrect.

At the outset, it bears noting that ODH does not even attempt to defend Section 3701.034 against Plaintiffs' claim that the law violates their First Amendment right of association. ODH

therefore concedes that argument. *See, e.g.*, *Aaron v. Durrani*, No. 1:13-CV-202, 2014 WL 996471, at *5 n.6 (S.D. Ohio Mar. 13, 2014) ("By ignoring this argument, Plaintiff concedes it."); *O'Malley v. NaphCare, Inc.*, No. 3:12-CV-326, 2014 WL 806381, at *8 (S.D. Ohio Feb. 28, 2014) ("[B]y not responding to Defendants' arguments, [plaintiff] has forfeited any defense to them"). As Plaintiffs have repeatedly made clear, their affiliation with Planned Parenthood Federation of America ("PPFA") is central to their mission of ensuring access to high-quality reproductive health care. *See* Compl. ¶¶ 19-20, 25; Harvey Decl. ¶ 16; Lawson Decl. ¶ 15. ODH is entirely silent on the point. That silence is particularly conspicuous given ODH's reliance elsewhere in its briefing on *Planned Parenthood Association of Hidalgo County Texas, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012), in which the Fifth Circuit recognized that a prohibition against entities receiving public funds based on their affiliations would raise serious First Amendment concerns. *See id.* at 351 ("[R]estriction on affiliation is [constitutionally] problematic because it is not a direct regulation of the content of a government program.").

More generally, rather than engage with the unconstitutional-conditions doctrine—the necessary implication of which is that Section 3701.034 is unconstitutional—ODH tries to reframe this case as a government-speech case. Relying principally on the Supreme Court's decision in *Rust v. Sullivan*, 500 U.S. 173 (1991), which recognized that the government may limit the topics of speech in a government-funded program, ODH argues that it has an interest in "not being seen as approving nontherapeutic abortion by selecting abortion providers to deliver state-funded health services and messages." ODH Br. 12, PageID# 544. That argument is based on two flawed premises: first, that because the State has chosen as a general matter to favor childbirth over abortion, each of the programs administered by the State necessarily conveys an

anti-abortion message; and, second, that Plaintiffs' participation in those programs garbles the

State's anti-abortion message. Neither argument withstands scrutiny.

First, ODH points to nothing to suggest that the programs at issue here carry an anti-

abortion message susceptible to being garbled. ODH has failed to identify *any* message that

accompanies the delivery of testing and treatment services under the Minority HIV/AIDS

Initiative, the STD Prevention Program, or the Breast and Cervical Cancer Program.[1] Nor do the

affected education programs (PREP, VAWA, and OIMRI) have an anti-abortion message.[2]

Where, as here, "there is no programmatic message of the kind recognized in *Rust*," the

government cannot justify its impermissible impositions on protected First Amendment speech

by invoking its own speech rights. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)

(rejecting the government's argument that speech restrictions were "necessary to define the

scope and contours of the federal program"); *see also Rosenberger v. Rector & Visitors of Univ.*

---

[1]     *See Part F – Minority AIDS Initiative*, Health Resources and Services Administration, http://hab.hrsa.gov/abouthab/partfminority.html (last visited July 26, 2016) (purpose of initiative is to "improve access to HIV care and health outcomes for disproportionately affected minority populations, including black/African Americans"); *Infertility Prevention Project*, Centers for Disease Control and Prevention ("CDC"), http://www.cdc.gov/std/infertility/ipp-archive.htm (last visited July 26, 2016) (CDC "funds chlamydia and gonorrhea screening and treatment services for low-income, sexually active women attending family planning, STD, and other women's healthcare clinics"); *National Breast and Cervical Cancer Early Detection Program*, CDC, https://www.cdc.gov/cancer/nbccedp/ (last visited July 26, 2016) (through state breast and cervical cancer prevention programs, the CDC "provide[s] low-income, uninsured, and underserved women access to timely breast and cervical cancer screening and diagnostic services").

[2]     *State Personal Responsibility Education Program Fact Sheet*, U.S. Department of Health and Human Services, Administration for Children & Families, http://www.acf.hhs.gov/programs/fysb/resource/prep-fact-sheet (last visited July 26, 2016) (purpose of PREP program is to "educate young people on both abstinence and contraception to prevent pregnancy and sexually transmitted infections, including HIV/AIDS"); *Office on Violence Against Women*, Department of Justice, https://www.justice.gov/ovw/grant-programs (last visited July 26, 2016) (VAWA "grant programs are designed to develop the nation's capacity to reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable"); *Ohio Infant Mortality Reduction Initiative*, Ohio Department of Health, https://www.odh.ohio.gov/odhprograms/cfhs/comcar/precare1.aspx (last visited July 26, 2016) (OIMRI "addresses the barriers (e.g., financial, geographic, cultural, infrastructural) African-American women and children experience, and improves their access to and utilization of health care and social services").

