**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Planned Parenthood of
Greater Ohio, *et al.*,

        Plaintiffs,                         Case No.  1:16cv539

        v.                             Judge Michael R. Barrett

Richard Hodges, *et al.*,

        Defendants.

**<u>OPINION & ORDER</u>**

This matter is before the Court upon Plaintiffs' Motion for Preliminary Injunction (Doc. 7); and Motions for Judgment on the Merits and a Permanent Injunction (Docs. 38, 47).  These motions have been fully briefed (Docs. 49, 53, 55); and on August 2, 2016, the Court held a hearing on the motions (Doc. 57).

For the reasons stated herein, Plaintiffs' Motion for Preliminary Injunction (Doc. 7); and Motions for Judgment on the Merits and a Permanent Injunction (Docs. 38, 47) are GRANTED.

## I.  <u>BACKGROUND</u>

Plaintiffs Planned Parenthood of Greater Ohio ("PPGOH") and Planned Parenthood Southwest Ohio Region ("PPSWO") filed this action under 42 U.S.C. § 1983 claiming that Ohio Revised Code § 3701.034 violates the First Amendment, as well as the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment. On May 23, 2016, this Court temporarily restrained the enforcement of Section 3701.034.  (Doc. 19).  Plaintiffs now seek judgment on the merits and to permanently

enjoin Defendant Richard Hodges, in his official capacity as the Director of the Ohio Department of Health ("ODH"), from enforcing Section 3701.034.

Section 3701.034 requires ODH to ensure that the federal funds and materials which ODH receives and distributes under six specific programs are either "not used to do any of the following" or "not distributed to entities that do any of the following:"

(1) Perform nontherapeutic abortions;

(2) Promote nontherapeutic abortions;

(3) Contract with any entity that performs or promotes nontherapeutic abortions;

(4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions.

Ohio Rev. Code § 3701.034(B)-(G).  Under the statute, "promote" means "to advocate for, assist with, encourage, or popularize through advertising or publicity."  Ohio Rev. Code § 3701.034(A)(8).

Plaintiffs operate twenty-eight health centers in Ohio. (Doc. 40-1, Iris E. Harvey 1st Decl. ¶ 9; Doc. 40-2, Jerry Lawson 1st Decl. ¶ 8).  At three of the health centers, Plaintiffs provide abortion services.  (Harvey 1st Decl. ¶ 13; Lawson 1st Decl. ¶ 12). Plaintiffs also advocate for a woman's right to abortion.  (Harvey 1st Decl. ¶ 15; Lawson 1st Decl. ¶ 14).  In addition, Plaintiffs are affiliates of Planned Parenthood Federation of America, Inc., which advocates for a woman's access to comprehensive reproductive health care, including abortion.  (Harvey 1st Decl. ¶ 16; Lawson 1st Decl. ¶ 15).   There is no dispute that Section 3701.034 applies to Plaintiffs.

For a number of years, Plaintiffs have received federal funds and materials distributed by ODH and Ohio county health departments under the six health and

2

education programs which are covered by Section 3701.034: (1) STD Prevention Program (federal program which subsidizes diagnostic tests and treatments for certain sexually transmitted diseases); (2) Minority HIV/AIDS Initiative (federal program designed to provide HIV testing and education for communities that are disproportionately affected by HIV); (3) Personal Responsibility Education Program (federal program designed to educate young people about abstinence and contraception, with the goal of reducing teen pregnancy and STD rates); (4) Breast and Cervical Cancer Prevention Program (federal program which subsidizes cancer screening and follow-up services for low-income and minority women); (5) Ohio Infant Mortality Reduction Initiative (federally-funded neighborhood outreach and care coordination program which assists pregnant, at-risk African-American women and their families); (6) Violence Against Women Act Sexual Violence Prevention Program (federally-funded program which aims to reduce sexual violence through primary prevention and education).  (Harvey 1st Decl. ¶¶ 12, 28, 32, 47; Lawson 1st Decl. ¶¶ 11, 26, 35, 40).

