# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: March 12, 2019

Mr. Steven H. Aden
Alliance Defending Freedom
801 G Street, N.W., Suite 509
Washington, DC 20001

Mr. Afshin Bahrampour
415 Thirteenth Street
Las Vegas, NV 89101

Ms. Jennifer L. Branch
Mr. Alphonse A. Gerhardstein
Gerhardstein & Branch
432 Walnut Street, Suite 400
Cincinnati, OH 45202

Mr. Stephen P. Carney
Mr. Benjamin Michael Flowers
Mr. Zachery P. Keller
Ms. Ryan Lynn Richardson
Ms. Hannah Carrigg Wilson
Office of the Attorney General of Ohio
30 E. Broad Street, 25th Floor
Columbus, OH 43215

Ms. Michelle Nicole Diamond
Mr. Alan Evan Schoenfeld
Wilmer Hale, 250 Greenwich Street
7 World Trade Center
New York, NY 10007

Ms. Laura Etlinger
New York State Office of the Attorney General
The Capitol, Albany, NY 12224

Mr. Thomas Molnar Fisher
Office of the Attorney General of Indiana
302 W. Washington Street
Fifth Floor
Indianapolis, IN 46204

Ms. Carrie Y. Flaxman
Mr. Alphonse A. Gerhardstein
Planned Parenthood Federation of America
1110 Vermont Avenue
Suite 300
Washington, DC 20005

Mr. Jyotin R. Hamid
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022

Mr. Thomas Dietrich Hill
1615 M Street, N.W.
Suite 800
Washington, DC 20036-0000

Mr. Hashim M. Mooppan
Mr. Lewis Yelin
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
7245
Washington, DC 20530

Ms. Kimberly A. Parker
Mr. Paul R.Q. Wolfson
Wilmer Hale
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Mr. Jay A. Sekulow
American Center for Law & Justice
1000 Regent University Drive
Robertson Hall Suite 422
Virginia Beach, VA 23467-0000

Re:    Case No. 16-4027, *Planned Parenthood of Grtr. OH, et al v. Richard Hodges*
           Originating Case No. : 1:16-cv-00539

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0042p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT
_____

PLANNED PARENTHOOD OF GREATER OHIO; PLANNED
PARENTHOOD OF SOUTHWEST OHIO REGION,
                         *Plaintiffs-Appellees*,

    *v.*

RICHARD HODGES, in his official capacity as Director
of the Ohio Department of Health,
                         *Defendant-Appellant*.

No. 16-4027

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:16-cv-00539—Michael R. Barrett, District Judge.

Argued: October 3, 2018

Decided and Filed: March 12, 2019

Before: COLE, Chief Judge; SILER, BATCHELDER, MOORE, CLAY, GIBBONS,
SUTTON, COOK, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD,
THAPAR, BUSH, LARSEN, and NALBANDIAN, Circuit Judges.
_____

### COUNSEL

**REARGUED EN BANC:** Stephen P. Carney, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellant. Alan E. Schoenfeld, WILMER CUTLER
PICKERING HALE AND DORR LLP, New York, New York, for Appellees. Hashim M.
Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal
Amicus Curiae. **ON SUPPLEMENTAL BRIEF:** Stephen P. Carney, Eric E. Murphy, Hannah
C. Wilson, Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, for Appellant. Alan E. Schoenfeld, WILMER CUTLER PICKERING HALE AND
DORR LLP, New York, New York, Jennifer L. Branch, GERHARDSTEIN & BRANCH CO.
LPA, Cincinnati, Ohio, Helene T. Krasnoff, Carrie Y. Flaxman, PLANNED PARENTHOOD
FEDERATION OF AMERICA, Washington, D.C., Paul R.Q. Wolfson, Kimberly A. Parker,
WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellees.

No. 16-4027        *Planned Parenthood of Greater Ohio et al. v. Hodges*        Page 2

Hashim M. Mooppan, Matthew M. Collette, Lewis S. Yelin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Aaron D. Lindstrom, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Jay Alan Sekulow, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., Steven H. Aden, AMERICANS UNITED FOR LIFE, Arlington, Virginia, Laura Etlinger, OFFICE OF THE NEW YORK ATTORNEY GENERAL, Albany, New York, T. Dietrich Hill, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., Jyotin Hamid, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amici Curiae.

SUTTON, J., delivered the opinion of the court in which SILER, BATCHELDER, GIBBONS, COOK, GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, and NALBANDIAN, JJ., joined. WHITE, J. (pp. 13–35), delivered a separate dissenting opinion in which COLE, C.J., and MOORE, CLAY, STRANCH, and DONALD, JJ., joined.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Ohio, like many governments, often partners with nonprofit organizations to promote policies of the State. Through one such partnership, the State distributes government funds to several organizations to address a wide range of public health issues. For many years, Planned Parenthood participated in these programs. In 2016, Ohio passed a law that bars its health department from funding organizations that "[p]erform nontherapeutic abortions." Ohio Rev. Code § 3701.034(B)(1). Two Planned Parenthood affiliates challenged the statute, claiming that it imposes an unconstitutional condition on public funding in violation of the Due Process Clause. The affiliates are correct that the Ohio law imposes a condition on the continued receipt of state funds. But that condition does not violate the Constitution because the affiliates do not have a due process right to perform abortions. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (plurality). We reverse the district court's contrary decision.

I.

Ohio distributes funds to organizations that participate in six government-sponsored health and education programs. The programs target sexually transmitted diseases, breast cancer and cervical cancer, teen pregnancy, infant mortality, and sexual violence.

Planned Parenthood of Greater Ohio and Planned Parenthood of Southwest Ohio manage twenty-seven health centers across the State.  They have participated in these programs for several years.  Both entities provide abortions at surgical centers in Bedford Heights, Columbus, and Cincinnati.

For several decades, both federal and state laws have prohibited recipients of public funds from using the money to provide abortions.  The Planned Parenthood affiliates comply with these requirements.

In 2016, the Ohio legislature enacted, and Governor Kasich signed into law, House Bill 294 to "Prohibit[] [the] use of certain funds concerning nontherapeutic abortions."  It requires the Ohio Department of Health to "ensure" that all of the funds it receives for the six programs "are not used to do any of the following:  (1) Perform nontherapeutic abortions; (2) Promote nontherapeutic abortions; (3) Contract with any entity that performs or promotes nontherapeutic abortions; (4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions."  Ohio Rev. Code § 3701.034(B)–(G).  The point of the limitation, the State maintains, is to promote childbirth over abortion, to avoid "muddl[ing]" that message by using abortion providers as the face of state healthcare programs, and to avoid entangling program funding and abortion funding.  Appellant's Br. 39–41.

Ohio's health department and its local counterparts notified Planned Parenthood of Greater Ohio and Planned Parenthood of Southwest Ohio that the new law would require the State to end their contracts under the programs.  Both entities perform abortions, advocate for abortion, and affiliate with other entities that do the same.

Both of the affiliates, from now on referred to as Planned Parenthood in the singular, sued, claiming that the law violates the First and Fourteenth Amendments by conditioning government funding on giving up their rights to provide abortions and to advocate for them.  The district court agreed and permanently enjoined the State from enforcing the law.

After a panel of this court affirmed the district court, 888 F.3d 224 (2018), the full court decided to review the appeal, 892 F.3d 1283 (2018) (mem.).

## II.

As the district court saw it, the Ohio law imposes two unconstitutional conditions on Planned Parenthood. It denies the organization funding if it continues to perform abortions—what the court perceived to be a due process violation. And the law denies the organization funding if it continues to promote abortion—what the court perceived to be a free speech violation. To prevail, Planned Parenthood must show that *both* limitations—the conduct and speech requirements—violate the U.S. Constitution. Ohio may deny funding to Planned Parenthood in other words if either limitation satisfies the Constitution. Because the conduct component of the Ohio law does not impose an unconstitutional condition in violation of due process, we need not reach the free speech claim.

First a word or two about unconstitutional conditions. The United States Constitution does not contain an Unconstitutional Conditions Clause. What it does contain is a series of individual rights guarantees, most prominently those in the first eight provisions of the Bill of Rights and those in the Fourteenth Amendment. Governments generally may do what they wish with public funds, a principle that allows them to subsidize some organizations but not others and to condition receipt of public funds on compliance with certain obligations. *See Rust v. Sullivan*, 500 U.S. 173, 192–94 (1991). What makes a condition unconstitutional turns not on a freestanding prohibition against restricting public funds but on a pre-existing obligation not to violate constitutional rights. The government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Otherwise, the government could leverage its spending authority to limit, if not eliminate, the exercise of this or that constitutional right. In the words of the Supreme Court, the principle "forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013).