*of Va.*, 515 U.S. 819, 833-34 (1995) (although the government "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted … [i]t does not follow, however, … [that speech] restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors").  Given that ODH has failed to show that there is any government message capable of being garbled, it "cannot recast a condition on funding as a mere definition of its program … , lest the First Amendment be reduced to a simple semantic exercise."  *AOSI*, 133 S. Ct. at 2328.

For this reason, the State's reliance on the Fifth Circuit's outlier decision in *Suehs* is unpersuasive.  As Plaintiffs have repeatedly explained, that decision misapplied the unconstitutional-conditions doctrine, cannot be squared with the Supreme Court's decision in *Rust*, and does not survive the Supreme Court's more recent decision in *AOSI*.  *See Rust*, 500 U.S. at 196; *see also AOSI*, 133 S. Ct. at 2332.  But even if *Suehs* were persuasive, its logic would not extend here.  As this Court recognized, the government program at issue in *Suehs* was designed to "expand access to preventative health and family planning services for women." TRO 11,  PageID# 318 (quoting *Suehs*, 692 F.3d at 346).  In other words, Texas's program contained a message related to family planning and abortion.  By contrast, the programs affected by Section 3701.034 have no abortion-related message (to the extent that they have any message at all), and so there is no risk that Plaintiffs will distort the State's message.

Nor has ODH shown that, even assuming that these programs had a pro-childbirth message, Plaintiffs' participation in these programs could somehow taint that message.  ODH has offered nothing to suggest that there is any opportunity for Plaintiffs to garble the program messages—let alone evidence that Plaintiffs actually do so.  As ODH itself acknowledges, the content of the education programs affected by Section 3701.034 is largely prescribed by federal

and state guidelines, and providers are limited to discussing pre-approved topics. *See* ODH Br. 21, PageID# 553 ("[R]ecipients of certain grants—such as the PREP—must use the Ohio Department of Health's curriculum for their training programs and may not develop their own curriculum."); *see also* PPGOH Dep. 124:3-20, 128:12-14.

ODH is left only to speculate about a far-fetched hypothetical situation in which a woman might go to one of Plaintiffs' health centers to receive free breast and cervical cancer screening under BCCP, might ask for and receive a pregnancy test, might learn that she was pregnant (even though women who qualify for BCCP tests must be aged 40 or older), might express uncertainty about whether to carry her child to term, might ask about her options, and then might receive "options counseling"—*i.e.*, be advised about the possibility of parenting the child, foster care or adoption, or terminating the pregnancy. *See* ODH Br. 9, PageID# 541. ODH's speculation has no basis in fact. Plaintiffs explained that they are unaware of any instance in which a request for cancer screening under the BCCP program led to a discussion of a woman's option to terminate her pregnancy. *See* PPSWO Dep. 263:18-20 ("I don't know that that's ever even happened, a BCCP patient receiving a pregnancy test."); PPGOH Dep. 252:11-253:3; Harvey 3d Decl. ¶ 4; Lawson 3d Decl. ¶ 5. Nor is there any testimony that such a scenario has ever arisen in connection with any of the other programs.

In any event, ODH's premise—that options counseling would express a "pro-abortion" message that ODH would want to avoid—is flawed. Under federal law, all Title X providers (including those who receive their Title X funds from the State) are *required* to provide such options counseling, and the counseling must be "neutral, factual information and nondirective counseling on each of the options" available to a pregnant woman. 42 C.F.R. § 59.5(a)(5)(ii). If ODH's apparent theory were correct, then all Title X providers in the State would be disqualified

by Section 3701.034 from receiving public funds.  But that is clearly not how ODH reads Section 3701.034.  Both the Cuyahoga County Board of Health and Belmont County General Health District receive Title X funds, and thus are *required* to provide options counseling,[3] and yet ODH has identified those entities as replacement providers under the affected programs.  *See* ODH's Responses to Plaintiffs' First Set of Interrogatories 5-6; *see also* Lawson 3d. Decl. ¶ 6 (ODH informed PREP providers that it would not disqualify Title X providers based on their provision of options counseling).  Nor are other medical providers in the programs at issue precluded from counseling pregnant patients about their options *outside* those programs, which is precisely how Plaintiffs provide that service.  ODH thus cannot say that options counseling by Plaintiffs would distort its pro-childbirth message.[4]