In many instances, Plaintiffs were chosen over other entities to receive these funds and materials as part of a competitive grant process.  (Harvey 1st Decl. ¶ 12; Lawson 1st Decl. ¶ 11).  Plaintiffs have also passed all state and local audits and program reviews.  (Harvey 1st Decl. ¶ 12; Lawson 1st Decl. ¶ 11).  However, after the passage of Section 3701.034, Plaintiffs received letters from ODH and local health departments which stated that their current contracts under the impacted programs would be terminated.  (Harvey 1st Decl., Exs. A-J; Lawson 1st Decl. Exs. A-G).

In their Complaint, Plaintiffs claim that Section 3701.034 is unconstitutional

because as a condition of receiving government funds, recipients must abandon their right to engage in free speech and association protected by the First Amendment and their right to provide abortion services protected by the Due Process Clause. Plaintiffs also claim that Section 3701.034 violates the Equal Protection Clause by discriminating against entities, such as Plaintiffs, who engage in this constitutionally protected activity.

## II. ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 65: "Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2). At the hearing on August 2, 2016, the parties agreed that Plaintiffs' request for preliminary injunctive relief should be consolidated with a final resolution on the merits of Plaintiffs' request for permanent injunctive relief. The parties also agreed that the Court can determine the propriety of Plaintiffs' requested permanent injunction solely on the basis of the record before the Court and the evidence presented in conjunction with the preliminary injunction hearing.

"A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 249 (6th Cir. 2011) (quoting *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010)). However, "[i]njunctive relief involving matters subject to state regulation may be no broader than necessary to remedy the constitutional violation." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998) (citations omitted).

4

B. **First Amendment: Freedom of Speech and Association**

Plaintiffs argue that under the unconstitutional conditions doctrine, Section 3701.034 violates Plaintiffs' First Amendment rights of freedom of speech and association.

The First Amendment, applicable to the States through the Due Process Clause of the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I; *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). "The First Amendment extends beyond the right to speak to encompass the 'right of expressive association,' *i.e.*, the 'right to associate for the purpose of speaking.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 68, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006)).[1]

However, before any further discussion of the First Amendment or the unconstitutional conditions doctrine, the Court must address Defendant's two-part argument that it is unnecessary for the Court to rule on Plaintiffs' speech and association claims.

First, Defendant argues that in enacting Section 3701.034, Ohio's legislature made a policy choice regarding public funding of nontherapeutic abortions, and that policy choice should stand. Defendant is correct that state legislatures have "wide latitude in choosing among competing demands for limited public funds." *Maher v. Roe*,

---

[1]The parties have not questioned that the speech proscribed by Section 3701.034 ("Promot[ing] nontherapeutic abortions") or the type of association proscribed by Section 3701.34 ("Becom[ing] or continu[ing] to be an affiliate of any entity that perfoms or promotes nontherapeutic abortions") falls within the protections of the First Amendment.

432 U.S. 464, 479, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484 (1977). However, this wide latitude to set spending priorities exists "[s]o long as legislation does not infringe on other constitutionally protected rights." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 588, 118 S. Ct. 2168, 2179, 141 L. Ed. 2d 500 (1998) (citing *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549, 103 S. Ct. 1997, 2002, 76 L. Ed. 2d 129 (1983)); *see also Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 942-44 (9th Cir. 1983) (although the state need not fund abortions, the state "may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities")).

Second, Defendant argues that because Plaintiffs cannot show that the provisions of Section 3701.034 which regulate conduct are unconstitutional, the doctrine of constitutional avoidance precludes this Court's review of Plaintiffs' speech and association claims. This is a misapplication of the constitutional avoidance doctrine. As the Supreme Court has explained, the constitutional avoidance doctrine "[i]s a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381-82, 125 S. Ct. 716, 724-25, 160 L. Ed. 2d 734 (2005) (citing *Rust v. Sullivan*, 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) and *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). Defendant concedes elsewhere, in a footnote, that the "promoting nontherapeutic abortions" provision can be severed from the "providing nontherapeutic abortions." (Doc. 36, PAGEID # 550) (citing *Free Enter. Fund v. Pub. Co. Accounting*

*Oversight Bd.,* 561 U.S. 477, 508, 130 S. Ct. 3138, 3161, 177 L. Ed. 2d 706 (2010) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (quotations and citation omitted)). Therefore, the Court concludes that it is proper to rule on Plaintiffs' speech and association claims.