What is the enumerated right at issue here? The guarantee of due process established by the Fourteenth Amendment. That provision, as the United States Supreme Court has come to construe it, prohibits a State from imposing an "undue burden" on a woman's access to an abortion before fetal viability. *Casey*, 505 U.S. at 877 (plurality).

These principles establish the following line between what Ohio may do and what it may not do. It may choose not to fund a private organization's health and education initiatives. Private organizations do not have a constitutional right to obtain governmental funding to support their activities. The State also may choose not to subsidize constitutionally protected activities. Just as it has no obligation to provide a platform for an individual's free speech, say a Speaker's Corner in downtown Columbus, it has no obligation to pay for a woman's abortion. Case after case establishes that a government may refuse to subsidize abortion services. *Rust*, 500 U.S. at 201–02; *Harris v. McRae*, 448 U.S. 297, 315–17 (1980); *Maher v. Roe*, 432 U.S. 464, 474 (1977). Both the United States and Ohio have done exactly that, whether through the Hyde Amendment, *see* Pub. L. No. 115-31, §§ 613–14, 131 Stat. 135, 372 (2017), or through Ohio Revised Code § 9.04(B).

By contrast, the State may not condition a benefit by requiring the recipients to sacrifice their constitutional rights. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983). Just as the State may not directly order someone to stop exercising his rights, it may not coerce him into "giving them up" by denying the benefits if he exercises those rights. *Koontz*, 570 U.S. at 604, 612.

The Ohio law falls on the permissible side of this line. Today's plaintiffs do not have a Fourteenth Amendment right to perform abortions. The Supreme Court has never identified a freestanding right to perform abortions. To the contrary, it has indicated that there is no such thing. "Whatever constitutional status the doctor-patient relation may have as a general matter," the Court has explained, "in the present context it is *derivative* of the woman's position. The doctor-patient relation does not underlie or override the two more general rights under which the abortion right is justified: the right to make family decisions and the right to physical autonomy. On its own, the doctor-patient relation here is entitled to the same solicitude it receives in other contexts." *Casey*, 505 U.S. at 884 (plurality) (emphasis added).

Any doubt about the point is confirmed by the debate at hand in *Casey*. The abortion providers claimed that a Pennsylvania law, requiring them to inform their patients of the abortion procedure's details and alternatives at least 24 hours beforehand, violated their patients' due process rights *and* their own due process rights that arose from their relationship with the

patients.  The plurality rejected both claims.  Abortion rights do not arise from the provider-patient relationship "[o]n its own," the Court reasoned.  *Id.*  After explaining that the law did not unduly burden *women's* rights, the plurality concluded that the law had no more constitutional import as to the *providers* than if its requirements dealt with "a kidney transplant."  *Id.* at 883.  In the absence of a constitutional right to perform abortions, the plaintiffs have no basis to bring an unconstitutional-conditions claim.

At the same time, the Ohio law does not violate a woman's right to obtain an abortion.  It does not condition a woman's access to any of these public health programs on refusing to obtain an abortion.  It makes these programs available to every woman, whether she seeks an abortion or not.  Nor, on this record, has there been any showing that the Ohio law will limit the number of clinics that offer abortions in the State.  *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–18 (2016).

A review of the Supreme Court's decisions in the area fails to reveal a single one in which the plaintiff obtained relief based on a restriction of unprotected activity.  The dissent to its credit concedes as much.  *Infra*, at 26 n.8.  A benefits condition becomes unconstitutional only when it violates a recipient's constitutional rights, as the following cases confirm.  *See, e.g.*, *Koontz*, 570 U.S. 595 (permit condition on landowner burdened *his* Fifth Amendment rights); *All. for Open Soc'y Int'l*, 570 U.S. 205 (funding condition on aid organization burdened *its* First Amendment rights); *Rust*, 500 U.S. 173 (funding condition on Title X grantees did not violate *their* First Amendment rights); *Regan*, 461 U.S. 540 (tax-exemption condition on organization did not violate *its* First Amendment rights); *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) (benefits condition on nonresident indigent burdened *his* Fourteenth Amendment rights).

The only other circuit in the country to squarely address this issue reached the same conclusion.  "The first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled," it reasoned, and abortion clinics lack a freestanding constitutional right to practice their trade.  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986–88 (7th Cir. 2012).  Accordingly, "[a]s long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently" than other entities.  *Id.* at 988.  In

that case, the Seventh Circuit rejected an unconstitutional-conditions challenge to an Indiana law with a conduct component identical in every material way to this Ohio law. In dicta, the Ninth Circuit reached a similar conclusion. "Never has it been suggested," the court explained, "that if there were no burden on a woman's right to obtain an abortion, medical providers could nonetheless assert an independent right to provide the service for pay." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 689 (9th Cir. 2017) (en banc).

Planned Parenthood nonetheless maintains that a bevy of cases establishes that clinics *do* have a due process right to perform abortions. But a review of the cases leaves the reader empty handed. *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989), held that physicians have no right to use public facilities to provide abortions, all consistent with the no-required-funding-of-abortions principle on which Ohio's policy decision rests. After explaining that holding, *Webster* speculated that it might "be different if the State barred doctors who performed abortions in private facilities from the use of public facilities for any purpose." *Id.* at 510 n.8. Three years after *Webster*, however, *Casey* ended any speculation over whether providers have a constitutional right to offer abortion services. It indicated they do not.

*Planned Parenthood of Central & Northern Arizona v. Arizona*, 718 F.2d 938, 946 (9th Cir. 1983), another pre-*Casey* case, fares no better. It never held that providers have a constitutional right to perform abortions and indeed had no occasion to do so because it analyzed a broad, speech-centric claim about restrictions on a combination of abortion-related activities. *Planned Parenthood of Mid-Missouri & East Kansas, Inc. v. Dempsey*, 167 F.3d 458, 461–64 (8th Cir. 1999), is to like effect.

The Tenth Circuit, it is true, accepted the existence of a Fourteenth Amendment right to provide abortions. *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1260 (10th Cir. 2016). But it did so without meaningful analysis or authority, and most importantly it did so in a case in which the State did not challenge the existence of the right.

Third-party-standing cases do not fill this gap. In those cases, the Supreme Court held that abortion providers have standing to bring due process challenges on behalf of their patients. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (plurality); *see also Diamond v. Charles*,

476 U.S. 54, 65–66 (1986). But these decisions do not establish that the providers themselves have due process rights. Much to the contrary. The premise of these challenges is that the providers have *no* constitutional rights of their own in this setting. Why else go through the rigmarole of granting the provider third-party standing to file the claim? The first party (the woman) has the claim, and the third party (the provider) sometimes may bring *that* claim on *her* behalf. Any other interpretation of the third-party doctrine, as the plaintiffs use it here, would have this disfiguring effect: It would create a constitutional right for providers to offer abortion services and, in doing so, move the law perilously close to requiring States to subsidize abortions. Case law rejects both possibilities.

Even if the Fourteenth Amendment does not grant Planned Parenthood a constitutional right to perform abortions and even if the third-party-standing doctrine does not fill this gap, the organization maintains that the unconstitutional-conditions doctrine defeats the law all the same. Ohio may not directly ban access to abortion services in the State, Planned Parenthood points out, and the unconstitutional-conditions doctrine bars a State from achieving that same goal indirectly, here by financially incentivizing abortion providers to cease offering this service. Yes, the doctrine would prohibit the State from requiring *women* to forfeit benefits if they chose to obtain an abortion and if that limitation unduly burdened their access to abortion services. That's because such a state law would try to achieve indirectly what the State cannot achieve directly with respect to the underlying constitutional right. But, no, the principle does not apply when the State regulates entities with no such constitutional right: abortion providers. In that setting, the clinic is like anyone else in the State, subject to all manner of regulatory incentives and disincentives, whether in the tax code, economic development plans, or any other part of state or local law.

Consistent with this explanation, all of the cases cited by Planned Parenthood with respect to this direct-indirect point involved individuals or entities who held the constitutional right and were discouraged from exercising it. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 360–61 (1976) (employees claimed that county fired *them* due to their political affiliation); *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972) (professor claimed that state college refused to renew *his* contract due to his protected speech); *Lane v. City of LaFollette*, 490 F.3d 410, 419 (6th Cir.

2007) (employee claimed that city fired him for *his* political beliefs); *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 321 (6th Cir. 1998) (public-employee unions claimed that prohibition on payroll deductions for political causes discouraged *their* political expression).

The direct-indirect dynamic, put another way, is not by itself what triggers the doctrine. The doctrine applies when the government attempts to ban or undermine a benefit recipient's exercise of a *right* that the Constitution guarantees. That's why an unconstitutional-conditions claim won't get far if the government could have directly ordered the outcome it wishes to incentivize. In that case, there is no right at issue. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 58–60 (2006) (upholding funding condition that required universities to give military recruiters equal access to students, because the First Amendment would allow Congress to directly impose such a requirement). Because Planned Parenthood has no constitutional right to perform abortions, the doctrine does not apply to Ohio's incentives to refrain from performing them.