ODH also suggests that funding Plaintiffs' health and education programs allows them to free up funds to use for other, disfavored activity—here, abortion—relying on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), for the proposition that "[m]oney is fungible." ODH Br. 22, PageID# 554.  That argument is far wide of the mark.  In the first place, courts have consistently rejected the notion that funding restrictions can be justified on the basis of speculation that the receipt of government funds frees up private funds for impermissible uses. *See, e.g.*, *AOSI*, 133 S. Ct. at 2331 (rejecting speculation that a funding condition was necessary

---

[3]     *See* United States Department of Health and Human Services, *Title X Family Planning Database*, available at http://www.hhs.gov/opa/title-x-family-planning/initiatives-and-resources/title-x-grantees-list/ (last visited July 27, 2016).

[4]     ODH also claims that Plaintiffs risk garbling the State's anti-abortion message and commingling abortion and non-abortion funds by offering screening and treatment through the STD Prevention Program at health centers where abortions are performed.  ODH Br. 23, PageID# 555.  That argument is entirely hypothetical.  PPGOH does not offer STD Prevention Program services at its surgical centers. PPGOH Dep. 194:13-17.  And even before Section 3701.034 was scheduled to take effect, PPSWO ceased providing such testing at one of its surgical centers, where it had previously offered testing under its agreement with ODH.  PPSWO Dep. 194:11-16.  More fundamentally, the STD Prevention Program has no "anti-abortion message"; it provides funding for a medical procedure that has nothing to do with abortion.  There is thus no message to garble.

to ensure that government funds did not "free a recipient's private funds" for impermissible uses); *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 945 (9th Cir. 1983) ("[A]s a matter of law, the freeing-up [private funds for abortion-related activities] theory cannot justify withdrawing all state funds from otherwise eligible entities[.]").

ODH's argument is also factually unsupported. The public funds that support Plaintiffs' affected education programs do not "free up" funds that Plaintiffs currently use for other purpose but could use to support those programs if Section 3701.034 went into effect. Rather, in the absence of grant funding for those education programs, Plaintiffs would not carry them out at all. And with respect to their testing and treatment programs, without the government funds that cover the costs of those programs, PPSWO will not provide free or subsidized STD, HIV, and cancer testing. Lawson 3d Decl. ¶ 10. PPGOH will aim to provide a small fraction of the free and subsidized services that it currently provides under the testing programs, but without program funds, it will be forced to dip into its Title X funds in order to do so, which will necessarily divert funds from other Title X projects that are unrelated to abortion advocacy. Harvey 3d Decl. ¶ 8.

In addition, the programs affected by Section 3701.034 do not provide Plaintiffs with any surplus funds that can be used for abortion-related purposes; to the contrary, the programs sometimes run at a deficit (and generally do not cover overhead costs), and Plaintiffs sometimes subsidize them from their own funds. *See* PPGOH Dep. 83:19-84:9; PPSWO Dep. 49:1-8; 80:11-15. Any available grant money not expended on the program cannot be used for other

purposes.  *See* PPGOH Dep. 91:3-22.  There is thus no risk that ODH is subsidizing anything outside the programs that it funds directly.  *See PPSCF*, 2016 WL 3556568, at *5.[5]

Reduced to its essentials, ODH's argument about the unconstitutional-conditions doctrine is that the doctrine is "unclear."  ODH Br. 13, 20, PageID# 545, 552.  That is hardly so after *AOSI* and *Koontz v. St. Johns River Water Management District,* 133 S. Ct. 2586 (2013); but in any event, whatever lack of clarity may exist at the doctrine's margins, Section 3701.034 falls squarely in its heartland.  Section 3701.034 violates the First Amendment because it disqualifies Plaintiffs based on their exercise of their First Amendment rights outside the affected programs. It imposes speech restrictions on *grantees* rather than *projects*, and in doing so crosses the constitutional line.[6]  *See AOSI*, 133 S. Ct. at 2332; *see also Rust*, 500 U.S. at 196.[7]