Plaintiffs argue that by categorically disqualifying entities that promote nontherapeutic abortions or affiliate with entities that perform or promote nontherapeutic abortions, Section 3701.034 imposes unconstitutional conditions on those entities' speech and association rights.

Under the "modern 'unconstitutional conditions' doctrine . . . the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). The Supreme Court has explained that:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697, 33 L. Ed. 2d 570 (1972); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2598, 186 L. Ed.

2d 697 (2013) ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing.") (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59-60, 126 S. Ct. 1297, 1307, 164 L. Ed. 2d 156 (2006)).

There is no dispute that, in this instance, Ohio could not have constitutionally legislated a direct ban on either promoting nontherapeutic abortions or affiliating with an entity that performs or promotes nontherapeutic abortions.  Such a ban on Plaintiffs' speech or association would have been a violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829, 115 S. Ct. 2510, 2516, 132 L. Ed. 2d 700 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.") (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

However, Defendant, citing *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 237, 653 L.Ed.2d 484 (1977), argues that Ohio could refuse to directly fund abortion services, and therefore it necessarily follows that Ohio can refuse to provide funding to abortion providers for separate services which are not related to abortion.

Defendant is correct that *Maher* made it clear that states are free to "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds."  *Maher*, 432 U.S. at 474.  As a result, for a long time, Ohio has had legislation in place which bars the use of public funds to directly fund abortion services.  *See*, *e.g.*, Ohio Rev. Code § 5101.56 (providing that "[u]nless

required by the United States Constitution or by federal statute, regulation, or decisions of federal courts, state or local funds may not be used for payment or reimbursement for abortion services" unless certain circumstances apply).  Whether Ohio can refuse to provide funding for non-abortion services to abortion providers is a different question, and is one which requires the application of the unconstitutional conditions doctrine.

In *Rust v. Sullivan*, 500 U.S. 173, 197, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Supreme Court explained that "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."

Applying the unconstitutional conditions doctrine in *Rust*, the Supreme Court upheld regulations promulgated under Title X of the Public Health Service Act, which provides federal funding for family-planning services and authorizes the Secretary of Health and Human Services to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."  *Id.* at 178 (quoting 42 U.S.C. § 300(a)).  The regulations prohibited these Title X funds from being used "in programs where abortion is a method of family planning."  *Id.* at 178.

The Supreme Court explained this restriction on the subsidization of abortion-related speech contained in the regulations was permissible:

> Title X expressly distinguishes between a Title X *grantee* and a Title X *project*.  The grantee, which normally is a health care organization, may

receive funds from a variety of sources for a variety of purposes. The grantee receives Title X funds, however, for the specific and limited purpose of establishing and operating a Title X project. The regulations govern the scope of the Title X project's activities and leave the grantee unfettered in its other activities. The Title X grantee can continue to provide abortion related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds.

*Id.* at 196 (emphasis in original). The Supreme Court concluded:

By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has . . . not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.

*Id.* at 198.

In support of its position that Section 3701.034 does not create an unconstitutional condition, Defendant relies on *Planned Parenthood Association of Hidalgo County Texas, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012). At issue in *Suehs* was a program created by the Texas Legislature, the Women's Health Program ("WHP"), which was designed to "expand access to preventative health and family planning services for women." *Id.* at 346. The WHP denied funding to entities that performed or promoted elective abortions. *Id.* at 347.