Truth be told, general concerns about indirect efforts to accomplish what cannot be accomplished directly illustrate what is wrong with this claim. Medical centers do not have a constitutional right to offer abortions. Yet, if we granted Planned Parenthood relief today, we would be effectively saying that they do. That is not the role of the unconstitutional-conditions doctrine.

That this traditional application of the unconditional-conditions doctrine might apply in other settings, as the dissent points out, *infra*, at 26, counts as a plus, not a minus, in the constitutional equation. It shows that the principle is a neutral one. And it shows that our assessment of the case turns on the nature of the unconstitutional-conditions doctrine, not on individual preferences with respect to this constitutional right or that one. Any risk of unequal application would arise in this case only if we *extend* the unconstitutional-conditions doctrine for the first time to an entity (here an abortion provider) that does not have a constitutional right.

In the absence of such an extension, Planned Parenthood worries that the unconstitutional-conditions doctrine will lead to several problematic outcomes. "Imagine," the dissent suggests, "that the government barred lawyers who represent indigent defendants from

eligibility for loan forgiveness programs." *Id.* Or imagine, we could add, that the government denied government construction contracts to companies that build for customers of a particular faith or race or burdened gun shops with punitive or irrational licensing requirements. Straw men, to be sure, but revealing all the same. None of these hypotheticals reveals a doctrinal (or policy) gap that an extension of the unconstitutional-conditions doctrine needs to fill.

The initial question in each instance is whether such a law would implicate the *regulated entity*'s constitutional rights or some other prohibition. That seems likely in each setting. The first application would implicate a lawyer's free speech rights. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001). The second application would implicate the prohibition on drawing racial and faith-based classifications in any law. Just as a State could not condition an abortion provider's subsidy on providing services only to individuals of a certain race or religion, so it could not condition a construction company's contracts on serving only non-Muslim clients or only white clients. *See Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Brown v. Bd. of Educ.*, 347 U.S. 483, 488, 495 (1954). Even aside from the question whether gun stores have Second Amendment rights, *compare Teixeira*, 873 F.3d at 681–90, *with id.* at 698–99 (Bea, J., dissenting), the third application confirms that all punitive or irrational licensing requirements run the risk of violating a store's constitutional rights, whether the store sells guns or not. But it is hardly punitive or irrational for a State to subsidize some activities and not others. The unconstitutional-conditions doctrine no more *elevates* non-constitutional claims into constitutional ones than it *insulates* protected rights from protection.

This last point answers the dissent's next hypotheticals about polling-place funding and gun-shop tax breaks, *infra*, at 26, as well as any others that a fertile imagination could identify, so long as the law does *not* violate the regulated entity's rights or another prohibition. Take the gun shop. Surely a State could deny subsidies for entities dealing with the needs of victims of gun violence to entities or stores that sold guns. In the end, so long as the subsidy program does not otherwise violate a constitutional right of the regulated entity, the State may choose to subsidize what it wishes—whether abortion services or adoption services, whether stores that sell guns or stores that don't.

That leads to Planned Parenthood's next argument.  Left untouched, the Ohio law will deprive Ohio women of their constitutional right of access to abortion services without undue burden, because it will lead Planned Parenthood and perhaps other abortion providers to stop providing them.  Maybe; maybe not.  More to the point, the conclusion is premature and unsupported by the record.  It is true that, if these two Planned Parenthood affiliates opted not to provide abortions, women seeking an abortion in Ohio would have to travel farther than they currently do to obtain an abortion.  It is also true that this kind of evidence may support an undue-burden challenge by establishing a "substantial obstacle" in the way of those seeking abortions.  *See Whole Woman's Health*, 136 S. Ct. at 2309–18; *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 604–05 (6th Cir. 2006).

But it is premature to assess any such claim now.  For one, it is not clear that the plaintiffs filed an undue-burden challenge on behalf of individual women, as opposed to an unconstitutional-conditions challenge on their own behalf.  For another, the record contains more speculation than evidence about what would happen if these two Planned Parenthood affiliates stopped providing abortions.  For still another, the only hard evidence on point is that Planned Parenthood *does not* plan to stop providing abortions, as representatives from each affiliate testified that they would sacrifice government funding to continue providing abortions.  On this record, it would be unduly conjectural, and unripe to boot, to imagine what would happen if the plaintiffs changed their mind.  Under our Article III authority to resolve "Cases" and "Controversies," we must limit ourselves to the seen rather than the unseen.  And all that the seen shows is that the law will not create an undue burden on a woman's right to an abortion.

Planned Parenthood insists that it has no obligation to establish an undue burden because the funding condition itself is unconstitutional, making it irrelevant whether the subject of the condition gives in.  *See Koontz*, 570 U.S. at 607.  That may be true if the subject of the funding incentive possesses the right.  But that is not true in this instance because the subject—here providers, not women—does not possess the right.  All of which takes us back to where we started.  To have an unconstitutional condition, the State must impose the condition on the individual (or entity) with the constitutional right.  If there's no right, there's no unconstitutional condition.  And the providers have no such constitutional right.  The point of the doctrine is to

protect the underlying right:  a woman's right of access to abortion services without an undue burden.  It is not to leverage a constitutional condition into an unconstitutional one while freeing the provider from either asserting a valid right of its own or showing any undue burden on anyone.

That this is a pre-enforcement action, last of all, changes nothing.  Even in that setting, Planned Parenthood must show that the Ohio law, if implemented, would impose an undue burden on a woman's right to an abortion.  Its vow to keep performing abortions sinks any pre-enforcement action, and any speculation about what would happen if it changed its mind is just that.

For these reasons, we reverse the district court's contrary decision and remand for proceedings consistent with this opinion.

---------------------

## DISSENT

---------------------

HELENE N. WHITE, Circuit Judge, dissenting.  The majority makes short work of Plaintiffs' arguments with three simple assertions.  Because Plaintiff clinics have no independent constitutional right to perform abortions, it is impossible for Ohio to violate their due process rights by withholding benefits or imposing burdens based on their abortion activities; a woman has a due process right to obtain certain nontherapeutic abortions, but no condition violates that right unless it imposes an undue burden on that right; because Plaintiff providers have made clear that they will not accede to Ohio's funding conditions, there is no undue burden on a woman's abortion right.

The majority does not mention, much less apply, the test the Supreme Court has recently articulated governing the unconstitutional-conditions doctrine.  That doctrine prohibits the government from conditioning the grant of funds under a government program if: (1) the challenged conditions would violate the Constitution if they were instead enacted as a direct regulation; and (2) the conditions affect protected conduct outside the scope of the government program.  *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 213-15 (2013) (hereafter *AOSI*).  Because (1) the funding conditions in this case would result in an undue burden on a woman's right to obtain nontherapeutic abortions if imposed directly, and (2) the six federal programs have nothing to do with Plaintiffs' performing abortions, advocating for abortion rights, or affiliating with organizations that engage in such activity, all on their own "time and dime," I respectfully dissent.

Enacted in 2016, Ohio Revised Code § 3701.034 (the Statute) requires the Ohio Department of Health (ODH) to ensure that all funds it receives through six non-abortion-related federal health programs are not used to contract with any entity that performs or promotes nontherapeutic abortions, or becomes or continues to be an affiliate of any entity that performs or promotes nontherapeutic abortions.  A direct regulation barring healthcare providers from performing or promoting nontherapeutic abortions or affiliating with any entity that performs or

promotes nontherapeutic abortions would violate the Constitution by imposing an undue burden on women seeking abortions and violating the healthcare providers' rights to free speech and association. The Statute thus satisfies the first element of an unconstitutional condition. The Statute also plainly conditions government funding for programs unrelated to abortion on an entity's refraining from performing or promoting abortions, or affiliating with any entity that does either. Because § 3701.034 fails both parts of the test applied in *AOSI*, the district court properly enjoined the law from going into effect.

The majority avoids this straightforward application of the unconstitutional-conditions doctrine primarily by adopting an unprecedented rule that abortion providers—entities that are necessary to ensure a woman's right to safe abortions—cannot prevail in challenging the Statute because there is no independent constitutional right to provide abortions. For the proposition that there is "no such thing" as a right to perform abortions, the majority cites the statement in the plurality opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey* that a provider's constitutional right "is derivative of the woman's position." 505 U.S. 833, 884 (1992). (Maj. Op. at 5.) The majority then assumes that a "derivative" right is no right at all. But of course, "derivative" simply means "developed from . . . something else." *Black's Law Dictionary* (10th ed. 2014). An abortion provider's constitutional right may be derivative of the patient's right—but it is a right nonetheless.