---

[5]     Moreover, Plaintiffs take great care to ensure that funds for abortion and non-abortion services are tracked and accounted for separately, making ODH's reliance on *Humanitarian Law Project* even less persuasive.  The record makes clear that Plaintiffs have thorough and detailed protocols in place that ensure that no funds received by the state or federal government are used, directly or indirectly, to subsidize abortion services.  PPSWO Dep. 198:11-199:13, 260:2-262:18; PPGOH Dep. 250:18-251:7; Harvey 3d Decl. ¶ 3; Lawson 3d Decl. ¶  4.  In *Humanitarian Law Project*, the Supreme Court upheld a restriction on providing material support to terrorist organizations based, in part, on evidence that "foreign terrorist organizations do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations."  561 U.S. at 31; *see also id.* (addressing evidence both that "some" terrorist organizations redirected "[f]unds raised ostensibly for charitable purposes … to fund the purchase of arms and explosives" and that these organizations "have not respected the line between humanitarian and violent activities") (internal quotation marks omitted).  ODH has never denied that Plaintiffs have adequate financial controls to ensure that abortion is not subsidized by public funds, and the record clearly established that they do. *See, e.g.*, Harvey Decl. ¶ 17; Lawson Decl. ¶ 16; Harvey 3d. Decl. ¶ 3; Lawson 3d. Decl. ¶ 3.

[6]     ODH attempts to distinguish *AOSI* on grounds that it was a compelled speech case.  ODH Br. 23, PageID# 555.  But the Supreme Court has never suggested that the principles articulated in *AOSI* and earlier decisions are limited to compelled-speech cases.  And courts have applied *AOSI* in cases that do not involve compelled speech.  *See, e.g.*, *PPSCF*, 2016 WL 3556568, at *4.

## II. Section 3701.034 Violates The Due Process Clause

In its TRO brief and now in its trial briefing, ODH has argued that the Supreme Court's decisions in *Maher v. Roe*, 432 U.S. 464 (1977), *Harris v. McRae*, 448 U.S. 297 (1980), and *Rust v. Sullivan*, 500 U.S. 173 (1991), establish conclusively that Section 3701.034 does not violate the Due Process Clause of the Fourteenth Amendment.  That argument is no more persuasive now than it was at the TRO stage.  By withholding public funding for programs unrelated to abortion unless recipients agree not to "perform" abortions, Section 3701.034 imposes an unconstitutional price on the exercise of activity protected by the Fourteenth Amendment.

Once again, ODH has elided the distinction—made plain in *AOSI*, *Rust*, *Maher*, and *McRae*—between government *subsidization* of constitutionally protected activity, which is not required, and government *exclusion* of otherwise-eligible individuals and entities from participation in government programs based on their engaging in constitutionally protected activities, which the Constitution forbids.  Section 3701.034 seeks to suppress privately funded abortions by withholding public funding for programs unrelated to abortion unless recipients agree not to perform abortions—that is, it suppresses the exercise of due process rights "outside the contours of the program."  *AOSI*, 133 S. Ct. at 2328.  In contrast, the laws at issue in *Rust*, *Maher*, and *McRae* were on the constitutional side of the line articulated in those decisions because they merely specified that certain abortion-related activities were not among the activities that the government would subsidize in a given program.  *See id.* (emphasizing

---

[7]    The "perform," "promote," "contract with," and "affiliate" clauses in Section 3701.034 are not severable from one another.  Among other things, an unconstitutional portion of a statute is not severable if it is "so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out."  *City of Cleveland v. State*, 5 N.E.3d 644, 650 (Ohio 2014).  As evinced in a legislative statement and communications between ODH and legislative staff, Section 3701.034 was an effort to penalize Plaintiffs for their abortion-related activities.  *See* Senate Floor Debate, Statement of Sen. Peggy Lehner (Jan. 27, 2016); Pl. Br. 4 n.3, PageID# 833.  All of these clauses are highly "connected with the general scope of the whole," each a slightly different means of accomplishing the same discriminatory end.

distinction between activities that government may choose not to subsidize under its programs, and activities that government may not seek to suppress outside those programs); *see also Rust*, 500 U.S. at 179 (regulations requiring that Title X family planning funds not be used to provide referral for abortion); *Maher*, 432 U.S. at 466 (regulation limiting Medicaid subsidization of abortions to those deemed "medically necessary"); *McRae*, 448 U.S. at 302 (appropriations rider barring use of federal funds to reimburse the cost of abortions under the Medicaid program).