Defendant points out that even though Texas's funding condition applied to program participants, rather than just program activities, the Fifth Circuit found the funding restriction was proper. However, there are key differences between Section 3701.034 and the WHP, as the Fifth's Circuit explanation of its holding illustrates:

Texas's restriction on promoting elective abortions directly regulates the content of the WHP as a state program. The policy expressed in the WHP is for public funds to subsidize non-abortion family planning speech to the exclusion of abortion speech. § 1.19(b), 2011 Tex. Gen. Laws at 335.

> Texas's authority to promote that policy would be meaningless if it were forced to enlist organizations as health care providers and message-bearers that were also abortion advocates. The authority of Texas to disfavor abortion within its own subsidized program is not violative of the First Amendment right, as interpreted by *Rust v. Sullivan*. Consequently, Texas's choice to disfavor abortion does not unconstitutionally penalize the appellees' speech.

*Id.* at 350. In contrast, Section 3701.034 is not a direct regulation of the content of a state program. Instead, Section 3701.034 places the speech-based funding condition on the recipient of the funds for activities conducted outside the six programs impacted by Section 3701.034. As a result, Section 3701.034 does not "leave the grantee unfettered in its other activities." *Rust*, 500 U.S. at 196. Moreover, Section 3701.034 lacks the policy which was specifically expressed in the WHP. Stated differently, Section 3701.034 is silent regarding the use of public funds to subsidize non-abortion family planning speech to the exclusion of abortion speech. As such, there is "no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548, 121 S. Ct. 1043, 1052, 149 L. Ed. 2d 63 (2001).

Next, Defendant argues that Section 3701.034 does not result in an unconstitutional burden on Plaintiffs' First Amendment rights because it does not compel any speech. However, that is not the relevant distinction. The Supreme Court has explained that an unconstitutional condition is not limited to those situations where the condition is not relevant to the objectives of the program, or "when the condition is actually coercive, in the sense of an offer that cannot be refused." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S.Ct. 2321, 2328, 186 L.Ed.2d 398 (2013). Instead,

"the relevant distinction . . . is between conditions that define the limits of the government spending program—those that specify the activities [the legislature] wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.*

Here, the conditions imposed by Section 3701.034 seek to leverage funding to regulate speech outside the contours of the six programs impacted by Section 3701.034. There is no dispute that these six programs subsidize tests and treatment for STDs, cancer screenings for women, HIV testing and education, measures to reduce infant mortality, education for teens regarding abstinence and contraception, and the prevention of sexual violence. There is nothing within the scope of these programs related to performing abortions, promoting abortions or affiliating with an entity that performs or promotes abortions. Therefore, under the unconstitutional conditions doctrine, Section 3701.034 cannot condition funding for these programs based on a recipient's exercise of the right to free speech or association outside of these programs. *Accord Planned Parenthood of Mid–Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 462 (8th Cir. 1999) ("Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional"); *Hill v. Kemp*, 645 F. Supp. 2d 992, 1002 (N.D. Okla. 2009) ("The State is free to fund adoption services to exclusion of any abortion-related services, but it may not deny [the plaintiff] funding conditioned upon [the plaintiff's] waiver of its right to engage in protected speech activity with its private funds.").

Finally, taking somewhat of a different tact, Defendant calls attention to the fact

that some of the grants impacted by Section 3701.034 require recipients of the grant to use ODH's curriculum for their training programs. Defendant explains that because Ohio has developed a particular message which it has approved as a part of these programs, Section 3701.034 avoids confusing this message by eliminating the potential that someone offering a contrary message will be among Ohio's messengers.