And, even if the abortion right belongs only to women, it has long been understood that "the right is inextricably bound up with" a provider's ability to offer these services. *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (plurality opinion). Further, the Supreme Court has never suggested that a party that could prevail in challenging a direct regulation is nevertheless powerless to challenge a law that attempts to achieve the same result by imposing a condition on unrelated funding. The majority's novel rule gives the government the authority to impose almost any condition it wants on abortion providers so long as the providers continue to perform abortions. The government acknowledged as much at oral argument. This type of assault on a constitutional right is precisely the type of harm the unconstitutional-conditions doctrine is meant to protect against.

# I. BACKGROUND

## Ohio Revised Code § 3701.034

Ohio Revised Code § 3701.034 provides:

**(A)** As used in this section:

(1) "Affiliate" means an entity that has with another entity a legal relationship created or governed by at least one written instrument that demonstrates any of the following:

(a) Common ownership, management, or control;

(b) A franchise agreement;

(c) The granting or extension of a license or other agreement that authorizes an entity to use the other entity's brand name, trademark, service mark, or other registered identification mark.

(2) "Violence Against Women Act" means section 1910A of section 40151 of the "Violent Crime Control and Law Enforcement Act of 1994," part A of Title XIX of the "Public Health and Human Services Act," 108 Stat. 1920 (1994), former 42 U.S.C. 300w, 42 U.S.C. 280b-1b, as amended.

(3) "Breast and Cervical Cancer Mortality Prevention Act" means the "Breast and Cervical Cancer Mortality Prevention Act of 1990," 104 Stat. 409 (1990), 42 U.S.C. 300k, as amended.

(4) "Infertility prevention project" means the infertility prevention project operated by the United States centers for disease control and prevention.

(5) "Minority HIV/AIDS initiative" means the minority HIV/AIDS initiative operated by the office of minority health in the United States department of health and human services.

(6) "Personal responsibility education program" means the program administered by the administration for children and families in the United States department of health and human services to educate adolescents on abstinence and contraception for the prevention of pregnancy and sexually transmitted infections.

(7) "Nontherapeutic abortion" has the same meaning as in section 9.04 of the Revised Code.[1]

---

[1]Ohio law defines "nontherapeutic abortion" as "an abortion that is performed or induced when the life of the mother would not be endangered if the fetus were carried to term or when the pregnancy of the mother was not the result of rape or incest reported to a law enforcement agency." Ohio Rev. Code § 9.04(A)(1).

(8) "Promote" means to advocate for, assist with, encourage, or popularize through advertising or publicity.

**(B) – (G)[2]** The department of health shall ensure that all funds it receives [through the Violence Against Women Act, Breast and Cervical Cancer Mortality Prevention Act, Infertility prevention project, Minority HIV/AIDS initiative, infant mortality reduction or infant vitality initiatives] are not used to do any of the following:

(1) Perform nontherapeutic abortions;

(2) Promote nontherapeutic abortions;

(3) Contract with any entity that performs or promotes nontherapeutic abortions;

(4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions.

### Plaintiffs

Plaintiffs Planned Parenthood of Greater Ohio (PPGOH) and Planned Parenthood Southwest Ohio Region (PPSWO) are not-for-profit corporations organized under Ohio law. PPGOH and PPSWO are also affiliates of Planned Parenthood Federation of America, Inc. (PPFA), which advocates for women's access to comprehensive reproductive healthcare, including abortion. Plaintiffs operate twenty-seven[3] health centers throughout Ohio, which are staffed with physicians, nurse practitioners, and physician assistants, who provide well-woman exams, testing and treatment for sexually transmitted diseases, screenings for breast and cervical cancer and HIV, and contraception and contraceptive counseling. Three of the twenty-seven health centers also provide abortion services. Separate from their government-funded health services and education programs, PPGOH and PPSWO advocate for a woman's right to safe and lawful abortion through public awareness campaigns and public education activities.

Consistent with federal and Ohio law, no government funds are used to pay for or subsidize Plaintiffs' abortion services or advocacy. It is undisputed that Plaintiffs "maintain

---

[2]Sections (B) through (G), which address each of the programs separately, share identical language in subsections (1) through (4), and are condensed for brevity.

[3]During the pendency of this appeal, Plaintiffs' counsel advised that one of the twenty-eight health centers has closed for reasons unrelated to this case. The district court's opinion states that Plaintiffs operate twenty-eight health centers, which was accurate at the time.

No. 16-4027 *Planned Parenthood of Greater Ohio et al. v. Hodges* Page 17

measures to ensure that none of the funds received from the state or federal government are used, directly or indirectly, to subsidize the promotion of abortion or performance of abortion services." (R. 60, PID 2136.)

Largely through competitive grant processes, Plaintiffs have for years received funds and material assistance distributed by ODH and county health departments under the six federal programs impacted by § 3701.034: the Infertility Prevention Project, Breast and Cervical Cancer Mortality Prevention Act, Violence Against Women Act, Minority HIV/AIDS Initiative, Infant Mortality Reduction Initiative, and Personal Responsibility Education Program (PREP).[4] Throughout those years, Plaintiffs passed all state and local audits and program reviews.

After § 3701.034 was enacted, ODH and local health departments notified Plaintiffs that their contracts under the six federal programs would be terminated and they would not be eligible for funding. Plaintiffs' termination of services they currently provide under these six programs could have dramatic public-health consequences. For example, as amicus American Public Health Association details, Plaintiffs currently provide over 70,000 free STD tests to low-income Ohioans annually under the STD Prevention Program. With STDs among Ohioans continuing to rise, Plaintiffs' non-eligibility in that program could lead to three counties being without any qualified provider because other existing program providers do not have the capacity to fill the gap. Section 3701.034's bar on funds being distributed to Plaintiffs under the other five programs would require Plaintiffs to cease providing other fundamental public-health services to primarily low-income or at-risk populations, including HIV testing and education, cancer screenings, and sexual-violence-prevention education.[5]

---

[4]Plaintiffs' counsel advised the court by letter dated July 27, 2017, that PPGOH did not reapply for grant funding under the PREP program when its contract expired on July 31, 2017, and that it appears that ODH will no longer be responsible for allocating PREP funds as of August 1, 2017; thus "there is a question as to whether [this court] need consider PREP in its analysis of Section 3701.034." (ECF No. 57.)

[5]PPGOH is the largest provider of HIV testing and treatment in Cleveland, Akron, and Canton, and PPSWO provides approximately 1,600 anonymous and confidential HIV tests annually. PPGOH also provided 4,400 pap smears and 3,700 breast exams in the fiscal year ending in June 2015. Approximately 75% of PPSWO's patients and 40% of PPGOH's patients fall within the low-income classification. Many of these patients live in medically underserved areas—communities classified by the U.S. Department of Health and Human Services as having too few primary-care providers, high infant mortality and poverty rates, or large elderly populations. ODH failed to identify alternative providers to fill most of the gaps in service that would result from excluding Plaintiffs from funding under the six federal programs.

No. 16-4027          *Planned Parenthood of Greater Ohio et al. v. Hodges*          Page 18

## Procedural History

Plaintiffs filed this action for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that § 3701.034 violates 1) their First Amendment rights "by denying state and federal funds" to Plaintiffs "because of—and in retaliation for—their constitutionally-protected advocacy for abortion rights and affiliation with other organizations that also advocate for abortion rights and/or provide abortion services"; 2) the Due Process Clause "by denying state and federal funds" to Plaintiffs "because of—and in retaliation for—the exercise of their own constitutionally protected right to provide abortions and their patients' exercise of the constitutional right to choose to have an abortion"; and 3) the Equal Protection Clause "by singling out abortion providers and those who 'promote' abortions, including [Plaintiffs], for unfavorable treatment without a constitutionally sufficient justification." (R. 1, PID 1, 27-28.) Plaintiffs sought to enjoin ODH from enforcing § 3701.034 or terminating Plaintiffs' funding under the six federal programs pursuant to the Statute.

The district court entered a temporary restraining order on the day § 3701.034 was to take effect. Following discovery, the district court granted Plaintiffs' motions for judgment on the merits and permanently enjoined ODH from enforcing § 3701.034, reasoning that § 3701.034 violates the unconstitutional-conditions doctrine by impermissibly conditioning funding from programs unrelated to abortion based on a recipient's refraining from exercising its First Amendment rights to free speech or association outside the contours of the six programs, and refraining from providing abortion services protected by the Due Process Clause.[6] *Planned Parenthood of Greater Ohio v. Hodges*, 201 F. Supp. 3d 898 (S.D. Ohio 2016). A unanimous panel affirmed the district court. 888 F.3d 224 (6th Cir. 2018). The full court then voted for rehearing en banc. 829 F.3d 1283 (6th Cir. 2018).