In fact, the Court explained that its decision in *McRae*, as well as in *Maher*, resolved only the constitutionality of certain laws that refused to *subsidize* abortions, and did not extend to laws that *penalized* the private exercise of abortion rights by withholding other, unrelated government benefits. Although the Court held that a "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity," it cautioned that a government action might be unconstitutional if it imposed "broad disqualification from receipt of public benefits" as a price for the exercise of constitutionally protected abortion rights. *McRae*, 448 U.S. at 317 n.19; *see also id.* ("A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion."). As ODH acknowledges, Section 3701.034 does not merely refuse to subsidize abortions; it broadly disqualifies those who provide abortions from government programs unrelated to abortion. *See* Dkt. 17 (ODH TRO Opp.) 11, PageID# 258. Thus, *McRae* itself tells us that *McRae* and *Maher* do not resolve the due process issue in this case. 448 U.S. at 317 n.19.

By urging reliance on *Maher*, *McRae*, and *Rust*, ODH implicitly contends that the unconstitutional-conditions doctrine does not apply when due process rights are at issue. But the Supreme Court has never suggested that the unconstitutional-conditions doctrine is so limited.

*Koontz*, by recognizing and applying the unconstitutional-conditions doctrine in the takings context, is to the contrary, *see Koontz v. St. Johns River Water Mgmt. Dist.,* 133 S. Ct. 2586, 2594 (2013) (unconstitutional-conditions doctrine applies in a "variety of contexts" to "vindicate[ ]" constitutional rights), and *McRae* makes the point plainly enough, *see* 448 U.S. at 317 n.19.  Further, ODH has no credible response to the string of recent cases holding similar state defunding actions unconstitutional under the Due Process Clause.  *See PPAU*, 2016 WL 3742008; *PPSCF*, 2016 WL 3556568; *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 319-20 (M.D.N.C. 2012).

ODH neglects entirely the Northern District of Florida's well reasoned decision in *PPSCF*, where the court determined that a virtually identical state law likely amounted to an unconstitutional condition because, "as a condition of receiving state or local funds for unrelated services, the plaintiffs must stop providing abortions that women are constitutionally entitled to obtain."  2016 WL 3556568, at *2.  Citing *Rust* and *AOSI*, the court explained that "[t]he Supreme Court has repeatedly said that a government cannot prohibit indirectly—by withholding otherwise-available public funds—conduct that the government could not constitutionally prohibit directly."  *Id*.  That reasoning applies with equal force here.

ODH attempts to distinguish the Tenth Circuit's decision in *PPAU* on two grounds—that it addressed an executive action rather than a statute, and that it rejected an equal protection claim.  ODH Br. 14 n.1, PageID# 546.  ODH does not explain why these distinctions make a difference, and neither does.  The Utah Department of Health cancelled PPAU's contracts under various programs unrelated to abortion, including PREP and an STD testing program similar to the STD Prevention Program at issue here, because PPAU was involved in providing abortions.  *See* 2016 WL 3742008, at *2-3.  The Tenth Circuit held that, under the Due Process Clause,

PPAU had a constitutionally protected interest in providing abortions, and that the State's

decision to cancel those contracts because of PPAU's provision of abortions amounted to an

unconstitutional condition. *Id.* at *11, *14.[8]

Finally, ODH again relies on *Planned Parenthood of Indiana, Inc. v. Commissioner of*

*Indiana Department of Health*, 699 F.3d 962 (7th Cir. 2012) ("*PPI*"), which predates both

*Koontz* and *AOSI*. ODH Br. 14, PageID# 546. To the extent the panel majority concluded that a

state funding condition can violate the constitutional right to abortion only if the effect of the

funding condition itself is to place an undue burden on women's ability to choose to have an

abortion (*see PPI*, 699 F.3d at 969-70), that decision was erroneous. *See* Dkt. 7 (Pl. TRO Br.)

17-18, PageID# 71-72; Dkt. 18 (Pl. TRO Reply) 7-8, PageID# 287-288. Moreover, ODH has

offered no persuasive explanation why the divided Seventh Circuit opinion is more persuasive

than the combined weight of the more recent opinions of the Tenth Circuit and Northern District

of Florida, which benefited from the Supreme Court's recent guidance in *Koontz* and *AOSI* and

did not require a showing that the effect of the funding condition would be to place an undue

burden on women seeking abortions.