Defendant relies on the Supreme Court's decision in *Rosenberger v. Rector & Visitors of Univ. of Virginia*, which held: "When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." 515 U.S. 819, 833, 115 S. Ct. 2510, 2519, 132 L. Ed. 2d 700 (1995) (citing *Rust*, 500 U.S. at 196-200). This principle has its origins in *Rust v. Sullivan*, which is considered to have been one of the first cases recognizing the government speech doctrine. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) ("The Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, we have explained *Rust* on this understanding."). However, this principle is not applicable here because as explained above, the programs impacted by Section 3701.034 do not convey any message related to abortion. Therefore, there is no potential that Ohio's message of favoring childbirth over abortion will be garbled or distorted. Moreover, the record is devoid of any evidence showing that in implementing these programs in the past, Plaintiffs have actually conveyed a message related to abortion.[2]

---

[2]Defendant only argues as a hypothetical that it is possible for pregnant patients who go to Planned Parenthood to receive services under one of the programs impacted by Section

Defendant makes a somewhat related argument that the funding provided by the programs impacted by Section 3701.034 frees up other general funds for Plaintiffs to use for other purposes, such as promoting abortions. Citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31, 130 S. Ct. 2705, 2725, 177 L. Ed. 2d 355 (2010), Defendant explains "[m]oney is fungible" and therefore Plaintiffs' education programs are inextricably intertwined with its abortion business. Defendant explains further that this confuses Ohio's message of favoring childbirth over abortion.

To begin, the Supreme Court has rejected "the assumption as a general matter" that government funding "will simply supplant private funding, rather than pay for new programs or expand existing ones." *Agency for Int'l Dev.*, 133 S. Ct. at 2331; *see also Planned Parenthood of Cent. & N. Arizona v. State of Ariz.*, 718 F.2d 938, 945 (9th Cir. 1983) (holding as a matter of law, "the freeing-up theory cannot justify withdrawing all state funds from otherwise eligible entities merely because they engage in abortion-related activities disfavored by the state.").

Moreover, *Holder v. Humanitarian Law Project* "concerned the quite different context of a ban on providing material support to terrorist organizations, where the record indicated that support for those organizations' nonviolent operations was funneled to support their violent activities." *Agency for Int'l Dev.*, 133 S. Ct. at 2331 (citing *Holder*, 561 U.S. at 29-30). There is no support in this record that the funds previously provided to Plaintiffs under the programs impacted by Section 3701.034 were

3701.034 could receive "options counseling," which could include discussing abortion as an option. However, as Plaintiffs point out, all providers who receive Title X funding are required to provide "options counseling." This counseling must be "neutral, factual information and nondirective counseling on each of the options" available to pregnant woman. 42 U.S.C. § 59.5(a)(5)(ii). Plaintiffs also point out that Defendant has identified the Cuyahoga County Board of Health and Belmont County General Health as eligible providers under Section 3701.034, yet those two entities also receive Title X funds and are required to provide "options counseling."

funneled to support Plaintiffs in the promotion of abortion or performance of abortion services. To the contrary, the record shows that Plaintiffs maintain measures to ensure that none of the funds received from the state or federal government are used, directly or indirectly, to subsidize the promotion of abortion or performance of abortion services.

Testifying on behalf of PPGOH as a witness under Federal Rule of Civil Procedure 30(b)(6), Barbara Singhaus, PPGOH's chief operating officer and chief financial officer, was asked, "[h]ow do you know that none of the funds received from the programs identified in the law that's challenged here contribute directly or indirectly to the performance or promotion or abortion?" (Doc. 40-15, PAGEID #1500). Singhaus responded:

> We have a very sophisticated cost allocation methodology that is audited and reviewed by our independent auditors and by the Title 10 reviewers. We allocate every single one of our costs to between our health centers and isolating the surgical centers, including all of our administrative costs and our medical director's costs, so those funds and the costs associated with those are allocated very carefully.

(Id., PAGEID # 1500-1501). When asked whether it is "fair to say then that none of the funds that have been provided to PPGOH through these programs are relied on by PPGOH to provide abortion services," Singhuas responded, "Yes." (Id., PAGEID #1501).

Similarly, testifying on behalf of PPSWO as a Rule 30(b)(6) witness, Jerry Lawson, PPSWO's president and chief executive officer, explained:

> We have very scrupulous financial accounting methods to make sure that revenue and expenses are properly coded to the service that's being provided, whether it's surgery or whether it's something else. We have different managers, so the surgery manager does not manage elsewhere.