## II. STANDARD OF REVIEW

This court reviews a challenge to the constitutionality of a statute de novo. *Entm't Prods., Inc. v. Shelby County*, 721 F.3d 729, 733 (6th Cir. 2013). In reviewing the district

---

[6]The district court did not reach Plaintiffs' Equal Protection claim, nor does the majority. Accordingly, the case must be remanded for the district court to consider the Equal Protection claim.

court's grant of injunctive relief, the district court's factual findings are reviewed for clear error, its legal conclusions are reviewed de novo, and the scope of injunctive relief is reviewed for abuse of discretion. *Sec'y of Labor, U.S. Dep't of Labor v. 3Re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003). "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011) (quoting *Wedgewood L.P. I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010)).

### III.  DISCUSSION

The majority concludes that the "conduct provision" of § 3701.034 (precluding entities that *perform* nontherapeutic abortions from obtaining funding under the six federal programs) does not impose an unconstitutional condition because Plaintiffs have no due process right to perform abortions. The majority declines to reach Plaintiffs' First Amendment challenges to the speech and affiliation provisions (prohibiting the allocation of program funds to any entity that either (1) *promotes* nontherapeutic abortions, or (2) *affiliates* with any entity that performs or promotes nontherapeutic abortions) concluding that Ohio may deny funding to Plaintiffs under the six federal programs if any one of the provisions is valid. I address all three provisions because each provision imposes an unconstitutional condition.

### A.  Due Process Claim

### 1.

I begin with the unconstitutional-conditions doctrine. The Supreme Court recognized this doctrine many decades ago to ensure that the government cannot leverage its allocation of benefits to "manipulate[]" constitutional rights "out of existence." *Frost v. R.R. Comm'n*, 271 U.S. 583, 594 (1926). Generally speaking, "the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose." *Id.* at 593. The state's power, however, "in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights." *Id.* at 593-94. "Broadly stated, the rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the

state which is hostile to the provisions of the federal Constitution." *United States v. Chi., M., St. P. & P.R. Co.*, 282 U.S. 311, 328-29 (1931). Thus, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons," the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This doctrine has been applied in a number of contexts where constitutional rights were implicated, *see Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'" (citation omitted)), including where the government "condition[s] benefits on a citizen's agreement to surrender due process rights," *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005).

"A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz*, 570 U.S. at 612. And, critically for this case, even when a party "refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury." *Id.* at 607; *see also AOSI*, 570 U.S. at 214 (explaining that a condition need not be "actually coercive" to violate the Constitution).

To be sure, the unconstitutional-conditions doctrine does not render any funding condition that may affect the exercise of constitutional rights unconstitutional. *See AOSI*, 570 U.S. at 214 (citing *United States v. Am. Library Ass'n., Inc.*, 539 U.S. 194 (2003) (plurality opinion), and *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983)). Rather, "the relevant distinction" is whether the conditions "define the limits of the government spending program" or are "outside the contours of the program itself." *Id.* at 214-15. In determining on which side of the line a condition falls, the Supreme Court distinguishes between conditions that regulate the government-funded *project* and conditions that regulate the *recipient* of government funds. *See Rust v. Sullivan*, 500 U.S. 173, 197 (1991) ("[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus

effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.").

In *AOSI*, the Supreme Court invalidated a statutory provision requiring organizations receiving funds under a program designed to combat AIDS and HIV to have a policy explicitly opposing prostitution and sex trafficking.  570 U.S. at 210, 221.  The Court first noted that "[w]ere [the Policy Requirement] enacted as a direct regulation of speech, [it] would plainly violate the First Amendment."  *Id.* at 213.  This did not end the inquiry, however.  The Court then asked whether the conditions "define the federal program" or "reach outside it," *id.* at 217, and explained that "[b]y demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program,'" *id.* at 218 (quoting *Rust*, 500 U.S. at 197).  This was because, under the statutory condition, a funding recipient could not "avow the belief dictated by the Policy Requirement when spending [federal program] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime."  *Id.* at 218.  Thus, "[b]y requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient."  *Id.* (citing *Rust*, 500 U.S. at 197).

A straightforward application of these principles establishes the Statute's unconstitutionality.  First, ODH could not impose the conduct provision as a direct regulation, because to do so would mean passing a law prohibiting the performance of nontherapeutic abortions.  There is no dispute that outlawing abortions in Ohio would be an undue burden on women's ability to access the procedure in that state.  Even if the direct regulation were limited to Plaintiffs—a constitutionally dubious maneuver as well, *see Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 327 (M.D.N.C. 2012)—ODH never contested Plaintiffs' argument that a ban on their providing nontherapeutic abortions would impose an undue burden on women seeking abortions in Ohio.[7]

---

[7]Plaintiffs consistently argued that their ceasing to perform abortions would impose an undue burden on women seeking abortion due to the reduction in abortion services available to the women of Ohio.  Despite multiple opportunities in several rounds of briefing before the district court and this court, ODH never attempted to explain

Second, the Supreme Court explained that permissible "conditions that define the limits of the government spending program" are "those that specify the activities Congress wants to subsidize." *AOSI*, 570 U.S. at 214. The condition contained in the conduct provision of § 3701.034, however, does not "define the limits" of the six federal programs at issue because those programs have nothing to do with abortion. Indeed, federal and Ohio law already mandate that funds from those six programs, or any other government funds, cannot be used to subsidize nontherapeutic abortion. Thus, there is no question that this condition "reach[es] outside" the six federal programs and therefore constitutes an unconstitutional condition. *See id.* at 214-15.

ODH disputes this conclusion, arguing that the conduct provision of § 3701.034 comports with due process under *Maher v. Roe*, 432 U.S. 464 (1977), *Harris v. McRae*, 448 U.S. 297 (1980), and *Rust*, 500 U.S. 173. But these cases merely establish that the government is under no obligation to subsidize abortion or abortion counseling by including coverage for abortion or abortion counseling in public-benefits programs. *Maher*, 432 U.S. at 470-71, 474 (rejecting challenge to regulation limiting state Medicaid benefits for first-trimester abortions to those that are medically necessary); *McRae*, 448 U.S. at 322-23 (rejecting challenge to Hyde Amendment's limitation of Medicaid funding to those abortions necessary to save life of mother or cases of rape or incest, while permitting funding of costs associated with childbirth); *Rust*, 500 U.S. at 192-94 (rejecting challenge to regulations providing that Title X family-planning funds could not be used to fund family-planning programs where abortion is a method of family planning). That principle is not at issue here because the six federal programs are completely divorced from abortion or family planning.

*Rust*, in fact, teaches why § 3701.034 is impermissible. *Rust* involved Title X, which "provides federal funding for family-planning services." 500 U.S. at 178. The regulations at issue prevented recipients from using Title X funds to engage in abortion advocacy and

---

why Plaintiffs' ceasing to perform abortions would not cause an undue burden, instead calling the argument "irrelevant." (R. 53, PID 2055.) At oral argument before the en banc court, ODH acknowledged that it never briefed the issue but summarily argued in rebuttal that it was "pretty sure we not only do dispute that, but we'd come out on the better side of it." (Oct. 3, 2018, Oral Arg. 58:58-59:43.) Because a party's claiming to be "pretty sure" that it would dispute an issue despite never briefing that issue is insufficient to preserve the issue for appeal, ODH forfeited the argument that Plaintiffs' ceasing to perform abortions would not result in an undue burden. *See United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 758 (6th Cir. 1999); *Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc).

counseling. *Id.* at 196. Because Title X was a program meant to encourage family-planning services leading to conception and childbirth, and thus discourage abortion, the regulations were permissible in part because they were "designed to ensure that the limits of the federal program are observed." *Id.* at 193. In contrast, the six federal programs here have nothing to do with family planning or abortion.

Further, in rejecting the plaintiffs' unconstitutional-conditions challenge to the regulations, the *Rust* Court explained that the Supreme Court's "'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197. That is precisely what § 3701.034 does; it places conditions on Plaintiffs—the recipients of the subsidies—that prohibit them from engaging in protected conduct outside the scope of the six federal programs.

Finally, it was critical in *Rust* that the regulations did not deny "the right to engage in abortion-related activities" as a condition of receiving funding. *Id.* at 198. The regulations were constitutional because they "govern[ed] the scope of the Title X *project*'s activities," while "leav[ing] the grantee unfettered in its other activities. The Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds." *Id.* at 196. In contrast, § 3701.034's whole purpose is to fetter Plaintiffs in their other (i.e., abortion-related) activities, which are unrelated to the government-funded programs. Similarly, in *FCC v. League of Women Voters of California*, 468 U.S. 364, 400 (1984), the Supreme Court struck down a law barring recipients of government funds from engaging in editorializing because the law barred funding recipients "from using even wholly private funds to finance its editorial activity." But the Court noted that such a law would have been permissible if it allowed the recipient "to establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds." *Id.* Here, § 3701.034 expressly precludes funding recipients from being an affiliate of any entity that performs or promotes nontherapeutic abortions. *See also Planned Parenthood of Mid-Mo.*

*& E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 463 (8th Cir. 1999) (explaining that a law prohibiting recipients of state family-planning funds from having independent abortion-provider affiliates "would cross the line established in *Rust*, *League of Women Voters*, and *Regan*, and hence be an unconstitutional condition").