Even if this Court were to adopt the framework of the Seventh Circuit as interpreted by

ODH, Plaintiffs would prevail on their due process claim. In its opening trial brief, ODH made

no effort to refute the extensive proof Plaintiffs provided establishing that, if Plaintiffs cease

providing abortions as the required price of accepting government funds, a significant percentage

---

[8]     *PPAU* did not involve a challenge to a defunding statute, but rather a challenge to the governor's
executive action to preclude a Planned Parenthood affiliate from certain programs. The court thus was
required to analyze whether PPAU's contracts were in fact cancelled *because of* its provision of abortions.
2016 WL 3742008, at *12-13. That analysis is not required here. Section 3701.034 makes plain that
PPSWO and PPGOH must be defunded because they "perform" abortions, and ODH has admitted that
Plaintiffs' contracts and grants are subject to termination because of this fact. *See* ODH's Response to
Plaintiffs' Request for Admission Nos. 1-2.

of women in Ohio will be prevented from obtaining abortions, resulting in an undue burden on women seeking an abortion. Pl. Br. 21-23, PageID# 850-52. By contrast, the plaintiffs in *Planned Parenthood of Indiana* simply did "not argue that the loss of its block-grant funding imposes an undue burden—directly or indirectly—on a woman's right to obtain an abortion." 699 F.3d at 988. ODH instead focuses on the fact that "Planned Parenthood concedes that it will continue providing abortions." ODH Br. 12, PageID# 544. But the Supreme Court has made clear that the validity of a law imposing a condition on the exercise of constitutional rights cannot rise or fall on whether the entities succumb to the government's pressure and abandon their constitutionally protected activity. *See Koontz*, 133 S. Ct. at 2596 ("As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury."); *AOSI*, 133 S. Ct. at 2328 (government action need not be "actually coercive" in order to amount to an unconstitutional condition); *PPSCF*, 2016 WL 3556568, at *5 (whether plaintiffs have "stopped providing abortions" or have "plans to do so" simply "d[oes] not matter" under unconstitutional conditions analysis). Ohio's attempt at coercion is unconstitutional regardless of Plaintiffs' steadfastness.

## III. Section 3701.034 Violates The Equal Protection Clause

ODH argues that rational-basis scrutiny applies because Section 3701.034 is "unrelated to any suspect class." ODH Br. 15, PageID# 547. But, as explained in Plaintiffs' opening brief (at 23-26), "irrespective of any suspect classification, the Equal Protection Clause … protect[s] against infringements on certain 'fundamental rights' basic to all Americans, whether or not such rights are explicitly guaranteed by the text of the Constitution," and "laws which impinge on identifiable fundamental rights are generally subject to strict scrutiny." *McGuire v. Ameritech Servs.*, 253 F. Supp. 2d 988, 998 (S.D. Ohio 2003).

ODH does not attempt to deny that Plaintiffs have a constitutionally protected right to advocate for safe and lawful abortion and to affiliate with entities that do so. Nor does ODH refute that, by denying government funds to Plaintiffs simply on the basis that they engage in this constitutionally protected speech and associational conduct, Section 3701.034 "burdens the exercise of … fundamental right[s]," thus triggering heightened scrutiny under the Equal Protection Clause. *LULAC v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007); *see McGuire*, 253 F. Supp. 2d at 999 ("Obviously, the rights of free speech and free association are fundamental in our society."). Yet ODH offers *no* constitutionally sufficient state interest to justify the denial of government funds to entities simply because they exercise their First Amendment rights, much less a "compelling interest." *O'Toole v. O'Connor*, 802 F.3d 783, 789 (6th Cir. 2015).

With respect to Section 3701.034's defunding of entities that "perform" abortions, ODH recognizes that "women have a right to an abortion under *Roe v. Wade*," but argues that "funding restrictions fail to implicate that right." ODH Br. 15, PageID# 547. Again, the cases ODH cites for that proposition (*Maher*, *McRae*) hold that a state's refusal *to subsidize abortion* does not impinge on a constitutionally protected right; those cases say nothing about laws like Section 3701.034, which deny separate funds to abortion providers as the price of carrying out constitutionally protected activity. *See Maher*, 432 U.S. at 466 (upholding regulation limiting Medicaid subsidization of abortions to those deemed "medically necessary" does not violate equal protection); *McRae*, 448 U.S. at 302 (upholding appropriations rider barring use of federal funds to reimburse the cost of abortions under the Medicaid program). Nor does ODH put forth a compelling interest sufficient to justify the denial of non-abortion-related funds to entities simply because Plaintiffs provide abortion services with *other* monies.