(Doc. 40-16, PAGEID # 1729).

Defendant points out that until April 2016, PPSWO offered free STD testing under the STD Prevention Program at the surgical center for patients receiving abortions. (See Doc. 40-16, PAGEID # 1724-1725). However, Defendant does not explain how offering this test at the surgical center garbles or distorts Ohio's message. The STD testing is not related to the abortion services, nor is it a precursor to a discussion about abortion services. Instead, it is a medically separate service, which Plaintiffs code and allocate to ensure the funding is also separate from Plaintiffs' abortion services. In addressing the same argument in support of similar legislation, one district court explained:

> To be sure, *Rust* upheld a requirement for adequate separation of abortion and non-abortion-related services. But that makes no difference here. The defunding provision does not impose a requirement for adequate separation. Instead, the provision flatly defunds abortion providers, no matter how thoroughly they separate abortion and non-abortion-related services. And while, without adequate separation, one might reasonably fear that money paid for a recipient's non-abortion-related services could indirectly support the provision of abortions—money, after all, is fungible— the contention that this defeats the plaintiffs' claim here fails both on the facts and on the law.

*Planned Parenthood of Sw. & Cent. Florida v. Philip*, No. 4:16CV321-RH/CAS, 2016 WL 3556568, at *5 (N.D. Fla. June 30, 2016). This Court's conclusion is the same.

Therefore, the Court concludes that Section 3701.034 violates the First Amendment.

## C. Fourteenth Amendment: Due Process

Plaintiffs argue that Section 3701.034 violates the Due Process Clause of the Fourteenth Amendment because Ohio cannot require Plaintiffs to cease performing nontherapeutic abortions as a condition of funding.

"The fundamental right to privacy contained in the Due Process Clause of the

Fourteenth Amendment includes the right to choose to have an abortion, subject to certain limitations." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (citing *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 869, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).  Abortion providers have standing to enforce their patients' right to choose to have an abortion under the Due Process Clause.  *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (concluding that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) (concluding that Planned Parenthood has standing to assert the due process rights of women seeking right to have an abortion).

Plaintiffs argue that Ohio could not pass a law directing otherwise qualified abortion providers not to perform "nontherapeutic" abortions, and therefore under the unconstitutional conditions doctrine, Ohio cannot require abortion providers to abandon a constitutionally protected activity as a condition of receiving public funds unrelated to abortion.

"[W]hile the unconstitutional conditions doctrine has been most consistently applied to protect First Amendment rights, it has also been applied by the Supreme Court to other constitutional provisions."  *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005); *see Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594, 186 L. Ed. 2d 697 (2013) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a

17

constitutional right.'") (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)).  Accordingly, the Sixth Circuit has held that "[t]he doctrine should equally apply to prohibit the government from conditioning benefits on a citizen's agreement to surrender due process rights." *R.S.W.W*, 397 F.3d at 434 (citing *Vance v. Barrett*, 345 F.3d 1083, 1089 (9th Cir. 2003)).

Citing *Rust v. Sullivan*, Defendant argues that there is no due process right to government subsidies: "'the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'"  *Rust*, 500 U.S. at 201 (quoting *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 507 (1989)); *see also Rust*, 500 U.S. at 193 ("A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." (quoting *Regan*, 461 U.S. at 549)).  However, this is not in dispute.   What is at issue is whether Section 3701.034 suppresses the exercise of due process rights "outside the contours" of the six impacted programs.  As one Florida district court has recently explained in addressing a provision similar to Section 3701.034:

> If, as the Court said in *Rust*, Congress can prohibit the use of federal funds for abortion services but cannot restrict a recipient of federal funds from separately providing abortion services, then the Florida legislature likewise can prohibit the use of state funds for abortion services but cannot prohibit a recipient of state funds from separately providing abortion services.  *Rust* is fatal to the defunding provision, which was enacted precisely and only for a prohibited purpose: to reach other, unrelated activities that are separate from the recipient's abortion services. That this was the only purpose of the defunding provision is clear because Florida law already prohibited the use of state funds for abortions.