In sum, none of the numerous reasons that the regulations in *Rust* were upheld is present here: § 3701.034 does not define the scope of the federal programs; and it does not distinguish between the programs and the grantee, restricting only the former, while permitting the latter to "continue to perform abortions, provide abortion-related services, and engage in abortion advocacy . . . through programs that are separate and independent from the project[s] that receive[] the [six program funds]." *Rust*, 500 U.S. at 196.

For all of these reasons, § 3701.034's conduct provision is unconstitutional.

## 2.

The majority avoids more than a cursory discussion of the principles underlying the unconstitutional-conditions doctrine by finding that Plaintiffs' purported lack of an independent constitutional right to perform abortions is dispositive. As discussed above, the Supreme Court label of the provider's constitutional right as "derivative of the woman's position," 505 U.S. at 884, is a statement about the source of an abortion provider's constitutional right—not a denial that the provider has a constitutionally protected interest.

However, even accepting that Plaintiffs have no wholly independent constitutional right to perform abortions, *but see, e.g.*, *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1258-60 (10th Cir. 2016) (noting that Planned Parenthood Association of Utah alleged, "without serious challenge from defendants, a Fourteenth Amendment right" "to provide . . . abortion services"); *Dempsey*, 167 F.3d at 464 (addressing the effect of the challenged Missouri law on "Planned Parenthood's constitutional right[]" to "provide abortion services"); *Planned Parenthood v. Doyle*, 162 F.3d 463, 471 (7th Cir. 1998) ("The constitutional right to an abortion carries with it the right to perform medical procedures that many people find distasteful or worse."); *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 944 (9th Cir. 1983) (determining "whether the State unduly interfered with Planned Parenthood's exercise of its right

to perform abortion and abortion-related services"), it does not follow that the Constitution is indifferent to laws that condition the grant of unrelated public funds on the abandonment of all abortion-related activity.  Treating the lack of a personally held, independent right divorced from a woman's abortion right as a bar to Plaintiffs in this case has dire implications for abortion providers in this circuit and is inconsistent with the purpose behind the unconstitutional-conditions doctrine for at least two reasons.

First, it is worth noting that the Supreme Court has not always couched the unconstitutional conditions doctrine in rights-based language, referring instead to "protected conduct," *Rust*, 500 U.S. at 197, or "constitutionally protected interests," *Perry*, 408 U.S. at 597.  Even if providers have no right of their own to provide abortions, surely providing women with abortions free from undue governmental interference falls into the category of constitutionally protected conduct.

Second, as discussed above, and as the majority acknowledges (*see* Maj. Op. at 8), one of the purposes of the unconstitutional-conditions doctrine is to prevent the government from achieving indirectly—by conditioning unrelated funds on forgoing constitutionally protected activity—what the government cannot achieve directly.  But the majority says that is not what is happening here because "the government could have directly ordered the outcome it wishes to incentivize" in this case.  (Maj. Op. at 9.)  The majority does not explain how Ohio could directly order the outcome it wishes to incentivize—that Ohio's healthcare providers cease performing abortions.  And even if the direct regulation could constitutionally be limited to Plaintiffs alone, ODH never challenged either in the district court or its briefing in this court, until en banc argument, that barring Plaintiffs from performing abortions would place an undue burden on women seeking abortion given the existing abortion providers in the area.  There is no doubt that if Ohio ordered either ban directly, Plaintiffs would be able to challenge that law on due process grounds.  *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (granting relief to plaintiff abortion providers who challenged on due process grounds regulations imposed on their services); *see also Singleton*, 428 U.S. at 117-18 (explaining that abortion providers may "assert the rights of women patients as against governmental interference with the abortion decision" because "[a] woman cannot safely secure an abortion without the aid of a physician," "the

constitutionally protected abortion decision is one in which the physician is intimately involved," and "there are several obstacles" to the woman asserting her own rights); *Craig v. Boren*, 429 U.S. 190, 195 (1976) (noting that service providers "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function").

Thus, there is no reason why Plaintiffs cannot prevail on an unconstitutional-conditions claim in this case. The Supreme Court has never suggested that the government can impose a condition on a third party to induce a result that would be unconstitutional if the condition were imposed directly on a party whose rights are affected.[8] Nor has the Supreme Court suggested that an entity that could challenge a direct regulation could not prevail in challenging the government's attempt to reach the same result through a condition imposed on unrelated funding. Consider the examples of the constitutional rights to counsel, to vote, and to bear arms. These rights belong to the criminal defendant, the voter, and the gun owner, respectively. Imagine that the government barred lawyers who represent indigent defendants from eligibility for loan forgiveness programs, denied all government funding to private entities that volunteer to serve as polling places in low-income neighborhoods, or ceased providing all existing tax breaks, subsidies, and government benefits to any store that sells guns. By the majority's logic, as long as the beleaguered lawyers, polling places, and gun store owners continue to perform these services, no one could successfully challenge the constitutionality of these laws based on the protected rights.[9]

---

[8]The unconstitutional-conditions cases that the Supreme Court has addressed thus far have involved plaintiffs' challenges to conditions that impact their own, personal constitutional rights. *See, e.g.*, *Koontz*, 570 U.S. 595; *AOSI*, 570 U.S. 205; *Rust*, 500 U.S. 173; *Regan*, 461 U.S. 540; *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250 (1974). But the fact that the Court has only had the opportunity to consider cases where a recipient's own constitutional rights were at issue does not mean that its cases "confirm" that a "benefits condition becomes unconstitutional *only* when it violates a recipient's constitutional rights." (Maj. Op. at 6 (emphasis added).) Those cases just confirm that the Court can only decide the cases that come before it.

[9]*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), is plainly distinguishable. That case involved the government providing funds to organizations representing indigent clients in a claim against the government for welfare benefits, but prohibiting those same organizations from challenging existing welfare laws as unconstitutional or unlawful in those cases. *Id.* at 545-47. This law violated the First Amendment, the Court explained, because "it operates to insulate current welfare laws from constitutional scrutiny and certain other legal challenges, a condition implicating central First Amendment concerns," and "there is no alternative channel for

The whole point of the unconstitutional-conditions doctrine is to prevent the government from achieving indirectly what it cannot constitutionally achieve directly. And because Plaintiffs could succeed on a due process challenge against the direct version of this law, they can likewise challenge the indirect version as an unconstitutional condition. The majority's position contravenes the purpose of the unconstitutional-conditions doctrine.[10]

ODH also asserts (and it appears the majority agrees) that the unconstitutional-conditions doctrine, at most, bars unconstitutional conditions only when they actually operate to impose an undue burden, and, the argument goes, § 3701.034 imposes no such undue burden because Plaintiffs' representatives testified that Plaintiffs would continue to perform abortions even if the law goes into effect. ODH relies on the Seventh Circuit's divided opinion in *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012) (hereafter *PPI*).[11]

There, PPI, a Medicaid provider that performs abortions, one of its doctors, and two low-income patients who used its services, brought suit under 42 U.S.C. § 1983, challenging the constitutionality of an Indiana law that prohibited state agencies from contracting with or making grants to any entity that performs abortions. In addressing PPI's unconstitutional-conditions claim, the panel majority reasoned:

> [T]he government need not be neutral between abortion providers and other medical providers, and this principle is particularly well-established in the context of governmental decisions regarding the use of public funds. As long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently.

---

expression of the advocacy Congress seeks to restrict." *Id.* at 546-47. No such argument could be made about a law stripping loan forgiveness eligibility from attorneys who represent indigent defendants.

[10]Nor would affirming the district court "effectively [be] saying" that abortion providers "have a constitutional right to offer abortions." (Maj. Op. at 9.) It would merely be saying that states cannot strip an entity of funding that is unrelated to abortion solely because that entity provides abortions on its "own time and dime." *See AOSI*, 570 U.S. at 218.

[11]The majority's reliance on the Seventh Circuit "reject[ing] an unconstitutional-conditions challenge to an Indiana law with a conduct component identical in every material way to this Ohio law" (Maj. Op. at 7) ignores that the law at issue in *PPI* did not prohibit funding for any entity that promotes abortions or, more critically, any entity that affiliates with an entity that promotes or performs abortions. *See PPI*, 699 F.3d at 967.