In any event, Section 3701.034 fails under any level of scrutiny, for ODH cannot identify a single legitimate government purpose that is served by barring otherwise eligible providers from participating in the specified programs, simply because they advocate for or provide safe and lawful abortions with separate monies. ODH repeatedly asserts that Ohio has an interest in "promoting childbirth over abortion" (*see, e.g.*, ODH Br. 15, PageID# 547), but does not even attempt to explain how Section 3701.034 is rationally related to that interest. Even if the State has an interest in preferring childbirth, it does not automatically follow that the State may single out abortion providers unfavorable treatment. As explained (at Pl. Br. 24-26, PageID# 853-55), barring Plaintiffs from participating in the programs at issue here—which have nothing to do with pregnancy or childbirth, and through which Plaintiffs do not advocate for or provide abortions—does nothing to further the State's interest in promoting childbirth over abortion.

And again, the cases cited by ODH provide no assistance. *Maher* and *McRae* stand for the proposition that refusing to provide public funds *for the provision of abortion services* is rationally related to the state's interest in "encouraging normal childbirth," not that refusing to provide public funds to abortion providers *for any purpose* serves that interest. As explained above and in Plaintiffs' briefs in support of the TRO, the funds at issue here are not for the provision of abortion services, and indeed could not have been used to subsidize abortion under applicable state and federal law. Nor is there any evidence in the record that "all Planned Parenthood funds are … inextricably intertwined with its abortion business," as ODH claims (at 22, PageID# 554). To the contrary, Plaintiffs keep the funds meticulously separated.

Lastly, as explained in Plaintiffs' opening brief (at 24-26, PageID# 853-55), penalizing abortion providers simply because they are abortion providers is not a legitimate state interest, and cannot justify Section 3701.034. The State's animus toward Plaintiffs is evident from the

face of the bill, the legislative record, and the evidence produced in discovery in this litigation.  It is not merely "a single quote from a legislator" (ODH Br. 16, PageID# 548) that supports this conclusion.  As explained in Plaintiffs' opening brief (at 25, PageID# 854), the legislature crafted a bill that applied only to PPGOH and PPSWO by identifying the specific programs in which they participate.  Indeed, emails between ODH and legislative staffers confirm that the bill was designed to target Planned Parenthood.  *See id.*  Where, as here, a law is motivated by a pure desire to disfavor a group, it cannot withstand scrutiny under the Equal Protection Clause.  *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) ("a bare … desire to harm a politically unpopular group … [is] not [a] legitimate state interest[]").

## IV.    Plaintiffs Are Entitled To Permanent Injunctive Relief

Plaintiffs have established in detail and with concrete evidence the ways in which they, as well as their patients and other Ohioans who benefit from the services they deliver, will be irreparably harmed if Section 3701.034 goes into effect.  *See, e.g.*, Pl. Br. 2-13, 27-28, PageID# 831-42, 856-57.  ODH offers little in response.

First, ODH asserts that "discontinuing services would have no financial impact" on Plaintiffs.  ODH Br. 8, PageID# 540.  ODH evidently believes that, because Plaintiffs operate some of the affected programs at a financial loss, Plaintiffs would be better off not operating these programs at all.  ODH Br. 8, PageID# 540 (ceasing to provide services under affected programs would "save [Plaintiffs] money").  That is an astounding position for ODH, an agency charged with delivering vital health and health-education services, to take.  These programs allow Plaintiffs to provide health and education services that the State and federal government have determined are critical.  Stripping Plaintiffs of this funding would force Plaintiffs to abandon programs that they have carried out for years, and would impede Plaintiffs' ability to

provide health care services and education programs to the community—activities that are at the core of Plaintiffs' missions. *See* Harvey 3d Decl. ¶¶ 6-8; Lawson 3d Decl. ¶¶ 8-10.

Even from a strictly financial perspective, the harm to Plaintiffs would be significant and irreparable. Plaintiffs would lose hundreds of thousands of dollars in grant money, including a significant percentage of their education budgets. *See* Harvey Decl. ¶¶ 5, 22; Lawson Decl. ¶ 5. As a result, Plaintiffs will have to lay off employees, as Plaintiffs will no longer have the funding to pay their salaries. *See* Harvey Decl. ¶ 6; Lawson Decl. ¶ 6. That Plaintiffs may operate some of the programs at a "financial loss" (ODH Br. 8, PageID# 540) does not demonstrate that stripping Plaintiffs of funding would "save [Plaintiffs] money" (*id.*); it proves only that the funds received from the government are not always sufficient to cover all costs associated with delivering the contracted-for services, and that Plaintiffs, consistent with their mission of ensuring access to affordable, high-quality health care and education services to the community, may subsidize the programs with their own funds to ensure that the contracted-for health care and education services are delivered to the highest standard.