*Planned Parenthood of Sw. & Cent. Florida v. Philip*, No. 4:16CV321-RH/CAS, 2016 WL

18

3556568, at *4 (N.D. Fla. June 30, 2016).[3]

Section 3701.034 fares no better under *Rust* because Section 3701.034 prohibits funding for programs which are not related to abortion services based on a recipient's exercise of due process rights to perform abortion services. *Accord Harris v. McRae*, 448 U.S. 297, 317, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980) ("A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion."). This Court has already concluded that Section 3701.034 conditions funding under the six impacted programs based on a recipient's exercise of the right to free speech or association outside the contours of these six programs. This conclusion is no different when it comes to a recipient's exercise of due process rights. The six programs impacted by Section 3701.034 subsidize tests and treatment, screenings and education programs which are not related to performing abortions. Section 3701.034 does not provide any way for an entity to limit its use of the funding distributed under Section 3701.034 to those six programs, while using private funds to perform abortions.

Defendant maintains that this does not end the analysis. Defendant relies on *Planned Parenthood of Indiana v. Commissioner of Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012), in which the Seventh Circuit upheld an Indiana law which

_____

[3]The provision challenged in *Planned Parenthood of Sw. & Cent. Florida v. Philip* provides that a state agency, local government entity, or Medicaid managed-care plan "may not expend funds for the benefit of, pay funds to, or initiate or renew a contract with an organization that owns, operates, or is affiliated with one or more clinics that are licensed under this chapter and perform abortions." Florida Statutes § 390.0111(15). This "defunding provision" was subject to certain exceptions "for contracts entered into before the provision's effective date, funds payable on a fee-for-service basis under the Medicaid statute, and funds paid to clinics that perform abortions only in limited circumstances—circumstances much narrower than encompassed by a woman's constitutional right to an abortion." 2016 WL 3556568, at *1.

prohibited abortion providers from receiving any state contracts and grants, including those involving state-administered federal funds. *Id.* at 969. As part of its analysis, the Seventh Circuit explained that under *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the government may not impose an "undue burden" on a woman's right to have an abortion, which exists "if the challenged law has the 'purpose or effect' of placing 'a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Id.* at 987 (quoting *Casey*, 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion)). The court then explained that under *Rust*, a state funding condition can violate the constitutional right to abortion only if the effect of the funding condition itself is to place an undue burden on women's ability to choose to have an abortion. *Id.* at 988 (explaining that if "the government's refusal to subsidize abortion does not unduly burden a woman's right to obtain an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services— cannot indirectly burden a woman's right to obtain an abortion.").

This Court has serious doubts as to whether it is proper to import the undue burden analysis from *Casey*,[4] into the analysis here, which Defendant has acknowledged is "a case about money." (Doc. 53, PAGEID #2049). *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218 (2d Cir. 2011), which was later affirmed by the Supreme Court, contains an explanation of the distinction:

> For constitutional purposes, a federal subsidy program is fundamentally different from "direct state interference" with a particular activity. *See Maher v. Roe*, 432 U.S. 464, 475, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). "Constitutional concerns are greatest when the State attempts to impose

---

[4]The Supreme Court recently reiterated this undue burden analysis in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016), as revised (June 27, 2016) (explaining that the rule announced in *Casey*, "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer.").

its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." *Id.* at 476, 97 S.Ct. 2376. As a result, "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). Subsidy conditions, absent special circumstances, "cannot be subject to the least- or less-restrictive means mode of analysis—which, like the undue burden test ..., is more appropriate for assessing the government's direct regulation of a fundamental right—when the government creates a federal spending program." *Brooklyn Legal Servs. v. Legal Servs. Corp.*, 462 F.3d 219, 229 (2d Cir. 2006), *cert. denied*, 552 U.S. 810, 128 S.Ct. 44, 169 L.Ed.2d 11 (2007).

*Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 243 (2d Cir. 2011) (Straub, J. dissenting), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013).[5] Because Section 3701.034 creates a subsidy condition, the undue burden test from *Casey* is not applicable. *Accord Planned Parenthood of Sw. & Cent. Florida v. Philip*, No. 4:16CV321-RH/CAS, 2016 WL 3556568, at *6 (N.D. Fla. June 30, 2016) ("Nothing in *Whole Woman's Health* or *Casey* suggests in any way that those decisions were intended to supplant the wholly separate unconstitutional-conditions doctrine.").

Therefore, the Court concludes that Section 3701.034 violates the Due Process Clause of the Fourteenth Amendment.

### D. **Equal protection**

Plaintiffs argue that Section 3701.034 violates the Equal Protection Clause by singling out entities that perform or promote abortions and those who affiliate with those entities. However, because the Court has concluded that the "performing

---

[5]The Seventh Circuit, at the time it issued its opinion in *Planned Parenthood of Indiana v. Commissioner of Indiana State Department of Health*, did not have the benefit of the Supreme Court's opinion in *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* because it was decided almost a year later.

nontherapeutic" and "promoting nontherapeutic abortions" provisions of Section 3701.034 are unconstitutional under the First Amendment and the Due Process Clause of the Fourteenth Amendment, the Court need not address Plaintiffs' claim under the Equal Protection Clause.

### E. Irreparable injury and lack of adequate remedy at law

"Where the plaintiff establishes a constitutional violation after a trial on the merits, the plaintiff will be entitled to permanent injunctive relief upon showing 1) a continuing irreparable injury if the court fails to issue the injunction, and 2) the lack of an adequate remedy at law." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998) (citing cases).

"The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (holding that if the constitutional right of privacy is either threatened or in fact being impaired, this mandates a finding of irreparable injury).

Plaintiffs maintain that if Section 3701.034 were to go into effect, they would no longer be unable to offer free of charge some of the services under the programs impacted by Section 3701.034. (Doc. 40-5, Iris Harvey 3d Decl., ¶ 6, PAGEID # 952) ("Without funding from those programs, PPGOH will be constrained in its ability to offer free services, such as screening for sexually transmitted diseases, HIV, and breast and cervical cancer"). Plaintiffs maintain that the requirement to pay even a reduced fee will deter patients from seeking these potentially life-saving services. (Harvey 3d Decl., ¶ 8,

PAGEID # 953).  Plaintiffs would also no longer have access to the juvenile justice and foster care systems to teach teenagers about healthy relationships as part of the PREP program.  (Harvey 3d Decl., ¶ 7, PAGEID # 953; Doc. 40-6, Jerry Lawson 3d Decl., ¶ 9, PAGEID # 959).  Based on this evidence in the record, the Court finds the irreparable injury is continuing and there is a lack of an adequate remedy at law because monetary damages could not compensate Plaintiffs for this injury.

Accordingly, the Court concludes that Plaintiffs have established that if the enforcement of Section 3701.034 is not permanently enjoined, Plaintiffs will suffer a continuing irreparable injury for which there is no adequate remedy at law.

## III. <u>CONCLUSION</u>

Based on the on the foregoing, Plaintiffs are entitled to judgment on the merits of their First Amendment claim and Fourteenth Amendment Due Process claim. Accordingly, Plaintiffs' Motion for Preliminary Injunction (Doc. 7); and Motions for Judgment on the Merits and a Permanent Injunction (Docs. 38, 47) are **GRANTED**.  It is hereby **ORDERED** that:

1. Defendant Richard Hodges, Director of the Ohio Department of Health, and his agents, employees, appointees, and successors are PERMANENTLY RESTRAINED AND ENJOINED from enforcing any provision of Ohio Revised Code § 3701.034 against Plaintiffs and any others similarly situated;

2. This Order is effective upon its entry; and

3. The Clerk is DIRECTED to enter judgment in favor of Plaintiffs.

**IT IS SO ORDERED.**

_____/s/ Michael R. Barrett_____
JUDGE MICHAEL R. BARRETT