> Applying these principles here, the unconstitutional-conditions claim is not likely to succeed.  Planned Parenthood does not argue that the loss of its block-grant funding imposes an undue burden—directly or indirectly—on a woman's right to obtain an abortion.  If . . . the government's refusal to subsidize abortion does not unduly burden a woman's right to obtain an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services—cannot *indirectly* burden a woman's right to obtain an abortion.

*PPI*, 699 F.3d at 988.

The Seventh Circuit's analysis avoids the unconstitutional-conditions argument by looking at the effect on a woman's right to obtain an abortion if the provider does not submit to the condition and continues providing abortions.  That is not the appropriate analysis.  In *AOSI*, for example, the Supreme Court did not hold that the organizations' First Amendment rights were not violated because they could simply decline the funding and continue to have whatever policy they wanted about prostitution and sex trafficking.  Rather, the Court determined that the condition, *if imposed directly*, would violate the Constitution.  Thus, forcing the organizations to have a policy opposing prostitution and sex trafficking to obtain the relevant funding violated the First Amendment, just as forcing Plaintiffs here to refrain from performing abortions to obtain unrelated funding would violate the Due Process Clause.  This is because the unconstitutional-conditions doctrine prohibits the imposition of the *condition itself* and does not require the party to actually submit to the condition to prevail.  *AOSI*, 570 U.S. at 214 (explaining that government action need not be "actually coercive" to qualify as an unconstitutional condition); *see also Koontz*, 570 U.S. at 607 ("As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.").[12]  In contrast to the Seventh Circuit's holding in *PPI*, this court has already held that whether an entity acquiesces to the government's proposed condition is "irrelevant" to the condition's constitutionality.  *R.S.W.W.*, 397 F.3d at 436.  Yet the majority perplexingly suggests that even a condition imposed directly on women to choose between having an abortion and receiving government benefits could be constitutional if women would choose to cease receiving government benefits.  (Maj. Op. at 8 ("[T]he doctrine would prohibit the State from requiring *women* to forfeit benefits if they chose

---

[12]*PPI* was decided before *Koontz* and *AOSI*, which may account for its flawed analysis.

to obtain an abortion and if that limitation unduly burdened their access to abortion services.").)[13]

The *PPI* majority also failed to recognize *Rust*'s distinction between conditions placed on the government *program* and those imposed on the *recipient*. And although in summarizing *Rust* the *PPI* majority seems to recognize that *Rust* treated the unconstitutional-conditions argument as separate from the undue-burden analysis,[14] the *PPI* majority engaged in no substantive discussion of *Rust*'s treatment of the separate unconstitutional-conditions claim. *See* 699 F.3d at 987-88. Rather, the *PPI* majority's entire discussion of the unconstitutional-conditions claim rested on the undisputed propositions that the government can constitutionally allocate funds in a manner that favors childbirth over abortion; that there is no constitutional requirement that the government subsidize abortion; and that denying funding for abortion does not unduly burden a woman's constitutional right to choose to have an abortion. The *PPI* majority concludes by quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 59-60 (2006): "It is clear that a funding condition cannot be unconstitutional if it could be constitutionally imposed directly." 699 F.3d at 988.

The unstated conclusion holding the *PPI* majority's opinion together is that because the government need not subsidize abortion and need not be neutral between abortion providers and other medical providers, particularly with respect to government funds, the government could directly prohibit providers from performing abortions. Of course, this is not the case. The cited cases[15] establish that the government can prohibit PPI or other abortion providers from using program funds to perform or advocate for abortion. But nowhere does *Rust* or any other case

---

[13]This suggestion would have particularly troubling implications. It seems that the majority would never allow a facial challenge claiming that a statute imposed an unconstitutional condition on a woman's abortion right, because the answer to whether a statute will create an undue burden is always "[m]aybe; maybe not." (Maj. Op. at 11.) This is antithetical to this court's precedent, *see R.S.W.W.*, 397 F.3d at 436, and antithetical to the purpose of the doctrine, *see, e.g., Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1377 n.4 (2018) ("The doctrine prevents the Government from using conditions 'to produce a result which it could not command directly.'" (quoting *Perry*, 408 U.S. at 597)).

[14]The *PPI* majority stated: "Because the Title X regulations did not place an undue burden on a woman's right to obtain an abortion *or otherwise impose an unconstitutional condition on grant recipients, the Court upheld the regulatory scheme*." 699 F.3d at 988 (emphasis added).

[15]*Maher*, 432 U.S. 464; *Harris*, 448 U.S. 297; *Rust*, 500 U.S. 173; and *Webster v. Reprod. Health Servs.*, 492 U.S. 490 (1989).

suggest that the government can condition the receipt of unrelated funds on a recipient's abandoning all activities that facilitate a woman's right to obtain an abortion, or that advocate for such a right, and any affiliation with any entity that does either.   Courts considering similar issues post-*AOSI* have not followed the Seventh Circuit's (or the majority's) analysis.   *See, e.g.*, *Planned Parenthood of Sw. & Cent. Fla. v. Philip*, 194 F. Supp. 3d 1213, 1218-19 (N.D. Fla. 2016) ("If, as the Court said in *Rust*, Congress can prohibit the use of federal funds for abortion services but cannot restrict a recipient of federal funds from separately providing abortion services, then the Florida legislature likewise can prohibit the use of state funds for abortion services but cannot prohibit a recipient of state funds from separately providing abortion services."); *Cansler*, 877 F. Supp. 2d at 320-21 (enjoining law that denied non-abortion-related funding based on Planned Parenthood's activity as an abortion-rights advocate and abortion provider under the unconstitutional-conditions doctrine).[16]

I agree with the majority that "[t]he point of the [unconstitutional-conditions] doctrine is to protect the underlying right: a woman's right of access to abortion services without an undue burden."   (Maj. Op. at 11–12.)   But the majority creates a loophole that enables states to circumvent the unconstitutional-conditions doctrine: the government *cannot* leverage its funding to carve away at constitutional rights by passing laws that target the individual who holds the right, but it *can* leverage funding to achieve that same result so long as it manages to find a proxy to target instead.   The majority's reasoning contorts a doctrine that aims to prevent the government from manipulating rights out of existence, *Frost*, 271 U.S. at 593-94, to permit the State to leverage its funding to launch a thinly veiled attack on women's rights so long as it

---

[16]The majority's suggestion that *Teixeira v. County of Alameda*, 873 F.3d 670, 689-90 (9th Cir. 2017) (en banc), supports its understanding of the unconstitutional-conditions doctrine is unpersuasive.   *Teixeira* does not expressly address the unconstitutional-conditions doctrine, but the law at issue there placed conditions on the sale of firearms in the form of zoning restrictions.   In *Teixeira*, the Ninth Circuit found that "the Second Amendment does not independently protect a proprietor's right to sell firearms," *id.* at 690, and still it held that "Teixeira, as the would-be operator of a gun store, . . . has derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers," *id.* at 678.   That is exactly what Plaintiffs argue here.   Moreover, the only reason the Ninth Circuit found there was no constitutional violation in *Teixeira* is that, *even if the store was entirely prevented from selling guns*, its customers' Second Amendment rights would not be infringed.   *Id.* at 679-81.   In contrast, ODH never contested below that women's abortion rights would be violated if Plaintiffs were prevented from performing abortions.   To the extent *Teixeira* can be read as instructive, its reasoning supports Plaintiffs' view of the unconstitutional-conditions doctrine, not the majority's.

camouflages its unconstitutional condition in provider-focused verbiage. This strikes me as exactly the type of maneuver the doctrine seeks to prevent.

At bottom, ODH's position and the majority's opinion open the door for the government to impose almost any condition[17] it wants on abortion providers so long as the abortion providers resist the coercion and continue to perform abortions. At oral argument, the United States, arguing in favor of ODH's position, acknowledged that ODH's position would authorize the government to pass a law prohibiting all doctors who perform abortions from providing any other medical services. (Oral Arg. at 33:10-35:30.) This is because as long as enough doctors continue to perform abortions, there would be no undue burden on a woman's right to obtain one. (*Id.*) And under the majority's reasoning, the doctors could not challenge the law as an unconstitutional condition because they have no due process right to provide abortions. Other hypotheticals are imaginable, which before today would have seemed absurd. Using this reasoning, the government can do almost anything it wants to penalize abortion providers so long as they resist the coercion and continue to perform abortions. (*Id.*)

This result is especially striking in juxtaposition with the Supreme Court's abortion jurisprudence over the last three decades, which reveals that virtually every attempt to ban or undermine a woman's abortion right since *Roe v. Wade* has operated by targeting providers, not women. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. 2292 (imposing admitting-privileges and surgical-center requirements on providers); *Stenberg v. Carhart*, 530 U.S. 914 (2000) (criminalizing providers' performance of particular abortion procedures); *Casey*, 505 U.S. 833 (imposing civil penalties on providers who perform abortions without receiving signed statement of spousal consent); *Hodgson v. Minnesota*, 497 U.S. 417 (1990) (criminalizing providers' performance of abortions on minors without both parents' consent). Those laws, each of which was struck down as unconstitutional, reflect a basic reality that legislatures seeking to undermine abortion rights have long understood: when a constitutional right requires a third party to vindicate it, a restriction imposed on that indispensable third party effectively restricts the rightholder. That is why the Constitution prohibits unduly burdening a woman's abortion right, even in the form of laws that directly target only the *gatekeeper* to a woman's abortion right—

---

[17]Subject only to rational basis review, according to the United States.

her provider.  The impact of the condition is the same, because the provider is the target in name only.  In practice, the provider is merely a proxy for the woman and her constitutional rights.