Second, ODH is incorrect in arguing that the impact to Plaintiffs' health care services and education programs would be "slight" (ODH Br. 8, 29, PageID# 540, 561). As Plaintiffs established in their opening brief (at 27-28, PageID# 856-57) and evidence in the record confirms, if Plaintiffs cease providing services under the affected programs, thousands of Ohioans, particularly minorities and those with low incomes, will be deprived of access to high-quality, affordable health care services and education programs, from a trusted and longtime provider familiar with the needs of the communities they serve, which could create a public health crisis. Evidence adduced in discovery disproves ODH's unsupported claims in this litigation that there would be "minimal to no gaps" in service under the affected programs if

Section 3701.034 went into effect, *see* ODH TRO Opp. 4-5, PageID# 251-52; ODH Br. 5, PageID# 537; and ODH does nothing in its brief to suggest otherwise. *See* Pl. Br. 6-13, PageID# 835-42. Without government funding, Plaintiffs will be forced either to charge for these life-saving STD tests, HIV tests, and breast and cervical cancer exams—which will put the services out of reach for many of Plaintiffs' patients—or to subsidize these programs with their own funds, thereby taking money away from Plaintiffs' other programs and services. And without access to the PREP and VAWA funding, Plaintiffs will have to abandon these educational programs altogether, for they will no longer have the right to teach the PREP curriculum or VAWA training program, nor will they have access to the juvenile justice and foster care facilities. The alternative education programs Plaintiffs have explored are not perfect substitutes, and could not be delivered to the same communities.

Third, ODH incorrectly contends that allowing Section 3701.034 to take effect would further the public's interest "in retaining the policy decisions of its elected representatives." ODH Br. 24, PageID# 556. In so arguing, ODH simply assumes the (incorrect) conclusion that Section 3701.034 is valid. Where, as here, the challenged statute has been shown to be unconstitutional, it is manifestly "in the public interest to prevent the violation of a party's constitutional rights." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

Finally, ODH's general appeal to "federalism" (ODH Br. 25, PageID# 557) is misplaced. These are federal programs with funding streams dedicated to highly specific purposes articulated in the federal authorizing statutes. It is the State of Ohio that has upset the federalism balance by attempting to convert those programs into a mechanism for penalizing abortion and abortion-related speech—a purpose that nothing in the federal statute authorizes. Thus, the law plainly does affect federal interests. In any event, even if Section 3701.034 concerned only the

distribution of state funds, the state legislature would not have the latitude to distribute those funds in a manner that violates parties' federal constitutional rights.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' opening memorandum, the Court should declare that Section 3701.034 violates the First and Fourteenth Amendments, enter final judgment for Plaintiffs, and grant Plaintiffs' motion for a permanent injunction.

Respectfully submitted,

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Trial Attorney for Plaintiffs*
Alphonse A. Gerhardstein  # 0032053
GERHARDSTEIN & BRANCH CO. LPA
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
 (513) 621-9100
 (513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com

Helene Krasnoff
Carrie Y. Flaxman
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, D.C. 20005
(202) 973-4800
(202) 296-3480 (fax)
helene.krasnoff@ppfa.org
carrie.flaxman@ppfa.org

Paul R.Q. Wolfson
Kimberly A. Parker
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000
 (202) 663-6363 (fax)
paul.wolfson@wilmerhale.com
kimberly.parker@wilmerhale.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
 (212) 937-7294
 (212) 230-8888 (fax)
alan.schoenfeld@wilmerhale.com

July 27, 2016

*Counsel for Plaintiffs Planned Parenthood of Greater Ohio and Planned Parenthood Southwest Ohio Region*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2016, I caused true and correct copies of the foregoing to be served via ECF and Federal Express on counsel for Defendant Richard Hodges.


/s/ Paul R.Q. Wolfson
Paul R.Q. Wolfson
*Attorney for Plaintiffs Planned Parenthood*
*of Greater Ohio and Planned Parenthood*
*Southwest Ohio Region*