Because the unconstitutional-conditions doctrine does not allow the government to penalize a party indispensable to the exercise of a constitutional right so long as the party refuses to cry uncle and submit to the condition, the conduct provision is unconstitutional.

## B. First Amendment Claims

The majority does not reach Plaintiffs' patently meritorious First Amendment claims, reasoning that because the conduct provision does not impose an unconstitutional burden, ODH may deny funding under the Statute without regard to whether the Statute violates Plaintiffs' First Amendment rights.  But Plaintiffs' First Amendment claims are not mooted by the purported constitutionality of the conduct provision, and a decision on the First Amendment claims is not rendered advisory by the majority's decision on the conduct provision.  If the First Amendment challenge is successful, Plaintiffs could form affiliate entities to take over their abortion-related activities (*see* Pls.' Br. on Reh'g at 18-19), and still receive funds under the six federal programs.  In any event, because the conduct provision is unconstitutional, I address Plaintiffs' First Amendment claims as well.

Plaintiffs assert two claims under the First Amendment, addressing both § 3701.034's speech provision—which prohibits the allocation of program funds to any entity that *promotes* nontherapeutic abortions—and its affiliation provision—which prohibits the allocation of program funds to any entity that *affiliates with* any entity that performs or promotes nontherapeutic abortions.  It is undisputed that a funding condition can result in an unconstitutional burden on First Amendment rights.  *See AOSI*, 570 U.S. at 218 ("By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient."); *Rumsfeld*, 547 U.S. at 59 (the First Amendment supplies "a limit on Congress' ability to place conditions on the receipt of funds").

Plaintiffs' First Amendment claim is not vulnerable to attack under either of the rationales the majority appears to adopt in analyzing the due process claim.  Plaintiffs are asserting their *own* First Amendment rights and need not show that a restriction amounts to an

No. 16-4027          *Planned Parenthood of Greater Ohio et al. v. Hodges*          Page 33

undue burden on a woman's right to obtain an abortion to prevail on a claim under the First Amendment. Nor does ODH dispute that it would be unconstitutional to legislate a direct ban on promoting nontherapeutic abortions or affiliating with entities that perform or promote nontherapeutic abortions.

Instead, relying on *Planned Parenthood Ass'n of Hidalgo County Texas, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012), ODH argues that the Statute's speech provision does no more than is constitutionally permissible by seeking "to ensure that contractors who convey Ohio's messages do so efficiently and effectively." (Appellant's Br. at 52-53 (citation and internal quotation marks omitted).) This argument is unpersuasive.

In *Suehs*, the Texas legislature had created the "Women's Health Program (WHP)," designed to "expand access to preventative health and family planning services for women." 692 F.3d. at 346 (internal quotation marks and citation omitted). The Texas legislature prohibited the Texas Health and Human Services Commission (THHSC), which administers the WHP, from contracting with "entities that perform or promote elective abortions or are affiliates of entities that perform or promote elective abortions." *Id.* (internal quotation marks and citation omitted). The plaintiff health-clinic operators alleged that the regulations violated their First Amendment rights of free-speech and association, and the Fourteenth Amendment's guarantee of equal protection. Applying the unconstitutional-conditions doctrine, the district court determined that the regulations likely violated these constitutionally guaranteed rights and issued a preliminary injunction. The Fifth Circuit vacated the preliminary injunction and remanded, explaining:

> Texas's restriction on promoting elective abortions directly regulates the content of the WHP as a state program. The policy expressed in the WHP is for public funds to subsidize non-abortion family planning speech to the exclusion of abortion speech. § 1.19(b), 2011 Tex. Gen. Laws at 335. Texas's authority to promote that policy would be meaningless if it were forced to enlist organizations as health care providers and message-bearers that were also abortion advocates. The authority of Texas to disfavor abortion within its own subsidized program is not violative of the First Amendment right, as interpreted by *Rust v. Sullivan.* Consequently, Texas's choice to disfavor abortion does not unconstitutionally penalize the appellees' speech.

*Suehs*, 692 F.3d at 350.

I agree with the district court that this out-of-circuit precedent is distinguishable and inapposite. *Suehs* is virtually indistinguishable from *Rust* because, as the Fifth Circuit observed, Texas's restriction "directly regulates the content of the WHP as a state program." *Id.* Here, however, § 3701.034 does not regulate, and has no relation to, the content of the six federal programs.

Further, although Ohio, like Texas, may, consistent with the First Amendment, ensure that its message favoring childbirth over abortion is not garbled, this case plainly involves no state "message" related to or regarding abortion; § 3701.034 affects programs that have nothing to do with abortion or family planning, and seeks to impose restrictions on recipients' speech outside of those six government programs.

As the Supreme Court made clear in *AOSI*, the government may not prevent a recipient of government funding from expressing its own views "when participating in activities on its own time and dime." 570 U.S. at 218. Because "the conditions imposed by Section 3701.034 seek to leverage funding to regulate speech outside the contours of the six programs impacted by Section 3701.034," the unconstitutional-conditions doctrine applies. *Planned Parenthood of Greater Ohio*, 201 F. Supp. 3d at 906. Therefore, the district court correctly determined that § 3701.034 violates the First Amendment by conditioning participation in funding for these programs on a recipient's forgoing the exercise of its rights of free speech outside these programs. *See AOSI*, 570 U.S. at 218; *see also Dempsey*, 167 F.3d at 462 ("Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional . . . ."); *Planned Parenthood of Cent. & N. Ariz.*, 718 F.2d at 944 (although the state need not fund abortions, the state "may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities").

Finally, by conditioning participation in the six federal programs on refraining from being an affiliate of any entity that promotes or performs nontherapeutic abortions, the Statute effects a separate First Amendment violation of Plaintiffs' right to free association. *See Runyon v. McCrary*, 427 U.S. 160, 175 (1976) ("[T]he Court has recognized a First Amendment right to 'engage in association for the advancement of beliefs and ideas[.]' That right is protected

because it promotes and may well be essential to the '[e]ffective advocacy of both public and private points of view, particularly controversial ones' that the First Amendment is designed to foster." (third alteration in original) (internal citation omitted) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958))). Plaintiffs are affiliates of PPFA, which advocates for women's access to comprehensive reproductive healthcare, including abortion. Thus, even if Plaintiffs ceased performing and promoting nontherapeutic abortions or transferred those functions to an affiliate, the affiliation provision would still prohibit them from obtaining funds under the six federal programs due to their status as affiliates of PPFA. *See AOSI*, 570 U.S. at 215 (explaining that the funding condition at issue in *Regan*, 461 U.S. 540, did not violate the unconstitutional-conditions doctrine because the organization retained the ability to "return[] to a 'dual structure' it had used in the past"). ODH offers no argument for the constitutionality of this provision aside from those offered to defend the speech provision. For the same reasons, the affiliation provision also imposes an unconstitutional condition.

## IV.  ENTRY OF PERMANENT INJUNCTION

ODH conceded that it "agrees that if this Court finds the Conduct and Speech Provisions both unconstitutional," the permanent injunction factors are met. (Reply Br. at 29.)

## V.  CONCLUSION

For the reasons stated, the district court correctly granted Plaintiffs' motions for judgment on the merits and for a permanent injunction. Its decision should be affirmed.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 16-4027

PLANNED PARENTHOOD OF GREATER OHIO;
PLANNED PARENTHOOD OF SOUTHWEST
OHIO REGION,

      Plaintiffs - Appellees,

      v.

RICHARD HODGES, in his official capacity as Director
of the Ohio Department of Health,

      Defendant - Appellant.

> **FILED**
> Mar 12, 2019
> DEBORAH S. HUNT, Clerk

Before: COLE, Chief Judge; SILER, BATCHELDER, MOORE, CLAY, GIBBONS,
SUTTON, COOK, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD,
THAPAR, BUSH, LARSEN, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

      UPON CONSIDERATION of the petition for rehearing en banc and the supplemental briefs and arguments of counsel,

      IT IS ORDERED that the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk